## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ICON AIRCRAFT, INC.,[1] | Case No. 24-10703 (CTG) |
| Debtors. | (Joint Administration Requested) |

## DEBTORS' MOTION FOR
## ENTRY OF INTERIM AND FINAL ORDERS
## (I) AUTHORIZING POSTPETITION FINANCING; (II) GRANTING
## LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE
## EXPENSE CLAIMS; (III) MODIFYING THE AUTOMATIC STAY;
## (IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors"), hereby submit this motion (this "Motion"), under sections 105, 361, 362(d), 363(c), 364(c)(1), 364(c)(2), 503(b), and 507 of title 11 of the United States Code (the "Bankruptcy Code") and rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of interim and final orders, (a) authorizing the Debtors to obtain postpetition financing pursuant to a superpriority, senior secured, debtor-in-possession multiple draw term loan facility in an aggregate principal amount of up to $9 million; (b) granting liens and providing superpriority administration expense claims; (c) modifying the automatic stay; (d) scheduling a final hearing on the Motion; and (e) granting related relief. In support of this Motion, the Debtors submit the *Declaration of Thomas McCabe in Support of the Debtors' Chapter 11 Petition and First Day Pleadings* (the "First Day Declaration") and the *Declaration of Neil Gupta in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Postpetition*

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: ICON Aircraft, Inc. (7443); Rycon LLC (5297); IC Technologies Inc. (7918); and ICON Flying Club, LLC (6101). The Debtors' service address is 2141 ICON Way, Vacaville, CA 95688.

*Financing; (II) Granting Liens and Providing Superpriority Administrative Expense Claims; (III)*

*Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief*

(the "<u>Gupta Declaration</u>"), both of which are filed contemporaneously herewith and incorporated

herein by reference.  In further support of this Motion, the Debtors respectfully state as follows:

<u>Preliminary Statement</u>[2]

1.      The Debtors commenced these chapter 11 cases to implement a value-maximizing

restructuring through a sale of some or all of their assets (the "<u>Sale Transaction(s)</u>").  In furtherance

of these efforts, the Debtors, with the assistance of their advisors, have negotiated the terms of a

postpetition delayed-draw financing facility, whereby the DIP Lenders will provide up to $9

million of new money financing to the Debtors, with $4 million available upon entry of the Interim

Order.

2.      The Debtors believe the amounts available under the DIP Facility will be sufficient

to allow them to move expeditiously through these cases to maximize recovery to all stakeholders

through one or more Sale Transactions.  As set forth in more detail in the First Day Declaration,

the Debtors intend to capitalize on their prepetition marketing and sale process, with an accelerated

postpetition timeline culminating in an auction and free-and-clear sale anticipated to occur

approximately two months post-filing.  The DIP Facility will provide adequate liquidity to achieve

this anticipated timeline, along with any runway necessary to distribute proceeds to stakeholders

and exit the chapter 11 cases.  In light of the facts and circumstances, the proposed DIP Facility

provides the best financing available to the Debtors, and the Debtors respectfully request that the

Court grant this Motion.

---

[2]    Capitalized terms used but not defined in this preliminary statement have the meaning given to them below.

31517384.1

**Jurisdiction**

3.      The United States Bankruptcy Court for the District of Delaware (the "Court") has

jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of*

*Reference* from the United States District Court for the District of Delaware, dated February 29,

2012 (Sleet, C.J.).  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2),

and the Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy

Practice and Procedure of the United States Bankruptcy Court for the District of Delaware

(the "Bankruptcy Local Rules"), to the entry of a final order or judgment by the Court in

connection with this Motion if it is determined that the Court, absent consent of the parties, cannot

enter final orders or judgments in connection herewith consistent with Article III of the United

States Constitution.

4.      The statutory and other bases for the relief requested in this Motion are

sections 105, 361, 362(d), 363(c), 364(c)(1), 364(c)(2), 503(b), and 507 of the Bankruptcy Code

and Rules 2002, 4001, 6003, 6004, and 9014 of the Bankruptcy Rules.

5.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

**Relief Requested**

6.      By this Motion, the Debtors seek entry of an interim order, substantially in the form

attached hereto at Exhibit A (the "Interim Order") and a final order (the "Final Order" and, together

with the Interim Order, collectively, the "DIP Orders"),[3] granting, among other things, the

following relief:

  a.  Authorizing ICON Aircraft, Inc. (the "DIP Borrower") to obtain postpetition
      financing (the "DIP Financing") pursuant to a senior secured, superpriority,
      debtor-in-possession, multiple-draw term loan facility (the "DIP Facility") in
      an aggregate principal amount of up to $9 million, of which $4 million will be

---

[3]   The Debtors will file the form of Final Order prior to the Final Hearing (as defined herein).

immediately available upon entry of the Interim Order and the satisfaction of other applicable conditions precedent (the "Initial Draw"), $4 million will be available upon the entry of the Final Order and the satisfaction of other applicable conditions precedent (the "Second Draw"), and the final $1 million will be available upon satisfaction of the other applicable conditions precedent (the "Final Draw"), subject to the terms and conditions set forth in that certain *Senior Secured, Superpriority Debtor-in-Possession Loan and Security Agreement* attached hereto in substantially final form as **Exhibit 1** to the Interim Order (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement"), by and among the DIP Borrower, the Guarantors (as defined in the DIP Credit Agreement), the financial institutions from time to time party thereto (collectively, the "DIP Lenders"), and FeiRen International Co., Ltd., as administrative agent (in such capacity, together with its successors and permitted assigns, the "DIP Agent" and, together with the DIP Lenders, the "DIP Secured Parties");

b.  authorizing the Debtors to execute, deliver, and perform under the DIP Credit Agreement and the other DIP Documents (defined below), the DIP Orders, and all other related agreements and documents creating, evidencing, or securing indebtedness or obligations of any of the Debtors to the DIP Secured Parties on account of the DIP Facility or granting or perfecting liens or security interests by any of the Debtors in favor of and for the benefit of the DIP Agent, for itself and for and on behalf of the DIP Lenders, on account of the DIP Facility, as the same now exists or may hereafter be amended, restated, amended and restated, supplemented or otherwise modified from time to time (any and all of the agreements and documents currently executed or to be executed in connection therewith or related thereto, by and among any of the Debtors, the DIP Agent, and the DIP Lenders, and, in accordance with the DIP Credit Agreement, collectively, the "DIP Documents");

c.  authorizing the Debtors to pay fees and reimburse expenses under the DIP Documents, and perform such other and further acts as required in connection with the DIP Documents;

d.  granting to the DIP Agent, for itself and for and on behalf of the DIP Lenders, and authorizing the Debtors to incur valid, binding, enforceable, non-avoidable, and automatically and properly and fully perfected DIP Liens (defined below) in all DIP Collateral (defined below) pursuant to sections 364(c)(2), (c)(3), and (d), to secure the loans under the DIP Facility (the "DIP Loans") and all obligations and indebtedness of any of the Debtors to the DIP Agent and the DIP Lenders under the DIP Documents, including all interest accrued and accruing thereon, and all other amounts owing by the respective Debtors in respect thereof (collectively, the "DIP Obligations"), which DIP Obligations shall be subject and subordinate only to the Carve Out (defined below);

e.  granting to the DIP Agent, for itself and for and on behalf of the DIP Lenders, allowed superpriority administrative expense claims pursuant to section

364(c)(1) of the Bankruptcy Code against each of the Debtors in respect of all DIP Obligations, with recourse to all prepetition and postpetition property of the Debtors;

f.  vacating and modifying the automatic stay of section 362 of the Bankruptcy Code to the extent provided herein to permit the Debtors and the DIP Secured Parties to implement and effectuate the terms and provisions of the DIP Orders and the DIP Documents and to deliver any notices of termination described herein;

g.  scheduling a Final Hearing (defined below) within thirty (30) days of the entry of the Interim Order and approving notice with respect thereto in accordance with Bankruptcy Rule 4001(c)(2); and

h.  waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the DIP Orders and providing for the immediate effectiveness of the DIP Orders.

### Background of the Debtors

7.      The Debtors are an aircraft design and manufacturing company focused on the creation of consumer-friendly, safe, and technologically advanced aircrafts that make the adventure of flying more accessible to mainstream consumers.  The Debtors' flagship production aircraft—the ICON A5—is an amphibious sport plane.

8.      On the date hereof (the "Petition Date"), the Debtors commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

9.      Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of this chapter 11 case is set forth  in the First Day Declaration, incorporated herein by reference.

## Summary Terms of the DIP Documents

10.     In accordance with Rules 4001(c)–(d) of the Bankruptcy Rules and Rule 4001-2(a)

of the Bankruptcy Local Rules, the chart below summarizes material terms of the DIP Facility.[4]

| Provision | Summary | Location |
|---|---|---|
| **DIP Borrower**<br><br>Bankruptcy Rule 4001(c)(1)(B) | ICON Aircraft, Inc., a Delaware corporation | DIP Credit Agreement, Preamble |
| **Guarantors**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The obligations of the DIP Borrower under the DIP Facility will be guaranteed, jointly and severally, by each of the following debtors and debtors in possession: (a) Rycon LLC, a Delaware limited liability company; (b) IC Technologies Inc., a Delaware corporation; and (c) ICON Flying Club, LLC, a Delaware limited liability company. | DIP Credit Agreement, Preamble |
| **DIP Agent**<br><br>Bankruptcy Rule 4001(c)(1)(B) | FeiRen International Co., Ltd. | DIP Credit Agreement, Preamble |
| **DIP Lenders**<br><br>Bankruptcy Rule 4001(c)(1)(B) | FeiRen International Co., Ltd., along with any subsequent successor or assignee. | DIP Credit Agreement, Preamble |
| **Facility Type and Amount**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Bankruptcy Local Rule 4001-2(a)(i)(A) | The DIP Facility is a superpriority, senior secured, debtor-in-possession multiple-draw term loan facility in an aggregate principal amount of up to $9 million consisting of: (a) an Initial Draw up to $4 million, (b) a Second Draw of up to $4 million, and (c) a Final Draw of up to $1 million.<br><br>Upon the Court's entry of the Interim Order, and the satisfaction of the other applicable conditions precedent, the DIP Borrower will be permitted to draw the Initial Draw and upon the Court's entry of the Final Order, and the satisfaction of the other applicable conditions precedent, the DIP Borrower will be permitted to draw the Second Draw and Final Draw, respectively. | DIP Credit Agreement, Section 2.1 |

---

[4]     The following summary of the terms of the DIP Facility is qualified entirely by the express terms of the referenced documents, including the DIP Credit Agreement and DIP Orders.  If there are any inconsistencies between the summary below and such documents, the terms of such documents shall control. Capitalized terms used but not otherwise defined in this summary chart shall have the meanings ascribed to them in the DIP Credit Agreement or the DIP Orders, as applicable.

| Provision | Summary | Location |
|---|---|---|
| **Use of Proceeds/Purpose**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Bankruptcy Local Rule 4001-2(a)(i)(A) | The proceeds of the DIP Facility shall be used for (a) working capital and other general corporate purposes, including the payment of professional fees and expenses; (b) the pursuit of a 363 Sale; and (c) non-operating, bankruptcy-related cash disbursements, subject to the Carve Out, and in each case, consistent with, subject to, and within the categories and limitations contained in the DIP Orders and the Approved Budget (defined below) (subject to Permitted Variances (defined below)). | DIP Credit Agreement, Section 6.11<br><br>Interim Order ¶ H |
| **Maturity Date**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Bankruptcy Local Rule 4001-2(a)(i)(B) | The DIP Facility shall mature on the earliest of (a) the date that is six (6) months after the closing of the DIP Facility; (b) the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the chapter 11 cases that is confirmed pursuant to an order entered by the Court; (c) the consummation of a sale or other disposition of all or substantially all of the assets of the Debtors under Section 363 of the Bankruptcy Code; (d) entry of an order converting the chapter 11 cases to cases under chapter 7 of the Bankruptcy Code or dismissing the chapter 11 cases; and (e) the acceleration of the outstanding DIP Obligations and termination of the DIP Facility as a result of the occurrence and continuation of an Event of Default (defined below) (collectively, the "Maturity Date"). | DIP Credit Agreement, Section 2.1<br><br>Interim Order ¶ 18 |
| **DIP Budget**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Bankruptcy Local Rule 4001-2(a)(iii) | The DIP Borrower has prepared and delivered to the advisors to the DIP Agent an initial budget (the "Initial DIP Budget"), attached to the Interim Order as **Exhibit 2**.  On April 29, 2024, and on the first business day of every four (4) week period thereafter, the DIP Borrower shall deliver to the DIP Agent a supplement to the Initial DIP Budget (each a "Proposed Budget") or the previously supplemented Proposed Budget so that it covers at least a 13-week period from the date of such Initial DIP Budget or Proposed Budget, as applicable, which supplemental Proposed Budget shall be subject to the DIP Agent's approval in its reasonable discretion and without further order of the Court (the Initial DIP Budget and each approved Proposed Budget shall constitute, without duplication, an "Approved Budget"); provided, however, that in the event the DIP Agent, on the one hand, and the DIP Borrower, on the other hand, cannot agree as to a supplemented budget | DIP Credit Agreement, Section 5.2(b) |

| Provision | Summary | Location |
|---|---|---|
| | promptly, but in any event within two (2) days after the delivery thereof, the Approved Budget in effect immediately prior to such requested supplement shall govern and control for purposes of variance testing hereunder.<br><br>The Debtors believe that the Approved Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the Approved Budget. | |
| **Variance Covenant**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Bankruptcy Local Rule 4001-2(a)(i)(E) | As of April 22, 2024 and the first business day of every other week thereafter (the "<u>Testing Date</u>"), for the period beginning as of the first day of the first full week following the Petition Date and ending on the last business day of the week prior to the week of such Testing Date (such period, the "<u>Testing Period</u>"), the DIP Borrower shall not permit (a) the aggregate actual Cash Receipts of the DIP Borrower and its subsidiaries for such Testing Period to be less than 85% of the cumulative Cash Receipts from the Approved Budget for such Testing Period; or (b) the aggregate actual Cash Operating Disbursements of the DIP Borrower and its Subsidiaries for such Testing Period to be greater than 115% of the cumulative Cash Operating Disbursements from the Approved Budget for such Testing Period (subsection (a) and (b) together, the "<u>Permitted Variance</u>"). | DIP Credit Agreement, Section 5.11 |
| **Interest Rate**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Bankruptcy Local Rule 4001-2(a)(i)(B) | Except as otherwise set forth in the DIP Credit Agreement, the DIP Loan shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) at the rate of 15.00% per annum, due monthly and payable in kind; <u>provided</u> that the outstanding unpaid principal balance and all accrued and unpaid interest shall be paid in full in cash on the Maturity Date. | DIP Credit Agreement, Section 2.4(a) and (c) |
| **Default Rate**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Bankruptcy Local Rule 4001-2(a)(i)(B) | The "<u>Default Rate</u>" shall be equal to the otherwise applicable rate per annum plus 2.00%. | DIP Credit Agreement, Section 2.4(b) |
| **Priority**<br><br>Bankruptcy Rule 4001(c)(1)(B)(vii)<br><br>Bankruptcy Local Rule | The DIP Obligations shall, subject to the Carve- Out, at all times:<br><br>(a)    <u>First Priority Lien</u>: pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority security interest | Interim Order ¶ 5 |

| Provision | Summary | Location |
|---|---|---|
| 4001-2(a)(i)(G), (J) | and lien on the DIP Collateral (defined below) to the extent such DIP Collateral (defined below) is not subject to valid, perfected and nonavoidable liens as of the Petition Date;<br><br>(b)  <u>Permitted Prior Liens</u>: pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on the DIP Collateral (defined below) to the extent such DIP Collateral (defined below) is subject to valid, perfected and nonavoidable liens (collectively, clauses (i) – (ii), the "<u>DIP Liens</u>"); and<br><br>(c)  <u>Super Priority Claims</u>: pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority administrative expense claim status, jointly and severally, with recourse to all prepetition and postpetition property of the Debtors (the "<u>DIP Superpriority Claim</u>").<br><br>The DIP Liens shall be senior to all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, subject to the Carve Out. | |
| **Parties with an Interest in Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B) | "<u>Cash Collateral</u>" means all of the Debtors' cash, wherever located and held, including cash in deposit accounts, that constitutes or will constitute "cash collateral" of any of the DIP Secured Parties within the meaning of section 363(a) of the Bankruptcy Code.<br><br>To the extent there exists or comes to exist any cash of the Debtors' estates that is not Cash Collateral, wherever located and however held, such cash shall be deemed to have been used first by the Debtors' estates, and such cash, to the extent applicable, shall be subject to the DIP Liens and DIP Superpriority Claims granted to the DIP Agent and DIP Lenders. | Interim Order ¶ 4 |
| **Conditions Precedent to Effectiveness / Credit Extensions**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Bankruptcy Local Rule 4001-2(a)(i)(E) | Conditions precedent to initial credit extension will be customary and appropriate for similar debtor-in-possession financings of this type, including as follows:<br><br>(a)  <u>Approved Budget</u>. Delivery to DIP Agent of Approved Budget.<br><br>(b)  <u>Interim Order</u>. The Court shall have entered the Interim Order in form and substance | DIP Credit Agreement, Section 3.1 and 3.2 |

31517384.1

| Provision | Summary | Location |
|---|---|---|
| | satisfactory to the DIP Agent in its reasonable discretion. | |
| | (c) <u>Lien Searches</u>. The DIP Agent shall have received copies of Uniform Commercial Code, tax, and judgment lien searches and title reports, in each case satisfactory to the DIP Agent in its reasonable discretion. | |
| | Conditions precedent to each credit extension are as follows: | |
| | (a) <u>Representations and Warranties</u>. The representations and warranties set forth in the DIP Credit Agreement shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of such extension of credit, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date). | |
| | (b) <u>No Default or Event of Default</u>. No Default or Event of Default under the DIP Facility shall have occurred and be continuing on the date of such extension of credit, nor shall either result from the making thereof. | |
| | (c) <u>Final Order</u>. Solely in respect of the Second Draw and Final Draw, the Court shall have entered the Final Order in form and substance satisfactory to the DIP Agent in its reasonable discretion. | |
| | The Final Draw is subject to a reasonable determination by the Debtors that the projected cash flow forecasts support the need for a final draw. | |
| **Affirmative Covenants**<br>Bankruptcy Rule 4001(c)(1)(B) | Affirmative covenants will be customary and appropriate for similar debtor-in-possession financings of this type, including as follows:<br><br>(a) <u>Monthly Reports</u>. Within 21 days after the end of each calendar month (which may consist of the monthly operating reports as filed in the chapter 11 cases):<br><br>    i. unaudited consolidated financial statements for such calendar month of the DIP Borrower consisting of a | DIP Credit Agreement, Section 5.1–5.14<br>Interim Order ¶ 19 |

| Provision | Summary | Location |
|---|---|---|
| | balance sheet, and related statements of income and cash flows, all of which shall be certified on behalf of the DIP Borrower; | |
| |  ii. an operating report for the DIP Borrower, including a detailed comparison of the actual year-to-date operating results against the Approved Budget; and | |
| |  iii. solely with respect to the last month of each fiscal quarter, a management report, describing in reasonable detail the DIP Borrower's operations and financial condition for such month. | |
| | (b) <u>Notice of Default</u>. Provide notice of any default under DIP Facility. | |
| | (c) <u>Other Materials</u>. Such additional information, documents, statements, and other materials as the DIP Agent may reasonably request from time to time and which is reasonably capable of being obtained, produced or generated by such Debtor. | |
| | (d) <u>Notices</u>. Notice of any Material Adverse Change or other material events, including material litigation or actions by governmental authorities, defaults under material contracts or receipt of bona fide offers to purchase the DIP Borrower's assets. | |
| | (e) <u>Conference Calls</u>. Conference calls requested by the DIP Agent, not more often than once per week. | |
| | (f) <u>Existence</u>. Maintenance of existence. | |
| | (g) <u>Maintenance of Properties</u>. Maintenance and preservation of the DIP Collateral. | |
| | (h) <u>Taxes</u>. Payment of taxes. | |
| | (i) <u>Insurance</u>. Maintenance of insurance. | |
| | (j) <u>Inspection</u>. Visitation of properties and inspection of DIP Collateral and books and records. | |
| | (k) <u>Environmental</u>. Compliance with applicable environmental laws. | |
| | (l) <u>Compliance with Laws</u>. Compliance with | |

| Provision | Summary | Location |
|---|---|---|
| | applicable laws.<br><br>(m) <u>Formation of Subsidiaries</u>. Limitations on formation of new subsidiaries.<br><br>(n) <u>Approved Budget</u>. Compliance with the Variance Covenant.<br><br>(o) <u>Pre-Carve Out Trigger Notice Reserve</u>. Maintenance of Pre-Carve Out Trigger Notice Reserve in segregated account, subject to weekly obligation to fund additional amounts up to Pre-Trigger Carve Out Cap. | |
| **Negative Covenants**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Bankruptcy Local Rule 4001-2(a)(i)(C) | Negative covenants will be customary and appropriate for similar debtor-in-possession financings of this type and will include exceptions set forth in the DIP Facility, including as follows:<br><br>(a) limitation on indebtedness;<br><br>(b) limitation on liens;<br><br>(c) limitation on fundamental changes;<br><br>(d) limitation on disposal of assets;<br><br>(e) limitations on modifications to material contracts and organizational documents;<br><br>(f) limitation on change of control;<br><br>(g) limitation on transactions with affiliates;<br><br>(h) limitation on use of proceeds of the DIP Facility;<br><br>(i) limitation on seeking modifications to the DIP Orders;<br><br>(j) limitations on proposing or supporting any plan of reorganization;<br><br>(k) limitations on acquisitions, loans or investments;<br><br>(l) limitations on paying other indebtedness; and<br><br>(m) limitations on distributions and redemptions of any equity interests. | DIP Credit Agreement, Section 6.1–6.17 |
| **Milestones**<br><br>Bankruptcy Rule 4001(c)(1)(B)(vi)<br><br>Bankruptcy Local Rule 4001-2(a)(i)(H) | The Debtors shall be subject to the following milestones in these Chapter 11 Cases (the "<u>Milestones</u>"):<br><br>(a) not later than ninety (90) days after the Petition Date, the Court shall have entered an order approving the sale of all or a potion of the DIP Collateral pursuant to section 363 of the Bankruptcy Code (the "<u>Sale Order</u>"); | DIP Credit Agreement, Section 6.17 |

| Provision | Summary | Location |
|---|---|---|
| | (b) not later than one hundred fifty (150) days after the Petition Date, the Court shall have entered an order to approve the disclosure statement for an Acceptable Plan (defined in Section 1.1 of the DIP Credit Agreement); and<br><br>(c) not later than one hundred eighty (180) days after the Petition Date, the Bankruptcy Court shall have entered an order to approve an Acceptable Plan (defined in Section 1.1 of the DIP Credit Agreement). | |
| **Postpetition Default**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Bankruptcy Local Rule 4001-2(a)(i)(M) | "Event of Defaults" under the DIP Credit Agreement include:<br><br>(a) failure to pay (i) when due, any principal or (ii) within 5 business days of when due, any other DIP Obligations;<br><br>(b) failure to comply with reporting and required notice affirmative covenants (which remain unremedied for 5 business days), existence of DIP Borrower, failure to join a new subsidiary as a loan party as and when required, any negative covenant, and any failure to maintain liens in favor of DIP Agent;<br><br>(c) failure to meet or satisfy the Milestones;<br><br>(d) any other breach that remains unremedied for 30 days;<br><br>(e) any misrepresentation that continues for 30 days;<br><br>(f) any Debtor files a motion with the Court or any other court with jurisdiction in the matter seeking an order, or an order is otherwise entered, (i) amending or modifying the DIP Orders in a manner materially adverse to the DIP Lenders' interests, or (ii) reversing, revoking, staying, rescinding, or vacating the DIP Orders;<br><br>(g) the DIP Borrower files or obtains Court approval of a disclosure statement for a chapter 11 plan that is not an Acceptable Plan or a chapter 11 plan is confirmed that is not an Acceptable Plan;<br><br>(h) except with respect to the Carve Out and any Permitted Liens, any Debtor shall file any motion or application, or the Court allows the | DIP Credit Agreement, Section 8.1<br>Interim Order ¶ 20 |

| Provision | Summary | Location |
|---|---|---|
| | motion or application of any other person, which seeks approval for or allowance of any claim, lien, security interest ranking equal or senior in priority to the claims, liens and security interests granted to the DIP Agent under the DIP Orders, or with respect to the DIP Collateral or any such equal or prior claim, lien, or security interest shall be established in any manner, except, in any case, as expressly permitted under the DIP Orders;<br><br>(i)  the DIP Orders shall cease to be in full force and effect from and after the date of entry thereof by the Court;<br><br>(j)  the entry of an order which provides relief from the automatic stay otherwise imposed pursuant to section 362 of the Bankruptcy Code, which order permits any creditor, other than the DIP Agent (other than any creditor having a lien on specific equipment that is senior to the DIP Agent), to realize upon, or to exercise any right or remedy with respect to, any material portion of the DIP Collateral;<br><br>(k)  conversion of the chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, or dismissal of the chapter 11 cases either voluntarily or involuntarily and the DIP Obligations are not simultaneously paid in full; or<br><br>(l)  a trustee or an examiner with special powers is appointed pursuant to section 1104 of the Bankruptcy Code. | |
| **Remedies; Waiver or Modification of the Automatic Stay**<br><br>Bankruptcy Rule 4001(c)(1)(B)(iv), (vii)<br><br>Bankruptcy Local Rule 4001-2(a)(i)(S), (T) | When an Event of Default exists, the DIP Agent may do any one or more of the following, in each case subject, as set forth in the DIP Orders, to the requirement for a Default Notice and the expiration of the Waiting Period:<br><br>(a)  declare the DIP Obligations due and payable, and the DIP Facility terminated, in each case upon the expiration of the Waiting Period, whereupon the DIP Obligations shall become and be immediately due and payable;<br><br>(b)  terminate, restrict, or reduce the DIP Borrower's ability to use Cash Collateral other than to pay expenses set forth in the Approved Budget that are necessary to avoid | DIP Credit Agreement, Section 8.2<br><br>Interim Order ¶ 21 |

| Provision | Summary | Location |
|---|---|---|
| | immediate and irreparable harm to the Debtors' estates; provided, however, that the professional fees and expenses of the Debtors and the Committee's professionals shall be governed by the paragraph in the DIP Order authorizing the Carve Out; | |
| | (c)    charge interest at the Default Rate; | |
| | (d)    upon five (5) business days' prior written notice, in accordance with the terms hereof, to the Debtors, the Office of the United States Trustee (the "U.S. Trustee") and lead counsel for any statutorily appointed committee (the "Committee"), obtain and liquidate the DIP Collateral; | |
| | (e)    require the applicable Debtor to assemble all of the DIP Collateral constituting personal property without judicial process pursuant to Section 9-609 of the Uniform Commercial Code; | |
| | (f)    upon five (5) business days' prior written notice, in accordance with the terms hereof, to the Debtors, the U.S. Trustee and the Committee, take possession of all DIP Collateral constituting tangible personal property without judicial process pursuant to Section 9-609 of the Uniform Commercial Code; and | |
| | (g)    exercise any of its other rights under the DIP Documents, any rights granted under the Final Order and applicable law.<br><br>Subject to the terms of the DIP Documents and the Interim Order, the automatic stay provisions of section 362 of the Bankruptcy Code shall be modified to the extent necessary to permit the DIP Secured Parties to exercise all rights and remedies and to take any or all of the above actions, without further order of or application to the Court, after five (5) business days (as may be extended by the Court, such period, the "Waiting Period") from the delivery of a written notice of the occurrence and continuance of an Event of Default (the "Default Notice") (e-mail being sufficient for this purpose) by the DIP Secured Parties to the Debtors, their counsel (Sidley Austin LLP), the U.S. Trustee, and the Committee, if any. | |

