**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| ICON AIRCRAFT, INC., *et al.*, | Case No. 24-10703 (CTG) |
| Debtors.[1] | (Jointly Administered) |
| | Related Docket No.: 101 |
| | Hearing Date: May 21, 2024 @ 3:00 p.m. ET |
| | Obj, Deadline: May 13, 2024 @ 4:00 p.m. ET (May 15, 2024 @ 4:00 p.m. for UST) |

**UNITED STATES TRUSTEE'S OBJECTION TO THE DEBTORS' NOTICE OF
<u>STALKING HORSE SUPPLEMENT</u>**

Andrew R. Vara, the United States Trustee for Region Three (the "<u>U.S. Trustee</u>"), through his undersigned counsel, hereby objects (this "<u>Objection</u>") to the *Debtors' Notice of Filing Stalking Horse Supplement* [D.I. 101] (the "<u>Notice</u>"), and in support of this Objection respectfully states:

**<u>PRELIMINARY STATEMENT</u>**

1. Pursuant to the Bid Procedures Order [D.I. 168], the Debtors were authorized to enter into an asset purchase agreement, and, subject to final Court approval, designate a Stalking Horse Bidder[2], with an objection deadline of May 13, 2024.

2. On May 1, 2024, the Debtors filed the Notice and proposed Stalking Horse Asset Purchase Agreement (the "<u>APA</u>"), naming SG Investments America, Inc. as the proposed Purchaser (the "<u>Affiliate Purchaser</u>"). SG Investments America is a newly formed subsidiary of Dürkopp Adler GmbH, an entity that is an affiliate of the Debtors and the DIP Lender. Not. at 1-

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: ICON Aircraft, Inc. (7443); Rycon LLC (5297); IC Technologies Inc. (7918); and ICON Flying Club, LLC (6101). The Debtors' service address is 2141 ICON Way, Vacaville, CA 95688.

[2] Unless otherwise stated, capitalized terms will have the meaning set forth in the Notice.

2. Whether the Affiliate Purchaser is technically an insider as contemplated by § 101(31)(B) remains unclear, and the Debtors have apparently not taken a position as to whether the Affiliate Purchaser is an insider[3], but the pattern of the actions and relationships in these cases, including the funding of the DIP Lender's DIP Obligations by the Affiliate Purchaser indicate that the Affiliate Purchaser's bid should be considered an insider bid.

3.  The U.S. Trustee objects to those portions of the Notice that propose to protect Affiliate Purchaser's bid with (i) a Break-Up Fee of $390,000.00 and (ii) an Expense Reimbursement of up to $130,000.00. When the bid protections are added to the $250,000.00 minimum overbid, other interested bidders will have to bid at least $770,000.00 over Affiliate Purchaser's bid of $13 million plus assumed liabilities in order for their bid to be considered.

4.  Bid protections are intended to provide an incentive for a party to expend the time and resources performing due diligence necessary to make a stalking horse bid. Here, Affiliate Purchaser did not need any additional incentive to place a bid. Affiliates of the Affiliate Purchaser own the majority of the Debtors' equity, are the largest unsecured creditors and provided the Debtors' debtor in possession financing (the "DIP Loan") (which includes payment of legal expenses) and manage the operations of the DIP Lender, obviating the need for additional due diligence.

5.  Further, Section 4.4(c) of the APA proposes that the Bid Protections are paid to the Affiliate Purchaser in the event of a breach or default of the Seller, improperly using Bid Protections as liquidated damages.

---

[3] Debtors' counsel stated at the May 8, 2024 hearing [14:20-14:45] that, although they acknowledge the affiliations, counsel did not believe the Debtors have taken a position as to whether the Affiliate Purchaser is an insider.

**JURISDICTION, VENUE AND STANDING**

6. This Court has jurisdiction to hear and determine this Objection pursuant to: (i) 28 U.S.C. § 1334; (ii) applicable order(s) of the United States District Court of the District of Delaware issued pursuant to 28 U.S.C. § 157(a); and (iii) 28 U.S.C. § 157(b)(2).

7. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1408 and 1409.

8. Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of chapter 11 cases filed in this judicial district. The duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the Courts. *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

9. The U.S. Trustee has standing to be heard on this Objection pursuant to 11 U.S.C. § 307. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest).

**BACKGROUND**

**A.     The Chapter 11 Cases**

10. On April 4, 2024 (the "Petition Date"), ICON Aircraft, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (this "Court"), thereby commencing the above-captioned jointly administered chapter 11 cases (collectively, the "Chapter 11 Cases").