| Provision | Summary | Location |
|---|---|---|
| **Prepayments**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Bankruptcy Local Rule 4001-2(a)(i)(I) | Mandatory prepayments include:<br><br>(a)    Within five (5) business days of the date of receipt by any Debtor of the Net Cash Proceeds of any disposition (whether through a voluntary or involuntary sale, the loss, destruction or damage thereof or any actual condemnation, confiscation, requisition, seizure or taking thereof or otherwise) of DIP Collateral (other than Permitted Transfers), the DIP Borrower shall prepay such portion of the outstanding amount of the DIP Obligations in an amount equal to one hundred percent (100%) of the Net Cash Proceeds received in connection with such sales or dispositions.<br><br>(b)    Within five (5) business days of the date of incurrence by any Debtor of any Indebtedness (other than Permitted Indebtedness), the DIP Borrower shall prepay the outstanding principal amount of the DIP Obligations in an amount equal to one hundred percent (100%) of the Net Cash Proceeds received by such Debtor in connection with the incurrence of such Indebtedness plus the accrued interest. | DIP Credit Agreement, Section 2.3(d)<br><br>Interim Order ¶ 17 |
| **Fees and Expenses; Indemnification**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix)<br><br>Bankruptcy Local Rule 4001-2(a)(i)(B), (K) | The DIP Borrower will reimburse the DIP Secured Parties for certain expenses in connection with the DIP Facility, including reasonable and documented:<br><br>(a)    costs or expenses (including taxes and insurance premiums) required to be paid by the DIP Borrower under any of the DIP Documents that are paid, advanced, or incurred by the DIP Agent and/or any DIP Lenders;<br><br>(b)    out-of-pocket fees or charges paid or incurred by the DIP Agent and/or such DIP Lenders in connection with its transactions with the DIP Borrower under any of the DIP Documents;<br><br>(c)    out-of-pocket costs and expenses incurred by the DIP Agent and/or such DIP Lenders in the disbursement of funds to the DIP Borrower (by wire transfer or otherwise);<br><br>(d)    out-of-pocket costs, fees (including reasonable and documented attorneys' fees, but limited to one primary counsel for the DIP Agent and the DIP Lenders (taken as a | DIP Credit Agreement, Sections 1.1 and 10.3<br><br>Interim Order ¶¶ 9–11 |

| Provision | Summary | Location |
|---|---|---|
| | whole) plus local counsel to the extent reasonably necessary in any relevant jurisdiction) and expenses paid or incurred by the DIP Agent and/or such DIP Lenders to enforce any provision of the DIP Documents, or during the continuance of an Event of Default, in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the DIP Collateral, or any portion thereof, irrespective of whether a sale is consummated; <br><br> (e) out-of-pocket audit fees and reasonable expenses of the DIP Agent and/or such DIP Lenders related to any inspections or audits; <br><br> (f) out-of-pocket costs and expenses of third party claims or any other suit paid or incurred by the DIP Agent and/or such DIP Lenders in enforcing or defending the DIP Documents or in connection with the transactions contemplated by the DIP Documents or the DIP Agent and/or such DIP Lenders' relationship with any Debtor; <br><br> (g) out-of-pocket costs and expenses (including attorneys' fees) incurred by the DIP Agent and/or such DIP Lenders incurred in advising, structuring, drafting, reviewing, administering, or amending the DIP Documents (limited to one primary counsel for the DIP Agent and the DIP Lenders (taken as a whole) plus local counsel to the extent reasonably necessary in any relevant jurisdiction); <br><br> (h) out-of-pocket fees and expenses of the DIP Agent and/or such DIP Lenders related to any due diligence in connection with the DIP Facility or meetings with the DIP Borrower in connection with the DIP Facility; and <br><br> (i) costs and expenses of the DIP Agent and/or such DIP Lenders incurred in terminating, enforcing, or defending the DIP Documents, irrespective of whether suit is brought, or in taking any Remedial Action concerning the DIP Collateral. <br><br> The Debtors will indemnify the DIP Agent, the DIP Lenders and their related persons for liabilities usual | |

| Provision | Summary | Location |
|---|---|---|
| | and customary for a facility of this type, subject to certain exceptions, including to the extent (a) any liability that a court of competent jurisdiction finally determines to have resulted from the gross negligence, bad faith or willful misconduct of such indemnified person; (b) arising from a material breach of any obligation of such indemnified person under the DIP Documents; or (c) arising out of any loss, claim, damage, liability or expense that does not involve an act or omission of the Debtors and that is brought by an indemnified person against another indemnified person (other than claims against an indemnified person in its capacity or in fulfilling its role as the DIP Agent or any similar role under the DIP Documents). | |
| **Carve Out**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Bankruptcy Local Rule 4001-2(a)(i)(F) | "Carve Out" shall mean the sum of: (a) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (collectively, the "Statutory Fees"); (b) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (the "Chapter 7 Trustee Carve Out"); (c) any incurred and unpaid professional's fees (excluding any success or transaction fees), costs, disbursements and expenses (the "Allowed Professional Fees") incurred or earned by persons or firms retained by the Debtors pursuant to sections 327, 328 or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Committee pursuant to sections 327, 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons" at any time before or on the first business day following delivery by any DIP Agent of a Carve Out Trigger Notice (as defined below) (the "Pre-Trigger Carve Out Cap"); and (d) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $1,000,000 incurred after the first business day following delivery by any DIP Agent of the Carve Out Trigger Notice (such date, the "Trigger Date"), to the extent allowed at any time, whether by final order, interim order, procedural order, or otherwise (the amounts set forth in this clause (d) being the "Post-Carve Out Trigger Notice Cap"); (all such amounts set forth in clauses (a) through (d), collectively, the "Carve Out Cap"); provided that nothing herein shall be construed to impair any party's ability to object to | Interim Order ¶¶ 12–14 |

| Provision | Summary | Location |
|---|---|---|
| | Court approval of the fees, expenses, reimbursement of expenses or compensation of any Professional Person.<br><br>The "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) to the Debtors and their counsel, the U.S. Trustee, and the Committee and its counsel, if any, which notice may be delivered following the occurrence and during the continuation of an Event of Default under the DIP Credit Agreement, stating that (a) the Post-Carve Out Trigger Notice Cap has been invoked, and (b) the obligations under the DIP Facility have been accelerated.<br><br>The Debtors shall deposit and hold in a segregated account a reserve sufficient to pay the then incurred but unpaid fees and expenses of the Professional Persons prior to any and all other claims (such reserves, the "Professional Fee Reserves"). The Professional Fee Reserves shall be funded by the Debtors on a weekly basis, and shall contain an amount equal to the amount of fees and expenses reflected in the Approved Budget from the Petition Date through the weekly date of funding. To the extent the incurred but unpaid fees and expenses of a Professional Persons exceeds the amount set forth for such Professional Person in the Approved Budget, the Debtors are authorized to increase the Professional Fee Reserves in an amount necessary to reconcile the deficiency. | |
| **DIP Collateral / Liens on Avoidance Actions**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Bankruptcy Local Rule 4001-2(a)(i)(U) | All assets of the DIP Borrower and the Guarantors, including (a) all accounts, contracts rights, chattel paper, cash, general intangibles, intellectual property, machinery, equipment, goods, inventory, furniture, fixtures, letter of credit rights, books and records, deposit accounts, documents, instruments, commercial tort claims, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations and instruments, all interests in leaseholds and real properties, all patents, copyrights, trademarks (but excluding trademark applications filed in the United States Patent and Trademark Office on the basis of the applicant's intent-to-use such trademark unless and until evidence of use of the trademark has been filed with, and accepted by, the United States Patent and Trademark Office pursuant to Section 1(c) or | DIP Credit Agreement, Section 1.1<br><br>Interim Order ¶ C |

| Provision | Summary | Location |
|---|---|---|
| | Section 1(d) of the Lanham Act (15 U.S.C. §1051, et seq.)), trade names and other intellectual property, all equity interests (to be limited to the extent of any adverse tax consequences, as reasonably determined by the DIP Agent and the DIP Borrower, and limitations imposed by applicable law), all books and records relating to the foregoing, all other personal and real property of the DIP Borrower and Guarantors, and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (in each case as the foregoing are defined in the Uniform Commercial Code as in effect from time to time in the State of New York (and, if defined in more than one Article of such Uniform Commercial Code, shall have the meaning given in Article 9 thereof)); and (b) subject to entry of the Final Order, proceeds of any actions under sections 544, 545, 547, 548 and 550 of the Bankruptcy Code; <u>provided</u>, that the DIP Collateral shall not include (a) property subject to a purchase money lien, capital lease or similar arrangement to the extent the creation of a security interest therein is prohibited thereby or creates a right of termination in favor of any other party thereto or otherwise requires third party consent thereunder, (b) the Professional Fee Reserves or any contents or proceeds thereof, or (c) the account that holds the adequate assurance deposits of the Debtors for the benefit of their utility providers; <u>provided</u>, <u>further</u>, <u>however</u>, that the DIP Collateral shall include any equity or residual value in such property described in clause (a) of the foregoing proviso. | |
| **Section 552(b) Waiver**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Bankruptcy Local Rule 4001-2(a)(i)(W) | The DIP Documents and DIP Orders do not seek to waive any "equities of the case" exception under section 552(b) of the Bankruptcy Code. | N/A |
| **Section 506(c) Waiver**<br><br>Bankruptcy Rule 4001(c)(1)(B)(x)<br><br>Bankruptcy Local Rule 4001-2(a)(i)(V) | The DIP Documents and DIP Orders do not seek a waiver under section 506(c) of the Bankruptcy Code. | N/A |
| **Marshalling**<br><br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Bankruptcy Local Rule | The DIP Documents and DIP Orders do not seek a waiver of the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral. | N/A |

| Provision | Summary | Location |
|---|---|---|
| 4001-2(a)(i)(X) | | |
| **Other Typical Provisions**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Bankruptcy Local Rule 4001-2(a)(i)(D), (L), (N), (O), (P), (Q) | There is no prepetition secured debt, so the DIP Facility does not seek to prime existing debt, limit the use of estate funds to investigate prior liens, cross-collateralize or "roll up" prepetition debt, or otherwise bind the estate with respect to any prepetition debt. Additionally, the DIP Facility shall not be used to fund any non-debtor affiliates. | N/A |

11.     The Debtors respectfully submit that the foregoing material terms are appropriate as necessary components of the consensual agreement with the DIP Lenders regarding the DIP Facility and use of the proceeds thereof.  Granting the relief requested herein is critical to the continued operation of the Debtors' businesses and will maximize the value of the Debtors' estates for all stakeholders by permitting an orderly and efficient sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code. Accordingly, the material provisions in the DIP Orders should be approved.

## Debtors' Prepetition Capital Structure

12.     The Debtors have significant prepetition unsecured funded debt obligations, consisting of approximately $105,400,000 in convertible note obligations and approximately $65,000,000 in other unsecured note obligations.  A summary chart of the Debtors' prepetition capital structure is set forth below:

| Note | Issuance Date | Principal | Maturity Date |
|---|---|---|---|
| **Convertible Notes** | | | |
| PDSTI | 3/20/2020 | $12,500,000 | 3/20/2021<br>(ext. 3/20/2025) |
| PDSTI | 1/26/2021 | $23,900,000 | 1/26/2022<br>(ext. 1/26/2025) |
| PDSTI | 2/24/2022 | $1,027,090 | 2/24/2023<br>(ext. 2/24/2024) |
| Unimax | 3/30/2022 | $2,400,000 | 9/30/2022<br>(ext. 9/25/2024) |

| | | | |
|---|---|---|---|
| PDSTI | 5/3/2022 | $1,300,000 | 11/3/2022 (ext. 5/3/2024) |
| PDSTI | 5/16/2022 | $2,300,000 | 11/14/2022 (ext. 5/16/2024) |
| Feiren | 6/28/2022 | $5,000,000 | 6/27/2023 (ext. 11/28/2024) |
| PDSTI | 8/11/2022 | $4,000,000 | 12/30/2022 (ext. 6/30/2024) |
| PDSTI | 11/25/2022 | $1,500,000 | 5/26/2023 (ext. 5/25/2024) |
| PDSTI | 12/9/2022 | $1,500,000 | 6/9/2023 (ext. 6/9/2024) |
| PDSTI | 1/11/2023 | $1,500,000 | 7/11/2023 (ext. 7/11/2024) |
| Feiren | 3/14/2023 | $5,000,000 | 11/12/2023 (ext. 11/13/2024) |
| PDSTI | 3/29/2023 | $28,972,910 | 3/29/2024 |
| PDSTI | 6/12/2023 | $1,000,000 | 12/12/2023 (ext. 12/12/2024) |
| PDSTI | 6/29/2023 | $2,000,000 | 12/29/2023 (ext. 12/29/2024) |
| PDSTI | 7/26/2023 | $3,000,000 | 1/22/2024 |
| PDSTI | 8/31/2023 | $1,000,000 | 2/27/2024 |
| PDSTI | 9/28/2023 | $2,000,000 | 3/26/2024 |
| PDSTI | 10/27/2023 | $1,500,000 | 4/26/2024 |
| PDSTI | 11/10/2023 | $2,000,000 | 5/10/2024 |
| PDSTI | 12/13/2023 | $2,000,000 | 12/12/2024 |
| | | | **Total (Convertible Notes): $105,400,000** |
| **Other Notes** | | | |
| East West Note  12/24/2020 | 12/24/2020 | $40,000,000[5] | 6/23/2021 (ext. 6/22/2024) |
| East West Note 12/22/2022 | 12/22/2022 | $16,500,000 | 12/23/2023 (ext. 6/22/2024) |
| East West Note 2/6/2023 | 2/6/2023 | $6,500,000 | 8/1/2023 (ext. 8/1/2024) |
| Ext. of 12/22/2022 Note | 1/8/2024 | $750,000 | 3/22/2024 (ext. 6/22/2024) |

---

[5]    The original principal of the 12/24/2020 note was $50 million, which was increased by $1.5 million and $1.25 million respectively at various points.  The 12/24/20 note was then replaced by a $40 million and a $16.5 million note in December 2022, which extended maturity to the dates listed in the chart.

| Ext. of 12/22/2022 Note | 3/14/2024 | $1,250,000 | 6/22/2024 |
| --- | --- | --- | --- |
| | | **Total (Other Notes): $65,000,000** | |

13.     As of the Petition Date, the aggregate principal amount outstanding under all of the Debtors' prepetition unsecured funded debt obligations totaled approximately $170,400,000.  The Debtors have no prepetition secured debt obligations.

## Need for DIP Facility

14.     As set forth in the Gupta Declaration, the Debtors require immediate access to the DIP Facility throughout the chapter 11 process to ensure they have sufficient liquidity to run an efficient and value-maximizing sale process, operate their businesses in the ordinary course, and administer their estates.[6]

15.     The Debtors' advisors, SSG Capital Advisors LLC ("SSG") and Armanino LLP, with the assistance of the Debtors' management, have evaluated the Debtors' financing needs and funding alternatives.[7]  The DIP Facility is designed to provide the Debtors with enough liquidity to continue the operation of their business, maintain relationships with vendors, suppliers and customers, satisfy wage and salary obligations, and continue to satisfy other working capital and operational needs during the chapter 11 cases, all while continuing the marketing process for the Debtors' assets that began prior to the Petition Date.[8]  This funding should allow the Debtors the necessary time to (a) achieve entry of an order from this Court approving one or more value maximizing Sale Transactions; (b) close such Sale Transactions; and (c) distribute the proceeds from the Sale Transactions to creditors pursuant to the terms of a liquidating plan.[9]  The Debtors' Initial DIP Budget, reflecting these requirements, is attached to the Interim Order as **Exhibit 2**.

---

[6]     Gupta Decl. ¶ 10.

[7]     *Id.* ¶ 9.

[8]     *Id.* ¶ 11.

[9]     *Id.* ¶ 10.

16.     Without access to the DIP Facility, the Debtors will also lose the ability to run their sale process, to the detriment of all creditors and other parties in interest, and will not otherwise have funds to proceed with the orderly administration of these chapter 11 cases.[10]   The Debtors respectfully submit such an outcome would constitute a clear, immediate, and irreparable harm to these estates and their stakeholders.

### DIP Facility Was Negotiated in Good Faith and at Arms' Length

17.     The DIP Facility is the product of extensive, good faith, arms' length negotiations among the Debtors, the DIP Lenders, and the DIP Agent.[11]   The Debtors and the Debtors' advisors actively negotiated the terms and provisions of the DIP Facility leading up to the Petition Date, including on material terms of the proposed financing, such as the economics and covenants, ultimately resulting in the deal embodied in the DIP Credit Agreement.[12]

18.     Based on extensive negotiations among the parties, the Debtors respectfully submit that the DIP Facility represents the best financing option reasonably available to the Debtors under the current circumstances.[13]   The interest rate, claim priority, liens, and other protections to be granted to the DIP Lenders pursuant to the DIP Facility, were essential features of the facility, without which the DIP Lenders would not have committed to provide funding for the Debtors, and are comparable to other debtor in possession financings and generally consistent with market terms for companies facing similar circumstances as the Debtors.[14]   Accordingly, based on the facts and circumstances of these chapter 11 cases, such terms should be approved.

---

[10]  *Id.*

[11]  *Id.* ¶ 12.

[12]  *Id.*

[13]  *Id.* ¶ 13.

[14]  *Id.*

## Debtors' Efforts to Obtain Postpetition Financing

19.     SSG canvassed the market to assess whether any financing would be available by any party on better terms than those offered by the DIP Lenders.[15]  As part of that marketing process, SSG considered a wide variety of potential alternative lenders, including third-party financial institutions experienced in distressed lending and financings as well as existing unsecured lenders and shareholders.[16]  The current unsecured lenders and shareholders were unwilling to offer financing due to the size of the facility requirement.[17]  Additionally, third-party prospective lenders were only willing to size the Debtors' facility based off a conservative loan-to-value ratio of the liquidation value of the assets.  However, the specialty nature of the Debtors' assets made it difficult for any third-party to assign a value sufficient to fulfill the financing need.[18]  Notably, no party was willing to provide postpetition financing on an unsecured basis.[19]

20.     Of the parties contacted, only the DIP Lender submitted a credit agreement for consideration.  Under the terms of the credit agreement, the DIP Lender originally proposed an $8 million DIP Facility with an up to twelve-month Maturity Date, 15.00% interest rate, and no origination fees or other premiums.[20]  Following negotiations, the Debtors were able to increase the available liquidity under the DIP Facility to $9 million.

21.     Shanghai Pudong Science and Technology Investment Co. ("PDSTI")— who holds approximately 50% of the of the Company's outstanding preferred shares through one or more of its affiliate companies and approximately $93,000,000 of the convertible unsecured notes—holds

---

[15]   *Id.* ¶ 14.

[16]   *Id.*

[17]   *Id.*

[18]   *Id.*

[19]   *Id.*

[20]   *Id.* ¶ 15.

an indirect minority equity interest in the DIP Lender.[21]  The DIP Lender is also the licensee of

the Intellectual Property License Agreement with ICON Aircraft, Inc., dated July 29, 2021.[22]  In

addition, a PDSTI affiliate is party to an arrangement with the DIP Lender's ultimate parent,

Shanghai Feiren Technology Co. Ltd. ("Feiren Shanghai"), pursuant to which the PDSTI affiliate

agreed to manage all assets, business, and daily operations of Feiren Shanghai.  All rights and

obligations under the arrangement were then assigned to a different PDSTI affiliate.[23]  Notably,

the DIP Lender is the only party to have offered financing in these Chapter 11 Cases.

22.     The proposed DIP Facility is the best financing available to these estates, it funds a

value-maximizing sale process for the benefit of all creditors and parties in interest, and it

otherwise provides the estate with the ability to continue operations in the ordinary course over

the term of the sale process.[24]  In addition, to the extent any party wishes to propose better terms,

the Debtors have the ability to obtain better financing during the period between entry of the

Interim Order and Final Order, subject to the consent of the DIP Lenders.[25]  The Debtors therefore

submit that DIP Facility presents the best terms available to these estates within the totality of the

circumstances of these chapter 11 cases.

## **Basis for Relief Requested**

## I.     **The Debtors Should be Authorized to Obtain Postpetition Financing Through the DIP Documents**

23.     The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy

Code, which authorizes a debtor to obtain secured or superpriority financing under certain

---

[21]    *See* First Day Decl. ¶ 48.

[22]    *Id.*

[23]    *Id.*

[24]    Gupta Decl. ¶ 16.

[25]    *Id.*

circumstances.  As set out above, the Debtors were unable to procure sufficient financing in the form of unsecured credit, which would be allowable under section 503(b)(1) or as an administrative expense, in accordance with sections 364(a) or (b) of the Bankruptcy Code.[26]  The Debtors also negotiated vigorously, and at arms' length with the DIP Lenders to secure the DIP Facility on the terms described herein.  For these reasons, as discussed further below, the Debtors satisfy the necessary conditions under section 364 for authority to enter into the DIP Facility.

### A.    Entering into the DIP Facility Is a Sound Exercise of Business Judgment

24.    The Court should authorize the Debtors, in an exercise of their sound business judgment, to enter into the DIP Documents and obtain access to the DIP Facility.  If an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts give debtors considerable deference in acting in accordance with their sound business judgment in obtaining postpetition credit.[27]

25.    To determine whether the business judgment test is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."[28]  In considering whether the terms of postpetition financings are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and

---

[26]    *See* 11 U.S.C. §§ 364(a)–(b).

[27]    *See, e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender.").

[28]    *In re AbitiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second-guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

the potential lender.[29]  The Court may also appropriately take into consideration non-economic

benefits to the Debtors offered by a proposed postpetition facility.[30]

26.    As more fully set forth above and in the Gupta Declaration, the DIP Facility

represents a proper exercise of the Debtors' business judgment.  The DIP Facility and the

accompanying economic terms were the product of extensive, good faith, arms' length

negotiations among the Debtors, the DIP Lenders, and the DIP Agent.[31]  The claim priority, liens,

and other protections (including the granting of liens on the proceeds of avoidance actions), were

essential features of the facility without which the DIP Lenders would not have committed to

provide funding for the Debtors.[32]  These protections are comparable to other debtor in possession

financings and generally consistent with market terms for companies facing similar circumstances

as the Debtors.[33]  Accordingly, the Debtors have exercised sound business judgment in negotiating

these protections

27.    The Debtors' decision to agree to the terms of the DIP Facility is reasonable under

the circumstances, where no viable alternative financing is available on superior terms and where

the Debtors' need for liquidity is immediate in order to avoid an immediate shutdown of operations

and resulting loss of employee jobs.  As the Approved Budget reflects, use of available cash alone

will be insufficient to fund these chapter 11 cases or otherwise allow the Debtors to continue

operations.[34]  Because the DIP Facility will preserve the Debtors as a going concern through the

entirety of the proposed sale process, thus maximizing value for the Debtors' estates for the benefit

---

29    *In re Farmland Indus., Inc.,* 294 B.R. 855, 880 (Bankr. W.D. Mo. 2003).

30    *In re Ion Media Networks, Inc.*, No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

31    Gupta Decl. ¶ 12.

32    *Id*. ¶ 13.

33    *Id*.

34    *See id.* ¶ 10.

of all creditors and other parties in interest, it represents the best course for the Debtors' stakeholders.[35]  Thus, the Court should authorize the Debtors' entry into the DIP Documents as a reasonable exercise of the Debtors' sound business judgment.

**B.      The Debtors Should Be Authorized to Obtain DIP Facility on a Secured and Superpriority Basis**

28.      Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business and (c) obtaining credit with specialized priority or with security.[36]  If a debtor in possession cannot obtain postpetition credit on an unsecured basis, pursuant to section 364(b) of the Bankruptcy Code, a court may authorize a debtor to obtain credit or to incur debt, the repayment of which is entitled to superpriority administrative expense status, or is secured by a senior lien on unencumbered property, or a junior lien on encumbered property, or a combination of the foregoing.[37]

29.      The Debtors propose to grant the DIP Lenders (a) first priority liens on all of the DIP Collateral; and (b) junior liens on any DIP Collateral that is subject to valid, perfected, and nonavoidable liens (collectively, clauses (a) and (b), the "DIP Liens"); and (c) superpriority administrative expense claim status with recourse to all prepetition and postpetition property of the Debtors (the "DIP Superpriority Claims").  Therefore, the approval of the DIP Facility is governed by section 364(c) of the Bankruptcy Code.

---

[35]   *Id.* ¶¶ 11, 16.

[36]   *See* 11 U.S.C. § 364.

[37]   *See* 11 U.S.C. § 364.

### i.  The Debtors Satisfy the Condition Under Section 364(c) to Obtain Financing on a Senior Secured and Superpriority Basis

30. In the event that a debtor demonstrates that it is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court:

> may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.[38]

31. In determining whether to authorize financing under 364(c) of the Bankruptcy Code, courts will consider whether (i) the debtor's efforts to obtain unsecured credit under sections 364(a) and 364(b) of the Bankruptcy Code, (ii) the credit transaction benefits the debtor and is necessary to preserve estate assets, and (iii) the terms of the credit transaction are fair, reasonable, and adequate, given the circumstances of the debtor and proposed lender.[39]

32. *First*, to show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of sections 364(c) of the Bankruptcy Code.[40] The Debtors have not been able to obtain unsecured credit or an alternative debtor-in-possession financing on better terms than those

---

[38]  11 U.S.C. § 364(c).

[39]  *In re Republic Airways Holdings Inc.*, No. 16-10429 (SHL), 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4, 2016); *In re Ames Dep 't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised").

[40]  *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating section 364 "imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable").

reflected in the DIP Credit Agreement, and there are no better offers available to the Debtors or before the Court at this time.[41]

33.     *Second*, the DIP Facility is necessary to preserve the Debtors' estates.  As noted, the DIP Facility should provide the Debtors with liquidity to (a) continue the operation of their business, maintain relationships with vendors, suppliers and customers, satisfy wage and salary obligations, and continue to satisfy other working capital and operational needs during the chapter 11 cases; and (b) implement one or more value maximizing Sale Transactions.[42]   In particular, the DIP Facility should allow the Debtors to preserve the going concern value of their operations through these chapter 11 cases, which maximizes value for all stakeholders.[43]

34.     *Third*, the terms of the DIP Facility are fair, reasonable, and adequate under the circumstances.  The DIP Facility is the best financing available to the Debtors and will allow the Debtors to continue the marketing process commenced prepetition to maximize the value of the Debtors' estate for the benefit of all parties in interest.[44]

35.     In light of the foregoing, the Court should authorize the Debtors to provide the DIP Lender with the DIP Loans and the DIP Superpriority Claims, each in accordance with the DIP Credit Agreement and as provided for in section 364(c) of the Bankruptcy Code.

### C.     The Scope of the Carve Out Is Appropriate

36.     The DIP Liens and the DIP Superpriority Claims are subject to the Carve Out. Without the Carve Out, the Debtors' estates or other parties in interest could be harmed because the services that professionals might otherwise provide in these chapter 11 cases could be

---

[41]     Gupta Decl. ¶ 14.

[42]     *Id.* ¶ 11.

[43]     *Id.*

[44]     *Id.* ¶¶ 11, 16.

restricted.[45]   Additionally, the Carve Out protects against administrative insolvency during the

pendency of the chapter 11 cases by ensuring that funds are available to pay U.S. Trustee's fees

and professional fees of the Debtors and any statutory Committee.   Accordingly, the scope of the

Carve Out is appropriate and should be approved.

### D.   Debtors Should Be Authorized to Pay Fees Required by the DIP Documents

37.   The Debtors have agreed to pay certain interest and fees in connection with the

DIP Facility, which are integral to the financing package.  The DIP Facility, including the fees and

other economic terms of the DIP Facility, were all negotiated in good faith and at arms' length.[46]

Under the circumstances, the terms of the DIP Facility, which include the fees payable in

connection therewith, are the most favorable terms the Debtors could obtain.[47]   Furthermore, the

Debtors submit that the interest payments and fees required by the DIP Facility are reasonable,

comparable to other debtor in possession financings, and generally consistent with market terms

for companies facing similar circumstances as the Debtors.[48]  The Debtors believe that under these

circumstances, authorization to pay the fees is warranted.

### E.   The DIP Lenders Should Be Deemed Good Faith Lenders under Section 364(e).

38.   Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect

on loans extended to a debtor, and its rights with respect to liens securing those loans, even if the

---

[45]   *See In re Ames Dep't Stores*, 115 B.R. at 38 (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").

[46]   Gupta ¶ 12.

[47]   *Id*. ¶ 13.