11. The Debtors continue to manage and operate their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

12. As of the date hereof, no trustee or examiner has been requested and no committee has been appointed in the Chapter 11 Cases.

**B.     The Bidding Procedures Order**

13. Paragraph 5 of the Bidding Procedures Order allows for the selection of a stalking horse bidder, subject to Court approval:

> The Debtors are authorized, but not directed, in the exercise of their reasonable business judgment and in consultation with the Consultation Parties, to (a) designate SG Investment America, Inc. as the Stalking Horse Bidder, (b) enter into the Stalking Horse APA in accordance with the Bidding Procedures, and (c) agree to any breakup fee and/or expense reimbursement (the "Bid Protections") subject to further Court approval, in each case in accordance with the Bidding Procedures.

D.I. 168. ¶ 5.

14. Paragraph 6 of the Bidding Procedures Order sets forth the deadline for Debtors to designate a Stalking Horse Bidder:

> The Debtors filed notice of the terms of the stalking horse bid [Docket No. 101] (the "Stalking Horse Bid"). Objections to the designation of a Stalking Horse Bidder or any of the terms of a Stalking Horse Bid (the "Stalking Horse Objection") shall (a) be in writing, (b) comply with the Bankruptcy Code, Bankruptcy Rules, and Local Rules, (c) state, with specificity, the legal and factual bases thereof, and (d) be filed with this Court and served on the Debtors and the Stalking Horse Notice Parties no later than May 13, 2024 at 4:00 p.m. (prevailing Eastern Time) (the "Stalking Horse Objection Deadline").

*Id.* at ¶ 6.

15. The Debtors identify the Affiliate Purchaser as follows:

> The Purchaser is a newly formed subsidiary of Dürkopp Adler GmbH ("DA"), whose parent entity is ShangGong Group Co. Ltd. ("ShangGong"). PK Investment Co., Ltd. and PK Capital L.P. (collectively with their respective affiliates, "PDSTI") are the largest stockholders of Debtor ICON Aircraft, Inc. and hold 51% of equity in in Shanghai Puke Flyingman Investment Co. Ltd., which holds 8.41% of equity in ShangGong. ShangGong also indirectly holds a minority equity stake in Feiren International Co., Ltd. (the "DIP Lender"), which has provided funding to the Debtors under that certain Senior Secured, Superpriority Debtor-in-Possession Loan and Security Agreement (the "DIP Credit Agreement"). The DIP Lender has indicated some or all of the funds necessary for the remaining draws

under the DIP Credit Agreement may be provided by the Purchaser or one of its affiliates.

Not. at 1-2.

16. The Purchase Price is set forth in Section 3.1(a) of the APA:

> In consideration of the sale of the Purchased Assets to Purchaser, upon the terms and subject to the conditions set forth in this Agreement, the purchase price for the Purchased Assets shall be (i) Thirteen Million Dollars ($13,000,000) in cash plus (ii) the assumption of the Assumed Liabilities by Purchaser, subject to adjustment in accordance with Sections 2.5(b), 10.1(c) and/or 12.1 of this Agreement (the "Purchase Price").

APA § 3.1(a).

17. Section 4.4 of the APA sets forth the criteria for termination of the APA. Section 4.4(c) contains the following rights of the Affiliate Purchaser to terminate the APA:

> by Purchaser, if there shall be a breach by the Sellers of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Sections 10.1 or 10.3 and which breach cannot be cured or has not been cured by the earlier of (i) ten (10) Business Days after the giving of written notice by Purchaser to the Sellers of such breach and (ii) one (1) Business Day prior to the Termination Date; provided, however, that if Purchaser shall have committed a breach of any of representations, warranties, covenants or agreements contained in this Agreement to an extent which would give the Sellers the right not to close pursuant to Article X, then it may not terminate this Agreement pursuant to this Section 4.4(c);

*Id.* at 4.4(c).