[48]   *Id.*

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on

appeal.  Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.[49]

39.    As explained herein and in the Gupta Declaration, negotiations of the DIP Facility

were conducted in good faith and at arms' length.[50]  The proceeds of the DIP Facility will be used

only for purposes that are permissible under the Bankruptcy Code and approved in the Approved

Budget.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within

the meaning of section 364(e) of the Bankruptcy Code, and therefore, entitled to all of the

protections afforded by that section.

## II.    Modification of the Automatic Stay Is Warranted

40.    The relief requested herein contemplates a modification of the automatic stay to the

extent necessary to permit the DIP Secured Parties to exercise all rights and remedies, and to take

certain actions without further order of or application to the Court, upon the occurrence and during

the continuance of any Event of Default, subject to the requirement for a Default Notice and the

expiration of the Waiting Period.  Upon satisfaction of the requirement for a Default Notice and

the expiration of the Waiting Period, the DIP Agent may: (a) declare the DIP Obligations due and

payable, and the DIP Facility terminated, whereupon the DIP Obligations shall become and be

immediately due and payable; (b) terminate, restrict, or reduce the DIP Borrower's ability to use

---

[49]    11 U.S.C. § 364(e).

[50]    Gupta Decl. ¶¶ 12–13.

Cash Collateral other than to pay expenses set forth in the Approved Budget that are necessary to avoid immediate and irreparable harm to the Debtors' estates; provided, however, that the professional fees and expenses of the Debtors and the Committee's professionals shall be governed by the paragraph in the DIP Order authorizing the Carve Out; (c) charge interest at the Default Rate; (d) obtain and liquidate the DIP Collateral; (e) require the applicable Debtor to assemble all of the DIP Collateral constituting personal property without judicial process pursuant to Section 9-609 of the Uniform Commercial Code; (f) take possession of all DIP Collateral constituting tangible personal property without judicial process pursuant to Section 9-609 of the Uniform Commercial Code; and (g) exercise any of its other rights under the DIP Documents, any rights granted under the Final Order and applicable law.[51]

41.   These provisions were part of the negotiations over the terms and conditions of the DIP Facility.  Notably, the exercise of remedies will be subject to five business days' notice (as such may be otherwise extended by the Court) to allow the Debtors or the Committee, if any, to seek relief.[52]  Under these circumstances, the Debtors believe that the extent of the modifications to the automatic stay under the DIP Orders are reasonable and should be approved.

**III.   Immediate Access to DIP Facility Should Be Approved**

42.   The Court may grant interim relief in respect of a motion filed pursuant to section 364 of the Bankruptcy Code if, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing."[53]  In examining requests for interim relief

---

[51]   *See* DIP Credit Agreement, § 8.2.

[52]   *See* Interim Order ¶ 22.

[53]   Fed. R. Bankr. P. 4001(c)(2).

31517384.1

34

under this rule, courts generally apply the same business judgment standard applicable to other business decisions.[54]

43.    Here, the Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein is not granted promptly.  As set forth in the Gupta Declaration, the Debtors have an immediate need for additional liquidity through the DIP Facility in order to continue the operation of their business, maintain relationships with vendors, suppliers and customers, satisfy wage and salary obligations, and continue to satisfy other working capital and operational needs during the chapter 11 cases.[55]  Without immediate access to the DIP Facility, the Debtors will be forced to shutter operations and terminate employees, thus destroying the value of the business as a going concern in any subsequent sale.[56]  Accordingly, approval of the DIP Facility will not only provide essential funding, but will allow the Debtors to preserve the value of their estates for the benefit of all creditors and other stakeholders.[57]  As such, the Debtors request the Court grant the interim relief requested herein to be effective immediately.

## IV.    Request for Final Hearing

44.    Pursuant to Bankruptcy Rules 4001c)(2), the Debtors request that the Court set a date for consideration of entry of the Final Order (the "Final Hearing").  The Debtors request that they be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filing of any objections, by first class mail and e-mail upon the notice parties listed below.  The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

---

[54]    *See In re Ames Dep't Stores*, 115 B.R. at 40.

[55]    Gupta Decl. ¶¶ 10–11.

[56]    *See id.* ¶ 10.

[57]    *See id.* ¶ 11.

## The Requirements of Bankruptcy Rule 6003 Are Satisfied

45.     The Debtors assert that immediate relief is necessary to avoid immediate and irreparable harm.  Bankruptcy Rule 6003 empowers a court to grant relief within the first twenty-one (21) days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm."  For the reasons discussed above, entry of the proposed interim order is integral to the Debtors' ability to successfully transition into chapter 11 and run an orderly sale.  Specifically, the relief requested is necessary to avoid a severe disruption of the Debtors' sale process and operations at this critical juncture and, in turn, to preserve and maximize the value of the Debtors' estates for the benefit of all stakeholders.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this Motion.

## Request for Bankruptcy Rule 6004 Waivers

46.     The Debtors request a waiver of any applicable notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h).  As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors' sale process and to preserve and maximize the value of the Debtors' estates for all stakeholders.  Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

## Reservation of Rights

47.     Nothing contained herein or any action taken pursuant to relief requested is intended to be or shall be construed as (a) an admission as to the validity of any claim against the

Debtors; (b) a waiver of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or validity of any claim or interest under applicable law or nonbankruptcy law; (c) a promise or requirement to pay any claim; (d) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law; or (e) a request for or granting of approval for assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any party in interest's rights to subsequently dispute such claim.

### Notice

48.     Notice of this Motion will be provided to: (a) the U.S. Trustee; (b) the holders of the thirty (30) largest unsecured claims against the Debtors; (c)  the DIP Secured Parties; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the state attorneys general for states in which the Debtors conduct business; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

WHEREFORE, the Debtors respectfully request entry of the Interim Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and granting such other relief as is just and proper.

Dated: April 4, 2024
Wilmington, Delaware

*/s/ Ashley E. Jacobs*
_____

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Sean M. Beach (No. 4070)
Ashley E. Jacobs (No. 5635)
Jared W. Kochenash (No. 6557)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:     (302) 571-6600
Facsimile:      (302) 571-1253
Email:           sbeach@ycst.com
                    ajacobs@ycst.com
                    jkochenash@ycst.com

**SIDLEY AUSTIN LLP**
Samuel A. Newman (*pro hac vice* pending)
1999 Avenue of the Stars, Floor 19
Los Angeles, California 90067
Telephone:     (310) 595-9500
Facsimile:      (310) 595-9501
Email:           sam.newman@sidley.com

*and*

Charles Persons (*pro hac vice* pending)
Jeri Leigh Miller (*pro hac vice* pending)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:     (214) 981-3300
Facsimile:      (214) 981-3400
Email:           cpersons@sidley.com
                    jeri.miller@sidley.com

*and*

Nathan Elner (*pro hac vice* pending)
787 Seventh Avenue
New York, New York 10019
Telephone:     (212) 839-5300
Facsimile:      (212) 839-5599
Email:           nelner@sidley.com

**<u>Exhibit A</u>**

**Proposed Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| ICON AIRCRAFT, INC., *et al.*,[1] | Case No. 24-10703 (CTG) |
| Debtors. | (Jointly Administered ) |
|  | **Ref. Docket No. ___** |

### INTERIM ORDER (I) AUTHORIZING
### POST-PETITION FINANCING; (II) GRANTING
### LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE
### EXPENSE CLAIMS; (III) MODIFYING THE AUTOMATIC STAY;
### (IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF

Upon consideration of the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), for entry of an interim order (this "Interim Order") (I) authorizing the Debtors to obtain postpetition financing pursuant to a superpriority, senior secured, debtor-in-possession multiple draw term loan facility in an aggregate principal amount of up to $9 million; (II) granting liens and providing superpriority administration expense claims; (III) modifying the automatic stay; (IV) scheduling a final hearing on the Motion; and (V) granting related relief, each as more fully set forth in the Motion; and upon consideration of the First Day Declaration, the Gupta Declaration, and the Approved Budget; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29,

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtors' federal tax identification number, are: ICON Aircraft, Inc. (7443); Rycon LLC (5297); IC Technologies Inc. (7918); and ICON Flying Club, LLC (6101). The Debtors' service address is 2141 ICON Way, Vacaville, CA 95688.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to them in the Motion or in the Senior Secured, Superpriority Debtor-in-Possession Loan and Security Agreement, dated as of April 4, 2024, and attached hereto as Exhibit 1 (the "DIP Credit Agreement"), as applicable.

2012 (Sleet, C.J.); and this matter being a core proceeding within the meaning of 28 U.S.C.

§ 157(b)(2); and this Court being able to issue a final order consistent with Article III of the United

States Constitution; and venue of this proceeding and the Motion in this district being proper

pursuant to 28 U.S.C. §§ 1408 and 1409; and appropriate notice of and opportunity for hearing on

the Motion having been given; and the Court having determined that the relief requested in the

Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates, as

contemplated by Bankruptcy Rule 6003; and the relief requested in the Motion being in the best

interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having

determined that the legal and factual bases set forth in the Motion establish just cause for the relief

granted herein; and after due deliberation and sufficient cause appearing therefor,

### IT IS HEREBY ORDERED THAT:[3]

A.      **Petition Date**.  On April 4, 2024 (the "Petition Date"), the Debtors filed voluntary

petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court

for the District of Delaware (the "Court") commencing these chapter 11 cases (the "Chapter 11

Cases").

B.      **Debtors in Possession**.  Each Debtor has continued with the management and

operation of its business and properties as a debtor in possession pursuant to Bankruptcy Code

sections 1107 and 1108.  No trustee or examiner has been appointed in these Chapter 11 Cases.

C.      **Jurisdiction and Venue**.  This Court has jurisdiction over this matter pursuant to

28 U.S.C. §§ 157 and 1334.  This matter constitutes a core proceeding within the meaning of 28

U.S.C. § 157(b) and, pursuant to Bankruptcy Local Rule 9013-1(f), the Debtors consent to the

---

[3]    Pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure, findings of fact shall be construed as
conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.

entry of a final order by this Court in connection with the Motion to the extent that it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue is proper in this jurisdiction pursuant to 28 U.S.C. §§ 1408 and 1409.

D. **Notice**. In accordance with Bankruptcy Rules 2002, 4001(c), 6003, 6004, and 9014, and Bankruptcy Local Rules 2002-1 and 4001-2, notice of the hearing for interim approval of the Motion (the "Interim Hearing") and the emergency relief requested in the Motion has been provided by the Debtors. Under the circumstances, the notice given by the Debtors of the Motion, the relief requested therein, and the Interim Hearing complies with Bankruptcy Rules 2002, 4001(c), 6003, 6004, and 9014 and Bankruptcy Local Rules 2002-1 and 4001-2.

E. **Committee**. As of the date hereof, no official committee of unsecured creditors has been appointed in the Chapter 11 Cases pursuant to Bankruptcy Code section 1102 (any such committee, the "Committee").

F. **Need for DIP Facility**. The Debtors have a critical need to obtain credit pursuant to the DIP Facility to, among other things, make payroll, satisfy other working capital and operational needs, and fund these Chapter 11 Cases, in each such case in accordance with the terms of this Interim Order and the Approved Budget. The Debtors' access to sufficient working capital and liquidity, including through access to the DIP Facility, is necessary to preserve and maintain the value of the Debtors' estates, to run a value-maximizing sale process for the Debtors' assets to the benefit of creditors, and to avoid immediate and irreparable harm to the Debtors, their estates, and their creditors. Entry into this Interim Order is in the best interests of the Debtors, their creditors, and their estates, and good cause exists for granting the relief requested in the Motion as set forth herein.

G.      **Best Available Financing**.  The Debtors represent that they are unable to procure financing in the form of (a) unsecured credit allowable as an administrative expense under sections 364(a), 364(b), or 503(b)(1) of the Bankruptcy Code; or (b) credit for money borrowed secured by a lien on the property of the estates on more favorable terms and conditions than those provided in the DIP Credit Agreement.  In light of the foregoing, the Debtors have reasonably and properly concluded, in the exercise of their business judgment, that the DIP Facility (as defined in the DIP Credit Agreement) represents the best financing available to the Debtors at this time, and is in the best interests of the Debtors, their estates, and all of their stakeholders.

H.      **Use of Proceeds of DIP Facility**.  The Debtors have prepared and delivered to the DIP Lender an initial budget (the "Initial DIP Budget"), a copy of which is attached hereto as Exhibit 2.  The Initial DIP Budget reflects the Debtors' anticipated cash receipts and disbursements for the 13-week period following the Petition Date (the Initial DIP Budget and each subsequent budget approved by the DIP Agent, in its reasonable discretion and in accordance with the DIP Credit Agreement, shall constitute, without duplication, an "Approved Budget").  The proceeds from the DIP Facility shall be used in accordance with the Approved Budget and consistent with the terms and conditions of the DIP Credit Agreement.

I.      **Good Faith of DIP Lender; Effect of Reversal**.  The DIP Lender has indicated a willingness to provide financing to the Debtors solely in accordance with the DIP Credit Agreement and this Interim Order; provided that the DIP Obligations and other protections granted by this Interim Order and the DIP Credit Agreement will not be affected by any subsequent reversal or modification of this Interim Order as provided in section 364(e) of the Bankruptcy Code.  The DIP Lender is hereby found to have acted in good faith in agreeing to provide the DIP Facility

approved by this Interim Order and is thus entitled to the protections provided under section 364(e) of the Bankruptcy Code.

J.      **Business Judgment and Good Faith**.  The terms and conditions of the DIP Facility and the DIP Credit Agreement, and the amounts to be paid thereunder, are fair, reasonable, and the best reasonably available under the circumstances, reflect the Debtors' exercise of sound business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration.  The DIP Credit Agreement was negotiated in good faith and at arms'-length between the Debtors and the DIP Lender.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.      **Motion Granted**.  The interim relief sought in the Motion is granted as set forth herein.  Any objection to the relief requested in the Motion on an interim basis that is not withdrawn, waived, or otherwise resolved, and all reservations of rights included therein, are hereby denied and overruled on the merits.  The rights of all parties in interest to object to the entry of a Final Order are fully reserved.

2.      **Final Hearing**.  The final hearing on the Motion shall be held on _____, 2024 at _____ (prevailing Eastern Time) (the "Final Hearing").  Any objections or responses to entry of the proposed final order shall be filed on or before 4:00 p.m. (prevailing Eastern Time) on _____, 2024.  In the event no objections to entry of a final order on the Motion are timely received, this Court may enter a final order without need for the Final Hearing

3.      **The DIP Credit Agreement**.

a.      **Approval of Entry into the DIP Credit Agreement**.  The Debtors are hereby authorized to negotiate, execute, make, enter into, and perform under the DIP Facility with the DIP Lender on the terms reflected in the DIP Credit Agreement attached hereto as Exhibit 1

(as amended, supplemented, or otherwise modified from time to time in accordance with the terms and conditions set forth herein), which is hereby approved and incorporated herein in its entirety, and to perform all obligations under the DIP Credit Agreement, which upon being entered into shall constitute valid, binding, and non-avoidable obligations of the Debtors that are enforceable against the Debtors in accordance with the terms of the DIP Credit Agreement and this Interim Order. The Debtors are hereby authorized to do and perform all acts, pay the principal, interest, fees, and expenses, and other amounts described in the DIP Credit Agreement as and when such amounts become due and payable.

b. **Authorization of Initial Draw**. Subject to the terms and conditions of the DIP Credit Agreement and this Interim Order, the Debtors are hereby authorized to draw an amount not to exceed $4,000,000. The Debtors are authorized to use the DIP Facility in accordance with the Debtors' Initial DIP Budget (subject to the Permitted Variance), which is hereby approved in all respects, to continue operations, fund operating expenses, service their debt, and administer and preserve the value of their estates, all in accordance with the terms of this Interim Order and the DIP Credit Agreement. The Initial DIP Budget comprises the Debtors' anticipated uses of the amounts advanced under the DIP Facility and will not be a cap on any particular line item.

c. **DIP Collateral**. The "DIP Collateral" shall consist of all assets of the Debtors, including: (i) all accounts, contracts rights, chattel paper, cash, general intangibles, intellectual property, machinery, equipment, goods, inventory, furniture, fixtures, letter of credit rights, books and records, deposit accounts, documents, instruments, commercial tort claims, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations and instruments, all interests in leaseholds and real properties, all patents,

31517385.1

copyrights, trademarks (but excluding trademark applications filed in the United States Patent and Trademark Office on the basis of the applicant's intent-to-use such trademark unless and until evidence of use of the trademark has been filed with, and accepted by, the United States Patent and Trademark Office pursuant to Section 1(c) or Section 1(d) of the Lanham Act (15 U.S.C. §1051, et seq.)), trade names and other intellectual property, all equity interests (to be limited to the extent of any adverse tax consequences, as reasonably determined by the DIP Agent and the DIP Borrower, and limitations imposed by applicable law), all books and records relating to the foregoing, all other personal and real property of the DIP Borrower and Guarantors, and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (in each case as the foregoing are defined in the Uniform Commercial Code ("UCC") as in effect from time to time in the State of New York (and, if defined in more than one Article of such UCC, shall have the meaning given in Article 9 thereof)); and (ii) subject to entry of the Final Order, proceeds of any actions under sections 544, 545, 547, 548 and 550 of the Bankruptcy Code; provided, that the DIP Collateral shall not include (i) property subject to a purchase money lien, capital lease or similar arrangement to the extent the creation of a security interest therein is prohibited thereby or creates a right of termination in favor of any other party thereto or otherwise requires third party consent thereunder, (ii) the Professional Fee Reserves (defined below) or any contents or proceeds thereof, or (iii) the account that holds the adequate assurance deposits of the Debtors for the benefit of their utility providers; provided, further, however, that the DIP Collateral shall include any equity or residual value in such property described in clause (i) of the foregoing proviso.

4.    **Cash Collateral**.  "Cash Collateral" shall mean all of the Debtors' cash, wherever located and held, including cash in deposit accounts, that constitutes or will constitute "cash

collateral" of any of the DIP Secured Parties within the meaning of section 363(a) of the Bankruptcy Code. To the extent there exists or comes to exist any cash of the Debtors' estates that is not Cash Collateral, wherever located and however held, such cash shall be deemed to have been used first by the Debtors' estates, and such cash, to the extent applicable, shall be subject to the DIP Liens and DIP Superpriority Claims granted to the DIP Agent and DIP Lender.

5.      **<u>Granting of the DIP Liens</u>**. To secure the DIP Obligations and subject in all respects to the terms of this Interim Order and the DIP Credit Agreement, including the Carve Out, the DIP Lender shall be granted valid, enforceable, and fully perfected liens under sections 364(c)(2) and (c)(3) of the Bankruptcy Code as follows (together the "<u>DIP Liens</u>"): (a) a perfected, first priority security interest and lien on the DIP Collateral to the extent such DIP Collateral is not subject to valid, perfected, and nonavoidable liens or security interests in existence as of the Petition Date, or that are perfected subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b); and (b) a perfected junior lien on the DIP Collateral to the extent such DIP Collateral is subject to valid, perfected, and nonavoidable liens or security interests in existence as of the Petition Date or that are perfected subsequent to the Petition Date as permitted by Bankruptcy Code section 546(b), whether arising by operation of law or otherwise (each a "<u>Statutory Lien</u>"). At all times prior to the indefeasible payment in cash in full of the DIP Obligations, the DIP Liens will be valid and enforceable against any trustee appointed in these Chapter 11 Cases, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (a "<u>Successor Case</u>"), or upon the dismissal of any of the Chapter 11 Cases or any Successor Case(s).

6.      Subject to the Carve Out, the DIP Liens and the DIP Superpriority Claim (defined below) (a) shall not be made subject or subordinated to, or made *pari passu* with, (i) any other lien,

31517385.1

security interest, or claim heretofore or hereinafter granted in any of these Chapter 11 Cases or any Successor Case (with the exception of liens perfected in accordance with section 546(b) of the Bankruptcy Code) and shall be valid and enforceable against the Debtors, their estates, any trustee, or any other estate representative appointed or elected in these Chapter 11 Cases or any Successor Case and/or upon the dismissal of any of these Chapter 11 Cases or any Successor Case; (ii) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise; (iii) any intercompany or affiliate lien or claim; (b) shall not be subject to Bankruptcy Code sections 510, 549, 550, or 551; and (c) shall be senior to all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code.

7.      **DIP Superpriority Claim**.  Subject to the Carve-Out, the DIP Lender is hereby granted pursuant to section 364(c)(1) of the Bankruptcy Code an allowed superpriority administrative expense claim, joint and several to all of the Debtors, with recourse to all prepetition and postpetition property of the Debtors (the "DIP Superpriority Claim").  Subject to the Carve Out, the DIP Superpriority Claim shall have the priority set forth in section 507(b) of the Bankruptcy Code.

8.      **Postpetition Lien Perfection**.  The DIP Liens shall be and hereby are deemed fully perfected liens and security interests, effectuated and perfected upon the date of this Interim Order, without the necessity of execution by the Debtors of mortgages, security agreements, pledge agreements, financing agreements, financing statements, account control agreements, or any other agreements, filings, or instruments (each a "Perfection Act"), such that no action whatsoever need be taken by the DIP Lender, the DIP Agent, the Debtors, or any other party (including any depository bank or securities intermediary) to perfect such interests.  This Interim Order shall

constitute sufficient and conclusive evidence of the priority, perfection, and validity of the DIP Liens without regard to any other federal, state, or local requirements or law.  Notwithstanding the foregoing, if the DIP Lender or DIP Agent, in their sole discretion, elect for any reason to file, record, or otherwise effectuate any Perfection Act, then the DIP Lender or DIP Agent, as applicable, is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code to perform such Perfection Act, and the Debtors are authorized and directed to perform such Perfection Act to the extent necessary or required by the DIP Documents, which act or acts shall be deemed to have been accomplished as of the date and time of entry of this Interim Order notwithstanding the date and time actually accomplished, and, in such event, the subject filing or recording office is authorized to accept, file, or record any document in regard to such act in accordance with applicable law.  The DIP Lender may choose to file, record, or present a certified copy of this Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file, or record such certified copy of this Interim Order in accordance with applicable law.  Should the DIP Lender so choose and attempt to file, record, or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive, or alter the validity, enforceability, attachment, priority, or perfection of the post-petition liens and security interests granted herein by virtue of the entry of this Interim Order.

9.      **Authorization for Payment of DIP Expenses**.  The Debtors are authorized to pay all fees, costs, and expenses set forth in the DIP Credit Agreement, including the Lender Expenses, without any requirement that the Debtors, the DIP Lender, the DIP Agent, or their respective attorneys file any further application or other pleading, notice, or document with this Court for approval or payment of such fees, costs, or expenses, and all such amounts are hereby approved to

the extent provided in the DIP Credit Agreement. "Lender Expenses" shall mean (a) costs or expenses (including taxes and insurance premiums) required to be paid by the DIP Borrower under any of the DIP Documents that are paid, advanced, or incurred by the DIP Agent and/or any DIP Lenders; (b) out-of-pocket fees or charges paid or incurred by the DIP Agent and/or such DIP Lenders in connection with its transactions with the DIP Borrower under any of the DIP Documents; (c) out-of-pocket costs and expenses incurred by the DIP Agent and/or such DIP Lenders in the disbursement of funds to the DIP Borrower (by wire transfer or otherwise); (d) out-of-pocket costs, fees (including reasonable and documented attorneys' fees, but limited to one primary counsel for the DIP Agent and the DIP Lenders (taken as a whole) plus local counsel to the extent reasonably necessary in any relevant jurisdiction) and expenses paid or incurred by the DIP Agent and/or such DIP Lenders to enforce any provision of the DIP Documents, or during the continuance of an Event of Default (defined below), in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the DIP Collateral, or any portion thereof, irrespective of whether a sale is consummated; (e) out-of-pocket audit fees and reasonable expenses of the DIP Agent and/or such DIP Lenders related to any inspections or audits; (f) out-of-pocket costs and expenses of third party claims or any other suit paid or incurred by the DIP Agent and/or such DIP Lenders in enforcing or defending the DIP Documents or in connection with the transactions contemplated by the DIP Documents or the DIP Agent and/or such DIP Lenders' relationship with any Debtor; (g) out-of-pocket costs and expenses (including attorneys' fees) incurred by the DIP Agent and/or such DIP Lenders incurred in advising, structuring, drafting, reviewing, administering, or amending the DIP Documents (limited to one primary counsel for the DIP Agent and the DIP Lenders (taken as a whole) plus local counsel to the extent reasonably necessary in any relevant jurisdiction); (h) out-of-pocket

fees and expenses of the DIP Agent and/or such DIP Lenders related to any due diligence in connection with the DIP Facility or meetings with the DIP Borrower in connection with the DIP Facility; and (i) costs and expenses of the DIP Agent and/or such DIP Lenders incurred in terminating, enforcing, or defending the DIP Documents, irrespective of whether suit is brought, or in taking any Remedial Action concerning the DIP Collateral.  The payment of all such Lender Expenses, whether incurred before or after the Petition Date, shall not be subject to the Approved Budget but shall be subject solely to the terms of the DIP Credit Agreement.

10.    Subject to the review rights below, none of the Lender Expenses shall be subject to the approval (whether prior to payment or after) of this Court or the guidelines of the U.S. Trustee, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court.  Payment of the Lender Expenses shall be made by the Debtors within fourteen (14) days after delivery of a summary invoice (redacted for privilege) to the Debtors and without the need for application to or order of this Court.  A copy of such summary invoice shall be provided by the DIP Agent to the U.S. Trustee and counsel for the Committee, if any, contemporaneously with the Debtors' receipt of such summary invoice.  An unredacted copy of the summary invoice will be supplied to the U.S. Trustee upon request.  If (a) either of the Debtors, the U.S. Trustee, or the Committee, if any, object to the reasonableness of a summary invoice submitted by the DIP Agent, and (b) the parties cannot resolve such objection within the fourteen (14)-day period following receipt of such summary invoice, the Debtors, the U.S. Trustee, or the Committee, if any, shall file with this Court and serve on the DIP Agent a fee objection (a "DIP Lender Fee Objection").  The Debtors shall promptly pay any submitted invoice after the expiration of the fourteen (14)-day period if no DIP Lender Fee Objection is filed with this Court and served on the DIP Lender in such fourteen (14)-day period.  If a DIP Lender Fee Objection is

timely filed and served, the Debtors shall promptly pay the undisputed amount of the summary invoices, and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the DIP Lender Fee Objection.

11.    **Indemnification**.   The Debtors are authorized to indemnify and hold harmless the DIP Agent, the DIP Lender, and solely in its capacity as such, each of their respective affiliates, and each such person's representatives, agents, attorneys, officers, directors, and employees, in accordance with, and subject to, the DIP Loan Documents, which indemnification is hereby authorized and approved.

12.    **Carve Out; Professional Fee Escrow**.   The DIP Liens and the DIP Superpriority Claim shall be subject to the payment, without duplication, of the following fees and expenses (the amounts set forth in the clauses (i) through (iv) collectively, the "Carve Out"):  (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate, which shall not be reduced by any Approved Budget (collectively, the "Statutory Fees"); (ii) all reasonable fees and expenses up to $25,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (the "Chapter 7 Trustee Carve Out"); (iii) any incurred and unpaid professional's fees (excluding any success or transaction fees), costs, disbursements and expenses (the "Allowed Professional Fees") incurred or earned by persons or firms retained by the Debtors pursuant to sections 327, 328 or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Committee, if any, pursuant to sections 327, 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by any DIP Agent of a Carve Out Trigger Notice (as defined below) (the "Pre-Trigger Carve Out Cap"); and (iv) Allowed Professional Fees of Professional Persons in an aggregate

amount not to exceed $1,000,000 incurred after the first business day following delivery by any DIP Agent of the Carve Out Trigger Notice (such date, the "Trigger Date"), to the extent allowed at any time, whether by final order, interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"); (all such amounts set forth in clauses (a) through (d), collectively, the "Carve Out Cap"); provided that nothing herein shall be construed to impair any party's ability to object to Court approval of the fees, expenses, reimbursement of expenses or compensation of any Professional Person.

13.     "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) to the Debtors and their counsel, the U.S. Trustee, and the Committee and its counsel, if any, which notice may be delivered following the occurrence and during the continuation of an Event of Default (defined below) under the DIP Credit Agreement, stating that (a) the Post-Carve Out Trigger Notice Cap has been invoked, and (b) the obligations under the DIP Facility have been accelerated.