18. Section 4.7 of the APA discusses the consequences of termination of the APA and sets forth the Breakup Fee and reimbursement of legal expenses (the "Expense Reimbursement"):

> Forfeiture of Purchaser Deposit; Breakup Fee. If the Sellers terminate this Agreement pursuant to Section 4.4(d) or Section 4.4(f), then the Sellers shall have the right to retain the Purchaser Deposit and Purchaser shall promptly execute any and all documentation required to release the Purchaser Deposit to the Sellers, it is being agreed by the Parties that the forfeiture of the Purchaser Deposit shall be the sole and exclusive remedy of the Sellers for any damages based upon, arising out of or otherwise in respect of the matters set forth in this Agreement (including representations, warranties, covenants and agreements) and the transactions contemplated hereby, whether based in contract or tort. In the event of any termination of this Agreement other than pursuant to Section 4.4(d) or Section

      4.4(f), the Sellers shall return the full amount of the Purchaser Deposit to an account designated in writing by Purchaser; provided, further, **if any such termination is by Purchaser pursuant to Section 4.4(c) or Section 4.4(g), the Sellers shall, in addition to the return of the full amount of the Purchaser Deposit, (i) pay to Purchaser a break-up fee (the "Breakup Fee") in the amount of three percent (3%) of the cash portion of the Purchase Price; and (ii) reimburse the Purchaser for the reasonable and documented out-of-court fees and expenses incurred by the Purchaser or its assignee prior to termination of the Agreement in connection with the Agreement, the sale, the sale motion, the sale procedures order, the sale order and the transactions contemplated herein and hereby, including reasonable and documented fees and expenses of legal counsel, financial advisors, consultants, and any other advisors that Purchaser engages in its reasonable discretion, provide that the aggregate amount of the reimbursement pursuant to this proviso shall not exceed one percent (1%) of the Purchase Price.** Notwithstanding anything to the contrary contained herein, (a) under no circumstances shall either Party be liable for any indirect, consequential, special, punitive, and exemplary damages, lost profits, and loss in value based on multiple of earnings of the other Parties, in each case except to the extent any such damages are payable to a third party, (b) the aggregate Liability of Purchaser based upon, arising out of or otherwise in respect of the matters set forth in this Agreement (including representations, warranties, covenants and agreements) and the transactions contemplated hereby, whether based in contract or tort, shall not exceed the then remaining amount of the Purchaser Deposit and the Purchaser Deposit shall be the sole and exclusive remedy and source for any indemnification available to Sellers under this Agreement.

*Id.* at § 4.7 (emphasis added).

## ARGUMENT

***Proposed Stalking Horse Purchaser Should be Considered an Insider***

      19.    According to the Notice, the controlling equity holder of the Debtors (PDSTI) owns 51% of the equity in Shanghai Puke Flyingman Investment Co. Ltd, which holds 8.41% of ShangGong Group Co. Ltd., ("ShangGong") the parent entity of the Proposed Stalking Horse Bidder, SG Investment America, Inc. Not. at 1-2.

20. ShangGong also holds "a minority equity stake" in the DIP Lender, Feiren International Co., Ltd. *Id.*[4] The Affiliate Purchaser may also be funding the remaining DIP loan draws. *Id.*

21. Paragraph 16 of the Final DIP Order preserves the right of the DIP Lender to credit bid the DIP Obligations. [D.I. 168 ¶ 16].

22. Bankruptcy Code § 101(31)(B) defines an insider to a corporation as (i) a director of the debtor; (ii) an officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; or (v) relative of a general partner, director, officer, or person in control of the debtor. 11 U.S.C. § 101(31)(B).

23. Even if not a statutory insider by statute, the extent of the interrelationships that *have* been disclosed between the Debtors, DIP Lender, and proposed Affiliate Purchaser leads one to the conclusion that the Stalking Horse should be considered a non-statutory insider.[5] *See Schubert v. Lucent Techs., Inc. (In re Winstar Comm'ns, Inc.)*, 554 F.3d 382, 395-97 (3d Cir. 2009) (discussing statutory and non-statutory insiders).

***Break-up Fees and Expense Reimbursement not Permitted Under Applicable Law***

24. Break-up fees must be sought and analyzed under Section 503(b). *See Reliant Energy Channelview LP*, 594 F.3d 200, 206 (3d Cir. 2010) ("[A] bidder must seek a break-up fee under 11 U.S.C. § 503(b)[.]") (citing *In re O'Brien Envt'l Energy, Inc.*, 181 F.3d 527 (3d Cir. 1999)).

---

[4] In addition, the DIP Lender also owns what appears to be key intellectual property that it licenses to the Debtors. In addition, an affiliate of the Debtors' majority equity holder (PDSTI) manages "all assets, business, and daily operations of the DIP Lender Parent. [D.I. 13, ¶ 21; D.I. 2, ¶ 50]. PDSTI or its affiliates also hold the vast majority of the Debtors' unsecured debt. See D.I. 2.