14.     The Debtors shall wire transfer funds, on a weekly basis, to the professional fee reserve maintained by Young, Conaway Stargatt & Taylor, LLP ("Young Conaway") for Debtor Professionals (such reserve, the "Debtor Professional Fee Reserve") in an amount equal to the amounts set forth in the professional fee line items under the "Professional Fees – Restructuring" subheading in the Approved Budget for each Debtor Professional for each such week, with such amounts used to pay the then incurred but unpaid fees and expenses of the Debtor Professionals prior to any and all other claims.  The Debtors shall also wire transfer funds, on a weekly basis, to the professional fee reserve maintained by Young Conaway for Committee Professionals (such reserve, the "Committee Professional Fee Reserve" and together with the Debtor Professional Fee Reserve, the "Professional Fee Reserves") in an amount equal to the amounts set forth in the

professional fee line items under the "Professional Fees – Restructuring" subheading in the Approved Budget for each Committee Professional for each such week, with such amounts used to pay the then incurred but unpaid fees and expenses of the Committee Professionals prior to any and all other claims.  To the extent the incurred but unpaid fees and expenses of Professional Persons exceeds the amount set forth for such Professional Person in the Approved Budget, the Debtors are authorized to increase the Professional Fee Reserves in an amount necessary to reconcile the deficiency.  Upon any delivery of a Carve Out Trigger Notice, the Debtors shall also fund the Professional Fee Reserves with the amount of the Post-Carve Out Trigger Notice Cap. Notwithstanding any (a) occurrence of any Event of Default (defined below), (b) delivery of a Carve Out Trigger Notice, or (c) termination of the DIP Credit Agreement, the Debtors shall be permitted to fund and make payments from the Professional Fee Reserves in accordance with the Approved Budget and this Interim Order, and the DIP Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Professional Fee Reserves have been fully funded as permitted above in an amount equal to all applicable obligations benefiting from the Carve Out.  Any payment or reimbursement made to any Professional Person prior to the delivery of the Carve Out Trigger Notice shall not reduce the Carve Out.

15.    **Payment of Compensation**.  Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of the Debtors or the Committee, if any, or affect the right of any party in interest to object to the allowance and payment of such fees and expenses. Notwithstanding the foregoing, the amounts held in the Professional Fee Reserves shall remain property of the estates unless and until paid to the Professional Persons according to approved

interim compensation procedures or a further order of this Court approving the allowance and payment of such fees and expenses.

16.    **Right to Credit Bid**.  Subject to entry of the Final Order and in connection with any sale or disposition of all or any portion of the DIP Collateral and, with respect to any credit bid, pursuant to section 363(k) of the Bankruptcy Code, the DIP Lender shall have the power and right to "credit bid" the full amount of all DIP Obligations to purchase (either directly or through one or more acquisition vehicles) all or any portion of the DIP Collateral.

17.    **Mandatory Prepayments**.  Mandatory prepayment of the DIP Obligations shall be required: (a) within five (5) business days of the date of receipt by any Debtor of the Net Cash Proceeds of any disposition (whether through a voluntary or involuntary sale, the loss, destruction or damage thereof or any actual condemnation, confiscation, requisition, seizure or taking thereof or otherwise) of DIP Collateral (other than Permitted Transfers), in an amount equal to one hundred percent (100%) of the Net Cash Proceeds received by the Debtors in connection with such sales or dispositions; and (b) within five (5) business days of the date of incurrence by any Debtor of any Indebtedness (other than Permitted Indebtedness), in an amount equal to one hundred percent (100%) of the Net Cash Proceeds received by the Debtors in connection with the incurrence of such Indebtedness, plus accrued interest.  There shall be no fee or penalty associated with any mandatory or voluntary prepayments of the DIP Obligations.

18.    **Maturity Date**.  The DIP Facility shall mature on the earliest of (a) the date that is six (6) months after the closing of the DIP Facility; (b) the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a chapter 11 plan filed in the chapter 11 cases that is confirmed pursuant to an order entered by this Court; (c) the consummation of a sale or other disposition of all or

substantially all of the assets of the Debtors under Section 363 of the Bankruptcy Code; (d) entry of an order converting the chapter 11 cases to cases under chapter 7 of the Bankruptcy Code or dismissing the chapter 11 cases; and (e) the acceleration of the outstanding DIP Obligations and termination of the DIP Facility as a result of the occurrence and continuation of an Event of Default (defined below) (collectively, the "Maturity Date").

19.     **Reporting**.  The Debtors shall be required to provide the DIP Agent with the following reports within twenty-one (21) days after the end of each calendar month (which may consist of the monthly operating reports as filed in the Chapter 11 Cases):   (a) unaudited consolidated financial statements for such calendar month of the DIP Borrower consisting of a balance sheet, and related statements of income and cash flows, all of which shall be certified on behalf of the DIP Borrower; (b) an operating report for the DIP Borrower, including a detailed comparison of the actual year-to-date operating results against the Approved Budget; and (c) solely with respect to the last month of each fiscal quarter, a management report, describing in reasonable detail the DIP Borrower's operations and financial condition for such month.

20.     **Events of Default**.  The following shall constitute an event of default under the DIP Credit Agreement and this Interim Order, unless expressly waived by the DIP Agent in the DIP Agent's reasonable discretion, in writing (email being sufficient), in accordance with the terms of the DIP Credit Agreement (each, an "Event of Default"):  (a) the failure to pay (i) when due, any principal or (ii) within five (5) business days of when due, any other DIP Obligations; (b) the failure to comply with reporting and required notice affirmative covenants (which remain unremedied for five (5) business days), existence of DIP Borrower, failure to join a new subsidiary as a loan party as and when required, any negative covenant, and any failure to maintain liens in favor of DIP Agent; (c) the failure to meet or satisfy the Milestones; (d) any other breach that

31517385.1

remains unremedied for thirty (30) days; (e) any misrepresentation that continues for thirty (30) days; (f) the filing of a motion by any Debtor with the Court or any other court with jurisdiction in the matter seeking an order, or an order is otherwise entered, (i) amending or modifying the DIP Orders in a manner materially adverse to the DIP Lenders' interests, or (ii) reversing, revoking, staying, rescinding, or vacating the DIP Orders; (g) the filing or obtaining of Court approval of a disclosure statement for a chapter 11 plan that is not an Acceptable Plan or a chapter 11 plan is confirmed that is not an Acceptable Plan; (h) except with respect to the Carve Out and any Statutory Liens or Permitted Liens, the filing of any motion or application, or this Court's granting of any motion or application of any other person, which seeks approval for or allowance of any claim, lien, security interest ranking equal or senior in priority to the claims, liens and security interests granted to the DIP Agent under this Interim Order, or with respect to the DIP Collateral or any such equal or prior claim, lien, or security interest shall be established in any manner, except, in any case, as expressly permitted under this Interim Order; (i) the ceasing of the DIP Orders to be in full force and effect from and after the date of entry thereof by the Court; (j) the entry of an order which provides relief from the automatic stay otherwise imposed pursuant to section 362 of the Bankruptcy Code, which order permits any creditor, other than the DIP Agent (other than any creditor holding a Statutory Lien that is senior to the DIP Agent), to realize upon, or to exercise any right or remedy with respect to, any material portion of the DIP Collateral; (k) conversion of the chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, or dismissal of the chapter 11 cases either voluntarily or involuntarily and the DIP Obligations are not simultaneously paid in full; and (l) the appointment of a trustee or examiner with special powers pursuant to section 1104 of the Bankruptcy Code.

21.    **Rights and Remedies upon Event of Default**.  Upon the occurrence and during the continuance of an Event of Default, the DIP Agent shall have the right to do one or more of the following, in each case subject to the requirement for a Default Notice (defined below) and the expiration of the Waiting Period (defined below):  (a) declare the DIP Obligations due and payable, and the DIP Facility terminated, in each case upon the expiration of the Waiting Period, whereupon the DIP Obligations shall become and be immediately due and payable; (b) terminate, restrict, or reduce the Debtors' ability to use Cash Collateral other than to pay expenses set forth in the Approved Budget that are necessary to avoid immediate and irreparable harm to the Debtors' estates; provided, however, that the professional fees and expenses of the Professional Persons shall be governed by Paragraphs 12 through 14 of this Interim Order relating to the Carve Out; (c) charge interest at the Default Rate; (d) upon five (5) business days' prior written notice to the Debtors, the U.S. Trustee, and the Committee, if any, obtain and liquidate the DIP Collateral; (e) require the Debtors to assemble all of the DIP Collateral constituting personal property without judicial process pursuant to Section 9-609 of the UCC; (f) upon five (5) business days' prior written notice to the Debtors, the U.S. Trustee, and the Committee, if any, take possession of all DIP Collateral constituting tangible personal property without judicial process pursuant to Section 9-609 of the UCC; and (g) exercise any of its other rights under the DIP Documents and applicable law.

22.    Subject to the terms of the DIP Documents and this Interim Order, the automatic stay provisions of section 362 of the Bankruptcy Code shall be modified to the extent necessary to permit the DIP Secured Parties to exercise all rights and remedies and to take any or all of the above actions, without further order of or application to the Court, after five (5) business days (as may be extended by the Court, such period, the "Waiting Period") from the delivery of a written

notice of the occurrence and continuance of an Event of Default (the "<u>Default Notice</u>") (e-mail being sufficient for this purpose) by the DIP Secured Parties to the Debtors, their counsel, the U.S. Trustee, and the Committee, if any.

23.    **<u>Binding Effect</u>**.  The terms of this Interim Order shall be valid and binding upon the Debtors, all creditors of the Debtors, and all other parties in interest from and after the entry of this Interim Order by this Court.

24.    **<u>Good Faith Under Section 364(e) of the Bankruptcy Code</u>**.  The DIP Lender has acted in good faith in connection with the DIP Facility, the DIP Documents, and this Interim Order, and is entitled to rely upon the protections granted herein and by section 364(e) of the Bankruptcy Code.  Any modification, amendment, waiver, or vacatur shall not affect the validity of any advances previously made, including advances made hereunder, or any priority lien granted, including liens granted hereunder, unless the advances made, or the granting of the priority or lien, is stayed pending appeal.

25.    **<u>Reversal, Stay, Modification, or Vacatur</u>**.  In the event the provisions of this Interim Order are reversed, stayed, modified, or vacated by court order following notice and any further hearing, such reversals, modifications, stays, or vacatur shall not affect the rights and priorities of the DIP Lender or DIP Agent granted pursuant to this Interim Order.  Notwithstanding any such reversal, stay, modification, or vacatur by court order, any indebtedness, obligation, or liability incurred by the Debtors pursuant to this Interim Order arising prior to the DIP Lender's receipt of notice of the effective date of such reversal, stay, modification, or vacatur shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lender and DIP Agent shall continue to be entitled to all of the rights, remedies, privileges, and benefits, including any payments authorized herein and the security interests and liens granted herein, and

with respect to all such indebtedness, obligation, or liability, and the validity of any payments made or obligations owed or credit extended or lien or security interest granted pursuant to this Interim Order, such shall remain subject to the protection afforded under this Interim Order and the Bankruptcy Code.

26.    **Proofs of Claim**.  Notwithstanding anything to the contrary contained in any prior or subsequent order of the Court, including, without limitation, any order establishing a deadline for the filing of proofs of claim or requests for payment of administrative expenses under Bankruptcy Code section 503(b), the DIP Agent and the DIP Lender shall not be required to file any proofs of claim or request for payment of administrative expenses with respect to any of the DIP Obligations; and the failure to file any such proof of claim or request for payment of administrative expenses shall not affect the validity, priority, or enforceability of any of the DIP Obligations or of any other indebtedness, liabilities, or obligations arising at any time under the DIP Credit Agreement or under this Interim Order or prejudice or otherwise adversely affect the DIP Agent or DIP Lender's rights, remedies, powers, or privileges under any of the DIP Documents or applicable law.  The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.

27.    **Survival of Final Order or Other Matters**.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive the entry of any order confirming a plan, converting the Chapter 11 Cases, or dismissing the Chapter 11 Cases or any Successor Case, and the terms and provisions of this Interim Order shall continue in full force notwithstanding any such order.  In the event of a conflict between this Interim Order and any order confirming a chapter 11 plan, the order confirming the chapter 11 plan shall control.

28.    The requirements set forth in Bankruptcy Rule 6003(b) are satisfied.

29.    Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion under the circumstances and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

30.    Notwithstanding the applicability of Bankruptcy Rule 6004(h), the terms and conditions of this Interim Order shall be immediately effective and enforceable upon its entry.

31.    The Debtors are authorized to take all such actions as are necessary or appropriate to implement the terms of this Interim Order.

32.    This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation and enforcement of this Interim Order.

**Exhibit 1**

**DIP Credit Agreement**

*Execution Version*

**SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION
LOAN AND SECURITY AGREEMENT**

**by and among**

**ICON AIRCRAFT INC.,
as Borrower,**

**the Guarantors party hereto,**

**the Lenders party hereto**

**and**

**FeiRen International Co., Ltd.,
as the Agent**

**Dated as of April 4, 2024**

# TABLE OF CONTENTS

Page

1.    DEFINITIONS AND CONSTRUCTION.................................................................................1
   1.1.    Definitions ..........................................................................................................1
   1.2.    Accounting Terms ...........................................................................................11
   1.3.    UCC................................................................................................................11
   1.4.    Construction ....................................................................................................11
   1.5.    Schedules and Exhibits ...................................................................................11
   1.6.    Payment and Performance ...............................................................................12

2.    LOAN AND TERMS OF PAYMENT...............................................................................12
   2.1.    Commitment to Lend.......................................................................................12
   2.2.    Borrowing Procedures .....................................................................................12
   2.3.    Payments; Reductions of the Commitment; Prepayments................................12
   2.4.    Interest Rates and Rates, Payments and Calculations......................................13
   2.5.    Crediting Payments; Clearance Charge ...........................................................14
   2.6.    Designated Account.........................................................................................14
   2.7.    Statements of Obligations ................................................................................14
   2.8.    Fees.................................................................................................................14

3.    CONDITIONS; TERM OF AGREEMENT.......................................................................15
   3.1.    Conditions Precedent to the Initial Advance ...................................................15
   3.2.    Additional Conditions Precedent to each Advance ..........................................15
   3.3.    Maturity ..........................................................................................................15
   3.4.    Effect of Maturity ...........................................................................................15

4.    REPRESENTATIONS AND WARRANTIES ...................................................................16
   4.1.    Due Organization and Qualification .................................................................16
   4.2.    Due Authorization ...........................................................................................16
   4.3.    Binding Obligations.........................................................................................16
   4.4.    Title to Properties ...........................................................................................16
   4.5.    Jurisdiction of Formation; Location of Chief Executive Office; Organizational; Identification Number; Commercial Tort Claims ...........................................................................16
   4.6.    Litigation ........................................................................................................16
   4.7.    Fraudulent Transfer .........................................................................................17
   4.8.    Disclosure.......................................................................................................17
   4.9.    Payment of Taxes ...........................................................................................17
   4.10.    Approved Budget...........................................................................................17

5.    AFFIRMATIVE COVENANTS......................................................................................17
   5.1.    Financial Statements, Reports, Certificates .....................................................17
   5.2.    Reporting; Budget; Conference Calls; Material Contracts; Sale Offers .............17
   5.3.    Existence.........................................................................................................18
   5.4.    Maintenance of Properties ...............................................................................18
   5.5.    Taxes ..............................................................................................................18
   5.6.    Insurance.........................................................................................................18
   5.7.    Inspection .......................................................................................................19
   5.8.    Environmental .................................................................................................19
   5.9.    Compliance with Laws ....................................................................................19
   5.10.    Formation of Subsidiaries...............................................................................19
   5.11.    Approved Budget Variance ............................................................................19
   5.12.    Professional Fee Reserve ................................................................................19

6.    NEGATIVE COVENANTS............................................................................................20
   6.1.    Indebtedness....................................................................................................20
   6.2.    Liens ...............................................................................................................21

-i-

| | | |
|---|---|---|
| 6.3. | Restrictions on Fundamental Changes | 21 |
| 6.4. | Disposal of Assets | 21 |
| 6.5. | Change Name | 21 |
| 6.6. | Nature of Business | 21 |
| 6.7. | Material Contracts; Amendments | 21 |
| 6.8. | Change of Control | 21 |
| 6.9. | Accounting Methods | 21 |
| 6.10. | Transactions with Affiliates | 22 |
| 6.11. | Use of Proceeds | 22 |
| 6.12. | Distributions or Redemptions | 22 |
| 6.13. | Chapter 11 Case | 22 |
| 6.14. | Plan | 22 |
| 6.15. | Acquisitions, Loans or Investments | 22 |
| 6.16. | Payments on Indebtedness | 23 |
| 6.17. | Case Milestones | 23 |
| 7. | GUARANTY | 23 |
| 7.1. | Guaranty | 23 |
| 7.2. | Separate Obligation | 23 |
| 7.3. | Limitation of Guaranty | 23 |
| 7.4. | Liability of Guarantors | 23 |
| 7.5. | Consents of Guarantors | 24 |
| 7.6. | Guarantor's Waivers | 24 |
| 7.7. | Continuing Guaranty | 25 |
| 7.8. | Reinstatement | 25 |
| 8. | EVENTS OF DEFAULT | 25 |
| 8.1. | Event of Default | 25 |
| 8.2. | Rights and Remedies | 26 |
| 8.3. | Application of Proceeds upon Event of Default | 27 |
| 8.4. | Remedies Cumulative | 27 |
| 8.5. | Acknowledgments | 27 |
| 9. | PRIORITY AND COLLATERAL SECURITY | 27 |
| 9.1. | Superpriority Claims; Subordination in favor of the Agent's Liens | 27 |
| 9.2. | Grant of Security Interest in the Collateral | 28 |
| 9.3. | Representations and Warranties in Connection with Security Interest | 28 |
| 9.4. | Locations of Collateral | 28 |
| 9.5. | Agent's Ability to Perform Obligations on Behalf of Loan Parties with Respect to the Collateral | 28 |
| 9.6. | Perfection | 28 |
| 9.7. | No Discharge; Survival of Claims | 28 |
| 10. | WAIVERS; INDEMNIFICATION | 28 |
| 10.1. | Demand; Protest; etc. | 28 |
| 10.2. | Agent's Liability for Collateral | 28 |
| 10.3. | Indemnification | 29 |
| 11. | NOTICES | 29 |
| 12. | CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER | 30 |
| 13. | AMENDMENTS; WAIVERS; SUCCESSORS | 31 |
| 13.1. | Amendments and Waivers | 31 |
| 13.2. | No Waivers; Cumulative Remedies | 31 |
| 13.3. | Successors | 31 |
| 14. | GENERAL PROVISIONS | 31 |
| 14.1. | Effectiveness | 31 |
| 14.2. | Section Headings | 31 |
| 14.3. | Interpretation | 31 |

14.4.    Severability of Provisions.................................................................................31
14.5.    Debtor-Creditor Relationship ..........................................................................31
14.6.    Counterparts; Electronic Execution.................................................................32
14.7.    Revival and Reinstatement of Obligations ......................................................32
14.8.    Lender Expenses...............................................................................................32
14.9.    Integration .......................................................................................................32

15.    TREATMENT OF CERTAIN INFORMATION..............................................................32

16.    AGENCY PROVISIONS...................................................................................................32
16.1.    Appointment of the Agent ...............................................................................32
16.2.    Powers and Duties ...........................................................................................33
16.3.    General Immunity.............................................................................................33
16.4.    Lenders' Representations, Warranties and Acknowledgment ..........................33
16.5.    Right to Indemnity...........................................................................................34
16.6.    Successor Agent ...............................................................................................34

Exhibits

Exhibit A – Approved Budget
Exhibit B – Reporting Requirements
Exhibit C – Form of Request for Advance
Exhibit D – Form of Guarantor Joinder Agreement
Exhibit E – Case Milestones


Schedules

Schedule A-1 – Payment Account
Schedule A-2 – Authorized Persons
Schedule D-1 – Designated Account and Designated Account Bank
Schedule 2.1 – Lenders' Commitments
Schedule 4.1 – Organizational Chart
Schedule 4.5 – Loan Party Information
Schedule 4.6 – Litigation
Schedule 6.1 – Existing Indebtedness
Schedule 6.2 – Existing Liens
Schedule 9.4 – Collateral Locations

4856-6379-6913v.14

**SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION
LOAN AND SECURITY AGREEMENT**

     **THIS SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT** (this "Agreement"), is entered into as of April 4, 2024, by and among ICON Aircraft Inc., a Delaware corporation (the "Borrower"), the guarantors from time to time party hereto (collectively, the "Guarantors" and, together with the Borrower, the "Loan Parties"), the financial institutions from time to time party hereto as lenders (collectively, the "Lenders") and FeiRen International Co., Ltd., as a Lender and as administrative agent (in such capacity, the "Agent") for itself and the other Lenders.

     **WHEREAS**, on April 4, 2024 (the "Petition Date"), the Borrower, the other Loan Parties, and certain other Affiliates of the Borrower (collectively, the "Debtors") commenced voluntary bankruptcy proceedings, under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") under the lead case filed by the Borrower substantially concurrently herewith (each, a "Chapter 11 Case" and collectively, the "Chapter 11 Cases");

     **WHEREAS**, the Loan Parties remain in possession of their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

     **WHEREAS**, the Loan Parties have requested that Lenders provide financing to Borrower consisting of a senior secured super-priority multiple draw term loan in a principal amount of up to Nine Million Dollars ($9,000,000) (the "Facility") pursuant to Sections 105, 363, 364(c) and 364(d) of the Bankruptcy Code;

     **WHEREAS**, the Guarantors have agreed to guarantee the Obligations under this Agreement;

     **WHEREAS**, Lenders have indicated their willingness to agree to extend the Facility to Borrower, all on terms and conditions set forth herein and in the other Loan Documents and in accordance with Sections 105, 363, 364(c) and 364(d) of the Bankruptcy Code, so long as the Obligations are (i) secured by Liens on the Collateral granted by the Loan Parties as hereinafter provided and (ii) given superpriority status as provided in the DIP Orders;

     **WHEREAS**, the Loan Parties have agreed to grant to the Agent a security interest in all their assets as Collateral, and the Borrower has further agreed that the Agent shall have Superpriority Claims in their Chapter 11 Cases for the repayment of the Obligations pursuant to the DIP Orders, subject to the approval of the Bankruptcy Court; and

     **NOW, THEREFORE**, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

**1.**     **DEFINITIONS AND CONSTRUCTION.**

     1.1.   **Definitions.** As used in this Agreement, the following terms shall having the meanings specified below:

     "Acceptable 363 Sale" means a sale of all or substantially all of the Loan Parties' assets pursuant to Section 363 of the Bankruptcy Code, subject to the following conditions: the Agent shall have reviewed and approved in writing in its reasonable discretion any "stalking horse" asset purchase agreement (the "Stalking Horse Purchase Agreement"), the bidding procedures governing a sale of any portion of the Collateral (the "Bidding Procedures"), any order or proposed order approving the Bidding Procedures (the "Bidding Procedures Order"), any order or proposed order approving a sale of all or any portion of the Collateral pursuant to Section 363 of the Bankruptcy Code (a "Sale Order"), and any motions seeking entry of a Sale Order or approval of the Bidding Procedures; provided that the Agent shall be deemed to approve such Stalking Horse Purchase Agreement, Bidding Procedures, Bidding Procedures Order, Sale Order, and related motions and forms of order if such documents (a) provide for the repayment in full in cash of the Facility on the date such sale is consummated or (b) are submitted or agreed by any affiliate of the Agent.

"Acceptable Plan" means a plan of reorganization or liquidation for the Chapter 11 Cases that (i) provides for the payment in full in cash of the Obligations, in exchange for full discharge thereof, on or prior to the effective date of the plan as a condition to the effectiveness thereof, and (ii) contains releases, exculpations and waivers for the Agent and Lenders (solely in their capacity as such) in form and substance reasonably acceptable to the Agent in its discretion.

"Advances" has the meaning set forth in Section 2.1(a).

"Affiliate" means, as to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. For purposes of this definition, the term "control" (and the correlative terms, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, whether through ownership of securities or other interests, by contract or otherwise.

"Agent" has the meaning set forth in the preamble to this Agreement.

"Agreement" has the meaning set forth in the preamble to this Agreement.

"Allowed Professional Fees" has the meaning set forth in the DIP Orders.

"Approved Budget" means an initial budget, prepared by Borrower, for the period commencing on the week ending April 5, 2024 through the week ending June 28, 2024 that sets forth in reasonable detail all of the Loan Parties' projected (i) Cash Receipts, (ii) Cash Operating Disbursements, and (iii) Cash Bankruptcy Disbursements, separated into line items for each category of receipt or disbursement, and is otherwise in form and substance reasonably acceptable to the Agent, and is attached hereto as Exhibit A.

"Authorized Person" means any one of the individuals identified on Schedule A-2, as such schedule is updated from time to time by written notice from Loan Parties to the Agent.

"Bankruptcy Code" has the meaning set forth in the recitals hereto.

"Bankruptcy Court" has the meaning set forth in the recitals hereto.

"Borrower" has the meaning set forth in the preamble to this Agreement.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banks are authorized or required to close in the State of New York.

"Capital Lease" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP as in effect prior to the adoption and/or effectiveness of Accounting Standards Codification No. 842 or any successor or replacement accounting provisions.

"Carve Out" has the meaning set forth in the DIP Orders.

"Case Milestones" has the meaning set forth in Section 6.17.

"Cash Bankruptcy Disbursements" means the non-operating, bankruptcy-related cash disbursements of the Debtors, including, but not limited to, fees and expenses owing to professionals and the United States Trustee.

"Cash Collateral" has the meaning set forth in the DIP Orders.

"Cash Operating Disbursements" means cash operating disbursements of the Debtors, which shall exclude, for the avoidance of doubt, all Cash Bankruptcy Disbursements.

-2-

"Cash Operating Variance" means a positive 15% or less variance of cumulative Cash Operating Disbursements from the Approved Budget for each Testing Date.

"Cash Receipt Variance" means a negative 15% or less variance of cumulative Cash Receipts from the Approved Budget for each Testing Date.

"Cash Receipts" means the cash receipts of the Debtors.

"Change of Control" means, except with respect to the consummation of a Sale (whether under a plan of reorganization or under Section 363 of the Bankruptcy Code), the acquisition, through purchase or otherwise (including the agreement to act in concert without anything more), by any Person or group (as such term is used in Section 13(d)(3) of the Securities Exchange Act of 1934, as amended), after the date of this Agreement, of the beneficial ownership, directly or indirectly, of 50% or more of the equity interests of the Borrower.

"Chapter 11 Cases" has the meaning set forth in the recitals hereto.

"Closing Date" means the date upon which the Initial Advance is made pursuant to Section 2.1.

"Collateral" means, collectively, (a) all real property and all tangible and intangible personal property of each Loan Party, in each case wherever located and whether now owned or hereafter acquired, including, but not limited to, all accounts, contracts rights, chattel paper, cash, general intangibles, intellectual property, machinery, equipment, goods, inventory, furniture, fixtures, letter of credit rights, books and records, deposit accounts, documents, instruments, commercial tort claims, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations and instruments, all interests in leaseholds and real properties, all patents, copyrights, trademarks (but excluding trademark applications filed in the United States Patent and Trademark Office on the basis of the applicant's intent-to-use such trademark unless and until evidence of use of the trademark has been filed with, and accepted by, the United States Patent and Trademark Office pursuant to Section 1(c) or Section 1(d) of the Lanham Act (15 U.S.C. §1051, et seq.)), trade names and other intellectual property, all equity interests (to be limited to the extent of any adverse tax consequences, as reasonably determined by the Agent and the Borrower, and limitations imposed by applicable law), all books and records relating to the foregoing, all other personal and real property of the Borrower and Guarantors, and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (in each case as the foregoing are defined in the Uniform Commercial Code as in effect from time to time in the State of New York (and, if defined in more than one Article of such Uniform Commercial Code, shall have the meaning given in Article 9 thereof)); and (b) subject to entry of the Final Order, proceeds of any actions under sections 544, 545, 547, 548 and 550 of the Bankruptcy Code; provided, that the Collateral shall not include (a) property subject to a purchase money lien, capital lease or similar arrangement to the extent the creation of a security interest therein is prohibited thereby or creates a right of termination in favor of any other party thereto or otherwise requires third party consent thereunder, (b) the Professional Fee Reserves or any contents or proceeds thereof, or (c) the account that holds the adequate assurance deposits of the Debtors for the benefit of their utility providers; provided, further, however, that the Collateral shall include any equity or residual value in such property described in clause (a) of the foregoing proviso.