[5] Indeed, at the First Day Hearing, Debtors' counsel referred to the proposed Affiliate Purchaser as an insider at 21:10 of the hearing.

25. The analysis of break-up fees under Section 503(b) "must be made in reference to general administrative expense jurisprudence. In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *O'Brien*, 181 F.3d at 535 (emphasis added). "[T]ermination fees are subject to the same general standard used for all administrative expenses under 11 U.S.C. § 503[.]" *In re Energy Future Holdings Corp.*, 904 F.3d 298, 313 (3d Cir. 2018).

26. Break-up fees are ordinarily predicated on a stalking horse attracting other bidders to an auction or enhancing the value of the estate in some other way. But that does not satisfy Third Circuit precedent: the requesting party must show that a break-up fee is "actually necessary" to preserve the value of the estate. *O'Brien*, 181 F.3d at 535. There is no certainty that a break-up fee will be actually necessary. For example, a secured creditor may not need an inducement to credit bid for its collateral. Even if a break-up fee would benefit the estate, the Court must still determine "whether the proposed fee's potential benefits to the estate outweigh any potential harms, such that the fee is actually necessary to preserve the value of the estate." *Id.* at 314 (citing *O'Brien*, 181 F.3d at 535) (quotation marks omitted).

27. That is the situation presented here. Since affiliates of the Affiliate Purchaser own more than 50% of the Debtors' equity, provided the DIP Loan, and are the largest unsecured creditor, Affiliate Purchaser would almost certainly would have made a bid whether or not the Breakup Fee or Expense Reimbursement was offered because, regardless of the outcome of the auction, Affiliate Purchaser will benefit. Affiliate Purchaser will be the winning bidder or, if it is outbid, the additional proceeds of the sale will be used to pay down their pre-petition claims and DIP financing claims. Affiliate Purchaser did not need any additional incentive to make the

stalking horse bid. Further, affiliates of the Affiliate Purchaser are intimately involved in the Debtors' business, obviating the need for extensive additional due diligence. As such, the Breakup Fee and Expense Reimbursement are not "actually necessary to preserve the value of the estate," as required under *O'Brien*.

28. The proposed Breakup Fee and Expense Reimbursement are not truly bid protections, but rather blocking devices to make it more costly for other bidders to propose a qualified bid. Approving a Breakup Fee and Expense Reimbursement of $520,000.00 to be paid by any winning bidder other than the Affiliate Purchaser will chill the bidding process, making such cost impermissible under the *O'Brien* standard.

29. While the Expense Reimbursement should not be approved for the reasons stated above, if the Court disagrees and approves such relief, all expenses to be reimbursed should be documented, with such documentation provided to the Debtors, the Committee (if any), and the U.S. Trustee for a 10-day review period to object, prior to being paid.

30. In addition, it is hard to see how at this juncture the Court could determine that payment of the Bid Protections resulting from a failure of Debtors to satisfy one of the myriad closing conditions listed in Sections 10.1 and 10.3 of the APA, including the representations and warranties of the Debtors, an adverse order by a governmental body or if Debtors are required to terminate the agreement to discharge their fiduciary duties would meet the appropriate standard. Without knowing the specific circumstances, payment of the Bid Protections cannot be demonstrated to be "actually necessary to preserve the value of the estate," as required under *O'Brien.*

31. If the Affiliate Purchaser wants payment of the Bid Protections under such circumstances, they must come back to the Court and make the case that, under the particular

circumstances, the payment of Bid Protections would meet the *O'Brien* standard. Other than as a result of the Debtors accepting a higher and better offer for its assets that closes, payment of the Bid Protections are not truly bid protections, but function as liquidated damages for breach of the APA.

**WHEREFORE**, the U.S. Trustee respectfully requests that the Court enter an order: (i) denying approval of the Stalking Horse Supplement, and (ii) granting such other and further relief as the Court deems just and equitable.

Dated: May 15, 2024

Respectfully submitted,

**ANDREW R. VARA**
**UNITED STATES TRUSTEE**
**REGIONS 3 AND 9**

By: */s/ Joseph F. Cudia*
Joseph F. Cudia
Malcolm M. Bates
Trial Attorneys
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 N. King Street, Room 2207, Lockbox 35
Wilmington, DE 19801
Telephone: (302) 573-6491
Email:   Joseph.Cudia@usdoj.gov
         Malcolm.M.Bates@usdoj.gov