"Commitment" means the commitment of each Lender to make Advances hereunder. The aggregate amount of the Lenders' Commitments on the Closing Date is Nine Million Dollars ($9,000,000).  In no event shall the Lenders be obligated to make Advances in an amount that exceeds the aggregate Commitments of the Lenders.

"Committee" means the statutory committee of unsecured creditors appointed by the United States Trustee in relation to the Chapter 11 Cases, if any.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. Section 1 *et seq.*).

"Daily Balance" means, as of any date of determination, the amount of the unpaid principal amount of the Facility owed at the end of such day.

"Debtors" has the meaning set forth in the recitals hereto.

-3-

"<u>Default</u>" means an event, condition, or default that, with the giving of notice, the passage of time, or both, would be an Event of Default.

"<u>Default Notice</u>" has the meaning set forth in the DIP Orders.

"<u>Default Rate</u>" has the meaning specified in <u>Section 2.4(b)</u>.

"<u>Deposit Account</u>" means any deposit account, as that term is defined in the UCC.

"<u>Designated Account</u>" means the Deposit Account of Borrower identified on <u>Schedule D-1</u>; which shall be an account existing within the Borrower's cash management system as of the Petition Date.

"<u>Designated Account Bank</u>" has the meaning specified in <u>Schedule D-1</u>.

"<u>DIP Orders</u>" means the Interim Order and/or the Final Order as applicable.

"<u>Dollars</u>" or "<u>$</u>" means United States dollars.

"<u>Environmental Action</u>" means any written complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment, letter, or other written communication from any Governmental Authority, or any third party relating to or arising out of violations of Environmental Laws or releases of Hazardous Materials (a) from any Collateral; (b) from adjoining properties or businesses of any real property that constitutes Collateral, or (c) from or onto any facilities, with respect to the Collateral, which received Hazardous Materials generated by any Loan Party.

"<u>Environmental Law</u>" means any applicable federal, state, provincial, foreign or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy, or rule of common law now or hereafter in effect and in each case as amended, or any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, in each case, to the extent binding on the Loan Parties, relating to the environment, the effect of the environment on employee health, or Hazardous Materials, in each case as amended from time to time.

"<u>Environmental Liabilities</u>" means all liabilities, monetary obligations, losses, damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts, or consultants, and costs of investigation and feasibility studies), fines, penalties, sanctions, and interest incurred as a result of any claim or demand, or Remedial Action required, by any Governmental Authority or any third party, and which relate to any Environmental Action.

"<u>Event of Default</u>" has the meaning specified in <u>Section 8.1</u>.

"<u>Excluded Swap Obligation</u>"  means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guarantee of such Guarantor or the grant of such security interest becomes effective with respect to such related Swap Obligation.  If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guarantee or security interest is or becomes illegal.

"<u>Facility</u>" has the meaning specified in the recitals to this Agreement.

"<u>Fees</u>" means all fees due to the Agent and/or Lenders under this Agreement, any Loan Document or the DIP Orders.

"Final Advance Amount" means One Million Dollars ($1,000,000).

"Final Order" means a final order of the Bankruptcy Court authorizing and approving the Borrower's entry into this Agreement and the other Loan Documents, in form and substance satisfactory to the Agent, in its reasonable discretion, on a final basis and entered following a final hearing.

"Governmental Authority" means any federal, state, local, or other governmental or administrative body, instrumentality, board, department, or agency or any court, tribunal, administrative hearing body, arbitration panel, commission, or other similar dispute-resolving panel or body.

"Guaranteed Obligations" has the meaning specified in Section 7.1.

"Guaranty" means the terms and provisions of Section 7.

"Hazardous Materials" means (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable laws or regulations as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity", (b) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources, (c) any flammable substances or explosives or any radioactive materials, and (d) asbestos in any form or electrical equipment that contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of 50 parts per million.

"Indebtedness" means (a) all obligations for borrowed money, including, without limitation, the Obligations, (b) all obligations evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, or other financial products, (c) all obligations as a lessee under Capital Leases, (d) all obligations or liabilities of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed, (e) all payment obligations to pay the deferred purchase price of assets (other than trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practices), (f) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to property acquired by such Person, (g) the principal balance outstanding under any synthetic lease, off-balance sheet loan or similar off balance sheet financing products, or (h) any obligation guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (g) above. For purposes of this definition, (i) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (ii) the amount of any Indebtedness described in clause (d) above shall be the lower of the amount of the obligation and the fair market value of the assets of such Person securing such obligation.

"Indemnified Liabilities" has the meaning specified in Section 10.3.

"Indemnified Person" has the meaning specified in Section 10.3.

"Indemnitee Agent Party" has the meaning specified in Section 16.5.

"Information" has the meaning specified in Section 15.

"Initial Advance" has the meaning specified in Section 2.1.

"Initial Advance Amount" means Four Million Dollars ($4,000,000).

"Interest Payment Date" has the meaning specified in Section 2.4(c).

"Interim Order" means that interim order entered by the Bankruptcy Court authorizing and approving the Borrower's entry into this Agreement and the other Loan Documents, in form and substance satisfactory to the Agent, in its reasonable discretion, the Loan Parties, and their respective counsel.

"Investment" has the meaning specified in Section 6.15.

"Lender Expenses" means all reasonable and documented (a) costs or expenses (including taxes and insurance premiums) required to be paid by the Borrower under any of the Loan Documents that are paid, advanced, or incurred by the Agent and/or any Lenders, (b) out-of-pocket fees or charges paid or incurred by the Agent and/or such Lenders in connection with its transactions with the Borrower under any of the Loan Documents, including, but not limited to, fees or charges for photocopying, notarization, couriers and messengers, telecommunication, public record searches (including tax lien, litigation, and UCC searches and including searches with the patent and trademark office or the copyright office), filing, recording, publication, appraisal (including periodic collateral appraisals or business valuations), real estate surveys, real estate title policies and endorsements, and environmental audits, (c) out-of-pocket costs and expenses incurred by the Agent and/or such Lenders in the disbursement of funds to Borrower (by wire transfer or otherwise), (d) out-of-pocket costs, fees (including reasonable and documented attorneys' fees, but limited to one primary counsel for the Agent and the Lenders (taken as a whole) plus local counsel to the extent reasonably necessary in any relevant jurisdiction) and expenses paid or incurred by the Agent and/or such Lenders to enforce any provision of the Loan Documents, or during the continuance of an Event of Default, in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated, (e) out-of-pocket audit fees and reasonable expenses of the Agent and/or such Lenders related to any inspections or audits, (f) out-of-pocket costs and expenses of third party claims or any other suit paid or incurred by the Agent and/or such Lenders in enforcing or defending the Loan Documents or in connection with the transactions contemplated by the Loan Documents or the Agent and/or such Lenders' relationship with the Borrower or any Loan Party, (g) out-of-pocket costs and expenses (including attorneys' fees) incurred by the Agent and/or such Lenders incurred in advising, structuring, drafting, reviewing, administering, or amending the Loan Documents (limited to one primary counsel for the Agent and the Lenders (taken as a whole) plus local counsel to the extent reasonably necessary in any relevant jurisdiction), (h) out-of-pocket fees and expenses of the Agent and/or such Lenders related to any due diligence in connection with the Facility or meetings with Borrower in connection with the Facility, and (i) costs and expenses of the Agent and/or such Lenders incurred in terminating, enforcing, or defending the Loan Documents, irrespective of whether suit is brought, or in taking any Remedial Action concerning the Collateral.

"Lender Related Person" means each Lender, together with such Lender's officers, directors, employees, attorneys, and agents (including the Agent).

"Lenders" has the meaning set forth in the preamble to this Agreement.

"Lien" means any pledge, hypothecation, assignment (which is intended as security), charge, deposit arrangement (which is intended as security), encumbrance, easement, lien (statutory or other), mortgage, security interest, or other security arrangement.

"Loan Account" means the loan accounts maintained by the Agent in the name of Borrower in which shall be recorded the date and amount of each Advance made by the Lenders and the amount of each payment in respect thereof.

"Loan Documents" means this Agreement and any other agreement entered into, now or in the future, by the Borrower or any other Loan Party and the Agent or any Lender in connection with this Agreement and designated a Loan Document, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing.

"Material Adverse Change" means, any event, condition, circumstance or contingency (other than as customarily occurs as a result of events leading up to and following the commencement of a proceeding under chapter 11 of the Bankruptcy Code) that, individually or in the aggregate, (a) has had or would reasonably be expected to have, a material adverse effect on the business, operations, performance or financial condition of the Loan Parties and their subsidiaries, taken as a whole, (b) has resulted in, or would reasonably be expected to result

in, a material adverse effect on the validity or enforceability of, or the rights, remedies or benefits available to the Agent or the Lenders under, any Loan Document (other than as permitted hereunder or as a result of an action or failure to take action by the Agent or a Lender) or of Agent's ability to enforce the Obligations, (c) has had or would reasonably be expected to have, a material adverse effect on the ability of the Borrower and the other Loan Parties, taken as a whole, to perform their obligations under any Loan Document, or (d) a material impairment of the enforceability or priority of the Agent's Liens with respect to the Collateral, or the priority of such Liens.

"Material Contract" means each contract or agreement as to which the breach, nonperformance, cancellation, termination, loss, expiration or failure to renew by any party thereto would reasonably be expected to result in a Material Adverse Change.

"Maturity Date" means the earliest of (i) the date that is six (6) months after the Closing Date, (ii) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court, (iii) the consummation of a sale or other disposition of all or substantially all of the assets of the Loan Parties under Section 363 of the Bankruptcy Code, (iv) entry of an order converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or dismissing the Chapter 11 Cases, and (v) the acceleration of the outstanding Obligations and termination of the Commitments as a result of the occurrence and continuation of an Event of Default.

"Net Cash Proceeds" means with respect to any sale or disposition of Collateral by any Person, the amount of cash proceeds received (directly or indirectly) from time to time (whether as initial consideration or through the payment of deferred consideration) by or on behalf of such Person, in connection therewith, after deducting therefrom only (i) fees, commissions, and expenses related thereto and required to be paid in connection with such sale or disposition and (ii) taxes paid or payable to any taxing authorities in connection with such sale or disposition, in each case to the extent, but only to the extent, that the amounts so deducted are properly attributable to such transaction.

"Obligations" means (a) the due and punctual payment by the Loan Parties of (i) the unpaid principal amount of and interest on (including interest accruing after the Maturity Date and interest accruing after the Petition Date) the Advances, as and when due, whether at maturity, by acceleration or otherwise, and (ii) all other monetary obligations, including advances, debts, contingent reimbursement or indemnification obligations, liabilities (including all amounts charged to the Loan Account pursuant to this Agreement), obligations (including indemnification obligations), fees (including, but not limited to, all Lender Expenses), premiums, costs, expenses and indemnities, whether primary, secondary, direct, indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise, irrespective of whether for the payment of money, of the Loan Parties to the Agent and Lenders under the Loan Documents and the DIP Orders, and including all interest not paid when due and all other expenses or other amounts that Borrower are required to pay or reimburse by the Loan Documents or by law or otherwise in connection with the Loan Documents including, without limitation, including in connection with the collection or enforcement of or preservation of rights of the Agent and the Lenders under the Loan Documents, and (b) the due and punctual payment and performance of all covenants, duties, agreements, obligations and liabilities of the Loan Parties to the Agent and the Lenders under or pursuant to the Loan Documents and the DIP Orders; provided, that Obligations shall not include any Excluded Swap Obligations.

"Ordinary Course" and "Ordinary Course of Business" shall mean, in respect of any Person, the ordinary course and reasonable requirements of such Person's business and undertaken in good faith except as such conduct has been changed resulting from the Chapter 11 Cases.

"Organizational Documents" means (a) for any corporation, the certificate or articles of incorporation, the bylaws, any certificate of designation or other instrument relating to the rights of preferred shareholders or stockholders of such corporation, any shareholder rights agreement and all applicable resolutions of the board of directors (or any committee thereof) of such corporation, (b) for any partnership, the partnership agreement and, if applicable, the certificate of limited partnership, (c) for any limited liability company, the operating agreement and articles or certificate of formation or organization and all applicable resolutions of any managing member of such limited liability company, and (d) any agreement between any Loan Party and its shareholders, members, partners or its equity owners, or among any of the foregoing relating to the governance of such Loan Party.

-7-

"Payment Account" means the Deposit Account of the Agent identified on Schedule A-1.

"Permitted Indebtedness" has the meaning set forth in Section 6.1.

"Permitted Liens" means:

(a)      all Liens granted pursuant to the Loan Documents and Liens created by the DIP Orders (including the Carve Out);

(b)      Permitted Prior Liens;

(c)      Liens existing on the Petition Date and listed on Schedule 6.2 and any renewals or extensions thereof, provided, that (i) the property or asset covered thereby has not changed, (ii) the outstanding principal amount thereof secured by such property or asset does not increase, and (iii) the Borrower or Subsidiary liable with respect there to has not changed;

(d)      Liens for taxes that are not delinquent or thereafter payable and that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(e)      statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, bailees, materialmen, repairmen, construction contractors and suppliers and other Liens imposed by law or pursuant to customary reservations or retentions of title arising in the Ordinary Course of Business for amounts not overdue or subject to Permitted Protest;

(f)      (i) pledges or deposits in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA, and (ii) pledges and deposits of cash in the Ordinary Course of Business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrower or any Subsidiary of the Borrower;

(g)      deposits to secure the performance of bids, trade contracts, governmental contracts and leases (other than Indebtedness for borrowed money), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) incurred in the Ordinary Course of Business;

(h)      easements, rights-of-way, restrictions, encroachments, protrusions and other similar encumbrances and minor title defects affecting real property that, in the aggregate, do not in any case materially detract from the value or use of the property subject thereto, impair the use or operation of the Collateral for the use currently being made thereof or impair Borrower's ability to pay the Obligations in a timely manner or materially interfere with the ordinary conduct of the business of the applicable Person;

(i)      Liens securing judgments for the payment of money (or appeal or other surety bonds relating to such judgments) in existence for less than sixty (60) days after the entry thereof or with respect to which execution has been stayed and which do not otherwise result in an Event of Default;

(j)      licenses and sublicenses of intellectual property entered into in the Ordinary Course of Business;

(k)      any interest or title of a lessor, sublessor, licensor or sublicensor or secured by a lessor's, sublessor's, licensor's or sublicensor's interest under leases or licenses entered into by the Borrower or any Subsidiary in the Ordinary Course of Business and covering only the assets so leased, subleased, licensed or sublicensed and Liens arising from precautionary Uniform

-8-

Commercial Code financing statements or similar filings (or equivalent filings, registrations or agreements in foreign jurisdictions) in connection with any such applicable leases or subleases;

(l)      normal and customary rights of setoff upon deposits of cash in favor of banks or other depository institutions incurred in connection with the maintenance of such deposits in the Ordinary Course and not arising in connection with the issuance or repayment of Indebtedness;

(m)      Liens that are contractual rights of setoff relating to pooled deposit or sweep accounts of the Borrower or its Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the Ordinary Course of Business of the Borrower and the Subsidiaries;

(n)      Liens on insurance policies and the proceeds thereof solely securing the financing of the premiums with respect thereto;

(o)      any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of (i) the Borrower, individually, or (ii) the Borrower and its Subsidiaries, taken as a whole;

(p)      Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(q)      Liens in favor of collecting banks arising under Section 4-210 of the Uniform Commercial Code;

(r)      Liens relating to non-assignment provisions under service contracts entered into in the ordinary course of business; and

(s)      other Liens securing liabilities in an aggregate amount not to exceed $500,000 at any time outstanding.

"Permitted Prior Liens" means valid, enforceable, and non-avoidable Liens on the Collateral that are in existence on the Petition Date and (A) are either perfected as of the Petition Date or perfected on or after the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code, (B) are not subject to avoidance, disallowance, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (C) are senior in priority to the Agent's Liens under applicable law and after giving effect to any lien release, subordination or inter-creditor agreements.

"Permitted Protest" means the right of any Loan Party to protest any Lien (other than any Lien that secures the Obligations), taxes (other than payroll taxes or taxes that are the subject of a United States federal tax lien), or rental payment, provided that (a) a reserve with respect to such obligation is established on such Loan Party's books and records in such amount as is required under GAAP and (b) any such protest is instituted promptly and prosecuted diligently by such Loan Party in good faith.

"Permitted Transfers" means (a) dispositions of inventory or obsolete or worn out property in the Ordinary Course of Business; (b) dispositions of property to the Borrower or any Loan Party; (c) dispositions of accounts receivable in connection with the collection or compromise thereof; (d) licenses and sublicenses of intellectual property entered into in the Ordinary Course of Business; (e) terminations of leases, subleases, licenses or sublicenses in the Ordinary Course of Business; (f) dispositions of cash equivalents for fair market value; (g) the lapse, abandonment or cancellation of immaterial intellectual property which is no longer used or useful in any material respect in the business of the Loan Parties; (h) dispositions of property so long as such sales are in accordance with the Approved Budget; and (i) other dispositions, the proceeds of which, when aggregated with the proceeds of all other dispositions made pursuant to this clause (i), do not exceed $500,000.

"Permitted Variance" means, collectively, the Cash Operating Variance and the Cash Receipt Variance.

"<u>Person</u>" means natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"<u>Petition Date</u>" has the meaning set forth in the recitals hereto.

"<u>Pre-Trigger Carve Out Cap</u>" has the meaning set forth in the DIP Orders.

"<u>Professional Fee Reserves</u>" has the meaning set forth in the DIP Orders.

"<u>Record</u>" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"<u>Remedial Action</u>" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any way address Hazardous Materials in the indoor or outdoor environment, (b) prevent or minimize a release or threatened release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (c) restore or reclaim natural resources or the environment, (d) perform any pre-remedial studies, investigations, or post-remedial operation and maintenance activities, or (e) conduct any other actions with respect to Hazardous Materials required by Environmental Laws.

"<u>Required Lenders</u>" means at any time Lenders then holding more than fifty percent (50%) of the aggregate unpaid principal amount of the Advances then outstanding.

"<u>Required Lien Priority</u>" means, with respect to any Lien purported to be created in any Collateral pursuant to this Agreement, that such Lien is the highest priority Lien to which such Collateral is subject, other than Permitted Liens.

"<u>Sale</u>" means the sale of all or substantially all of the assets of Borrower or any Subsidiary thereof to any party, including the Agent, any Lender or any of their respective Affiliates, pursuant to an Acceptable 363 Sale or pursuant to an Acceptable Plan.

"<u>Schedules</u>" means those certain schedules annexed hereto and made a part hereof.

"<u>Second Advance Amount</u>" means Four Million Dollars ($4,000,000).

"<u>Subsidiary</u>" means, with respect to any Person, any corporation, partnership, limited liability company, association or other business entity of which more than fifty percent (50%) of the total voting power of shares of stock (or equivalent ownership or controlling interest) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, governors or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

"<u>Superpriority Claim</u>" has the meaning set forth in <u>Section 9.1(a)(i)</u>.

"<u>Swap Obligation</u>" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"<u>Testing Date</u>" means April 22, 2024 and the first Business Day of every other week thereafter.

"<u>Testing Period</u>" means the period beginning as of the first day of the first full week following the Petition Date and ending on the last Business Day of the week prior to the week of such Testing Date.

"<u>UCC</u>" means the Uniform Commercial Code as in effect in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC"

means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"United States" means the United States of America.

"United States Trustee" means the United States Trustee applicable to the Chapter 11 Cases.

"Variance Report" has the meaning specified in Section 5.2(b).

"Waiting Period" has the meaning set forth in the DIP Orders.

1.2.    **Accounting Terms.** All accounting terms not specifically defined herein shall be construed in accordance with GAAP; provided, that if Borrower notifies the Agent that Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Agent notifies Borrower that the Agent requests an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then the Agent and Borrower agree that they will negotiate in good faith amendments to the provisions of this Agreement that are directly affected by such change in GAAP with the intent of having the respective positions of the Agent and the Borrower after such change in GAAP conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon, the provisions in this Agreement shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective. When used herein, the term "financial statements" shall include the notes and schedules thereto. Whenever the term "Borrower" is used in respect of a financial covenant or a related definition, it shall be understood to mean Loan Parties on a consolidated basis, unless the context clearly requires otherwise.

1.3.    **UCC.** Any terms used in this Agreement that are defined in the UCC shall be construed and defined as set forth in the UCC unless otherwise defined herein; provided, that to the extent that the UCC is used to define any term herein and such term is defined differently in different Articles of the UCC, the definition of such term contained in Article 9 of the UCC shall govern.

1.4.    **Construction.** Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be. Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified. Any reference in this Agreement or in any other Loan Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein). The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts, and contract rights. Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the repayment in full in cash of all Obligations other than unasserted contingent indemnification Obligations (with all such Obligations consisting of monetary or payment Obligations having been paid in full in cash). Any reference herein to any Person shall be construed to include such Person's successors and assigns. Any requirement of a writing contained herein or in any other Loan Document shall be satisfied by the transmission of a Record. Any reference herein to the Agent shall mean the Agent on behalf of the Lenders and not in the Agent's individual capacity.  Any reference to a time of day or day of the week shall be a reference to New York time or a day of the week in New York, respectively.

1.5.    **Schedules and Exhibits.** All of the schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

1.6.    **Payment and Performance**.  Whenever the payment of any Obligation or the performance of any covenant, duty or other obligation hereunder or under any other Loan Document is stated to be due on a day that is not a Business Day, the date of such payment or performance shall extend to the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder.

2.    **LOAN AND TERMS OF PAYMENT.**

2.1.    **Commitment to Lend**.

(a)    Lenders severally and not jointly agree, subject to the satisfaction or waiver of the conditions precedent in Section 3, to make advances to Borrower (each, an "Advance" and, collectively, the "Advances"); provided that in no event shall the Advances made by a Lender exceed such Lender's Commitment set forth on Schedule 2.1 hereto. The first Advance shall be made upon entry of the Interim Order (the "Initial Advance") and shall be in an aggregate principal amount equal to the Initial Advance Amount. Upon or after entry of the Final Order, Lenders further severally and not jointly agree, subject to the satisfaction or waiver of the conditions precedent in Section 3.2, to make a second Advance to Borrower, as Borrower may request, in an aggregate principal amount equal to the Second Advance Amount.  After Borrower has received the Initial Advance Amount and the Second Advance Amount, if Borrower determines in its reasonable discretion based on the then-current projected cash flow forecast of the Loan Parties (including, without limitation, taking into account any expected sales of inventory) that Borrower has a need for additional funding, Borrower may request, and Lenders severally and not jointly agree, subject to the satisfaction or waiver of the conditions precedent in Section 3.2, to make, a final Advance to Borrower in an aggregate principal amount equal to the Final Advance Amount.  Any Advance, or portion thereof, that is repaid or prepaid (whether as an optional prepayment or a mandatory prepayment) cannot be reborrowed.

(b)    The Advances shall be secured by the Collateral as set forth in this Agreement, the DIP Orders, and the other Loan Documents.

(c)    Each Loan Party agrees that it is jointly and severally liable for the prompt payment and performance of all Obligations under the Loan Documents. Borrower promises to pay the Obligations in Dollars in full on the Maturity Date.

2.2.    **Borrowing Procedures**. Each Advance under Section 2.1(a) shall be made by a written request substantially in the form of the Request for Advance attached hereto as Exhibit C executed by an Authorized Person of the Borrower and delivered to the Agent no later than one (1) Business Day prior to the requested funding date (or such shorter period as the Agent may permit in its sole discretion); provided that the aggregate amount of all such Advances shall not exceed the aggregate Commitments of all Lenders. Upon satisfaction or waiver of the applicable conditions precedent specified herein, the Agent shall make the proceeds of the relevant Advance available to the Borrower on the requested funding date by causing the principal amount of the relevant Advance to be credited to the Designated Account.

2.3.    **Payments; Reductions of the Commitment; Prepayments**.

(a)    **Payments by Borrower.** Except as otherwise expressly provided herein, all payments by Borrower shall be made to the Payment Account for the account of the Lenders and shall be made in immediately available funds, no later than 4:00 p.m. on the date specified herein. Any payment received by the Agent later than 4:00 p.m. shall be deemed to have been received on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day.

(b)    **Application of Payments and Proceeds.** If no Event of Default has occurred and is continuing, all payments remitted to the Agent and all proceeds of Collateral received by the Agent shall be applied as directed by the Borrower.  Upon the occurrence and during the continuance of an Event of Default, all payments remitted to the Agent and all proceeds of Collateral received by the Agent shall be applied as follows (unless otherwise directed by the Agent):

-12-

(i)      <u>first</u>, to pay any Lender Expenses (including reasonable cost or expense reimbursements, such as reasonable attorneys' fees) then owed to the Agent and Lenders or Lender Related Persons in accordance with the DIP Orders, or indemnities then due to the Agent and the Lenders under the Loan Documents, until paid in full;

(ii)      <u>second</u>, to pay any Fees then due to the Agent and the Lenders under the Loan Documents until paid in full;

(iii)      <u>third</u>, to pay interest due in respect of the Advances until paid in full;

(iv)      <u>fourth</u>, to pay the principal of the Advances until paid in full;

(v)      <u>fifth</u>, to pay any other Obligations until paid in full; and

(vi)      <u>sixth</u>, to Borrower (to be wired to the Designated Account) or as otherwise required by applicable law.

In the event of a direct conflict between the priority provisions of this <u>Section 2.3(b)</u> and any other provision contained in any other Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this <u>Section 2.3(b)</u> shall control and govern. Notwithstanding the foregoing, to the extent there is a conflict between the DIP Orders and any other Loan Document, the DIP Orders shall control and govern.

(c)      **Optional Prepayments.** Upon one (1) Business Day's prior notice to Agent, Borrower may prepay any Advance, in whole or in part, at any time, <u>provided</u> that Borrower shall also pay all accrued and unpaid interest on such principal amount.

(d)      **Mandatory Prepayments**.

(i)      **Dispositions.** Within five (5) Business Days of the date of receipt by any Loan Party or any Subsidiary of a Loan Party of the Net Cash Proceeds of any disposition (whether through a voluntary or involuntary sale, the loss, destruction or damage thereof or any actual condemnation, confiscation, requisition, seizure or taking thereof or otherwise) of Collateral (other than Permitted Transfers), the Borrower shall prepay such portion of the outstanding amount of the Obligations in accordance with <u>Section 2.3(b)</u> in an amount equal to 100% of the Net Cash Proceeds (including insurance proceeds, condemnation awards, and payments in lieu thereof) received in connection with such sales or dispositions. Nothing contained in this <u>Section 2.3(d)(i)</u> shall permit any Loan Party to sell any Collateral other than in accordance with <u>Section 6.4</u>. In no event shall any amount paid to the Agent under this <u>Section 2.3(d)(i)</u> exceed the outstanding amount of the Obligations.

(ii)      **Indebtedness**. Within five (5) Business Days of the date of incurrence by any Loan Party or any Subsidiary of a Loan Party of any Indebtedness (other than Permitted Indebtedness), the Borrower shall prepay the outstanding principal amount of the Obligations in accordance with <u>Section 2.3(b)</u> in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with the incurrence of such Indebtedness plus the accrued interest. The provisions of this <u>Section 2.3(d)(ii)</u> shall not be deemed to be implied consent to any such incurrence otherwise prohibited by the terms and conditions of this Agreement.

2.4.      <u>**Interest Rates and Rates, Payments and Calculations**</u>.

(a)      **Interest Rate.** Except as provided in <u>Section 2.4(b)</u>, the Advances shall bear interest on the Daily Balance thereof at a rate equal to fifteen percent (15.00%) per annum.

(b)      **Default Rate.** Upon the occurrence and during the continuation of an Event of Default, the principal balance of the Facility shall bear interest on the Daily Balance thereof at a per annum rate equal to the interest rate set forth in Section 2.4(a) *plus* two percent (2.00%) upon written notice from the Agent of its election to impose interest at the default rate. Any such notice may impose interest at the default rate retroactively to the date of the occurrence of the related Event of Default.

(c)      **Payment.** Except to the extent provided to the contrary herein, all interest payable hereunder shall be due and payable, in arrears, on the first (1st) day of each month (each, an "Interest Payment Date") at any time that the Advances are outstanding and shall be paid in kind and capitalized and added to the principal amount of the Facility on each Interest Payment Date. Borrower agrees that the Agent and each Lender have all rights of setoff and bankers' liens provided by applicable law on account of any accounts maintained at Agent or such Lender, and in addition thereto, the Borrower agrees that at any time any Event of Default exists, upon prior written notice to the Borrower, the Agent and each Lender may apply all balances, credits, deposits, accounts or moneys of the Borrower then or thereafter with the Agent or such Lender to the payment of any Obligations of the Borrower hereunder, whether or not then due.  Lender Expenses payable hereunder shall be paid within thirty (30) days after written demand by the Agent.  To the extent not previously paid, the outstanding unpaid principal balance of the Advances, together with all accrued and unpaid interest thereon, shall be due and payable in full in cash on the Maturity Date.

(d)      **Computation.** All interest and fees chargeable under the Loan Documents shall be computed on the basis of a 365 or 366 day year, as applicable, in each case, for the actual number of days elapsed in the period during which the interest or fees accrue.

(e)      **Intent to Limit Charges to Maximum Lawful Rate.** In no event shall the interest rate or rates payable under this Agreement, plus any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable. The Loan Parties, the Agent and the Lenders, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; provided, that, anything contained herein to the contrary notwithstanding, if said rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, *ipso facto*, as of the date of this Agreement, Loan Parties are and shall be liable only for the payment of such maximum as allowed by law, and payment received from Loan Parties in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Obligations to the extent of such excess.

2.5.      **Crediting Payments; Clearance Charge.** The receipt of any payment item by the Agent shall not be considered a payment on account unless such payment item is a wire transfer of immediately available federal funds made to the Payment Account or unless and until such payment item is honored when presented for payment. Should any payment item not be honored when presented for payment, then Loan Parties shall be deemed not to have made such payment and interest shall be calculated accordingly. Anything to the contrary contained herein notwithstanding, any payment item shall be deemed received by Lender only if it is received into the Payment Account on a Business Day on or before 4:00 p.m. If any payment item is received into the Payment Account on a non-Business Day or after 4:00 p.m. on a Business Day, it shall be deemed to have been received by Lender as of the opening of business on the immediately following Business Day.

2.6.      **Designated Account**. Borrower agrees to maintain the Designated Account with the Designated Account Bank and to receive the proceeds of the Advances requested by Borrower and made by Lenders hereunder in such Designated Account (or such other Deposit Account as the Agent may agree).

2.7.      **Statements of Obligations**. The Agent shall maintain true, correct and complete electronic or written records evidencing the Indebtedness and other Obligations owed by the Borrower to the Agent and the Lenders, in which the Agent will record in the Loan Account (i) the amount of the Advances made under this Agreement, (ii) the amount of any principal and/or interest due and payable and/or to become due and payable from the Borrower to the Agent and Lenders under this Agreement and (iii) all amounts received by the Agent under this Agreement from any Loan Party.

2.8.      **Fees**. On the Closing Date, Borrower shall pay the applicable Lender Expenses, including reasonable and documented attorney's fees, to the Lenders from the proceeds of the Facility. The Fees payable to the

Agent and the Lenders hereunder or under any of the other Loan Documents shall not be subject to proration and shall be non-refundable and non-avoidable obligations of the Borrower and shall be paid by the Borrower in full in cash, or deducted from the applicable Advance, as the case may be.

**3.     CONDITIONS; TERM OF AGREEMENT.**

    3.1.    <u>**Conditions Precedent to the Initial Advance**</u>. Lenders shall not be required to make the Initial Advance unless and until all of the conditions specified below in this <u>Section 3.1</u> and <u>Section 3.2</u> shall have been satisfied or waived by the Agent in its sole discretion.

        (a)     The Agent shall have received a copy of the initial Approved Budget.

        (b)     The Bankruptcy Court shall have entered the Interim Order in form and substance satisfactory to the Agent in its reasonable discretion. The Borrower and the Agent be entitled to rely in good faith upon the Interim Order and shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objections thereto, unless the relevant order has been stayed by a court of competent jurisdiction.

        (c)     The Agent shall have received copies of UCC, tax, and judgment lien searches and title reports, in each case satisfactory to the Agent in its sole discretion.

        (d)     All Fees required to be paid as of the Closing Date under this Agreement shall have been paid or will be paid from the Initial Advance.

    3.2.    <u>**Additional Conditions Precedent to each Advance**</u>. No Lender shall be required to make any Advance unless and until all of the additional conditions specified below (in addition to the conditions set forth above in <u>Section 3.1</u>) shall have been satisfied or waived by the Agent in its sole discretion.

        (a)     The representations and warranties of Loan Parties contained in this Agreement or in the other Loan Documents shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of such extension of credit, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date).

        (b)     No Default or Event of Default shall have occurred and be continuing on the date of such extension of credit, nor shall either result from the making thereof.

    3.3.    <u>**Maturity.**</u> This Agreement shall continue in full force and effect until the payment in full of the Obligations. All Obligations including, without limitation, the outstanding unpaid principal balance and all accrued and unpaid interest and all Fees on the Advances shall be due and payable on the Maturity Date.

    3.4.    <u>**Effect of Maturity.**</u> On the Maturity Date, the Commitment of the Lenders to provide any additional credit hereunder shall automatically be terminated and all Obligations immediately shall become due and payable without notice or demand. No termination of the obligations of Lenders (other than payment in full of the Obligations and termination of the Commitment) shall relieve or discharge any Loan Party of its duties, obligations, or covenants hereunder or under any other Loan Document and the Agent's Liens in the Collateral shall continue to secure the Obligations and shall remain in effect until all Obligations have been paid in full and the Commitment has been terminated. When all of the Obligations have been paid in full in immediately available funds and Lenders have no further obligation hereunder to make further Advances, the Agent will, at the Borrower's expense, execute and deliver any termination statements, lien releases, discharges of security interests, and other similar discharge or release documents (and, if applicable, in recordable form) as are reasonably necessary to release, as of record, the Agent's Liens and all notices of security interests and Liens previously filed by the Agent with respect to the Obligations.

4.    **REPRESENTATIONS AND WARRANTIES.**

In order to induce the Agent and the Lenders to enter into this Agreement, each Loan Party makes the following representations and warranties to the Agent and the Lenders. The Loan Parties further represent that such representations and warranties shall be true, correct, and complete, in all respects, as of the Closing Date and such representations and warranties shall survive the execution and delivery of this Agreement until all Obligations have been paid in full:

4.1.    **Due Organization and Qualification**. Each Loan Party (i) is duly formed and existing and in good standing under the laws of the jurisdiction of its formation, (ii) where the ownership of Collateral requires such qualification, is qualified to do business in any state where the failure to be so qualified would reasonably be expected to result in a Material Adverse Change, and (iii) subject to the Bankruptcy Court's entry of the Interim Order and the Final Order, as applicable, and any limitation under the Bankruptcy Code or other debtor relief law, has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby. Schedule 4.1 is an organizational chart showing, as of the Closing Date, the complete and accurate direct ownership structure of the Loan Parties.

4.2.    **Due Authorization.** The execution, delivery, and performance by each Loan Party of the Loan Documents to which it is a party have been duly authorized by all necessary corporate or limited liability company action on the part of such Loan Party and, with respect to each Loan Party, is only subject to the Bankruptcy Court's entry of the Interim Order or Final Order, as applicable.

4.3.    **Binding Obligations.** Each Loan Document has been duly executed and delivered by each Loan Party that is a party thereto and, subject to the entry of the Interim Order or Final Order, as applicable, is the legally valid and binding obligation of such Loan Party, enforceable against such Loan Party in accordance with its respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally (regardless of whether such enforceability is considered in a proceeding at law or in equity).

4.4.    **Title to Properties.** Except for Permitted Liens, each Loan Party has (i) good, sufficient and legal title to (in the case of real property), and (ii) good and marketable title to (in the case of personal property), all of such Loan Party's right, interest and title in the Collateral.

4.5.    **Jurisdiction of Formation; Location of Chief Executive Office; Organizational; Identification Number; Commercial Tort Claims**.

(a)    As of the Closing Date, Schedule 4.5 sets forth, for each Loan Party, its legal name (within the meaning of Section 9-503 of the UCC), jurisdiction of incorporation or formation, type of entity (for profit or non-profit), tax identification number and organizational identification number (if any).

(b)    As of the Closing Date, the chief executive office of each Loan Party is located at the address indicated on Schedule 4.5. Except with respect to potential claims with respect to accounts receivable collections, the Loan Parties have no actual knowledge of the existence of any commercial tort claims except as described on such Schedule 4.5 (as such Schedule may be updated from time to time by notice from such Loan Party to Agent).

4.6.    **Litigation**. Other than the Chapter 11 Cases, there are no unstayed actions, suits, proceedings, claims or disputes pending or, to the actual knowledge of Loan Parties, threatened in writing, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or against any of its properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby (other than objections or pleadings that may have been filed in the Chapter 11 Cases with respect to the Loan Parties seeking authorization to enter into the Loan Documents and incur the Obligations under this Agreement), or (b) except as set forth on Schedule 4.6 as of the Closing Date, either individually or in the aggregate, if determined adversely, would reasonably be expected to have a Material Adverse Change.

-16-

4.7.     **Fraudulent Transfer**. No transfer of property is being made by a Loan Party and no obligation is being incurred by a Loan Party in connection with the transactions contemplated by this Agreement or the Loan Documents with the intent to hinder, delay or defraud either present or future creditors of any Loan Party.

4.8.     **Disclosure**.  None of the information and data heretofore or contemporaneously furnished in writing by or on behalf of any Loan Party (other than financial estimates, forecasts and other forward-looking information, pro forma financial information and information of a general economic or industry-specific nature) to the Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or any other Loan Document (as modified or supplemented by other information so furnished) when taken as a whole contains any material misstatement of fact or omits to state any material fact necessary to make such information and data (taken as a whole), in the light of the circumstances under which it was delivered, not materially misleading.  With respect to any financial estimates, forecasts and other forward-looking information or any pro forma financial information, the Borrower represents that such information was prepared in good faith based upon assumptions believed to be reasonable at the time of preparation; it being understood that such projections may vary from actual results and that such variances may be material.

4.9.     **Payment of Taxes**. Except as permitted under Section 5.5, all United States federal, state and other material tax returns and reports of each Borrower required to be filed by any of them with respect to the Collateral have been timely filed, and all taxes due with respect to the period covered by such tax returns and all material assessments, fees and other governmental charges upon any Collateral that are due and payable have been paid when due and payable, other than taxes that are the subject of a Permitted Protest.

4.10.     **Approved Budget**. As of the Closing Date, attached to this Agreement as Exhibit A is a true and complete copy of the initial Approved Budget.

Except for the representations and warranties contained in this Article 4 (including the related portions of the Schedules), no Loan Party nor any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of the Loan Parties including, without limitation, any representation or warranty as to the accuracy or completeness of any information, documents or material delivered to the Agent and each Lender or made available to the Agent and such Lender. Each Lender hereby acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, such Lender has relied solely upon its own investigation and the express representations and warranties of the Loan Parties set forth in this Article 4 (including the related portions of the Schedules) and (b) no Loan Party nor any other Person has made any representation or warranty except as expressly set forth in this Article 4 (including the related portions of the Schedules).

**5.     AFFIRMATIVE COVENANTS.**

Each Loan Party covenants and agrees that, until the payment in full of the Obligations, it shall comply with each of the following, as applicable:

5.1.     **Financial Statements, Reports, Certificates**. Borrower shall deliver to the Agent (a) promptly upon it or any Loan Party becoming aware of any Default, notice of such Default; and (b) promptly upon becoming aware of any litigation threatened in writing against any Loan Party or filed (other than any adversary proceeding filed in the Chapter 11 Cases), or any event (other than events of public knowledge in the Chapter 11 Cases) which would reasonably be expected to have a Material Adverse Change, notice of such event. In addition, the Borrower agrees to maintain a system of accounting that enables the Borrower to produce unaudited financial statements in accordance with GAAP in all material respects.

5.2.     **Reporting; Budget; Conference Calls; Material Contracts; Sale Offers**.

(a)     Each Loan Party shall comply with the agreements, requirements, covenants and undertakings applicable to it set forth in Exhibit B, in accordance with the terms thereof.

(b)    Borrower will, on April 29, 2024 and on the first Business Day of every four (4) week period thereafter, prepare and deliver to the Agent a supplement to the initial Approved Budget (or the previously supplemented Approved Budget) updating and/or extending the period covered by the initial Approved Budget (or the previously supplemented Approved Budget) so that it covers at least a 13 week period from the date of such initial Approved Budget or supplemental Approved Budget, as applicable, which supplemental Approved Budget shall be subject to the Agent's approval in its reasonable discretion and without further order of the Bankruptcy Court; provided, however, that in the event the Agent, on the one hand, and the Borrower, on the other hand, cannot agree as to a supplemented budget promptly, but in any event within two (2) days after the delivery thereof, the Approved Budget in effect immediately prior to such requested supplement shall govern and control for purposes of variance testing hereunder.

(c)    Borrower will, on each Testing Date, prepare and deliver to the Agent a variance report, which shall be certified in writing by an Authorized Person of Borrower, and shall set forth (i) the actual Cash Operating Disbursements and Cash Receipts made by the Borrower and its Subsidiaries for the applicable Testing Period ending on the last Business Day of the prior week, (ii) the variance, if any, of the Cash Operating Disbursements and Cash Receipts of the Borrower and its Subsidiaries for such Testing Period against the Cash Operating Disbursements and Cash Receipts set forth for such period in the most recent Approved Budget and (iii) a written explanation of all such variances greater than 10% (the "Variance Report").

(d)    If requested by the Agent, an Authorized Person of the Borrower shall participate in a conference call with the Agent (as long as no Event of Default has occurred and is continuing, such call shall be no more often than once per week), following the Petition Date regarding management issues and other matters.

(e)    Other than defaults existing as of the date hereof, Borrower shall deliver to the Agent (a) promptly upon any Loan Party becoming aware of any material default (other than the filing of the Chapter 11 Case) under any Material Contract to which any Loan Party is a party, notice of such defaults, and (b) promptly notify the Agent upon any bona fide written offer by a third party to purchase all or substantially all of the assets of the Borrower, or to purchase all or substantially all of the equity of the Borrower, in a binding bid related to a potential Sale.

5.3.    **Existence**. At all times, each Loan Party shall (a) maintain and preserve in full force and effect its existence (including being in good standing in its jurisdiction of incorporation or formation) and (b) maintain all its rights and franchises, licenses and permits, except where the failure to maintain any such rights and franchises, or licenses and permits would not reasonably be expected to result in a Material Adverse Change.

5.4.    **Maintenance of Properties.** Each Loan Party shall maintain and preserve the Collateral that is necessary to the proper conduct of its business in good working order and condition, ordinary wear, tear, and casualty and condemnation excepted.

5.5.    **Taxes**. Each Loan Party shall cause all assessments and taxes imposed, levied, or assessed after the Petition Date against any Collateral to be paid in full, before delinquency or before the expiration of any extension period, except (a) to the extent that any such assessments and taxes (i) shall be paid as part of a Sale or pursuant to the Approved Budget or (ii) is subject to a Permitted Protest or (b) where the failure to so pay would not reasonably be expected to have a Material Adverse Change.

5.6.    **Insurance**. At the relevant Loan Party's expense, each Loan Party shall maintain insurance with respect to the Collateral in which such Loan Party has any right, interest or title, covering loss or damage by fire, theft, explosion, and all other hazards and risks as ordinarily are insured against by other Persons engaged in the same or similar businesses operating in the same and similar locations and consistent with such Loan Party's insurance policies in effect on the Petition Date. All such policies of insurance shall be with responsible and reputable insurance companies and in such amounts as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and located. All proceeds of insurance maintained by the Loan Parties shall be payable to the Lenders in accordance with the DIP Orders. If any Loan Party fails to maintain the insurance required by this Section 5.6, the Agent may arrange for such insurance, but at the Borrower's expense and without any responsibility on the Agent's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims. Each relevant Loan Party shall give the Agent prompt notice of any loss covered by its casualty or business interruption insurance. Upon the occurrence and during

-18-

the continuance of an Event of Default, the Agent shall have the sole right to file claims under any property and general liability insurance policies in respect of the Collateral, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

5.7.    **Inspection.** Each Loan Party shall permit the Agent and each of its duly authorized representatives or agent to visit any of its properties and inspect any of its Collateral or books and records, to conduct appraisals and valuations, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers and employees at such reasonable times and intervals as the Agent may reasonably require and, so long as no Default or Event of Default exists, with reasonable prior notice to the applicable Loan Party; provided, that no Loan Party will be required to deliver or disclose any document, information or other matter that (x) constitutes non-financial trade secrets or non-financial proprietary information, (y) in respect of which disclosure to the Agent or any Lender (or its attorneys, accountants and representatives) is prohibited by applicable requirement of law or any binding agreement with any third party or (z) is subject to attorney-client or similar privilege or constitutes attorney work product. Such inspections shall not occur more than once every six (6) months; provided that no such limitation shall apply in the event that an Event of Default exists.

5.8.    **Environmental**. Each Loan Party shall:

(a)    Comply with all applicable Environmental Laws, except where the failure to so comply would not reasonably be expected result in a Material Adverse Change.

(b)    Promptly notify the Agent of any release of which such Loan Party has knowledge of a Hazardous Material in any reportable quantity from or onto property owned or operated by any Loan Party that would reasonably be expected to result in a Material Adverse Change.

(c)    Promptly after its receipt thereof, provide the Agent with written notice of (i) commencement of any Environmental Action against a Loan Party, and (ii) written notice of a material violation, citation, or other administrative order from a Governmental Authority against a Loan Party.

5.9.    **Compliance with Laws**. Each Loan Party shall comply with the requirements of all applicable laws, rules, regulations, and orders of any Governmental Authority, other than laws, rules, regulations, and orders the non-compliance with which, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Change.

5.10.    **Formation of Subsidiaries**. No Loan Party may form any direct or indirect Subsidiary or acquire any direct or indirect Subsidiary after the Closing Date without the consent of the Agent, in its sole but reasonable discretion, unless such Subsidiary is joined as a Loan Party under this Agreement by executing a Guarantor Joinder Agreement in substantially the form attached hereto as Exhibit D within thirty (30) days after formation or acquisition.

5.11.    **Approved Budget Variance**. As of any Testing Date, for the Testing Period ending on such Testing Date, the Borrower shall not permit (a) the aggregate actual Cash Receipts of the Borrower and its Subsidiaries for such Testing Period to be less than 85% of the cumulative Cash Receipts from the Approved Budget for such Testing Period or (b) the aggregate actual Cash Operating Disbursements of the Borrower and its Subsidiaries for such Testing Period to be greater than 115% of the cumulative Cash Operating Disbursements from the Approved Budget for such Testing Period.

5.12.    **Professional Fee Reserve**. The Loan Parties shall deposit and hold in a segregated account the Professional Fee Reserve to pay such then unpaid Allowed Professional Fees prior to any and all other claims. The Professional Fee Reserve shall be funded by Loan Parties on a weekly basis, and shall contain an amount equal to the amount of Pre-Trigger Carve Out Cap reflected in the Approved Budget from the Petition Date through the weekly date of funding.

-19-

6.      **NEGATIVE COVENANTS.**

        Each Loan Party covenants and agrees that, until the payment in full of the Obligations, such Loan Party will not do any of the following without the prior consent of the Agent in its reasonable discretion:

        6.1.    **Indebtedness**. Create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness with respect to the Collateral, except for the following ("Permitted Indebtedness"):

        (a)      Indebtedness evidenced by this Agreement and the other Loan Documents (including, for the avoidance of doubt, the Carve Out);

        (b)      Indebtedness outstanding as of the Petition Date and listed on Schedule 6.1;

        (c)      intercompany Indebtedness owing from a Subsidiary of the Borrower that is a Loan Party to the Borrower or to any other Subsidiary of the Borrower that is a Loan Party;

        (d)      obligations (contingent or otherwise) of the Borrower or any Subsidiary existing or arising under any swap contract, provided that (i) such obligations are (or were) entered into by such Person in the Ordinary Course of Business for the purpose of directly mitigating risks associated with liabilities, commitments, investments, assets, or property held or reasonably anticipated by such Person, or changes in the value of securities issued by such Person, and not for purposes of speculation or taking a "market view", and (ii) such swap contract is not for speculative purposes;

        (e)      obligations under any cash management agreement and other Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections, credit cards, credit card processing services, debit cards, stored value cards, purchase cards (including so-called "procurement cards" or "P-cards") and other cash management and similar arrangements incurred in the Ordinary Course of Business;

        (f)      Indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, incurred in the Ordinary Course of Business;

        (g)      Indebtedness incurred by Borrower or any Subsidiary in respect of letters of credit, bank guarantees, bankers' acceptances, warehouse receipts or similar instruments issued or created in the Ordinary Course of Business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims, provided that upon the drawing of such letter of credit, the reimbursement of obligations in respect of bankers' acceptances and the incurrence of such Indebtedness, and such obligations are reimbursed promptly (but no more than five (5) Business Days) following such drawing, reimbursement obligation or incurrence;

        (h)      Indebtedness incurred in accordance with the DIP Orders;

        (i)      guarantees with respect to Indebtedness permitted under this Section 6.1;

        (j)      Indebtedness that may be deemed to exist pursuant to any performance, surety, regulatory, bid, appeal or similar bonds or statutory obligations incurred in the Ordinary Course of Business;

        (k)      Indebtedness consisting of endorsements for collection, deposit or negotiation and warranties of products or services and obligations owing to suppliers, in each case incurred in the Ordinary Course of Business;

        (l)      unfunded pension fund and other employee benefit plan obligations and liabilities incurred by the Borrower and its Subsidiaries in the Ordinary Course of Business to the extent that the unfunded amounts are permitted to remain unfunded under applicable law;

(m)      Indebtedness in respect of any incentive, supplier finance or similar programs or similar agreements entered into with vendors in the Ordinary Course of Business;

(n)      Indebtedness consisting of customer deposits and advance payments received by the Borrower or its Subsidiaries in the ordinary course of business from their customers for goods purchased by such customers from the Borrower or such Subsidiaries in the Ordinary Course of Business;

(o)      other Indebtedness in an outstanding principal amount not to exceed $500,000 at any time; and

(p)      all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (a) through (o) above below.

6.2.      **Liens.** Create, incur, assume, or suffer to exist on or after the date of this Agreement, directly or indirectly, any Lien on or with respect to any of the Collateral, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Permitted Liens.

6.3.      **Restrictions on Fundamental Changes.** Except in connection with a plan of reorganization or a Sale or Sales approved by the Bankruptcy Court:

(a)      no Loan Party shall enter into any merger, consolidation, reorganization, or recapitalization, or reclassify its equity interests, and

(b)      Borrower shall not liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution);

provided (i) any Loan Party may merge or consolidate with any other Loan Party, (ii) any foreign Subsidiary may be merged or consolidated with or into any other foreign Subsidiary, (iii) any Subsidiary may dissolve, liquidate or wind up its affairs at any time if such Subsidiary is inactive or holds assets of a *de minimis* value, (iv) any Loan Party and any Subsidiary may make any investments permitted hereunder and (v) any Loan Party and any Subsidiary may make any disposition permitted under Section 6.4.

6.4.      **Disposal of Assets.** Except for a Sale or Sales approved by the Bankruptcy Court, convey, sell, lease, license, assign, transfer, or otherwise dispose of any Collateral held by any Loan Party, other than (a) Permitted Transfers, (b) any loss of, damage to or destruction of, any property of any Loan Party or any Subsidiary, and (c) any condemnation or other taking for public use of, any property of any Loan Party or any Subsidiary. Any proceeds of such disposed assets and property shall be used to replace such Collateral within one hundred and eighty (180) days after such assets and property are damaged or destroyed, or to satisfy the Obligations are required by Section 2.3(d)(i).

6.5.      **Change Name**. Change any Loan Party's name, state of organization or organizational identity.

6.6.      **Nature of Business.** Make any change in the nature of any Loan Party's business or acquire any properties or assets that are not reasonably related to the conduct of such business activities; provided, that the foregoing shall not prevent any Loan Party from (i) engaging in any business that is reasonably related or ancillary to its or their business, or (ii) complying with any requirement of the Bankruptcy Code or the DIP Orders.

6.7.      **Material Contracts; Amendments**. Change or modify the material terms of any Material Contract in connection with Collateral except in a manner that would not reasonably be expected to result in a Material Adverse Change, or materially alter any Organizational Documents except in a manner that is not materially adverse to the Lenders' interests.

6.8.      **Change of Control**. Cause, permit, or suffer, directly or indirectly, any Change of Control.

6.9.      **Accounting Methods**. Modify or change its fiscal year or its method of accounting (other than as may be required to conform to GAAP).

6.10.    **Transactions with Affiliates**. Directly or indirectly enter into or permit to exist any transaction with any Affiliate of any Loan Party, except for (a) transactions that are in the Ordinary Course of such Loan Party's business, such as intercompany transactions with Subsidiaries and various employee incentive and retention programs (in compliance with the Bankruptcy Code) among the Loan Parties and their Affiliates, (b) transactions between or among the Loan Parties and (c) any transaction in accordance with an order of the Bankruptcy Court.

6.11.    **Use of Proceeds**. Use the proceeds of the Advances for any purpose other than to fund payments related to the: (a) working capital and other general corporate purposes of the Loan Parties, including the payment of professional fees and expenses; (b) the pursuit of an Acceptable 363 Sale; and (c) bankruptcy-related expenses, subject to the Carve Out, and in each case, consistent with, subject to, and within the categories and limitations contained in the DIP Orders and the Approved Budget (subject to Permitted Variances).

6.12.    **Distributions or Redemptions**. Pay any dividends or distributions on, or make any redemptions of, any equity interest of any Loan Party except in a manner consistent with the Approved Budget (subject to Permitted Variances).

6.13.    **Chapter 11 Case**. Seek, consent or suffer to exist (i) any modification, stay, vacation or amendment to the DIP Orders; (ii) in connection with the Collateral, a priority claim for any administrative expense or unsecured claim against any Borrower (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of any kind specified in Section 503(b), 506(b) or (c) or 507(b) of the Bankruptcy Code) equal to or superior to the priority claim of the Agent in respect to the Collateral; and (iii) any Lien on Collateral having a priority equal or superior to the Liens in favor of the Agent in respect of the Obligations, other than as required under a purchase agreement with respect to the good faith deposit thereunder.

6.14.    **Plan**. Propose and/or support any plan that is not an Acceptable Plan.

6.15.    **Acquisitions, Loans or Investments**. Make any acquisition of the capital stock or debt or other securities of another Person or of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person or make any advance, loan or any other capital contribution of any kind or nature (each, an "Investment"), other than:

(a)    acquisitions of inventory in the Ordinary Course;

(b)    Investments held by the Borrower and its Subsidiaries in the form of cash or cash equivalents;

(c)    Investments existing as of the Closing Date;

(d)    Investments in any Person that is a Loan Party;

(e)    Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the Ordinary Course of Business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(f)    Investments made in accordance with the DIP Orders;

(g)    Investments representing non-cash consideration received in connection with any disposition permitted hereunder;

(h)    Investments (including debt obligations, capital stock and capital stock equivalents) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers arising in the Ordinary Course of Business or upon the foreclosure with respect to any secured investment or other transfer of title with respect to any secured Investment;

-22-

(i)      Investments consisting of Indebtedness, Liens, fundamental changes and dispositions permitted under Sections 6.1, 6.2, 6.3 and 6.4, respectively; and

(j)      other Investments that do not exceed in the aggregate at any time outstanding $500,000.

6.16.    **Payments on Indebtedness**. Other than pursuant to the Approved Budget (subject to Permitted Variances), prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any unsecured Indebtedness for borrowed money, any Indebtedness that is secured by Liens that are junior to the Liens securing the Obligations, or any Indebtedness that is subordinated in right of payment to the Obligations expressly by its terms.

6.17.    **Case Milestones.**  Fail to comply with any of the milestones set forth on <u>Exhibit E</u> (each, a "<u>Case Milestone</u>" and, collectively, the "<u>Case Milestones</u>") on or before the deadline specified for such Case Milestone set forth on <u>Exhibit E</u> (subject to extension by the Agent in its reasonable discretion).

## 7.    GUARANTY.

7.1.    **Guaranty**. Each Guarantor unconditionally and irrevocably guarantees to the Agent and Lenders the full and prompt payment when due (whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise) and performance of the Obligations (the "<u>Guaranteed Obligations</u>").

7.2.    **Separate Obligation**. Each Guarantor acknowledges and agrees that, in providing benefits to Borrower, the Agent and the Lenders are relying upon the enforceability of this <u>Section 7</u> and the Guaranteed Obligations. The fact that the guaranty is set forth in this Agreement rather than in a separate guaranty document is for the convenience of Borrower and Guarantors and shall in no way impair or adversely affect the rights or benefits of the Agent or any Lender under this <u>Section 7</u>.

7.3.    **Limitation of Guaranty**. To the extent that any court of competent jurisdiction shall impose by final judgment under applicable laws (including Sections 544 and 548 of the Bankruptcy Code) any limitations on the amount of any Guarantor's liability with respect to the Guaranteed Obligations that the Agent can enforce under this <u>Section 7</u>, the Agent accepts such limitation on the amount of such Guarantor's liability hereunder only to the extent needed to make this <u>Section 7</u> fully enforceable and non-avoidable.

7.4.    **Liability of Guarantors**. The liability of each Guarantor under this <u>Section 7</u> shall be irrevocable, absolute, independent and unconditional, and shall not be affected by any circumstance that might constitute a discharge of a surety or Guarantor other than the payment and performance in full of all Guaranteed Obligations. In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)      such Guarantor's liability hereunder shall be the immediate, direct, and primary obligation of such Guarantor and shall not be contingent upon the Agent's exercise or enforcement of any remedy it may have against Borrower or any other Person, or against any Collateral or any security for any Guaranteed Obligations;

(b)      this guarantee is a guaranty of payment when due and not merely of collectability;

(c)      such Guarantor's payment of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge such Guarantor's liability for any portion of the Guaranteed Obligations remaining unsatisfied; and

(d)      such Guarantor's liability with respect to the Guaranteed Obligations shall remain in full force and effect without regard to, and shall not be impaired or affected by, nor shall such Guarantor be exonerated or discharged by, any of the following events:

(i)      any proceeding under the Bankruptcy Code (except to the extent set forth in <u>Section 7.3</u>);

-23-

(ii)     any limitation, discharge, or cessation of the liability of Borrower or any other Person for any Guaranteed Obligations due to any applicable law, or any invalidity or unenforceability in whole or in part of any of the Guaranteed Obligations or the Loan Documents;

(iii)     any merger, acquisition, consolidation or change in structure of Borrower, any Subsidiary thereof or any other Guarantor or Person, or any sale, lease, transfer or other disposition of any or all of the assets of Borrower or any other Person;

(iv)     any assignment or other transfer, in whole or in part, of the Agent's interests in and rights under this Agreement (including this Section 7) or the other Loan Documents;

(v)     any claim, defense, counterclaim or setoff, other than that of prior performance, that Borrower, such Guarantor, any other Guarantor or any other Person may have or assert, including any defense of incapacity or lack of corporate or other authority to execute any of the Loan Documents;

(vi)     the amendment, modification, renewal, extension, cancellation or surrender of any Loan Document or any Guaranteed Obligations; or

(vii)     the Agent's exercise or non-exercise of any power, right or remedy with respect to any Guaranteed Obligations.

7.5.     **Consents of Guarantors**. Each Guarantor hereby unconditionally consents and agrees that, without notice to or further assent from such Guarantor:

(a)     the principal amount of the Guaranteed Obligations may be increased or decreased and additional indebtedness or obligations of Borrower under the Loan Documents may be incurred and the time, manner, place or terms of any payment under any Loan Document may be extended or changed, by one or more amendments, modifications, renewals or extensions of any Loan Document or otherwise;

(b)     the time for Borrower's (or any other Person's) performance of or compliance with any term, covenant or agreement on its part to be performed or observed under any Loan Document may be extended, or such performance or compliance waived, or failure in or departure from such performance or compliance consented to, all in such manner and upon such terms as the Agent may deem proper;

(c)     the Agent may request and accept other guaranties and may take and hold security as collateral for the Guaranteed Obligations, and may, from time to time, in whole or in part, exchange, sell, surrender, release, subordinate, modify, waive, rescind, compromise or extend such other guaranties or security and may permit or consent to any such action or the result of any such action, and may apply such security and direct the order or manner of sale thereof; and

(d)     the Agent may exercise, or waive or otherwise refrain from exercising, any other right, remedy, power or privilege even if the exercise thereof affects or eliminates any right of subrogation or any other right of such Guarantor against Borrower.

7.6.     **Guarantor's Waivers**. Each Guarantor waives and agrees not to assert:

(a)     any defense arising by reason of any lack of corporate or other authority or any other defense of Borrower, such Guarantor or any other Person, other than a defense that the Obligations have been paid in full;

(b)     any and all notice of the acceptance of this Guaranty, and any and all notice of the creation, renewal, modification, extension or accrual of the Guaranteed Obligations. The Guaranteed Obligations shall conclusively be deemed to have been created, contracted, incurred and permitted to exist in reliance upon this Guaranty. Each Guarantor waives promptness, diligence, presentment, protest, demand for payment, notice of default, dishonor or nonpayment and all other notices to or upon Borrower, each Guarantor or any other Person with respect to the Guaranteed Obligations.

4856-6379-6913v.14

7.7.    **Continuing Guaranty**. This Guaranty is a continuing guaranty and agreement of subordination and shall continue in effect and be binding upon each Guarantor until termination of the Commitment and payment and performance in full of the Guaranteed Obligations.

7.8.    **Reinstatement**. This Guaranty shall continue to be effective or shall be reinstated and revived, as the case may be, if, for any reason, any payment of the Guaranteed Obligations by or on behalf of Borrower (or receipt of any proceeds of Collateral) shall be rescinded, invalidated, declared to be fraudulent or preferential, set aside, voided or otherwise required to be repaid to Borrower, its estate, trustee, receiver or any other Person (including under the Bankruptcy Code), or must otherwise be restored by the Agent in the Chapter 11 Cases of the Borrower.

## 8.    EVENTS OF DEFAULT.

8.1.    **Event of Default.** Any one or more of the following events shall constitute an event of default following giving of any applicable notice (if required) and the expiration of the applicable cure period (if any) (each, an "Event of Default") under this Agreement:

(a)    Any Loan Party shall fail to pay (i) when due, any principal (including without limitation pursuant to Section 2.3(d) hereof), and (ii) within five (5) Business Days of when due, interest, Fees or costs due to Agent and Lenders or any other Obligations, other than payment of principal, under this Agreement or any Loan Document;

(b)    Any Loan Party shall fail to comply with its obligations under Sections 5.1 and 5.2 (and such failure to comply with Sections 5.1 and 5.2 shall continue unremedied for five (5) Business Days), Section 5.3(a) (solely with respect to the Borrower), Section 5.10, Section 6 and/or Section 9.1;

(c)    Other than as set forth in any other sub-section of this Section 8.1, any Loan Party, as applicable, shall fail to perform, or otherwise breach, any of its respective covenants or obligations contained in this Agreement, which failure or breach shall continue for thirty (30) days after the earlier to occur of (i) the date on which any officer of the relevant Loan Party has knowledge of the failure or breach, or (ii) the date on which the Agent shall have notified the relevant Loan Party of such failure;

(d)    Any representation or warranty made by any Loan Party in this Agreement or in any agreement, certificate, instrument or financial statement or other statement delivered to the Agent pursuant to or in connection with this Agreement shall prove to have been incorrect in any material respect when made or deemed made, which failure or breach shall continue for thirty (30) days after the date upon which any officer of the relevant Loan Party has knowledge of the failure or breach or it has received a written notice of such failure or breach from the Agent;

(e)    Except upon the Agent's prior written request or with the Agent's express prior written consent (and no such consent shall be implied from any other action, inaction, or acquiescence of the Agent), any Loan Party shall file a motion with the Bankruptcy Court or any other court with jurisdiction in the matter seeking an order, or an order is otherwise entered, (i) amending or modifying the DIP Orders in a manner materially adverse to the Lenders' interests or (ii) reversing, revoking, staying, rescinding, or vacating the DIP Orders;

(f)    Borrower shall file or obtain Bankruptcy Court approval of a disclosure statement for a plan of reorganization that is not an Acceptable Plan or a Chapter 11 plan is confirmed that is not an Acceptable Plan;

(g)    Except with respect to the Carve Out and any Permitted Liens, any Loan Party shall file any motion or application, or the Bankruptcy Court allows the motion or application of any other Person, which seeks approval for or allowance of any claim, lien, security interest ranking equal or senior in priority to the claims, liens and security interests granted to the Agent under the DIP Orders, or with respect to the Collateral or any such equal or prior claim, lien, or security interest shall be established in any manner, except, in any case, as expressly permitted under the DIP Orders;

(h)    The DIP Orders shall cease to be in full force and effect from and after the date of entry thereof by the Bankruptcy Court;

(i)        The entry of an order which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code, which order permits any creditor, other than the Agent (other than any creditor having a Lien on specific equipment that is senior to the Agent), to realize upon, or to exercise any right or remedy with respect to, any material portion of the Collateral;

(j)        Conversion of the Chapter 11 Case to a Chapter 7 case under the Bankruptcy Code, or dismissal of the Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily and the Obligations are not simultaneously paid in full; or

(k)        A trustee or an examiner with special powers is appointed pursuant to Section 1104 of the Bankruptcy Code.

8.2.    **Rights and Remedies**.

(a)        Upon the occurrence and during the continuance of an Event of Default, and notwithstanding Section 362 of the Bankruptcy Code and without further order of the Bankruptcy Court or any other court or the initiation of any further proceeding with the Loan Parties except as provided in this Section 8.2, in addition to any other rights or remedies provided for hereunder or under any other Loan Document (including the DIP Orders) or by the UCC or any other applicable law, the Agent may do any one or more of the following, in each case subject, as set forth in the DIP Orders, to the requirement for a Default Notice and the expiration of the Waiting Period:

(i)        declare the Obligations, whether evidenced by this Agreement or by any of the other Loan Documents due and payable, and the Commitments terminated, in each case upon the expiration of the Waiting Period, whereupon the Obligations shall become and be immediately due and payable, without presentment, demand, protest, or further notice or other requirements of any kind, all of which are hereby expressly waived by the Loan Parties;

(ii)        terminate, restrict or reduce the Borrower's ability to use Cash Collateral other than to pay expenses set forth in the Approved Budget that are necessary to avoid immediate and irreparable harm to the Debtors' estates provided, however, that the professional fees and expenses of the Loan Parties' and the Committee's professionals shall be governed by Paragraph 19 of the DIP Orders;

(iii)        charge interest at the Default Rate;

(iv)        upon five (5) Business Days' prior written notice (which period shall be deemed to be reasonable notice) to the Loan Parties in accordance with the terms hereof, the United States Trustee and lead counsel for any creditors' committee, obtain and liquidate the Collateral. If notice of disposition of Collateral is required by law, ten (10) days prior notice by the Agent to the Loan Parties designating the time and place of any public sale or the time after which any private sale or other intended disposition of Collateral is to be made, shall be deemed to be reasonable notice thereof and shall constitute "authenticated notice of disposition" within the meaning of Section 9-611 of the UCC, and the Loan Parties waive any other notice. The Agent or any Lender may bid for and purchase the Collateral at any public sale. The Agent or any Lender may bid and purchase any Collateral at a private sale if the Collateral in question has a readily ascertainable market value;

(v)        require the applicable Loan Party to assemble all of the Collateral constituting personal property without judicial process pursuant to Section 9-609 of the UCC;

(vi)        upon five (5) Business Days' prior written notice (which period shall be deemed to be reasonable notice) to the Loan Parties in accordance with the terms hereof, the United States Trustee and lead counsel for any creditors' committee, take possession of all Collateral constituting tangible personal property without judicial process pursuant to Section 9-609 of the UCC; and

(vii)        exercise any of its other rights under the Loan Documents, any rights granted under the Final Order and applicable law.

-26-

8.3.    **Application of Proceeds upon Event of Default.** The Agent shall apply the cash proceeds actually received from any foreclosure sale, other disposition of the Collateral upon an Event of Default as follows: (i) first, to fund the Carve Out (to the extent not fully funded by Borrower at such time), (ii) second to Lender Expenses consisting of reasonable attorneys' fees and all expenses (including, but not limited to, court costs, advertising expenses, auctioneer's fees, premiums for any required bonds, auditor's fees, amounts advanced for taxes and other expenses) incurred by the Agent in attempting to enforce this Agreement or in the prosecution or defense of any action or proceeding related to the subject matter of this Agreement; (iii) third, to the discharge of any accrued but unpaid Fees, (iv) fourth, to the discharge of any accrued but unpaid interest on the Obligations, (v) fifth, to the outstanding principal balance of any Obligations and (vi) sixth, to pay any remaining surplus to Borrower, on behalf of the Loan Parties collectively.

8.4.    **Remedies Cumulative.** The rights and remedies of the Agent and the Lenders under this Agreement, the other Loan Documents, and all other agreements shall be cumulative. The Agent and the Lenders shall have all other rights and remedies not inconsistent herewith or with the DIP Orders, as provided under the UCC, by law, or in equity. No exercise by the Agent or any Lender of one right or remedy shall be deemed an election, and no waiver by the Agent or such Lender of any Event of Default shall be deemed a continuing waiver. No delay by the Agent or any Lender shall constitute a waiver, election, or acquiescence by it.

8.5.    **Acknowledgments.** Notwithstanding anything herein to the contrary, the Agent and each Lender acknowledges and agrees that in no event shall an "event of default" or "default" under any other Indebtedness of Borrower (other than the Indebtedness evidenced by this Agreement and the other Loan Documents), cause a Default or Event of Default hereunder, or cause a breach of any covenant described in Section 5 or Section 6 of this Agreement.

9.    **PRIORITY AND COLLATERAL SECURITY.**

9.1.    **Superpriority Claims; Subordination in favor of the Agent's Liens.**

(a)    Subject to the terms and conditions of the DIP Orders, Borrower and each other Loan Party warrants and covenants that, except as otherwise expressly provided in this paragraph, the Obligations of Borrower under the Loan Documents:

(i)    Shall, in accordance with section 364(c)(1) of the Bankruptcy Code, constitute allowed senior administrative expense claims against each Borrower and their estates (the "Superpriority Claims") with priority in payment over any and all administrative expenses at any time existing or arising, of any kind or nature whatsoever, including, without limitation, the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 and 1114 of the Bankruptcy Code or otherwise, including those resulting from the conversion of any of the Chapter 11 Cases pursuant to Section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided, however, that the Superpriority Claims shall be subject to and subordinate to only the Carve Out and Permitted Prior Liens;

(ii)    shall be secured by valid, enforceable, non-avoidable and perfected liens on and security interests in favor of the Agent in all Collateral in which any Loan Party has any right, title or interest, in accordance with the Required Lien Priority.

(b)    In the event any of the Collateral is transferred to any Loan Party, such transfer shall be subject in all respects to the Agent's Liens.

(c)    The Superpriority Claims referred to in this Section 9.1 shall have the priority afforded to such Superpriority Claims in the DIP Orders.

-27-

9.2.     **Grant of Security Interest in the Collateral.** Subject to the terms and conditions of the DIP Orders, to secure the payment and performance of the Obligations, Borrower and each Loan Party hereby grants, pledges and collaterally assigns to the Agent for its benefit and for the ratable benefit of the Lenders the following:

(a)      Pursuant to Section 364(d)(1) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable automatically and fully perfected first priority senior liens and security interests in all Collateral, regardless of where located and subject only to Permitted Prior Liens and the Carve Out.

(b)      Pursuant to Section 364(c)(2) of the Bankruptcy Code, subject only to the Carve Out, valid, binding, continuing, enforceable, non-avoidable automatically and fully perfected first priority liens on and security interests in all Collateral that is not otherwise subject to any Permitted Prior Lien.

9.3.     **Representations and Warranties in Connection with Security Interest.** Each Loan Party represents and warrants to the Agent and Lenders as follows:

(a)      Subject to the approval of the Bankruptcy Court, such Loan Party has full right and power to grant to the Agent a perfected, security interest and Lien, in accordance with the Required Lien Priority, on such Loan Party's respective interests in the Collateral pursuant to this Agreement and the other Loan Documents.

(b)      Subject to the approval of the Bankruptcy Court, upon (i) the execution and delivery of this Agreement, and (ii) upon the entry of the Interim Order or the Final Order, as applicable, the Agent will have a good, valid and perfected Lien and security interest in the Collateral granted by the applicable Loan Party, in accordance with the Required Lien Priority, subject to no transfer or other restrictions or Liens of any kind in favor of any other Person.

9.4.     **Locations of Collateral.** The Collateral shall be kept only at the locations set forth on <u>Schedule 9.4</u> and shall not be moved from such locations without the prior consent of the Agent, except for ordinary course activities incidental to the operation of the Loan Parties' businesses.

9.5.     **Agent's Ability to Perform Obligations on Behalf of Loan Parties with Respect to the Collateral.** At any time when an Event of Default has occurred and is continuing, the Agent shall have the right, but not the obligation, to perform on such Loan Party's behalf any or all of such Loan Party's obligations under this Agreement with respect to the Collateral, when such obligations are due, at the expense, for the account and at the sole risk of the applicable Loan Party.

9.6.     **Perfection.**   No perfection steps shall be required so long as the Interim Order or the Final Order, as applicable, remains in full force and effect.

9.7.     **No Discharge; Survival of Claims.** Pursuant to Section 1141(d)(4) of the Bankruptcy Code, the Borrower hereby waives any discharge of the Obligations with respect to any plan of reorganization that shall not provide for the payment in full in cash of the Obligations under this Agreement.

**10.     WAIVERS; INDEMNIFICATION.**

10.1.    **Demand; Protest; etc**. To the extent permitted by applicable law or as expressly required pursuant to the terms of this Agreement, each Loan Party waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guarantees at any time held by the Agent on which such Loan Party may in any way be liable.

10.2.    **Agent's Liability for Collateral.** As long as the Agent complies with its obligations, if any, under the UCC and applicable law, neither the Agent nor any Lender shall in any way or manner be liable or responsible for: (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person. All risk of loss, damage, or destruction of the Collateral

-28-

shall be borne by the Loan Parties, except any thereof resulting from (x) the gross negligence, bad faith or willful misconduct of the Agent or such Lender as finally determined by a court of competent jurisdiction or (y) a material breach of any obligation of the Agent or such Lender under the Loan Documents.

10.3.    **Indemnification**. Each Loan Party shall pay, indemnify, defend, and hold the Lender Related Persons (each, an "<u>Indemnified Person</u>") harmless (to the fullest extent permitted by law) for any losses, claims, damages, liabilities, expenses, penalties, fined, actions, judgement, and disbursements of any kind or nature whatsoever (including reasonable and documented out of pocket fees and disbursements of experts, consultants and counsel incurred by any of them, but limited to one primary counsel for the Indemnified Persons (taken as a whole) plus local counsel to the extent reasonably necessary in any relevant jurisdiction (a) in connection with or as a result of or related to the execution and delivery, enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the other Loan Documents, or the transactions contemplated hereby or thereby or the monitoring of the Loan Parties' compliance with the terms of the Loan Documents, (b) with respect to any investigation, litigation, or proceeding related to this Agreement, any other Loan Document, or the use of the proceeds of the credit provided hereunder (irrespective of whether any Indemnified Person is a party thereto), or any act, omission, event, or circumstance in any manner related thereto, and (c) in connection with or arising out of any presence or release of Hazardous Materials at, on, under, to or from any Collateral or any Environmental Actions, Environmental Liabilities or Remedial Actions related in any way to any Collateral (each and all of the foregoing, the "<u>Indemnified Liabilities</u>"). The foregoing to the contrary notwithstanding, the Loan Parties shall have no obligation to any Indemnified Person under this <u>Section 10.3</u> (i) with respect to any Indemnified Liability that a court of competent jurisdiction finally determines to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnified Person, (ii) to the extent arising from a material breach of any obligation of such Indemnified Person under the Loan Documents or (iii) to the extent arising out of any loss, claim, damage, liability or expense that does not involve an act or omission of the Loan Parties and that is brought by an Indemnified Person against another Indemnified Person (other than claims against an Indemnified Person in its capacity or in fulfilling its role as the Agent or any similar role under the Loan Documents). This provision shall survive the termination of this Agreement and the repayment of the Obligations.

## 11.    NOTICES.

All notices or demands relating to this Agreement or any other Loan Document shall be in writing and shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, or electronic mail (at such email addresses as a party may designate in accordance herewith). In the case of notices or demands to any party hereunder or any service of process to any party hereunder, they shall be sent to the respective addresses set forth below:

If to any Loan Party:

ICON Aircraft Inc.
2141 ICON Way

Vacaville, CA 95688
Attn: Jason Huang
Email: jason.huang@iconaircraft.com

with a copy to (which shall not constitute notice):

Sidley Austin LLP
2021 McKinney Avenue
Suite 2000
Dallas, TX 75201
Attn: Charles M. Persons; Banks Bruce
Email: cpersons@sidley.com; bbruce@sidley.com

4856-6379-6913v.14

If to the Agent or any Lender:

> FeiRen International Co., Ltd.
> 12/F, Henley Building
> 5 Queen's Road Central, Central, Hong Kong, China
> Attn: Zheng Ying
> Email: zhengy@flymen.com.cn

with a copy to (which shall not constitute notice):

> Tian Yuan Law Firm
> Attention: Hao Zheng
> Email: Teamxu1@tylaw.com.cn

Any party hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other party. All notices or demands sent in accordance with this <u>Section 11</u>, shall be deemed received on the earlier of the date of actual receipt or five (5) Business Days after the deposit thereof certified, return receipt requested in the mail; <u>provided</u>, <u>that</u> (a) notices sent by overnight courier service shall be deemed to have been given when received, and (b) notices by electronic mail shall be deemed received when sent upon confirmation of transmission as evidenced by a delivery receipt or similar electronic mail function. If any notice, disclosure, or report is required to be delivered pursuant to the terms of this Agreement on a day that is not a Business Day, such notice, disclosure, or report shall be deemed to have been required to be delivered on the immediately following Business Day.

## 12.    CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.

(a)    THE VALIDITY OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

(b)    THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE BANKRUPTCY COURT AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, FEDERAL COURTS LOCATED IN NEW YORK; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT THE AGENT'S OR ANY LENDER'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE THE AGENT OR SUCH LENDER ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. EACH LOAN PARTY AND THE AGENT WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF <u>FORUM NON CONVENIENS</u> OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS <u>SECTION 12(b)</u>; <u>PROVIDED</u>, <u>FURTHER</u>, <u>HOWEVER</u>, THAT ALL PARTIES HEREBY AGREE THAT THEY HAVE CONSENTED TO THE JURISDICTION OF THE BANKRUPTCY COURT AND THAT THE BANKRUPTCY COURT WILL RETAIN EXCLUSIVE JURISDICTION WITH RESPECT TO ALL DISPUTES SO LONG AS THE CHAPTER 11 CASE REMAINS PENDING.

(c)    EACH LOAN PARTY, THE AGENT AND THE LENDERS HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. EACH LOAN PARTY, THE AGENT AND EACH LENDER ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A

BUSINESS RELATIONSHIP, THAT EACH HAS RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS. EACH LOAN PARTY, THE AGENT AND EACH LENDER WARRANTS AND REPRESENTS THAT IT HAS HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.

**13.      AMENDMENTS; WAIVERS; SUCCESSORS.**

13.1.    **Amendments and Waivers.** No amendment, waiver or other modification of any provision of this Agreement or any other Loan Document, and no consent with respect to any departure by any Loan Party therefrom, shall be effective unless the same shall be in writing and signed by the Agent, the Required Lenders and Loan Parties that are party thereto and then any such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which given.

13.2.    **No Waivers; Cumulative Remedies.** No failure by the Agent or any Lender to exercise any right, remedy, or option under this Agreement or any other Loan Document, or delay by the Agent or such Lender in exercising the same, will operate as a waiver thereof. No waiver by Lender will be effective unless it is in writing, and then only to the extent specifically stated.

No waiver by the Agent or any Lender on any occasion shall affect or diminish the Agent's or such Lender's rights thereafter to require strict performance by Loan Parties of any provision of this Agreement. The Agent's and each Lender's rights under this Agreement and the other Loan Documents will be cumulative and not exclusive of any other right or remedy that the Agent or such Lender may have.

13.3.    **Successors.** This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided that no Loan Party may assign this Agreement or any rights or duties hereunder without the Agent's prior written consent and such consent shall not, unless otherwise provided in such consent, release any Loan Party from its Obligations. Any assignment by a Loan Party which is not explicitly permitted hereunder shall be absolutely void *ab initio*. Any Lender (with the consent of (a) Agent which shall not be unreasonably withheld or delayed and (b) if no Event of Default has occurred and is continuing, the Borrower, which shall not be unreasonably withheld or delayed and which consent shall be deemed given if the Borrower does not respond to such request within ten (10) Business Days) may freely assign all or part of its rights and duties hereunder to any Person except in no event shall any Lender assign its rights hereunder to any Person that competes, directly or indirectly, with the Borrower or any of its respective Subsidiaries.

**14.      GENERAL PROVISIONS.**

14.1.    **Effectiveness.** This Agreement shall be binding and deemed effective when executed by the Loan Parties, the Agent and the initial Lenders.

14.2.    **Section Headings.** Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

14.3.    **Interpretation.** Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against Lender or any Loan Party, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

14.4.    **Severability of Provisions.** Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

14.5.    **Debtor-Creditor Relationship.** The relationship between the Agent and each Lender, on the one hand, and each Loan Party, on the other hand, is solely that of creditor and debtor, as applicable. Neither Agent nor

any Lender has (and shall not be deemed to have) any fiduciary relationship or duty to any Loan Party arising out of or in connection with the Loan Documents or the transactions contemplated thereby, and there is no agency or joint venture relationship between the Agent and each Lender, on the one hand, and Loan Parties, on the other hand, by virtue of any Loan Document or any transaction contemplated therein.

14.6.    **Counterparts; Electronic Execution.** This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by facsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by facsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement. The foregoing shall apply to each other Loan Document *mutatis mutandis*.

14.7.    **Revival and Reinstatement of Obligations**. If the incurrence or payment of the Obligations by Loan Parties or the transfer to the Agent of any property should for any reason subsequently be asserted, or declared, to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (each, a "Voidable Transfer"), and if the Agent is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that the Agent is required or elects to repay or restore, and as to all reasonable and actual out-of-pocket costs, expenses, and attorneys' fees of the Agent related thereto, the liability of Loan Parties automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made.

14.8.    **Lender Expenses.** The Borrower agree to pay any and all Lender Expenses within thirty (30) days after written demand therefor by the Agent and that such Obligations shall survive payment or satisfaction in full of all other Obligations.

14.9.    **Integration.** This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

## 15.    TREATMENT OF CERTAIN INFORMATION.

The Agent and each Lender agrees to use reasonable precautions to keep confidential, in accordance with its customary procedures for handling confidential information of the same nature, all non-public information supplied by the Borrower or any of its Subsidiaries pursuant to this Agreement ("Information"), provided, however that nothing herein shall limit the disclosure of any such Information (i) to any Lender Related Person who needs to know such Information (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (ii) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, or requested by any bank regulatory authority, provided that the Agent or such Lender, as applicable, agrees that it will notify the Borrower as soon as practicable in the event of any such disclosure by such Person (other than at the request of a regulatory authority) unless such notification is prohibited by law, rule or regulation, (iii) in connection with any litigation to which Agent or any Lender is a party, (iv) to the extent such Information (A) becomes publicly available other than as a result of a breach of this Agreement, (B) becomes available to the Agent or such Lender on a confidential basis from a source other than the Borrower or any Subsidiary, or (C) was available to the Agent on a non-confidential basis prior its disclosure to it by the Borrower, any Subsidiary, or any of their agents or advisors, and (v) to the extent the Borrower shall have consented to such disclosure in writing.

## 16.    AGENCY PROVISIONS

16.1.    **Appointment of the Agent**. Each Lender hereby appoints the Agent as its agent hereunder and under the other Loan Documents and such Lender hereby authorizes the Agent, in such capacity, to act as the

-32-

Lender's agent in accordance with the terms hereof and the other Loan Documents. The Agent hereby agrees to act upon the express conditions contained herein and the other Loan Documents, as applicable. The provisions of this Article 16 (other than Section 16.6) are solely for the benefit of the Agent and the Lenders and no Loan Party shall have any rights as a third party beneficiary of any of the provisions thereof. In performing its functions and duties hereunder, the Agent shall act solely as an agent of the Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for any Loan Party.

16.2.    **Powers and Duties**. Each Lender authorizes the Agent to take such action on the Lender's behalf and to exercise such powers, rights and remedies hereunder and under the other Loan Documents as are specifically delegated or granted to the Agent by the terms hereof and thereof, together with such powers, rights and remedies as are reasonably incidental thereto. The Agent shall have only those duties and responsibilities that are expressly specified herein and the other Loan Documents. The Agent may exercise such powers, rights and remedies and perform such duties by or through its agents or employees. The Agent shall not have, by reason hereof or any of the other Loan Documents, a fiduciary relationship in respect of the Lender; and nothing herein or any of the other Loan Documents, expressed or implied, is intended to or shall be so construed as to impose upon the Agent any obligations in respect hereof or any of the other Loan Documents except as expressly set forth herein or therein.

16.3.    **General Immunity**.

(a)    No Responsibility for Certain Matters. The Agent shall not be responsible to the Lenders for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency hereof or any other Loan Document or for any representations, warranties, recitals or statements made herein or therein or made in any written or oral statements or in any financial or other statements, instruments, reports or certificates or any other documents furnished or made by the Agent to Lenders or by or on behalf of any Loan Party to the Agent in connection with the Loan Documents and the transactions contemplated thereby or for the financial condition or business affairs of any Loan Party or any other Person liable for the payment of any Obligations, nor shall the Agent be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained in any of the Loan Documents or as to the use of the proceeds of any Advance or as to the existence or possible existence of any Event of Default or Default or to make any disclosures with respect to the foregoing. Anything contained herein to the contrary notwithstanding, the Agent shall not have any liability arising from confirmations of the amount of outstanding Advances or the component amounts thereof.

(b)    Exculpatory Provisions. Neither the Agent nor any of its officers, partners, directors, employees or agents shall be liable to the Lenders for any action taken or omitted by the Agent under or in connection with any of the Loan Documents except to the extent caused by the Agent's gross negligence or willful misconduct, as determined by a court of competent jurisdiction in a final, non-appealable order. The Agent shall be entitled to refrain from any act or the taking of any action (including the failure to take an action) in connection herewith or any of the other Loan Documents or from the exercise of any power, discretion or authority vested in it hereunder or thereunder unless and until the Agent shall have received instructions in respect thereof from the Lenders and, upon receipt of such instructions from the Lender, the Agent shall be entitled to act or (where so instructed) refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions. Without prejudice to the generality of the foregoing, (i) the Agent shall be entitled to rely, and shall be fully protected in relying, upon any communication, instrument or document believed by it to be genuine and correct and to have been signed or sent by the proper Person or Persons, and shall be entitled to rely and shall be protected in relying on opinions and judgments of attorneys (who may be attorneys for the Loan Parties), accountants, experts and other professional advisors selected by it; and (ii) the Lenders shall not have any right of action whatsoever against the Agent as a result of the Agent acting or (where so instructed) refraining from acting hereunder or any of the other Loan Documents in accordance with the instructions of such Lender.

16.4.    **Lenders' Representations, Warranties and Acknowledgment**.

(a)    Each Lender represents and warrants that it has made its own independent investigation of the financial condition and affairs of the Loan Parties in connection with the making of any Advance hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of the Loan Parties. The Agent shall not have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of any Lender or to provide any Lender with any credit or other information with respect

-33-

thereto, whether coming into its possession before the making of any Advance or at any time or times thereafter, and the Agent shall not have any responsibility with respect to the accuracy of or the completeness of any information provided to any Lender.

(b)     Each Lender, by delivering its signature page to this Agreement and funding any Advance, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be approved by such Lender.

16.5.    **Right to Indemnity**. Each Lender agrees to indemnify the Agent, its Affiliates and their respective officers, partners, directors, trustees, employees and agents of the Agent (each, an "Indemnitee Agent Party"), to the extent that such Indemnitee Agent Party shall not have been reimbursed by any Loan Party, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against such Indemnitee Agent Party in exercising its powers, rights and remedies or performing its duties hereunder or under the other Loan Documents or otherwise in its capacity as such Indemnitee Agent Party in any way relating to or arising out of this Agreement or the other Loan Documents, IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY, OR SOLE NEGLIGENCE OF SUCH INDEMNITEE AGENT PARTY; provided, such Lender shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Indemnitee Agent Party's gross negligence or willful misconduct, as determined by a court of competent jurisdiction in a final, non-appealable order.

16.6.    **Successor Agent**.

(a)     The Agent may resign at any time by giving thirty (30) days' prior written notice thereof to the Lenders and the Loan Parties, or Required Lenders may remove the Agent at any time by giving thirty (30) days' prior written notice thereof to the Agent and the Loan Parties. Upon any such notice of resignation by the Agent or notice of removal from the Required Lenders, the Lenders shall have the right, upon ten (10) Business Days' prior written notice to the Loan Parties to appoint a successor agent reasonably satisfactory to Borrower; provided, that in no event shall any successor agent be a Person that competes, directly or indirectly, with the Borrower or any of its Subsidiaries. Upon the acceptance of any appointment as agent hereunder by a successor agent, that successor agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring agent and the retiring agent shall promptly (i) transfer to such successor agent all records and other documents necessary or appropriate in connection with the performance of the duties of the successor agent under the Loan Documents, and (ii) take such other actions as may be necessary or appropriate in connection with the assignment of the retiring agent's rights and obligations under the Loan Documents to such successor agent, whereupon such retiring agent shall be discharged from its duties and obligations under the Loan Documents. After any retiring agent's resignation hereunder as agent, the provisions of this Section 16.6 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was agent hereunder.

(b)     Notwithstanding anything herein to the contrary, the Agent may assign its rights and duties as agent hereunder to any Lender or an Affiliate of any Lender without the prior written consent of, or prior written notice to, the Loan Parties; provided that the Loan Parties may deem and treat such assigning agent as the agent for all purposes hereof, unless and until such assigning agent provides written notice to the Loan Parties of such assignment. Upon such assignment, such Lender or such Affiliate shall succeed to and become vested with all rights, powers, privileges and duties as agent hereunder and under the other Loan Documents.

[Signature pages follow.]

4856-6379-6913v.14

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

**BORROWER:**

**ICON AIRCRAFT INC.**, a Delaware corporation


By: _____
Name:  Thomas McCabe
Title:   Chief Restructuring Officer

**GUARANTORS:**


**RYCON, LLC**, a Delaware limited liability
company

By:_____
Name:  Thomas McCabe
Title:  Chief Restructuring Officer

**IC TECHNOLOGIES, INC.**, a Delaware
corporation

By:_____
Name:  Thomas McCabe
Title:    Chief Restructuring Officer

**ICON FLYING CLUB, LLC**, a Delaware
limited liability company

By:_____
Name:  Thomas McCabe
Title:    Chief Restructuring Officer

[Signature Page to Senior Secured, Super-Priority DIP Loan and Security Agreement]

**AGENT**:

**FEIREN INTERNATIONAL CO., LTD.**

By:



Name:  Ying Zheng
Title:    Managing Director

**LENDER**:

**FEIREN INTERNATIONAL CO., LTD.**

By:

Name:    Ying Zheng
Title:      Managing Director

[Signature Page to Senior Secured, Super-Priority DIP Loan and Security Agreement]

**<u>EXHIBIT A</u>**

**<u>Approved Budget</u>**

See attached.

4856-6379-6913v.14

**ICON Aircraft**
13-Week Projected Cash Flow
   5-Apr    thru    28-Jun

**13-Week Cash Forecast - DRAFT**

| week---> | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *In US$k* | Mar-24 | Mar-24 | Apr-24 | Apr-24 | Apr-24 | Apr-24 | May-24 | May-24 | May-24 | May-24 | May-24 | Jun-24 | Jun-24 | Jun-24 | Jun-24 |
| Week ending Friday | **22-Mar** | **29-Mar** | **5-Apr** | **12-Apr** | **19-Apr** | **26-Apr** | **3-May** | **10-May** | **17-May** | **24-May** | **31-May** | **7-Jun** | **14-Jun** | **21-Jun** | **28-Jun** |
| **Opening Cash Balance** | 242 | 859 | 471 | (76) | (698) | (2,070) | (2,857) | (3,942) | (4,948) | (5,773) | (6,343) | (7,548) | (8,434) | (8,641) | (8,828) |
| Payroll/Benefits:  US | 351 | 15 | 328 | 8 | 295 | 10 | 418 | 10 | 295 | 10 | 240 | 88 | - | - | - |
| Payroll/Benefits:  MX | | | - | | 110 | 110 | 110 | 110 | 110 | 110 | 110 | 110 | - | - | - |
| Consultants | 4 | 4 | 47 | 7 | 4 | 1 | 61 | 1 | 1 | 4 | 1 | 61 | - | - | - |
| Rent | (67) | - | - | 0 | 342 | | | (45) | - | - | 342 | (45) | - | - | - |
| Facilities | 1 | - | 80 | - | - | | 31 | 80 | - | - | 31 | 80 | - | - | - |
| Loans | 5 | 3 | - | 3 | - | | | 3 | - | - | - | - | - | - | - |
| Taxes | - | - | - | - | 32 | - | - | - | - | - | - | - | - | - | - |
| IT | - | 0 | 21 | 63 | 68 | 36 | 37 | - | - | - | 37 | 2 | - | - | - |
| Legal fees | - | - | - | - | - | | | - | - | - | - | - | - | - | - |
| Professional Fees - Restructuring | 400 | 342 | 372 | 497 | 372 | 402 | 295 | 420 | 295 | 325 | 295 | 466 | 186 | 186 | 186 |
| Unsecured Creditor Committee | - | - | - | - | 52 | 52 | 52 | 52 | 52 | 52 | 52 | 46 | 46 | 26 | 26 |
| Insurance expenses | - | 24 | 40 | - | - | 105 | 10 | 280 | - | - | - | 10 | - | - | - |
| Other professional expenses | - | 104 | 5 | 5 | 34 | 6 | 9 | 30 | 9 | 6 | 34 | 5 | - | - | - |
| Credit Cards/Travel | 13 | 10 | 14 | 15 | 14 | 15 | 14 | 16 | 13 | 14 | 14 | 15 | - | - | - |
| Vendor/Employee/Other Obligations | 204 | 318 | 56 | 50 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | - | - | - |
| **Total Obligations** | 909 | 820 | 962 | 647 | 1,397 | 812 | 1,110 | 1,032 | 850 | 595 | 1,229 | 911 | 232 | 212 | 212 |
| (Airplane Revenue) | - | - | (390) | - | - | | | | | | | | | | |
| (Other revenue) | (27) | (22) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) |
| (Funding) | (1,500) | (410) | - | - | - | | | | | | | | | | |
| **Cash Balance** | 859 | 471 | (76) | (698) | (2,070) | (2,857) | (3,942) | (4,948) | (5,773) | (6,343) | (7,548) | (8,434) | (8,641) | (8,828) | (9,015) |
| **Airplane Sales (in units)** | - | - | 1 | - | - | - | - | - | - | - | - | - | - | - | - |

<--- Input #

**EXHIBIT B**

**Reporting Requirements**

(a)    **Financial Reports**. Borrower shall furnish to the Agent, which, subject to the following sentence, shall be in a form reasonably satisfactory to the Agent, as soon as available and in any event within twenty-one (21) days after the end of each calendar month:

    (i)    unaudited consolidated financial statements for such calendar month, as applicable, of the Borrower consisting of a balance sheet, and related statements of income and cash flows, all of which shall be certified on behalf of the Borrower by an Authorized Person as being in compliance with this paragraph (a);

    (ii)    an operating report for Borrower, including a detailed comparison of the actual year-to-date operating results against the Approved Budget; and

    (iii)    solely with respect to the last month of each fiscal quarter, a management report signed by an Authorized Person of Borrower, describing in reasonable detail the Borrower's operations and financial condition for such month.

The reports required under sub-sections (a)(i) and (a)(iii) above may consist of the monthly operating reports as filed in the Chapter 11 Case.

All financial statements shall be prepared, and shall be complete, correct and fairly presenting in all material respects, in each case in accordance with GAAP, consistently applied, the financial position and results of operations of the Borrower on a consolidated basis, in each case, subject to the absence of footnote disclosure and may be subject to normal year-end adjustments.

(b)    **Other Materials**. The Loan Parties shall promptly furnish to the Agent, in form and substance reasonably satisfactory to the Agent, such additional information, documents, statements, and other materials as the Agent may reasonably request from time to time and which is reasonably capable of being obtained, produced or generated by such Loan Party; provided that in no event shall the Loan Parties be required to provide any information, documents, statements, and other materials (x) that constitutes non-financial trade secrets or non-financial proprietary information, (y) in respect of which disclosure to the Agent or any Lender (or its attorneys, accountants and representatives) is prohibited by applicable requirement of law or any binding agreement with any third party or (z) that is subject to attorney-client or other privilege or that consists of attorney work product.

(c)    **Notices**. Borrower or the Loan Parties shall promptly notify the Agent in writing of:

    (i)    any action, suit, proceeding or investigation involving a Loan Party or Subsidiary thereof, or any such Person's property, that is pending or threatened in writing, to the extent such action, suit, proceeding or investigation would reasonably be expected to have a Material Adverse Change; or

    (ii)    (A) the receipt of any written notice or request from any Governmental Authority regarding any liability or claim or (B) any material action taken or threatened in writing to be taken by any Governmental Authority (or any written notice of any of the foregoing), in each case, that would reasonably be expected to have a Material Adverse Change.

(d)    **Material Adverse Change**. Promptly upon an Authorized Person of any Loan Party obtaining knowledge of any development or event pertaining to such Loan Party that has caused, or which would reasonably be expected to cause, a Material Adverse Change with respect to which notice is not otherwise required to be given pursuant to this <u>Exhibit B</u>, a certificate signed by an Authorized Person of Borrower or the relevant Loan Party setting forth the details of such development or event and stating what action the relevant Loan Party has taken or proposes to take with respect thereto; provided that in no event shall the Loan Parties be

subject to provide any detail or action-related decision that is subject to attorney-client or other privilege or that consists of attorney work product.

## EXHIBIT C

**Request for Advance**

FeiRen International Co., Ltd., as Agent
12/F, Henley Building
5 Queen's Road Central, Central, Hong Kong, China
Attention: Zheng Ying

Ladies and Gentlemen:

The undersigned, as Borrower, executes and delivers this Request for Advance (this "Request") in connection with the Senior Secured, Super-Priority Debtor-In-Possession Loan and Security Agreement, dated as of April 4, 2024 (as amended, restated, supplemented, replaced, renewed or otherwise modified from time to time, the "Loan Agreement") by and among ICON Aircraft Inc., a Delaware corporation ("Borrower"), the guarantors party thereto, the Lenders (as defined below) and FeiRen International Co., Ltd., as agent (in such capacity, "Agent") for itself and the other financial institutions from time to time a party thereto as lenders (collectively, "Lenders"). Capitalized terms used in this Request without definition shall have the same meanings herein as they have in the Loan Agreement.

Pursuant to Section 2.2 of the Loan Agreement, Borrower hereby requests an Advance in the amount of _____ Million Dollars ($ _____) to be made on _____, 2024.

[Signature Page Follows]

Exhibit C-1

**BORROWER:**

**ICON AIRCRAFT INC.,** a
Delaware corporation

By: _____
Name: _____
Title: _____

4856-6379-6913v.14

### EXHIBIT D

### GUARANTOR JOINDER AGREEMENT

THIS GUARANTOR JOINDER AGREEMENT (this "Agreement"), dated as of [ ], is entered into between [ ], a [ ] (the "New Subsidiary") and FeiRen International Co., Ltd., as agent (in such capacity, "Agent") under that certain Senior Secured, Super-Priority Debtor-In-Possession Loan and Security Agreement, dated as of April 4, 2024 (as amended, restated, supplemented, replaced, renewed or otherwise modified from time to time, the "Loan Agreement") by and among ICON Aircraft Inc., a Delaware corporation ("Borrower"), the guarantors party thereto, the Lenders (as defined below) the Agent, for itself and the other financial institutions from time to time a party thereto as lenders (collectively, "Lenders"). Capitalized terms used in this Agreement without definition shall have the same meanings herein as they have in the Loan Agreement. This Agreement constitutes a Loan Document.

The New Subsidiary and the Agent, for the benefit of the Lenders, hereby agree as follows:

1.      The New Subsidiary hereby acknowledges, agrees and confirms that, by its execution of this Agreement, the New Subsidiary will be deemed to be a Loan Party under the Loan Agreement and a "Guarantor" for all purposes of the Loan Agreement and shall have all of the obligations of a Loan Party and a thereunder as if it had executed the Loan Agreement.

2.      The New Subsidiary hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Loan Agreement, including without limitation (a) all of the representations and warranties of the Loan Parties set forth in Article 4 of the Loan Agreement, (b) all of the covenants set forth in Articles 5 and 6 of the Loan Agreement and (c) all of the guaranty obligations set forth in Article 7 of the Loan Agreement.

3.      Without limiting the generality of the foregoing terms of this paragraph 1, the New Subsidiary, subject to the limitations set forth in Article 7 of the Loan Agreement, hereby guarantees, jointly and severally with the other Guarantors, to the Agent and the Lenders, as provided in Article 7 of the Loan Agreement, the prompt payment and performance of the Obligations in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration or otherwise) strictly in accordance with the terms thereof and agrees that if any of the Obligations are not paid or performed in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration or otherwise), the New Subsidiary will, jointly and severally together with the other Guarantors, promptly pay and perform the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Obligations, the same will be promptly paid in full when due (whether at extended maturity, as a mandatory prepayment, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

4.      The New Subsidiary hereby waives acceptance by the Agent and the Lenders of the guaranty by the New Subsidiary upon the execution of this Agreement by the New Subsidiary.

5.      This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall constitute one and the same Agreement. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

6.      THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

**IN WITNESS WHEREOF**, the New Subsidiary has caused this Agreement to be duly executed by its authorized officer, and the Agent, for the benefit of the Lenders, has caused the same to be accepted by its authorized officer, as of the day and year first above written.

[NEW SUBSIDIARY]

By: _____

    Name: _____

    Title: _____

Acknowledged and accepted:

FeiRen International Co., Ltd., as Agent

By: _____

    Name: _____

    Title: _____

Exhibit D-1

## EXHIBIT E

## CASE MILESTONES

1.      Not later than ninety (90) days after the Petition Date, the Bankruptcy Court shall have entered the Sale Order.

2.      Not later than one hundred fifty (150) days after the Petition Date, the Bankruptcy Court shall have entered an order to approve the disclosure statement for an Acceptable Plan.

3.      Not later than one hundred eighty (180) days after the Petition Date, the Bankruptcy Court shall have entered an order to approve an Acceptable Plan.

4856-6379-6913v.14

## Schedule A-1

### PAYMENT ACCOUNT

The bank account designated by Agent to Borrower in writing from time to time.

## Schedule A-2

### AUTHORIZED PERSONS

| Name | Title |
|------|-------|
| Jerry Meyer | Chief Executive Officer |
| Jason Huang | President |
| Simi Gupta | Controller |
| Thomas McCabe | Chief Restructuring Officer |

## Schedule D-1

### DESIGNATED ACCOUNT AND DESIGNATED ACCOUNT BANK

| Account Holder | Designated Account Bank | Account Number |
|---|---|---|
| ICON Aircraft, Inc. | Wells Fargo | 4124007964 |

## Schedule 2.1

### LENDER COMMITMENTS

| Lender | Commitment |
|---|---|
| FeiRen International Co., Ltd. | $9,000,000.00 |

## Schedule 4.1

### ORGANIZATIONAL CHART

| Entity Name | Purpose | Fed Tax ID # | Incorporation date | Ownership |
|---|---|---|---|---|
| ICON Aircraft, Inc. | Parent Company | 20-5147443 | 6/30/2006 | |
| Rycon, LLC | A holding entity for watercraft/vehicles | 47-5365297 | 10/12/2015 | 100% owned by ICON Aircraft, Inc. |
| IC Technologies Inc. | Composite Production for Mexico | 37-1747918 | 12/31/2013 | 100% owned by ICON Aircraft, Inc. |
| ICON Flying Club, LLC | ICON Flying Club | 30-1146101 | 10/27/2016 | 100% owned by ICON Aircraft, Inc. |

## Schedule 4.5

### LOAN PARTY INFORMATION

General Information

| Legal Name | Jurisdiction of Incorporation or Formation, (as applicable) | Type of Entity | Tax ID Number | Organizational ID Number |
|---|---|---|---|---|
| ICON Aircraft, Inc. | Delaware | For profit | 20-5147443 | 4155135 |
| Rycon, LLC | Delaware | For profit | 47-5365297 | 5848324 |
| IC Technologies Inc. | Delaware | For profit | 37-1747918 | 5458081 |
| ICON Flying Club, LLC | Delaware | For profit | 30-1146101 | 6194285 |

Chief Executive Office

| Loan Party | Chief Executive Office |
|---|---|
| ICON Aircraft, Inc. | 2141 ICON Way Vacaville, CA 95688 |
| Rycon, LLC | 2141 ICON Way Vacaville, CA 95688 |
| IC Technologies Inc. | 2141 ICON Way Vacaville, CA 95688 |
| ICON Flying Club, LLC | 2141 ICON Way Vacaville, CA 95688 |

Commercial Tort Claims:

None.

## Schedule 4.6

### LITIGATION

1. Asset Management Company Venture Fund, L.P., et al. v. Shanghai Pudong Science and Technology Investment Co. Ltd., et al., C.A. No. 2021-0475-JTL (Del. Ct. Chancery).
2. Hawkins v. Icon Aircraft, Inc., et al., Case No. 20STCV24193 (pending in Los Angeles, California, Superior Court).

## Schedule 6.1

### EXISTING INDEBTEDNESS

1. Notes owing to East West Bank in a principal amount of $65,000,000.00.
2. Convertible notes owing Pudong Science and Technologies Investment in an aggregate principal amount of $93,000,000.00.
3. Convertible notes owing to FEIREN International Co., Limited in an aggregate principal amount of $10,000,000.00.
4. Convertible notes owing to Unimax Asset Holdings Ltd. in an aggregate principal amount of $2,400,000.00.
5. Advances booked to customer deposits owing to FEIREN International Co., Limited in an aggregate principal amount of $8,500,000.00.
6. Vehicle financing in respect of two (2) Chevrolet Tahoes owing to GM Financial in an amount of $14,728.03.
7. Indebtedness in respect of the Liens disclosed on Schedule 6.2.

## Schedule 6.2

### EXISTING LIENS

| Debtor | Secured Party | Filing Number | Filing Type | Jurisdiction | Collateral | Amount |
|---|---|---|---|---|---|---|
| ICON Aircraft, Inc. | CIT Bank, N.A. | 2018 1039821 | UCC-1 | Delaware Secretary of State | Fortus 450mc 3D Printer | $0 |
| | | 2023 1096253 | UCC-3 (Continuation) | Delaware Secretary of State | | |
| ICON Aircraft | G.A.R. Plumbing Partners INC | 201600025877 | Mechanics Lien | Official Records, Solano County, CA | Labor and material related to heating/chilling piping | $66,436.33 |
| ICON Aircraft Manufacturing | G.A.R. Plumbing Partners INC | 201600011339 | Mechanics Lien | Official Records, Solano County, CA | Labor and material related to heating/chilling piping | $112,020.97 |

## Schedule 9.4

### COLLATERAL LOCATIONS

1.  2141 ICON Way Vacaville, CA 95688

**Exhibit 2**

**Initial DIP Budget**

**ICON Aircraft**
13-Week Projected Cash Flow                                **13-Week Cash Forecast**
   5-Apr   thru   28-Jun

| week---> | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *In US$k* | Mar-24 | Mar-24 | Apr-24 | Apr-24 | Apr-24 | Apr-24 | May-24 | May-24 | May-24 | May-24 | May-24 | Jun-24 | Jun-24 | Jun-24 | Jun-24 |
| Week ending Friday | **22-Mar** | **29-Mar** | **5-Apr** | **12-Apr** | **19-Apr** | **26-Apr** | **3-May** | **10-May** | **17-May** | **24-May** | **31-May** | **7-Jun** | **14-Jun** | **21-Jun** | **28-Jun** |
| **Opening Cash Balance** | **242** | **859** | **471** | **(76)** | **(698)** | **(2,070)** | **(2,857)** | **(3,942)** | **(4,948)** | **(5,773)** | **(6,343)** | **(7,548)** | **(8,434)** | **(8,641)** | **(8,828)** |
| Payroll/Benefits:  US | 351 | 15 | 328 | 8 | 295 | 10 | 418 | 10 | 295 | 10 | 240 | 88 | - | - | - |
| Payroll/Benefits:  MX | - | - | - | - | 110 | 110 | 110 | 110 | 110 | 110 | 110 | 110 | - | - | - |
| Consultants | 4 | 4 | 47 | 7 | 4 | 1 | 61 | 1 | 1 | 4 | 1 | 61 | - | - | - |
| Rent | (67) | - | - | 0 | 342 | - | (45) | - | - | - | 342 | (45) | - | - | - |
| Facilities | 1 | - | 80 | - | - | - | 31 | 80 | - | - | 31 | 80 | - | - | - |
| Loans | 5 | 3 | - | 3 | - | - | - | 3 | - | - | - | - | - | - | - |
| Taxes | - | - | - | - | 32 | - | - | - | - | - | - | - | - | - | - |
| IT | - | 0 | 21 | 63 | 68 | 36 | 37 | - | - | - | 37 | 2 | - | - | - |
| Legal fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fees - Restructuring | 400 | 342 | 372 | 497 | 372 | 402 | 295 | 420 | 295 | 325 | 295 | 466 | 186 | 186 | 186 |
| Unsecured Creditor Committee | - | - | - | - | 52 | 52 | 52 | 52 | 52 | 52 | 52 | 46 | 46 | 26 | 26 |
| Insurance expenses | - | 24 | 40 | - | - | 105 | 10 | 280 | - | - | - | 10 | - | - | - |
| Other professional expenses | - | 104 | 5 | 5 | 34 | 6 | 9 | 30 | 9 | 6 | 34 | 5 | - | - | - |
| Credit Cards/Travel | 13 | 10 | 14 | 15 | 14 | 15 | 14 | 16 | 13 | 14 | 14 | 15 | - | - | - |
| Vendor/Employee/Other Obligations | 204 | 318 | 56 | 50 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | - | - | - |
| **Total Obligations** | **909** | **820** | **962** | **647** | **1,397** | **812** | **1,110** | **1,032** | **850** | **595** | **1,229** | **911** | **232** | **212** | **212** |
| (Airplane Revenue) | - | - | (390) | - | - | - | - | - | - | - | - | - | - | - | - |
| (Other revenue) | (27) | (22) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) |
| (Funding) | (1,500) | (410) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Cash Balance** | **859** | **471** | **(76)** | **(698)** | **(2,070)** | **(2,857)** | **(3,942)** | **(4,948)** | **(5,773)** | **(6,343)** | **(7,548)** | **(8,434)** | **(8,641)** | **(8,828)** | **(9,015)** |
| **Airplane Sales (in units)** | - | - | 1 | - | - | - | - | - | - | - | - | - | - | - | - | <--- Input # |