## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| ICON AIRCRAFT, INC., *et al.*,[1] | Case No. 24-10703 (CTG) |
| Debtors. | (Jointly Administered) |
|  | **Ref. Docket Nos. 83, 101, 191, 203, 204, 207 & 208** |

## CERTIFICATION OF COUNSEL REGARDING REVISED
## PROPOSED ORDER APPROVING DESIGNATION OF
## STALKING HORSE AND GRANTING RELATED RELIEF

On April 17, 2024, the above-captioned debtors and debtors in possession (collectively, the

"Debtors") filed the *Debtors' Motion for Entry of (I) an Order (A) Approving Certain Bidding*

*Procedures and the Form and Manner of Notice Thereof, (B) Scheduling an Auction and a Hearing*

*on the Approval of the Sale of All or Substantially All of the Debtors' Assets, (C) Establishing*

*Certain Assumption and Assignment Procedures and Approving the Manner of Notice Thereof,*

*and (D) Granting Related Relief; and (II) an Order (A) Authorizing and Approving the Debtors'*

*Entry into an Asset Purchase Agreement, (B) Authorizing the Sale of All or Substantially All of the*

*Debtors' Assets Free and Clear of All Encumbrances, (C) Approving the Assumption and*

*Assignment of the Assumed Contracts, and (D) Granting Related Relief* [Docket No. 83] with the

United States Bankruptcy Court for the District of Delaware (the "Court").

On May 1, 2024, the Debtors filed their *Notice of Filing of Stalking Horse Supplement*

[Docket No. 101] (the "Stalking Horse Supplement").  The deadline to file objections to the

---

[1]    The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: ICON Aircraft, Inc. (7443); Rycon LLC (5297); IC Technologies Inc. (7918); and ICON Flying Club, LLC (6101).  The Debtors' service address is 2141 ICON Way, Vacaville, CA 95688.

designation of a Stalking Horse Bidder or any of the terms of the Stalking Horse Bid was established as May 13, 2024 at 4:00 p.m. (ET), which was extended to May 15, 2024 for the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") and the Derivative Litigation Plaintiffs.[2]

On May 10, 2024, the Court entered the *Order (A) Approving Certain Bidding Procedures and the Form and Manner of Notice Thereof, (B) Scheduling an Auction and a Hearing on the Approval of the Sale of All or Substantially All of the Debtors' Assets, (C) Establishing Certain Assumption and Assignment Procedures and Approving the Manner of Notice Thereof, and (D) Granting Related Relief* [Docket No. 191] (the "Bidding Procedures Order").[3]

On May 15, 2024, the U.S. Trustee filed an objection to the Stalking Horse Supplement [Docket No. 203], and the Derivative Litigation Plaintiffs filed a reservation of rights to the Stalking Horse Supplement [Docket No. 204] (together, the "Responses").

On May 17, 2024, the Debtors filed their *Notice of (I) Hearing on Designation of Stalking Horse Bidder and (II) Filing of Proposed Stalking Horse Approval Order* [Docket No. 207] (the "Notice") and *Notice of Filing of Revised Stalking Horse APA* [Docket No. 208] (the "Revised Stalking Horse APA").  Attached as **Exhibit 1** to the Notice was a copy of the proposed order approving the designation of the Stalking Horse Bidder and the Revised Stalking Horse APA (the "Proposed Order").

Following discussions with the U.S. Trustee and the Derivative Litigation Plaintiffs, the parties have resolved the Responses through the Revised Stalking Horse APA and revisions to the

---

[2]    As used herein, the term "Derivative Litigation Plaintiffs" has the meaning set forth in the *Verified Statement of Paul, Weiss, Rifkind, Wharton & Garrison LLP and Landis Rath & Cobb LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019* [Docket No. 111].

[3]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Order or the Stalking Horse Supplement, as applicable.

Proposed Order (the "Revised Proposed Order"), which is attached hereto as **Exhibit A**.  For the convenience of the Court and other interested parties, a blackline comparing the Revised Proposed Order against the Proposed Order is attached hereto as **Exhibit B**.

WHEREFORE, as the Debtors did not receive any objections or responses other than those described herein, and the U.S. Trustee and Derivative Litigation Plaintiffs do not object to entry of the Revised Proposed Order, the Debtors respectfully request that the Court enter the Revised Proposed Order without further notice or hearing at the Court's earliest convenience.

[*Remainder of page intentionally left blank*]

Dated: May 17, 2024
Wilmington, Delaware

/s/ Ashley E. Jacobs

**YOUNG CONAWAY STARGATT &**
**TAYLOR, LLP**
Sean M. Beach (No. 4070)
Ashley E. Jacobs (No. 5635)
Jared W. Kochenash (No. 6557)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:     (302) 571-6600
Facsimile:     (302) 571-1253
Email:     sbeach@ycst.com
          ajacobs@ycst.com
          jkochenash@ycst.com

**SIDLEY AUSTIN LLP**
Samuel A. Newman (admitted *pro hac vice*)
1999 Avenue of the Stars, Floor 19
Los Angeles, California 90067
Telephone:     (310) 595-9500
Facsimile:     (310) 595-9501
Email:     sam.newman@sidley.com

*and*

Charles Persons (admitted *pro hac vice*)
Jeri Leigh Miller (admitted *pro hac vice*)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:     (214) 981-3300
Facsimile:     (214) 981-3400
Email:     cpersons@sidley.com
          jeri.miller@sidley.com

*and*

Nathan Elner (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone:     (212) 839-5300
Facsimile:     (212) 839-5599
Email:     nelner@sidley.com

*Counsel for the Debtors and Debtors in Possession*

**<u>EXHIBIT A</u>**

**Revised Proposed Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ICON AIRCRAFT, INC., *et al.*,[1] | Case No. 24-10703 (CTG) |
| Debtors. | (Jointly Administered) |
| | **Docket Ref. Nos. 83, 101, 191, 203 & 204** |

## ORDER APPROVING DESIGNATION OF
## STALKING HORSE AND GRANTING RELATED RELIEF

Upon consideration of the motion (the "<u>Motion</u>"),[2] of the Debtors in the above-captioned

chapter 11 cases (these "<u>Chapter 11 Cases</u>"), seeking, pursuant to sections 105 and 363 of title 11

of the United States Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>"), Rules 2002, 6004,

and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and Rules 2002-

1, and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States

Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), an order (this "<u>Order</u>")

approving the Debtors' designation of the SG Investment America, Inc. (the "<u>Stalking Horse</u>

<u>Bidder</u>") as the stalking horse bidder and the Asset Purchase Agreement, attached hereto as

**<u>Exhibit 1</u>** (the "<u>Stalking Horse APA</u>"), as the stalking horse bid (the "<u>Stalking Horse Bid</u>"); and

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: ICON Aircraft, Inc. (7443); Rycon LLC (5297); IC Technologies Inc. (7918); and ICON Flying Club, LLC (6101).  The Debtors' service address is 2141 ICON Way, Vacaville, CA 95688.

[2] Capitalized terms not otherwise defined in this Order shall have the meanings given to them in the *Debtors' Motion for Entry of (I) an Order (A) Approving Certain Bidding Procedures and the Form and Manner of Notice Thereof, (B) Scheduling an Auction and a Hearing on the Approval of the Sale of All or Substantially All of the Debtors' Assets, (C) Establishing Certain Assumption and Assignment Procedures and Approving the Manner of Notice Thereof, and (D) Granting Related Relief; and (II) an Order (A) Authorizing and Approving the Debtors' Entry into an Asset Purchase Agreement, (B) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances, (C) Approving the Assumption and Assignment of the Assumed Contracts, and (D) Granting Related Relief* [Docket No. 83] (the "<u>Motion</u>") or the Bidding Procedures, as applicable.

this Court having reviewed the Motion, the *Notice of Filing of Stalking Horse Supplement* [Docket No. 101] (the "Stalking Horse Supplement") and any objections filed thereto; and this Court having considered the statements of counsel, the First Day Declaration, the Gupta Declaration filed in support of the Motion, and the revised Order and Stalking Horse Bid; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT**:[3]

A.      This Court has jurisdiction over this matter and over the property of the Debtors and their bankruptcy estates pursuant to 28 U.S.C. §§ 157(a) and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M), (N), and (O). The statutory predicates for the relief sought herein are sections 105 and 363of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 9014. Venue of these Chapter 11 Cases and this matter is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      The Debtors have offered good and sufficient reasons for, and the best interest of their estates will be served by, this Court authorizing, but not directing, the Debtors to designate the Stalking Horse Bidder on the terms set forth in the Stalking Horse APA, all in accordance with the *Order (A) Approving Certain Bidding Procedures and the Form and Manner of Notice Thereof, (B) Scheduling an Auction and a Hearing on the Approval of the Sale of all or Substantially All of the Debtors' Assets, (C) Establishing Certain Assumption and Assignment Procedures and*

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. All findings of fact and conclusions of law announced by the Court at the Bidding Procedures Hearing are hereby incorporated herein to the extent not inconsistent herewith.

*Approving the Manner of Notice Thereof, and (D) Granting Related Relief* [Docket No. 191]

(the "Bidding Procedures Order").

C.      Notice of the designation of the Stalking Horse Bidder was (a) appropriate and reasonably calculated to provide all interested parties with timely and proper notice; (b) in accordance with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules; and (c) adequate and sufficient under the circumstances of these Chapter 11 Cases, such that no other or further notice is required.  A reasonable opportunity to be heard regarding the relief provided herein has been afforded to all interested persons and entities.

D.      The Debtors have properly filed and noticed the approval of the Stalking Horse Bidder.  The issuance and immediate effectiveness of this Order as of the date hereof is supported by evidence of compelling business justifications and other circumstances demonstrating that the relief granted by this Order is necessary to prevent immediate and irreparable harm to the Debtors and their estates.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.      The Debtors are authorized, but not directed, to designate the Stalking Horse Bidder on the terms set forth in the Stalking Horse Bid.

2.      The Debtors are authorized, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, to enter into and perform under the Stalking Horse APA, subject to the solicitation of higher or otherwise better offers and the entry of the Sale Order.  The Stalking Horse APA is authorized and approved, substantially in the form attached hereto as **Exhibit 1**, as the Stalking Horse Bid.  The Stalking Horse Bidder shall be deemed a Qualified Bidder, and the

Stalking Horse Bid shall be deemed a Qualified Bid, for all purposes under the Bidding Procedures Order.

3.      The Stalking Horse APA shall be binding and enforceable on the parties thereto in accordance with its terms and subject to entry of the Sale Order.  The failure to describe specifically or include any provision of the Stalking Horse APA in the Stalking Horse Supplement or herein shall not diminish or impair the effectiveness of such provision as to such parties.

4.      Notwithstanding anything to the contrary in this Order, including the authorizations in paragraph 3 above, the approval of the Sale of the Assets (whether to the Stalking Horse Bidder or any other party) remains subject to the Court's approval of the Sale and entry of the Sale Order.  All parties' rights related to the Sale and entry of the Sale Order, including but not limited to the Derivative Litigation Plaintiffs'[4] rights to object to the Sale based on the Stalking Horse Bidder's or any other bidder's insider status, are fully preserved.

5.      All objections to the entry of this Order or to the relief provided herein that have not been withdrawn, waived, resolved, or settled are hereby denied and overruled.

6.      The requirements set forth in Local Rules 6004-1 and 9013-1 are hereby satisfied, modified, or waived.

7.      Notwithstanding any applicability of Bankruptcy Rule 6004(h), 6006(d), 7052 or 9014, this Order shall be immediately effective and enforceable upon its entry.  All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

8.      This Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order.

---

[4]     "Derivative Litigation Plaintiff" shall have the meaning ascribed to it in the *Verified Statement of Paul, Weiss, Rifkind, Wharton & Garrison LLP and Landis Rath & Cobb LLP Pursuant to Federal Rules of Bankruptcy Procedure 2019* [Docket No. 111].

**Exhibit 1**

**Stalking Horse APA**

**Execution Version**

**ASSET PURCHASE AGREEMENT**

**AMONG**

**ICON AIRCRAFT, INC.,**

**THE SUBSIDIARIES OF ICON AIRCRAFT, INC. LISTED ON <u>ANNEX 1</u>**

**AND**

**SG INVESTMENT AMERICA, INC.**

**Dated as of May 1, 2024**

## TABLE OF CONTENTS

Page

**ARTICLE I DEFINITIONS** ........................................................................................ 2
    **1.1**    Certain Definitions ........................................................................ 2
    **1.2**    Other Definitional and Interpretive Matters ............................ 10

**ARTICLE II PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES** ............... 11
    **2.1**    Purchase and Sale of Assets .................................................. 11
    **2.2**    Excluded Assets ..................................................................... 12
    **2.3**    Assumption of Liabilities ....................................................... 14
    **2.4**    Excluded Liabilities ............................................................... 15
    **2.5**    Assignment and Assumption of Contracts. ............................ 15
    **2.6**    Bulk Sales Laws ..................................................................... 16

**ARTICLE III CONSIDERATION** ............................................................................. 16
    **3.1**    Purchase Price. ....................................................................... 16
    **3.2**    Withholding ............................................................................ 16

**ARTICLE IV CLOSING AND TERMINATION** .......................................................... 17
    **4.1**    Closing Date ........................................................................... 17
    **4.2**    Deliveries by the Sellers ........................................................ 17
    **4.3**    Deliveries by Purchaser ......................................................... 17
    **4.4**    Termination of Agreement ..................................................... 17
    **4.5**    Procedure Upon Termination ................................................. 18
    **4.6**    Effect of Termination ............................................................. 18
    **4.7**    Forfeiture of Purchaser Deposit ............................................ 19

**ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLERS** .......................... 19
    **5.1**    Organization and Good Standing ........................................... 20
    **5.2**    Authorization of Agreement .................................................. 20
    **5.3**    Conflicts; Consents of Third Parties. .................................... 20
    **5.4**    Title to Purchased Assets ....................................................... 21
    **5.5**    Real Property .......................................................................... 21
    **5.6**    Intellectual Property. .............................................................. 21
    **5.7**    Inventories ............................................................................. 22
    **5.8**    Material Contracts. ................................................................ 22
    **5.9**    Employee Benefits ................................................................. 23
    **5.10**   Labor ...................................................................................... 24
    **5.11**   Litigation ................................................................................ 24
    **5.12**   Compliance with Laws; Permits. ........................................... 25
    **5.13**   Financial Advisors ................................................................. 25
    **5.14**   Financial Statements; Benchmark List. .................................. 25
    **5.15**   "AS IS" TRANSACTION ...................................................... 25
    **5.16**   No Material Adverse Effect ................................................... 26
    **5.17**   No Other Representations or Warranties; Schedules ............. 26

**ARTICLE VI REPRESENTATIONS AND WARRANTIES OF PURCHASER** .................. 26
    **6.1**    Organization and Good Standing ........................................... 26
    **6.2**    Authorization of Agreement .................................................. 26

| | | |
|---|---|---|
| **6.3** | Conflicts; Consents of Third Parties. | 27 |
| **6.4** | Litigation | 27 |
| **6.5** | Financial Advisors | 27 |
| **6.6** | Financial Capability; Equity Commitment Letter | 27 |
| **6.7** | Condition of the Business | 28 |

**ARTICLE VII BANKRUPTCY COURT MATTERS** ................................................ 29
| | | |
|---|---|---|
| **7.1** | Competing Bids. | 29 |
| **7.2** | Bankruptcy Court Filings | 29 |
| **7.3** | Adequate Assurances | 29 |
| **7.4** | Purchaser Deposit. | 29 |

**ARTICLE VIII** COVENANTS ................................................ 30
| | | |
|---|---|---|
| **8.1** | Due Diligence; Access to Information | 30 |
| **8.2** | Conduct of the Business Pending the Closing. | 31 |
| **8.3** | Consents | 33 |
| **8.4** | Further Assurances | 33 |
| **8.5** | Confidentiality | 33 |
| **8.6** | Preservation of Records. | 34 |
| **8.7** | Further Disclosure | 34 |
| **8.8** | Publicity | 34 |
| **8.9** | Use of Name. | 35 |
| **8.10** | Schedules | 35 |
| **8.11** | No Control. | 35 |
| **8.12** | Letters of Credit | 35 |
| **8.13** | WARN Act. | 35 |
| **8.14** | Section 363(b)(1)(A). | 35 |

**ARTICLE IX EMPLOYEES AND EMPLOYEE BENEFITS** ................................ 35
| | | |
|---|---|---|
| **9.1** | Transferred Employees | 35 |
| **9.2** | Employee Benefits. | 36 |

**ARTICLE X CONDITIONS TO CLOSING** ................................................ 37
| | | |
|---|---|---|
| **10.1** | Conditions Precedent to Obligations of Purchaser | 37 |
| **10.2** | Conditions Precedent to Obligations of the Sellers | 38 |
| **10.3** | Conditions Precedent to Obligations of Purchaser and the Sellers | 38 |
| **10.4** | Frustration of Closing Conditions | 38 |

**ARTICLE XI NO SURVIVAL** ................................................ 39
| | | |
|---|---|---|
| **11.1** | No Survival of Representations and Warranties | 39 |

**ARTICLE XII TAXES** ................................................ 39
| | | |
|---|---|---|
| **12.1** | Transfer Taxes. | 39 |
| **12.2** | Purchase Price Allocation. | 39 |
| **12.3** | Income Tax Treatment | 40 |
| **12.4** | Cooperation | 40 |
| **12.5** | Audits, Claims and Proceedings | 40 |

**ARTICLE XIII MISCELLANEOUS** ................................................ 40
| | | |
|---|---|---|
| **13.1** | Expenses. | 40 |
| **13.2** | Reserved. | 40 |

| | | |
|---|---|---|
| **13.3** | Submission to Jurisdiction; Consent to Service of Process | 41 |
| **13.4** | WAIVER OF RIGHT TO TRIAL BY JURY | 41 |
| **13.5** | Entire Agreement; Amendments and Waivers | 41 |
| **13.6** | Governing Law. | 41 |
| **13.7** | Notices | 42 |
| **13.8** | Severability | 42 |
| **13.9** | Binding Effect; Assignment | 43 |
| **13.10** | Release | 43 |
| **13.11** | Non-Recourse | 43 |
| **13.12** | Counterparts; Electronic Signatures | 43 |
| **13.13** | No Interpretation Against Drafter | 44 |
| **13.14** | Appointment of Sellers' Representative | 44 |

## ANNEX

1          Applicable Subsidiaries of the Company

## SCHEDULES

| | |
|---|---|
| 1.1(a) | Knowledge of the Sellers |
| 1.1(b) | Permitted Exceptions |
| 2.1(f) | Purchased Permits |
| 2.2(o) | Other Excluded Assets |
| 2.2(r) | Specified Federal Government Contracts |
| 2.5(a) | Purchased Contracts |
| 2.5(b) | Cure Schedule |
| 5.3(a) | Conflicts (Seller) |
| 5.3(b) | Consents |
| 5.4 | Title to Purchased Assets |
| 5.5(a) | Real Property |
| 5.5(b) | Defaults Under Real Property Leases |
| 5.6(a) | Owned Intellectual Property |
| 5.6(b) | Intellectual Property Licenses - Exceptions |
| 5.6(c) | Owned Intellectual Property Legal Proceedings |
| 5.6(d) | Material Intellectual Property Licenses |
| 5.6(e) | Infringement on Owned Intellectual Property |
| 5.6(f) | Computer Software |
| 5.8(a) | Material Contracts |
| 5.8(c) | |
| 5.8(d) | Material Contract Defaults |
| 5.9(a) | Employee Benefit Plans |
| 5.9(c) | Employee Benefit Plans Payments |
| 5.11 | Litigation |
| 5.12(b) | Permits |
| 5.13 | Financial Advisors |
| 6.3(a) | Conflicts (Purchaser) |
| 8.2(a) | Conduct of Business Pending the Closing |
| 8.2(b) | Negative Covenants |
| 8.2(b)(i) | Compensation |
| 8.9 | Use of Names |

**<u>EXHIBITS</u>**

| A | Form of Bill of Sale |
|---|---|
| B | Form of Assignment and Assumption Agreement |
| C | Form of Assignment and Assumption Agreement (Intellectual Property) |
| D | Form of Bidding Procedures |
| E | Form of Equity Commitment Letter |
| F | Inventory Value on Benchmark List |
| G | Form of Escrow Agreement |

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT**, dated as of May 1, 2024 (as amended, supplemented, amended and restated or otherwise modified from time to time, this "Agreement"), by and among ICON Aircraft, Inc., a Delaware corporation (the "Company"), the Subsidiaries (as defined below) of the Company listed on Annex 1 (together with the Company, the "Sellers"), and SG Investment America, Inc., a Delaware corporation ("Purchaser").

## RECITALS

**WHEREAS**, the Sellers filed voluntary petitions for relief under Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "Bankruptcy Code"), on April 4, 2024 (the "Petition Date") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") (such cases, collectively, the "Bankruptcy Cases");

**WHEREAS**, the Sellers design, develop, manufacture, service, sell, lease and otherwise commercialize lightweight sports aircrafts (as currently conducted and as proposed to be conducted by the Sellers as of immediately prior to the Closing, the "Business");

**WHEREAS**, subject to the terms and conditions hereof, the Sellers desire to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from the Sellers, certain specified assets and certain specified liabilities of the Business, all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363, 365, 1123, as applicable, and other applicable provisions of the Bankruptcy Code;

**WHEREAS**, the board of directors, board of managers, managing member or other applicable governing body of each Seller has determined that a sale of the assets of such Seller is necessary to maximize value and it is advisable and in the best interests of their respective estates and the beneficiaries of such estates to consummate the transactions provided for herein and has approved this Agreement;

**WHEREAS**, the board of directors of Purchaser has approved this Agreement;

**WHEREAS**, the transactions contemplated by this Agreement are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Bidding Procedures (as defined below) and, if Purchaser is the Successful Bidder, the Sale Order (as defined below) to be entered by the Bankruptcy Court in the Bankruptcy Cases; and

**WHEREAS**, certain terms used in this Agreement are defined in Section 1.1.

**NOW**, **THEREFORE**, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the Parties hereby agree as follows:

**AGREEMENT**

**ARTICLE I**
**DEFINITIONS**

 **1.1** <u>Certain Definitions</u>.  For purposes of this Agreement, the following terms shall have the meanings specified in this <u>Section 1.1</u>:

 "<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "<u>control</u>" (including the terms "<u>controlled by</u>" and "<u>under common control with</u>") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

 "<u>Agreement</u>" has the meaning set forth in the <u>Preamble</u> hereto.

 "<u>Allocation Dispute</u>" has the meaning set forth in <u>Section 12.2(a)</u>.

 "<u>Allocation Dispute Notice</u>" has the meaning set forth in <u>Section 12.2(a)</u>.

 "<u>Alternative Transaction</u>" means a sale of all or substantially all of the Purchased Assets to a Person or Persons other than Purchaser or an Affiliate of Purchaser pursuant to the Auction.

 "<u>Ancillary Agreements</u>" means any other agreement, document or instrument that any Seller or Purchaser, as applicable, enters into in connection with the consummation of the transactions contemplated hereby (including the Seller Documents and the Purchaser Documents).

 "<u>Assignable Contract</u>" means any Contract to which any Seller is a party, but excluding, in each case, this Agreement and the Ancillary Agreements, the Sale Order, the DIP Facility and any ancillary agreements related thereto, any engagement letters or agreements between the Company and any estate professionals retained by it and approved by the Bankruptcy Court, and any Contract that cannot be assigned in accordance with <u>Section 2.5(a)</u>.

 "<u>Assignment and Assumption Agreement(s)</u>" means the Assignment and Assumption Agreement(s) in substantially the form annexed hereto as <u>Exhibit B</u> and <u>Exhibit C</u>, evidencing the assignment to and assumption by Purchaser of the Purchased Assets on the terms and subject to the conditions set forth in this Agreement and the Sale Order.

 "<u>Assumed Liabilities</u>" has the meaning set forth in <u>Section 2.3</u>.

 "<u>Auction</u>" shall mean the auction as contemplated by the Bidding Procedures.

 "<u>Avoidance Actions</u>" means all rights, lawsuits, claims, rights of recovery, objections, causes of action, avoidance actions and other similar rights of any Seller arising under Chapter 5 of the Bankruptcy Code (whether or not asserted as of the Closing Date) and all proceeds thereof.

 "<u>Backup Bidder</u>" has the meaning set forth in the Bidding Procedures.

 "<u>Bankruptcy Cases</u>" has the meaning set forth in the <u>Recitals</u> hereto.

 "<u>Bankruptcy Code</u>" has the meaning set forth in the <u>Recitals</u> hereto.

"Bankruptcy Court" has the meaning set forth in the Recitals hereto.

"Benchmark List" has the meaning set forth in Section 5.14.

"Bidding Procedures" means the bidding procedures filed in the Bankruptcy Cases substantially in the form attached as Exhibit D.

"Budget" has the meaning set forth in the DIP Order.

"Business" has the meaning set forth in the Recitals hereto.

"Business Day" means any day of the year other than a Saturday, Sunday or a day on which national banking institutions in all of San Francisco, California, Germany and the People's Republic of China are required or authorized to close.

"Closing" has the meaning set forth in Section 4.1.

"Closing Date" has the meaning set forth in Section 4.1.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" has the meaning set forth in the Preamble hereto.

"Confidentiality Agreement" has the meaning set forth in Section 8.5.

"Confirmation Order" means an order or orders of the Bankruptcy Court in form and substance reasonably acceptable to Purchaser and the Sellers confirming a Chapter 11 plan of reorganization of the Sellers under section 1129 of the Bankruptcy Code.

"Consent" means any consent, waiver, approval, order or authorization of, or registration, declaration or filing with or notice to, any Governmental Body or other Person.

"Contract" means any contract, indenture, note, bond, lease, Personal Property Lease, Real Property Lease or other lease, license, purchase or sale order, warranties, commitments, or other written or oral agreement.

"Cure Amount Overage" has the meaning set forth in Section 2.5(b).

"Cure Amounts" means all amounts, costs and expenses required by the Bankruptcy Court to cure defaults, if any, under the Purchased Contracts so that they may be assumed and assigned to Purchaser pursuant to Sections 363, 365, and/or 1123 of the Bankruptcy Code.

"Cure Schedule" has the meaning set forth in Section 2.5(b).

"Customer and Utility Deposits" has the meaning set forth in Section 2.2(b).

"Default" has the meaning set forth in the DIP Order.

"DIP Agent" means FeiRen International Co., Ltd., as administrative agent under the DIP Facility.

"DIP Facility" means that certain Senior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement, dated as of April 4, 2024, by and among the Company, the DIP Agent, the guarantors

party thereto and the lenders party thereto, as may be amended, restated, amended and restated, supplemented or modified from time to time.

"DIP Order" means any order of the Bankruptcy Court then in-effect authorizing Sellers to obtain post-petition financing in the Bankruptcy Cases.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, stationery, forms, labels, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, catalogs, flyers, pamphlets, web pages, art work, photographs, etc.), and other similar materials owned or used by any Seller, in each case, whether or not in electronic form.

"Employee Benefit Plans" means all "employee benefit plans," as defined in Section 3(3) of ERISA, and all other employee benefit arrangements or payroll practices, including, without limitation, bonus plans, consulting or other compensation agreements, incentive, equity or equity-based compensation, or deferred compensation arrangements, stock purchase, severance pay, sick leave, vacation pay, salary continuation, disability, hospitalization, medical insurance, life insurance, scholarship programs maintained by the Sellers or to which any Seller contributed or is obligated to contribute thereunder for current or former employees of the Sellers or under which any Seller has any liability.

"Employees" means all individuals, as of the date hereof, whether or not actively at work as of the date hereof, who are employed by any Seller, together with individuals who are hired after the date hereof and prior to the Closing, and excluding individuals who are terminated prior to the Closing.

"Equipment" means the tangible personal property owned, used or held for use by any Seller and primarily related to the Purchased Assets, including, but not limited to, the physical assets and all equipment, machinery, tools, supplies, spare parts, molds, trucks, cars, other vehicles and rolling stock vehicles, artwork, any and all computer and computer-related hardware (including, but not limited to, computers, file servers, facsimile servers, scanners, color printers, laser printers and networks, copiers, and telecommunication equipment), and miscellaneous office materials (wherever located and whether or not carried on a Seller's books), and all maintenance records and other documents primarily relating thereto.

"Equity Commitment Letter" has the meaning set forth in Section 6.6.

"Equity Financing" has the meaning set forth in Section 6.6.

"Equity Interests" means, with respect to any Person, (i) capital stock of, partnership interests, membership interests or other equity interests in, such Person, (ii) securities or other rights exercisable, convertible into or exchangeable for shares of capital stock, partnership interests, membership interests, voting securities or other equity interests in such Person and (iii) options, warrants, calls, commitments or other rights to acquire any of the foregoing described in clauses (i) and (ii), whether fixed or contingent, matured or unmatured, contractual, legal, equitable or otherwise.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agent" has the meaning set forth in Section 7.4.

"Escrow Agreement" has the meaning set forth in Section 7.4.

"Event of Default" has the meaning set forth in the DIP Order.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contract" means any Seller Contract which is not a Purchased Contract.

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded Matter" has the meaning set forth in the definition of "Material Adverse Effect."

"Excluded Taxes" means all Taxes, other than any Taxes attributable to the Purchaser's payment of a Cure Amount, if any, pursuant to Section 2.5(b); and for the purpose of avoiding any doubts, the Transfer Taxes shall be Excluded Taxes.

"Final Allocation" has the meaning set forth in Section 12.2(a).

"Final Order" means an order, judgment or other decree of the Bankruptcy Court or any other court or judicial body with proper jurisdiction, as the case may be, which is in full force and effect, as to which no appeal is pending and which has not been, and is not subject to being, reversed, stayed, modified or amended; provided, however, that any potential for modification or amendment pursuant to Federal Rules of Bankruptcy Procedure 9023 and/or 9024 shall not be considered in determining whether an order is a Final Order.

"Financial Statements" has the meaning set forth in Section 5.13.

"GAAP" means generally accepted accounting principles in the United States as of the date hereof, consistently applied with the Financial Statements.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, regional or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Income Tax" means any Tax based on or measured by reference to net income.

"Indebtedness" of any Person means, without duplication, (i) the principal, interest and premium (if any) in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iii) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (iv) all obligations of the type referred to in clauses (i) through (iii) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (v) all obligations of the type referred to in clauses (i) through (iv) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Intellectual Property" means all intellectual property rights, including, without limitation, all intellectual property rights arising from or in respect of the following:  (i) all patents and applications therefor, including continuations, divisionals, continuations-in-part, or reissues of patent applications and patents issuing thereon, (ii) trademarks, service marks, trade names, service names, brand names, all trade dress rights, logos and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof (collectively,

"Marks"), (iii) copyrights and registrations and applications therefor, (iv) trade secrets and confidential business information that derive independent economic value, actual or potential, from not being generally known or readily ascertainable by others, and (v) Internet domain names.

"Intellectual Property Licenses" means any Contract to which any Seller is a party, pursuant to which (i) any Seller grants to any third Person any right to use any of the Owned Intellectual Property or Licensed Intellectual Property, and (ii) any Seller receives from any third Person any right to use such third Person's Intellectual Property.

"Inventory" means all of the Sellers' inventory (including, without limitation, finished goods, merchandise, work in progress, residual by-products, supplies, spare parts, shipping materials, packaging materials and raw materials) owned and maintained, held or stored by or for any of the Sellers and primarily related to the Purchased Assets.

"IRS" means the Internal Revenue Service.

"Knowledge of the Sellers" means, as of the relevant date, the actual knowledge possessed by those officers of the Sellers identified on Schedule 1.1(a) and the knowledge that each such officer would reasonably be expected to obtain in the course of diligently performing his or her duties for any Seller.

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation.

"Legal Proceeding" means any claim, liability, action, complaint, suit, citizen suit, litigation, arbitration, appeal, petition, demand, inquiry, hearing, proceeding, investigation or other dispute, whether civil, criminal, administrative or otherwise, at law or in equity, by or before any Governmental Body and any appeal from any of the foregoing; provided, that, the Bankruptcy Cases shall not be considered a "Legal Proceeding".

"Letters of Credit" means the letters of credit that are outstanding under the DIP Facility as of any time of determination.

"Liability" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all costs and expenses relating thereto.

"Licensed Intellectual Property" means any Intellectual Property that any Seller is licensed or otherwise permitted by other Persons to use pursuant to any Intellectual Property License.

"Lien" means any claim, community or other marital property interest, condition, equitable interest, lien, option, encumbrance, pledge, mortgage, deed of trust, security interest, right of way, easement, encroachment, servitude, charge, encumbrance, or similar restriction.

"Marks" has the meaning set forth in the definition of "Intellectual Property."

"Material Adverse Effect" means any event, circumstance, development, change or effect (regardless of whether foreseeable at the time of the Parties' execution and delivery of this Agreement) that, individually or in that aggregate, has had or would reasonably be expected to have or result in a material adverse effect (a) on the Business, Purchased Assets and the Assumed Liabilities, taken as a whole, or the results of operations or conditions (financial or otherwise) of the Business or the Purchased Assets and the Assumed Liabilities, taken as a whole, in each case, other than an effect resulting from an Excluded Matter or (b) on the ability of the Sellers to consummate the transactions contemplated by this Agreement.

"Excluded Matter" means any one or more of the following, whether independently or in combination with any other of the following: (i) the effect of any change in the global, domestic or any foreign economy or business in general; (ii) the effect of any change that generally affects the industry or industries in which any Seller operates; (iii) in exchange rates, interest rates or securities, financial or capital markets in general; (iv) the effect of any change arising in connection with earthquakes, hurricanes, floods, other natural disasters, hostilities, national calamities, acts of war, acts of God, political conditions, sabotage or terrorism or military actions or any escalation or worsening of any such hostilities, national calamities, acts of war, acts of God, political conditions, sabotage or terrorism, military actions, epidemic, pandemic or other force majeure event existing or underway; (v) the effect of any changes in applicable Laws or Tax or accounting rules or GAAP or any change in the interpretation of the foregoing by any Governmental Body; (vi) any effect resulting from the public announcement or pendency of this Agreement, the identity of Purchaser, compliance with terms of this Agreement, the taking of any action permitted to be taken hereunder or the transactions contemplated hereby, or the consummation of the transactions contemplated by this Agreement; in each case, including on relationships, contractual or otherwise, with customers, suppliers, vendors or employees; (vii) failure by the Sellers to meet any projections (provided that the underlying causes of the failure shall not be excluded); (viii) any action by Purchaser or any of its Affiliates or the omission of an action that was required to be taken by Purchaser or any of its Affiliates; (ix) any action taken by the Sellers which is required by this Agreement or is taken at the request of Purchaser; (x) any effect resulting from the filing or prosecution of the Bankruptcy Cases or any action taken by the Bankruptcy Court, or (xi) any action taken by the Sellers in accordance with <u>Section 8.2</u> for purposes of reducing or eliminating operational expenses (including related to payrolls) or professional fees on or after June 14, 2024; <u>provided</u>, <u>however</u>, that the foregoing clauses (i) through (v) shall not include, and thus the determination of "Material Adverse Effect" shall not exclude, any event, circumstance, development, change or effect that has a material and disproportionate adverse effect on the Purchased Assets and the Assumed Liabilities (taken as a whole) as compared to the effect on other affected Persons that operate in the industries in which the Sellers operate, in which case the incrementally disproportionate effect or effects may be taken into account in determining whether there has had, or would reasonably be expected to have or result in, a Material Adverse Effect.

"Material Contracts" has the meaning set forth in <u>Section 5.8(a)</u>.

"Material Decision" shall mean any of the following to the extent the same may affect the Business, the Purchased Assets and/or the Assumed Liabilities following the Closing Date: (i) entering into any Material Contract; (ii) terminating any Material Contract to which any Seller is a party; (iii) making any material amendment to any Material Contract to which any Seller is a party; or (iv) other operational decisions of a material nature.

"Neutral Firm" has the meaning set forth in <u>Section 12.2(a)</u>.

"Non-Recourse Parties" has the meaning set forth in <u>Section 13.11</u>.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"Ordinary Course of Business" means the ordinary course of business, subject, to the extent applicable to any action to be taken by any Seller on or following the date hereof, to any limitations applicable to such Seller arising as a result of the fact that it is a debtor-in-possession under the Bankruptcy Code and that it is operating under the supervision of the Bankruptcy Court, including actions taken by any Seller that are reasonable or prudent for such Seller to take in connection with events surrounding any earthquake, hurricane, flood, other natural disaster, hostility, national calamity, act of war, acts of God, political condition, sabotage or terrorism or military action or any escalation or worsening of any such

hostility, national calamity, act of war, act of God, political condition, sabotage or terrorism, military action, epidemic, pandemic, public health emergency or other force majeure event.

"Owned Intellectual Property" means the Intellectual Property owned by any Seller, including, for the purpose of avoiding any doubt, the Registered Owned Intellectual Property.

"Party" means and refers to any signatory to this Agreement.  Such parties are collectively referred to as the "Parties."

"Permits" means any material approvals, authorizations, consents, registrations, licenses, permits or certificates issued by a Governmental Body, and all pending applications therefor and renewals thereof.

"Permitted Exceptions" means (i) all Liens, defects, exceptions, restrictions, easements, rights of way and encumbrances disclosed in title records or policies of title insurance; (ii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the Ordinary Course of Business; (iii) zoning, building codes, entitlement and other land use and environmental regulations by any Governmental Body; (iv) pledges or deposits in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance and other social security legislation; (v) deposits by or on behalf of any Seller to secure the performance of bids, trade contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations incurred in the Ordinary Course of Business; (vi) any interest or title of a lessor under any lease of a Seller; (vii) Liens created under this Agreement or any Ancillary Agreement or arising from any action provided for under this Agreement or any Ancillary Agreement, or created by or through Purchaser; (viii) Liens set forth on Schedule 1.1(b); (ix) Liens for Taxes not yet due and payable under applicable Law or that are being contested in good faith by appropriate proceedings; (x) licenses to Intellectual Property granted in the Ordinary Course of Business; and (xi) such other imperfections in title, charges, easements, restrictions and encumbrances which would not reasonably be expected to, individually or in the aggregate, result in a Material Adverse Effect.

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

"Personal Property Lease" means each Contract under which any Seller leases or subleases personal property in connection with the Business.

"Petition Date" has the meaning set forth in the Recitals hereto.

"PRC Overseas Investment Approvals" means the governmental approvals required under the applicable Laws in the People's Republic of China with respect to the transactions contemplated hereby.

"Products" means any and all products designed, developed, manufactured, marketed, sold or given away by the Sellers.

"Proposed Allocation" has the meaning set forth in Section 12.2(a).

"Purchased Assets" has the meaning set forth in Section 2.1.

"Purchased Contracts" has the meaning set forth in Section 2.5(a).

"Purchased Permits" has the meaning set forth in Section 2.1(h).

"Purchase Price" has the meaning set forth in Section 3.1(a).

"Purchaser" has the meaning set forth in the Preamble hereto.

"Purchaser Core Representations" has the meaning set forth in Section 10.2(a).

"Purchaser Deposit" has the meaning set forth in Section 7.4.

"Purchaser Documents" has the meaning set forth in Section 6.2.

"Purchaser's 401(k) Plan" has the meaning set forth in Section 9.2(c).

"Purchaser Plans" has the meaning set forth in Section 9.2(b).

"Real Property Lease" and "Real Property Leases" has the meaning set forth in Section 5.5(a).

"Receivables" means any and all accounts receivable, credit card receivables, notes and other amounts receivable by the Sellers from third parties, including customers, and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of goods shipped or products sold or services rendered, and any claim, remedy or other right related to any of the foregoing, arising on or before the Closing Date and primarily related to the Purchased Assets, in each case excluding any tax refund, credit or reimbursement regardless of whether issued or paid to the Sellers by a Governmental Body or a third party.

"Registered Owned Intellectual Property" has the meaning set forth in Section 5.6(a).

"Resolution Period" has the meaning set forth in Section 12.2(a).

"Review Period" has the meaning set forth in Section 12.2(a).

"Sale Order" means, if Purchaser is the Successful Bidder, an order or orders of the Bankruptcy Court, including a Confirmation Order, if applicable, in form and substance reasonably acceptable to Purchaser and the Sellers approving this Agreement and all of the terms and conditions hereof, and approving and authorizing the Sellers to consummate the transactions contemplated hereby.

"Seller Contract" means any Contract to which Seller is a party or by which Seller is bound.

"Seller Documents" means any agreement, document, instrument or certificate contemplated by this Agreement or which has been or is to be executed by any Seller in connection with the consummation of the transactions contemplated by this Agreement.

"Seller Marks" has the meaning set forth in Section 8.8.

"Seller Property" and "Seller Properties" has the meaning set forth in Section 5.5(a).

"Seller Released Parties" has the meaning set forth in Section 13.10.

"Sellers" has the meaning set forth in the Preamble hereto.

"Sellers Core Representations" has the meaning set forth in Section 10.1(a).

"Subsidiary" means, with respect to any Person, any other Person a majority of the outstanding voting securities or other voting Equity Interests of which is owned, directly or indirectly, by such first Person.

"Successful Bidder" has the meaning set forth in the Bidding Procedures.

"Tax Authority" means any federal, state, local or foreign government, or agency, instrumentality or employee thereof, charged with the administration of any law or regulation relating to Taxes.

"Tax Claim" has the meaning set forth in Section 12.5.

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes.

"Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including, without limitation, all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, environmental, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes whether computed on a separate or consolidated, unitary or combined basis or in any other manner, and (ii) all interest, penalties, fines, additions to tax or additional amounts, whether disputed or not, imposed by any Tax Authority in connection with any item described in clause (i).

"Termination Date" has the meaning set forth in Section 4.4(a).

"Transfer Taxes" has the meaning set forth in Section 12.1.

"Transferred Employees" has the meaning set forth in Section 9.1.

"Treasury Regulations" means the income tax regulations promulgated under the Code and effective as of the date hereof.

"WARN Act" means and refers to the Worker Adjustment and Retraining Notification Act of 1988, and all comparable state, local or other Laws, in each case, as amended from time to time.

**1.2**    Other Definitional and Interpretive Matters.  Unless otherwise expressly provided herein, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Dollars.  Any reference in this Agreement to "$" shall mean U.S. dollars.

Exhibits/Schedules.  All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any matter or item disclosed on one Schedule shall be deemed to have been disclosed on each other Schedule.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

Headings.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.  All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

Herein.  Words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

Including.  The word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1    Purchase and Sale of Assets.  Pursuant to Sections 105, 363, 365, and/or 1123 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and (if Purchaser is the Successful Bidder) the Sale Order, and subject to Section 2.5(a), at the Closing, Purchaser shall purchase, acquire and accept from the Sellers, and the Sellers shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Purchaser all of the Sellers' right, title and interest, in, to and under the Purchased Assets, on an "as is" and "where is" basis, free and clear of all Liens (except for Permitted Exceptions) to the extent set forth in the Sale Order.  "Purchased Assets" shall mean, as of the Closing Date, all Sellers' rights, title and interests in and to all the following property and assets (real, personal or mixed, tangible and intangible), wherever located, owned, held or used in the conduct of the Business by the Sellers, except to the extent constituting the Excluded Assets:

    **(a)**    the Inventory;

    **(b)**    the Equipment;

    **(c)**    the Owned Intellectual Property;

    **(d)**    the Purchased Contracts;

    **(e)**    all Documents that are primarily used in, held for use in or intended to be used in, or that arise primarily out of, the Purchased Assets, irrespective of whether they are available in written, electronic or other form, including without limitation, Documents primarily relating to Products, services, marketing, advertising, promotional materials, Owned Intellectual Property, supplier lists, customer lists, records, literature, business books, price lists, design documents, plans, drawings, other commercial and technical documents, correspondence and financial and tax records, but excluding to the extent (i) such files or portion of such files as may not be transferred under applicable Law, including, without limitation, laws regarding confidentiality and privacy, and (ii) any Documents or portion of such Documents primarily related to any Excluded Assets or required to realize the benefits of any Excluded Assets; provided, that, following the Closing, Purchaser shall provide the Sellers copies of or continued access to all Documents as are necessary to administer the Bankruptcy Cases or in connection with any Tax Claims or Tax filings of the Sellers;

11

(f)    all Permits, to the extent assignable or transferable (but if any Permits cannot be transferred, such Seller agrees to cooperate with and reasonably assist Purchaser in obtaining such Permits, in each case at the sole cost of Purchaser), held by the Sellers and required for the conduct of the Business as currently conducted or in connection with the Purchased Assets, as set forth on Schedule 2.1(f) hereto ("Purchased Permits"), provided that the cost of any such assignment shall be borne by Purchaser;

(g)    all supplies owned by the Sellers and related to the Purchased Assets;

(h)    to the extent assignable, all rights (including the rights to enforce) of the Sellers under non-disclosure or confidentiality, non-compete, non-solicitation or similar agreements with any Employees and agents of the Sellers or with third parties, other than any such rights of the Sellers to the extent pertaining primarily to any Excluded Assets;

(i)    to the extent assignable, all rights (whether choate or inchoate, known or unknown, contingent or non-contingent) of the Sellers under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to Products sold, or services provided, to the Sellers and affecting any Purchased Assets, other than any warranties, representations and guarantees to the extent pertaining primarily to any Excluded Assets;

(j)    all goodwill associated with the Business and the Purchased Assets;

(k)    to the extent not prohibited by applicable Law, all personnel files and employment records of the Transferred Employees (including, without limitation, I-9 forms and attachments);

(l)    to the extent transferable, all unexpired warranties, indemnities, or guaranties from any third party related to the Purchased Assets, including any such item of real property, personal property or equipment;

(m)    to the extent transferable and to the extent related to the Purchased Assets, the full benefit of all representations, warranties, guarantees, indemnities, undertakings, certificates, covenants, agreements and all security therefor received by any of the Sellers on the purchase or other acquisition of the Purchased Assets; and

(n)    any rights, demands, claims, credits, allowances, rebates, or rights of setoff (other than against the Sellers or any of their Affiliates) arising out of or relating to any of the Purchased Assets (other than Avoidance Actions).

Notwithstanding the foregoing, the transfer of the Purchased Assets pursuant to this Agreement shall not include the assumption of any Liability related to the Business or any of the Purchased Assets unless Purchaser expressly assumes that Liability pursuant to Section 2.3.

2.2    Excluded Assets.  Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Purchaser, and the Sellers shall retain all right, title and interest to, in and under the Excluded Assets.  "Excluded Assets" shall mean each of the Sellers' assets that is not a Purchased Asset, including:

(a)    the Receivables;

(b)    all customer deposits and security deposits for rent, electricity, telephone or other utilities of the Sellers on the Closing Date related to the Purchased Assets, excluding any refund or reduction

in the amount of such customer deposits and security deposits after the Closing Date (including as a result of the transfer of the Purchased Assets from the Sellers to Purchaser) (the "<u>Customer and Utility Deposits</u>");

     **(c)**    subject to section 363(b)(1)(A) of the Bankruptcy Code (or similar provision in any Confirmation Order), all rights to the telephone and facsimile numbers and email addresses used by the Sellers, as well as rights to receive mail and other communications addressed to the Sellers (including mail and communications from customers, suppliers, distributors and agents), in each case to the extent related to the Purchased Assets;

     **(d)**    the Excluded Contracts (including this Agreement and the Ancillary Agreements), including any accounts receivable and other rights arising out of or in connection with any Excluded Contract (including, without limitation, the Purchase Price under this Agreement);

     **(e)**    any (i) other books and records that the Sellers are required by Law or Contract to retain or that are necessary to retain including, without limitation, Tax Returns, financial statements, and corporate or other entity filings; (ii) legal entity, minute books, stock ledgers, corporate seals, taxpayer and other identification numbers, stock certificates and similar materials of the Sellers; and (iii) documents primarily relating to the Excluded Assets or Excluded Liabilities or proposals to acquire the Business by Persons other than Purchaser or primarily relating to any employees of the Sellers who are not Transferred Employees;

     **(f)**    all cash, cash equivalents, securities and negotiable instruments of the Sellers;

     **(g)**    all Avoidance Actions;

     **(h)**    the Equity Interests or other ownership interest in the Sellers;

     **(i)**    all directors or officers liability insurance policies owned by any Seller (in each case of the foregoing, including any tail policies or coverage thereon), together with all rights, claims, demands, proceedings, credits, causes of action or rights of set off thereunder;

     **(j)**    professional retainers paid by any Seller to its advisors or representatives in connection with the Bankruptcy Cases and the transactions contemplated herein;

     **(k)**    the portion of any deposits and prepared charges and expenses of the Sellers primarily related to any Excluded Asset (including any Excluded Contract) or Excluded Liability, including, without limitation, (i) security deposits with third party suppliers, vendors, service providers or landlords, and lease and rental payments, (ii) rebates, (iii) tenant reimbursements, (iv) prepaid Taxes (including ad valorem Taxes, personal property Taxes and real estate Taxes), and (v) pre-payments;

     **(l)**    any claim, right or interest of any Seller in or to any refund, rebate, abatement or recovery of any Taxes, together with interest thereon and any refund of any penalties in respect thereof;

     **(m)**    any Seller Contract that any Seller is unable to assign to Purchaser or that is an Excluded Contract;

     **(n)**    all Permits held by any Seller that are not Purchased Permits;

     **(o)**    all other assets listed on <u>Schedule 2.2(o)</u>;

     **(p)**    all assets under, funding, or related to any Employee Benefit Plan;

(q)     all claims or causes of action that relate primarily to any Excluded Asset or Excluded Liability (including all claims or causes of action arising out of, in connection with, or contemplated by the DIP Order and/or under an Employee Benefit Plan (e.g. claims or causes of actions against the equity holders of the Sellers, against the Sellers' directors, officers, managers and employees, against lenders or other third parties, and/or against any of the Affiliates, agents or representatives of the foregoing));

(r)     all Contracts, subcontracts, purchase orders, documentation, data, technology, or other materials or items related to, or derived from, any work performed by the Sellers (including work performed by the Sellers for a third party) directly or indirectly for any federal Governmental Body in the U.S. listed on Schedule 2.2(r);

(s)     all Contracts, subcontracts, purchase orders, documentation, data, technology, or other materials or items related to, or derived from, any work performed by the Sellers (including work performed by the Sellers for a third party) directly or indirectly for XQT, LLC and Mark Gamache; and

(t)     any other assets of the Sellers that are not lawfully transferable.

2.3     Assumption of Liabilities.  Purchaser shall assume no liability or obligation of the Sellers, or of any predecessor or any Affiliate of any of the Sellers, except the liabilities and obligations expressly set forth in this Section 2.3 (collectively, the "Assumed Liabilities"), which Purchaser or its permitted assignee, as the case may be, shall on the terms and subject to the conditions of this Agreement, assume at the Closing, and thereafter pay, perform and discharge in accordance with their respective terms, subject to all defenses or counterclaims with respect thereto:

(a)     all Liabilities or obligations (including indemnification obligations) of the Sellers under the Purchased Contracts arising (i) after the Closing Date or (ii) prior to the Closing Date to the extent such Liabilities become payable after the Closing Date; in each case, including all Cure Amounts;

(b)     all Liabilities (i) from the sale or giving away of Products after the Closing Date pursuant to product warranties, product returns and rebates and (ii) in respect of gift cards, merchandise credits, coupons and any other similar arrangement or program;

(c)     all Liabilities relating to amounts required to be paid by, or other obligations of, Purchaser hereunder or under any Ancillary Agreement;

(d)     amounts owing to the Transferred Employees for accrued salary, vacation time and sick leave arising after the Petition Date;

(e)     all Liabilities arising from the employment of the Transferred Employees from and after the Closing Date;

(f)     all Liabilities with respect to earned and accrued wages, salaries, commissions, bonuses, and reimbursable employee travel expenses, in each case with respect to the items described in this Section 2.3(f), earned and/or accrued with respect to the Transferred Employees after the Petition Date and as of the Closing Date; and

(g)     except as otherwise provided in this Agreement, all Liabilities with respect to the Business and/or the Purchased Assets arising on and after the Closing Date, including, without limitation, under any Indebtedness incurred by Purchaser or any of its Affiliates concurrently with or following the Closing except if the facts or circumstances of such Liabilities existed prior to the Closing Date.

**2.4**     <u>Excluded Liabilities</u>.  Except as specifically set forth in <u>Section 2.3</u>, Purchaser will not assume or be liable for any Liabilities or other obligations of the Sellers, or any predecessor or Affiliate of the Sellers, of any nature whatsoever, whether presently in existence or arising hereafter, known or unknown, disputed or undisputed, contingent or non-contingent, liquidated or unliquidated or otherwise (other than the Assumed Liabilities), including without limitation the following (other than the Assumed Liabilities) (collectively, the "<u>Excluded Liabilities</u>"):

**(a)**     all Liabilities primarily related to or arising out of the Excluded Assets, including the Excluded Contracts;

**(b)**     except as expressly set forth in <u>Article IX</u> or assumed by Purchaser pursuant to <u>Section 2.3</u>, any liability primarily under or relating to any Employee Benefit Plan;

**(c)**     all Indebtedness of any Seller;

**(d)**     all obligations and Liabilities of the Sellers primarily related to the right to or issuance of any capital stock or other Equity Interest of any Seller, including any stock options or warrants;

**(e)**     except as expressly stated otherwise in this Agreement, any obligation or Liability of the Sellers arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement or any Ancillary Agreement and the transactions contemplated hereby and thereby, including, without limitation, fees and expenses of counsel, accountants, consultants, advisers and others;

**(f)**     any claim (as defined in the Bankruptcy Code) arising prior to Closing and not expressly assumed pursuant to this Agreement;

**(g)**     all Excluded Taxes; and

**(h)**     any other Liabilities of the Sellers not expressly assumed by Purchaser pursuant to <u>Section 2.3</u> above.

**2.5**     <u>Assignment and Assumption of Contracts</u>.

**(a)**     <u>Assignment of Contracts and Unexpired Leases</u>.  To the maximum extent permitted by Law, at the Closing, pursuant to the Sale Order and the Assignment and Assumption Agreement(s), the Sellers shall assign to Purchaser and Purchaser shall assume from the Sellers (the consideration for which is included in the Purchase Price), those Assignable Contracts that are set forth on <u>Schedule 2.5(a)</u> (the "<u>Purchased Contracts</u>").  Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Purchased Asset or any right thereunder if an attempted assignment, without the consent of a third party, would constitute a breach or in any way adversely affect the rights of Purchaser or Sellers thereunder.  If such consent is not obtained or such assignment is not attainable pursuant to Sections 105, 363, 365, and/or 1123 of the Bankruptcy Code, then such Purchased Assets shall not be transferred hereunder and the Closing shall proceed with respect to the remaining Purchased Assets without any reduction in the Purchase Price.

**(b)**     <u>Cure Payments</u>.  Purchaser will pay all Cure Amounts in connection with the assumption and assignment of Purchased Contracts for which all necessary Consents and Bankruptcy Court approval to transfer have been obtained (as agreed to between Purchaser and the Sellers or as determined by the Bankruptcy Court), and Purchaser will assume and agree to perform and discharge the Assumed Liabilities under the Purchased Contracts, pursuant to the Assignment and Assumption Agreement.  The

15

Sellers have provided to Purchaser a schedule set forth on Schedule 2.5(b) setting forth a good faith estimate of all Cure Amounts for all Purchased Contracts ("Cure Schedule"), which schedule the Sellers may update from time to time prior to the date that is three (3) Business Days prior to the Closing Date.  If the Cure Amounts for any Purchased Contract exceeds the amount set forth on the Cure Schedule, as may be updated pursuant to the foregoing sentence (a "Cure Amount Overage"), Purchaser can elect (in its sole discretion) to (a) exclude such contract from the list of Purchased Contracts at which point such contract shall be deemed an Excluded Contract and Purchaser shall have no obligation with respect thereto, or (b) reduce the Purchase Price by the amount equal to the Cure Amount Overage; provided, however, that unless otherwise provided under this Agreement, Purchaser shall have no other recourse or redress with respect to any Cure Amount Overage.  There shall be no adjustment to the Purchase Price as a result of Purchaser's election to designate any one or more of the Purchased Contracts as Excluded Contracts.

> (c)     Preservation of Contracts and Unexpired Leases.  The Sellers shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to Purchased Contracts and use commercially reasonable efforts to take all other actions necessary to cause such Purchased Contracts to be assigned to and assumed by Purchaser pursuant to Section 365 of the Bankruptcy Code, and Purchaser shall, at or prior to Closing, comply with all requirements under Section 365 of the Bankruptcy Code necessary for the Sellers to assign to Purchaser the Purchased Contracts.

**2.6**    Bulk Sales Laws.    Notwithstanding any other provision in this Agreement, Purchaser hereby waives compliance by the Sellers with the requirements and provisions of any "bulk-transfer" and similar Laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Purchased Assets to Purchaser.

## ARTICLE III
## CONSIDERATION

**3.1**    Purchase Price.

> (a)     In consideration of the sale of the Purchased Assets to Purchaser, upon the terms and subject to the conditions set forth in this Agreement, the purchase price for the Purchased Assets shall be (i) Thirteen Million Dollars ($13,000,000) in cash plus (ii) the assumption of the Assumed Liabilities by Purchaser, subject to adjustment in accordance with Sections 2.5(b), 10.1(c) and/or 12.1 of this Agreement (the "Purchase Price").

> (b)     On the Closing Date, Purchaser or its designated party shall pay the cash portion of the Purchase Price (less the full amount of the Purchaser Deposit in accordance with Section 7.4) to the Sellers, which shall be paid by wire transfer of immediately available funds into one or more accounts designated by the Sellers.

> (c)     No later than three (3) Business Days prior to the Closing Date, the Sellers' Representative shall prepare and deliver, or cause to be prepared and delivered, to Purchaser a statement setting forth a reasonably detailed list of the Purchased Assets that will be transferred, assigned and delivered to the Purchaser upon the Closing, together with (a) in the case of Equipment and Inventory, a good faith calculation of the value thereof, and (b) in the case of the Purchased Contracts, the Cure Amount Overage, if any, in accordance with Section 2.5(c) hereof.

**3.2**    Withholding.  As of the date of this Agreement and provided that the Sellers deliver the documents described in Section 4.2(d) at or prior to Closing, Purchaser is not aware of a reason why it would be required under Law to deduct and withhold Taxes from the amounts payable pursuant to this Agreement.  If Purchaser becomes aware of such a requirement, Purchaser shall notify the Sellers prior to

withholding and provide the Sellers with a reasonable opportunity to submit such documents and forms as may be required or necessary to reduce or eliminate the obligation to withhold Taxes.

## ARTICLE IV
## CLOSING AND TERMINATION

**4.1**     Closing Date.  The closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II hereof (the "Closing") shall take place via electronic exchange of closing documents and signature pages on the date that is ten (10) Business Days after the satisfaction of the conditions set forth in Sections 10.1, 10.2 and 10.3 hereof (or the waiver of any condition by the Party entitled to waive that condition).  The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date."  Unless otherwise agreed by the Parties in writing, the Closing shall be deemed effective and all right, title and interest of the Sellers to be acquired by Purchaser hereunder shall be considered to have passed to Purchaser as of 12:01 a.m. (Pacific time) on the Closing Date.

**4.2**     Deliveries by the Sellers.  At the Closing, the Sellers shall deliver to Purchaser:

**(a)**     a duly executed Bill of Sale substantially in the form of Exhibit A hereto;

**(b)**     duly executed Assignment and Assumption Agreement(s) substantially in the form of Exhibit B and Exhibit C hereto;

**(c)**     the officer's certificate required to be delivered pursuant to Sections 10.1(a) and 10.1(b); and

**(d)**     a duly executed and completed IRS Form W-9 with respect to each Seller.

**4.3**     Deliveries by Purchaser.  At the Closing, Purchaser shall deliver to the Sellers:

**(a)**     the cash portion of the Purchase Price as set forth in Section 3.1(a) hereof;

**(b)**     duly executed Assignment and Assumption Agreement(s) substantially in the form of Exhibit B and Exhibit C hereto; and

**(c)**     the officer's certificate required to be delivered pursuant to Sections 10.2(a) and 10.2(b).

**4.4**     Termination of Agreement.  This Agreement may be terminated prior to the Closing as follows:

**(a)**     by Purchaser or the Sellers' Representative, if the Closing shall not have occurred by the close of business August 31, 2024 (the "Termination Date"); provided, however, that nothing in the preceding clause shall diminish the representations of Purchaser in Section 6.6; provided, further, that if the Closing shall not have occurred on or before the Termination Date due to a breach of any of representations, warranties, covenants or agreements contained in this Agreement by Purchaser or the Sellers to an extent which would give the other Party a right not to close pursuant to Article X, then the breaching Party may not terminate this Agreement pursuant to this Section 4.4(a);

**(b)**     by mutual written consent of the Sellers' Representative and Purchaser;

(c)      by Purchaser, if there shall be a breach by the Sellers of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Sections 10.1 or 10.3 and which breach cannot be cured or has not been cured by the earlier of (i) ten (10) Business Days after the giving of written notice by Purchaser to the Sellers of such breach and (ii) one (1) Business Day prior to the Termination Date; provided, however, that if Purchaser shall have committed a breach of any of representations, warranties, covenants or agreements contained in this Agreement to an extent which would give the Sellers the right not to close pursuant to Article X, then it may not terminate this Agreement pursuant to this Section 4.4(c);

(d)      by the Sellers' Representative, if there shall be a breach by Purchaser of (x) any representation or warranty, or (y) any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Sections 10.2 or 10.3 and which breach cannot be cured or has not been cured by the earlier of (i) ten (10) Business Days after the giving of written notice by the Sellers to Purchaser of such breach and (ii) one (1) Business Day prior to the Termination Date; provided, however, that if the Sellers shall have committed a breach of any of representations, warranties, covenants or agreements contained in this Agreement to an extent which would give Purchaser the right not to close pursuant to Article X, then they may not terminate this Agreement pursuant to this Section 4.4(d);

(e)      by the Sellers' Representative or Purchaser if there shall be in effect a Final Order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement, it being agreed that the Parties shall promptly appeal any adverse determination which is not non-appealable (and pursue such appeal with reasonable diligence);

(f)      by Sellers' Representative, if the Sale Order with respect to the transactions contemplated by this Agreement has been entered and (i) Sellers have provided the Purchaser with written notice that they are prepared to consummate the Closing, (ii) the conditions to Closing in Sections 10.1 and 10.3 have been satisfied (or waived, to the extent permissible, by the Party entitled to the benefit of such condition), other than those conditions that by their nature can only be satisfied at Closing) and (iii) the Closing Date does not occur within ten (10) Business Days after the satisfaction of the conditions set forth in Sections 10.1, 10.2 and 10.3 hereof (or the waiver of any condition by the Party entitled to waive that condition); provided, however, that if the Sellers shall have committed a breach of any of representations, warranties, covenants or agreements contained in this Agreement to an extent which would give Purchaser the right not to close pursuant to Article X, then they may not terminate this Agreement pursuant to this Section 4.4(f); and

(g)      by (i) Purchaser or the Sellers' Representative if (1) the Sellers consummate an Alternative Transaction or (2) Purchaser is neither the Successful Bidder nor a Backup Bidder at the conclusion of the Auction; or (ii) by Sellers, as may be required in connection with the discharge of their fiduciary duties in the Bankruptcy Cases.

4.5      Procedure Upon Termination.  In the event of termination and abandonment by Purchaser or the Sellers, or both, pursuant to Section 4.4 hereof and except as set forth therein, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate, and the purchase of the Purchased Assets hereunder shall be abandoned, without further action by Purchaser or the Sellers. If this Agreement is terminated as provided herein, each Party shall destroy or return to the Party furnishing the same all documents, work papers and other material of any other Party relating to the transactions contemplated hereby, whether obtained before or after the execution hereof.

4.6      Effect of Termination.  In the event that this Agreement is validly terminated pursuant to Section 4.4, (i) all further obligations of the Parties under this Agreement shall terminate, except that the

obligations in this Section 4.6, Section 4.7 (Forfeiture of Purchaser Deposit; Backup Fee), and Article XIII shall survive and (ii) each Party shall pay the fees, costs and expenses incurred by it in connection with this Agreement, except as provided in clause (i) above or Article XIII.  Notwithstanding the foregoing, the Confidentiality Agreement shall survive any termination of this Agreement and nothing in this Section 4.6 shall relieve Purchaser or the Sellers of their obligations under the Confidentiality Agreement.

**4.7**     Forfeiture of Purchaser Deposit.  If the Sellers terminate this Agreement pursuant to Section 4.4(d) or Section 4.4(f), then the Sellers shall have the right to retain the Purchaser Deposit and Purchaser shall promptly execute any and all documentation required to release the Purchaser Deposit to the Sellers, it is being agreed by the Parties that the forfeiture of the Purchaser Deposit shall be the sole and exclusive remedy of the Sellers for any damages based upon, arising out of or otherwise in respect of the matters set forth in this Agreement (including representations, warranties, covenants and agreements) and the transactions contemplated hereby, whether based in contract or tort. In the event of any termination of this Agreement other than pursuant to Section 4.4(d) or Section 4.4(f), the Sellers shall return the full amount of the Purchaser Deposit to an account designated in writing by Purchaser.  Notwithstanding anything to the contrary contained herein, (a) under no circumstances shall either Party be liable for any indirect, consequential, special, punitive, and exemplary damages, lost profits, and loss in value based on multiple of earnings of the other Parties, in each case except to the extent any such damages are payable to a third party, (b) the aggregate Liability of Purchaser based upon, arising out of or otherwise in respect of the matters set forth in this Agreement (including representations, warranties, covenants and agreements) and the transactions contemplated hereby, whether based in contract or tort, shall not exceed the then remaining amount of the Purchaser Deposit and the Purchaser Deposit shall be the sole and exclusive remedy and source for any indemnification available to Sellers under this Agreement.

### ARTICLE V
### REPRESENTATIONS AND WARRANTIES OF SELLERS

Purchaser specifically acknowledges and agrees to the following with respect to the representations and warranties of the Sellers:

**A.**     Purchaser will not have any recourse to any Seller or to any Non-Recourse Party in the event any of the representations and warranties made herein or deemed made are untrue as at any time of expression thereof.  The remedy for a breach of such representations and warranties shall be Purchaser's option, under certain circumstances provided herein, not to close in accordance with and subject to the limitations in Sections 4.4, 10.1 and 10.3 hereof and, without limiting the foregoing, Purchaser shall have no remedy whatsoever for any such breach after the Closing.

**B.**     Purchaser has conducted its own due diligence investigations of the Business, the Purchased Assets and the Assumed Liabilities or has waived its right to conduct such due diligence. Purchaser waives, to the maximum extent allowed by Law, the entitlement or benefit of any notifications regarding conditions at or near property leased, subleased, or otherwise occupied by the Sellers pursuant to the Real Property Leases and the Personal Property Leases, including under any applicable Law.

**C.**     If information provided in any Section of the Schedules delivered by Sellers to Purchaser and made a part hereof is applicable to any other Sections, then such information shall be deemed to have been provided with respect to all such Sections to the extent that the relevance of any such information to any other Section is reasonably apparent from the text of such disclosure.

**D.**     Except as expressly provided, Sellers make no representations or warranties in this Article V with respect to the Excluded Assets or the Excluded Liabilities.

Except as otherwise disclosed to Purchaser in the Schedules hereto, the Sellers jointly and severally represent and warrant to Purchaser that the following statements contained in this Article V are true and correct as of the date hereof and as of the Closing Date:

**5.1**    <u>Organization and Good Standing</u>.  Each Seller is a limited liability company or corporation duly organized, incorporated or formed, validly existing and in good standing under the laws of the jurisdiction of its organization or formation and has all requisite corporate or limited liability company power and authority to own, lease and operate its properties and to carry on its business as now conducted. Each Seller is duly qualified or authorized to do business in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties owned or leased by it requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing would not reasonably be expected to have a Material Adverse Effect.

**5.2**    <u>Authorization of Agreement</u>.  Subject to entry by the Bankruptcy Court of the Sale Order in the Bankruptcy Case, the execution, delivery and performance by the Sellers of this Agreement and the consummation of the transactions contemplated by this Agreement are within each Seller's corporate or limited liability company powers and have been duly authorized by all necessary internal actions on the part of the Sellers.  Subject to entry by the Bankruptcy Court of the Sale Order in the Bankruptcy Case, assuming due authorization, execution and delivery by Purchaser, this Agreement constitutes a valid and binding agreement of the Sellers that is enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

**5.3**    <u>Conflicts; Consents of Third Parties</u>.

**(a)**    Except as set forth on <u>Schedule 5.3(a)</u>, none of the execution and delivery by any Seller of this Agreement or the Seller Documents, the consummation of the transactions contemplated hereby or thereby, or compliance by any Seller with any of the provisions hereof or thereof will result in the creation of any Lien (other than Permitted Exceptions) upon the Purchased Assets, or conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of payment, termination, modification, revocation, withdrawal, suspension, acceleration or cancellation under any provision of (i) the certificate of incorporation, bylaws, certificate of formation, limited liability company agreement, operating agreement or comparable organizational documents of any Seller; (ii) subject to entry of the Sale Order, any Contract or Permit to which any Seller is a party or by which any of the properties or assets of any Seller are bound; (iii) subject to entry of the Sale Order, any Order of any Governmental Body applicable to any Seller or any of the properties or assets of any Seller; or (iv) subject to entry of the Sale Order, any applicable Law, other than, in the case of clauses (ii), (iii) and (iv), such conflicts, violations, defaults, terminations, modifications, accelerations or cancellations that would not reasonably be expected to have a Material Adverse Effect.

**(b)**    Subject to entry of the Sale Order, except for consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, and except as otherwise set forth on <u>Schedule 5.3(b)</u>, there is no Contract binding upon the Sellers requiring a consent or other action by any Person as a result of the execution, delivery and performance of this Agreement, except such consents or actions as would not, individually or in the aggregate, have a Material Adverse Effect if not received or taken by the Closing Date.

**5.4**     Title to Purchased Assets.  Except as set forth in Schedule 5.4, the Sellers have good and valid title to the Purchased Assets (which, for the avoidance of doubt, do not include Excluded Assets), free and clear of all Liens, except for Permitted Exceptions.

**5.5**     Real Property.

**(a)**     Schedule 5.5(a) sets forth a complete list of all material real property and interests in real property leased, subleased, or otherwise occupied by the Sellers (each such real property, a "Seller Property," and collectively, the "Seller Properties" and each Contract providing for such real property or interests in real property, a "Real Property Lease," and collectively, the "Real Property Leases") as lessee, sublessee, lessor or sublessor, together with the parties to, and date of, each Real Property Lease and the full street address of each parcel subject to a Real Property Lease. The Sellers have good and valid leasehold interests in the real property conveyed by the Real Property Leases.  Each Real Property Lease is in full force and effect, and is valid and enforceable in accordance with its terms.  No Seller has received any written notice of any default or event that with notice or lapse of time, or both, would constitute a default by any Seller under any of the Real Property Leases that are currently in effect and eligible to be assumed by Purchaser. Except as set forth in Schedule 5.5(a), such Seller has not assigned its interest under any Real Property Lease, or leased, subleased or sublicensed all or any part of the space demised thereby, to any Person (other than Purchaser).  No renewal or other option to extend lease term has been exercised under any of the Real Property Leases, except such renewal or other options whose exercise has been evidenced by a written document, a true, correct and complete copy of which has been delivered to Purchaser with the corresponding Real Property Lease.

**(b)**     Except as a result of the filing of the Bankruptcy Cases or as set forth on Schedule 5.5(b), such Seller is in compliance in all material respects with the terms of each Real Property Lease and to the Knowledge of the Sellers, there has been no default or event that with notice or lapse of time, or both, would give rise to a right on the part of the landlord thereunder to terminate a Real Property Lease.  To the Knowledge of the Sellers, each landlord under the Real Property Leases is in compliance in all material respects with the terms of such Real Property Lease and no event has occurred and no condition exists which, with the giving of notice or the lapse of time or both, would give rise to a material default by the landlord of such Real Property Lease.

**5.6**     Intellectual Property.

**(a)**     Schedule 5.6(a) lists each item of Owned Intellectual Property for which any Seller has received or applied for a registration with any Governmental Body or domain name registrar ("Registered Owned Intellectual Property"). To the Knowledge of the Sellers, all of the Registered Owned Intellectual Property is subsisting, valid and enforceable, free and clear of any Liens, except for Permitted Exceptions.  Such Seller has instituted commercially reasonable measures (including the entering into of appropriate written agreements with present employees and consultants of the Business) intended to maintain the confidentiality of the Owned Intellectual Property used in the Business.

**(b)**     Except as set forth on Schedule 5.6(b), (i) the Sellers own or have the right to use all material Intellectual Property owned or used by them in the Business as currently conducted, and (ii) to the Knowledge of the Sellers, the Owned Intellectual Property and Licensed Intellectual Property constitutes all Intellectual Property used in the Business as currently conducted.

**(c)**     Except as set forth on Schedule 5.6(c), there are no pending or, to the Knowledge of the Sellers, threatened claims against any Seller by any third party contesting the validity, enforceability, or ownership of any Owned Intellectual Property (other than in connection with prosecution during examination of pending Registered Owned Intellectual Property).  Subject to Section 5.3, the consummation

of the transactions contemplated hereunder will not result in the loss or impairment of any of the material Owned Intellectual Property or the right to use any of the material Licensed Intellectual Property in the Business;

(d)      Schedule 5.6(d) sets forth all material Intellectual Property Licenses.  Except as set forth on Schedule 5.6(d), no Seller has received any written notice of any default or any event that with notice or lapse of time, or both, would constitute a default by any Seller under any material Intellectual Property License;

(e)      To the Knowledge of the Sellers, no Seller is currently infringing, misappropriating or otherwise violating, and the operation of the Business as currently conducted does not infringe, misappropriate or violate, any Intellectual Property of any Person, except for any infringement, misappropriation or violation that is not material to the Business.  Except as set forth on Schedule 5.6(e), to the Knowledge of the Sellers, no Person is currently infringing, misappropriating or violating any of the Owned Intellectual Property;

(f)      Schedule 5.6(f) identifies each computer software program owned, held or used in the conduct of the Business, other than off-the-shelf software, that assists with or relates to computer aided engineering, design, manufacturing or other analysis, archival or retrieval of technical information.  Such Seller owns, or possesses sufficiently broad and valid rights to use, all computer software programs that are material to the conduct of, used or held for use in the Business.  There are no infringement proceedings pending or, to such Seller's Knowledge, threatened against such Seller with respect to any software owned or licensed by such Seller or used by such Seller in the Business.

(g)      Notwithstanding any other representation or warranty set forth in this Agreement, the representations and warranties in this Section 5.6 are the sole and exclusive representations and warranties of the Sellers relating to Intellectual Property, and no other representation or warranty of the Sellers in this Agreement shall be construed to relate thereto.

**5.7**     Inventories.  Except for reserves reflected on the Financial Statements, the Inventories of each Seller (including that reflected on the Financial Statements), taken as a whole, are in merchantable condition, are suitable and usable or, in the case of finished goods, salable in the ordinary course of business, consistent with past practice, for the purposes for which such Inventories were intended, and have been reflected on the Financial Statements and carried on the books of account of such Seller at the lower of cost or market value, in each case in all material respects.

**5.8**     Material Contracts.

(a)      Schedule 5.8(a) sets forth all of the following Seller Contracts that are currently in effect as of the date of this Agreement (collectively, the "Material Contracts"):

(i)      all Real Property Leases;

(ii)      all Personal Property Leases with annual payments by the Sellers in excess of $50,000 or with a term of no less than one year;

(iii)      all Contracts that involves performances of services or delivery of goods or materials by or to such Seller with an amount or value in excess of $50,000;

(iv)     any Contract (A) granting or obtaining any right to use any material Owned Intellectual Property or Licensed Intellectual Property or (B) materially restricting the Sellers' rights to the use of any Owned Intellectual Property or Licensed Intellectual Property;

(v)     all employment Contracts with employees of the Sellers and Contracts with independent contractors or consultants (or similar arrangements) engaged in connection with the Business, in each case with annual payments in excess of $100,000;

(vi)     each franchise, joint venture, partnership, strategic alliance, co-marketing, co-promotion, co-packaging or joint development Contract, or other Contract involving a sharing of profits, losses, costs or liabilities by such Seller with any other Person;

(vii)     each Contract containing covenants that in any way purport to restrict the business activity of such Seller or limit the freedom of such Seller to engage in any line of business or to compete with any Person or which contain any exclusivity, non-competition, non-solicitation or no-hire provisions restricting such Seller;

(viii)     each written warranty, guaranty, and or other similar undertaking with respect to contractual performance by such Seller extended by such Seller;

(ix)     each Contract with a Governmental Body; or

(x)     any Contract that was not entered into in the Ordinary Course of Business, consistent with past practice.

(b)     The Sellers have delivered to Purchaser true and complete copies of such Material Contracts and any and all amendments, modifications, supplements, exhibits and restatements thereto and thereof in effect as of the date of this Agreement.

(c)     Each Material Contract included in the Purchased Assets or the Assumed Liabilities is in full force and effect and is the valid and binding obligation of the Seller party thereto, and to the Knowledge of the Sellers, each other party thereto, and will continue to be so legal, valid, binding and enforceable and in full force and effect following the assignment of such Contract at the Closing or pursuant to other arrangements in accordance with this Agreement.

(d)     Except as set forth on Schedule 5.8(d) and under the Documents evidencing the Sellers' Indebtedness for borrowed money, no Seller has received any notice of any material default or event that with notice or lapse of time or both would constitute a material default by any Seller under any Material Contract.

5.9     Employee Benefits.  The representations and warranties contained in this Section 5.9 are the sole and exclusive representations and warranties of the Sellers pertaining or relating to any employee benefits matters.

(a)     Schedule 5.9(a) lists all material Employee Benefit Plans. The Sellers have provided to, or made available to, Purchaser true and correct copies of each material Employee Benefit Plan (including all plan documents and amendments thereto).  Except as set forth on Schedule 5.9(a), each material Employee Benefit Plan has been established, maintained, funded and administered in material compliance with its terms and all applicable requirements of ERISA, the Code, and other applicable Laws. Except as set forth on Schedule 5.9(a), each Employee Benefit Plan which is intended to be qualified within the meaning of Section 401(a) of the Code is so qualified and has received a favorable determination letter

from the IRS upon which it may rely, or is comprised of a master or prototype plan that has received a favorable opinion letter from the IRS, and to the Knowledge of the Sellers, nothing has occurred that is reasonably likely to adversely affect the qualified status of such Employee Benefit Plan.  No Employee Benefit Plan is subject to Title IV or Section 302 of ERISA or Section 412 of the Code, and the Sellers do not contribute to nor have any liability with respect to any such plan.

        **(b)**      None of the Sellers are a party to any "multiemployer plan" as defined in Section 3(37) of ERISA ("<u>Multiemployer Plan</u>").  None of the Sellers have incurred any unsatisfied withdrawal liability with respect to any Multiemployer Plan, and none of the Sellers are bound by any contract or has any liability described in Section 4204 of ERISA.

        **(c)**      Except as set forth on <u>Schedule 5.9(c)</u>, with respect to each Employee Benefit Plan, all payments, premiums, contributions, distributions, reimbursements or accruals for all periods (or partial periods) ending prior to or as of the Closing Date shall have been timely made in accordance with the terms of the applicable Employee Benefit Plan and applicable Law.

    **5.10**   <u>Labor</u>.  The representations and warranties contained in this <u>Section 5.10</u> are the sole and exclusive representations and warranties of the Sellers pertaining or relating to any employment, labor or collective bargaining matters:

        **(a)**      No Seller is a party to any labor or collective bargaining agreement and no Employees are represented by any labor organization; no labor organization or group of Employees has made a pending demand for recognition or certification to the Seller and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or, to the Knowledge of the Sellers, threatened to be brought or filed with the National Labor Relations Board or any other labor relations tribunal or authority relating to Sellers.  To the Knowledge of the Sellers, there are no organizing activities involving the Seller pending with any labor organization or group of Employees.

        **(b)**      There are no (i) strikes, work stoppages, work slowdowns or lockouts pending or, to the Knowledge of the Sellers, threatened against or involving any Seller, or (ii) unfair labor practice charges, grievances or complaints pending or, to the Knowledge of the Sellers, threatened by or on behalf of any employee or group of employees of any Seller, except in each case as would not have a Material Adverse Effect.

        **(c)**      The Sellers are in compliance with all laws governing the employment of labor, including, but not limited to, all such laws relating to wages, hours, collective bargaining, discrimination, civil rights, safety and health, workers' compensation and the collection and payment of withholding and/or social security Taxes and similar Taxes, except where such violation would not have a Material Adverse Effect.

    **5.11**   <u>Litigation</u>.  Except as set forth on <u>Schedule 5.11</u>, there are no Legal Proceedings pending or, to the Knowledge of the Sellers, threatened by or against any Seller before any Governmental Body that is reasonably likely to result in a Material Adverse Effect.

    **5.12**   Compliance with Laws; Permits.

        **(a)**      The Sellers are in compliance with all Laws applicable to their respective operations or assets or the Business, except where the failure to be in compliance would not reasonably be expected to have a Material Adverse Effect.  No Seller has received any written notice of or been charged with the violation of any Laws since the Petition Date, except where such violation would not reasonably be expected to have a Material Adverse Effect.

**(b)** The Sellers currently have, and the Purchased Assets include, all Permits which are reasonably required for the operation of the Business as presently conducted, to own the assets it owns, and to perform all of its obligations under the Contracts, except where the absence of which would not have a Material Adverse Effect, and such Permits are in full force and effect, subject to renewal in the ordinary course of business, and no Legal Proceeding is pending by any Governmental Body, or to the Knowledge of the Sellers, threatened by any Governmental Body, seeking the revocation, limitation or non-renewal of any such Permits.  To the Knowledge of the Sellers, Schedule 5.12(b) sets forth a complete and correct list as of the date of this Agreement of all Permits required for and material to the conduct of the business, together with the name of the Governmental Body issuing such Permits and their respective dates of issuance and expiration.  To the Knowledge of the Sellers, no Seller is in material default or violation (and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation) of any term, condition or provision of any Permit to which it is a party, except where such default or violation would not be material to the operation of the Business.  Upon consummation of the transactions contemplated hereunder and upon obtaining any required approvals, authorizations, transfers and/or assignments by Governmental Bodies as explicitly set forth hereunder, Purchaser will have all of such Seller's rights, title and interests in and to all of the Permits listed on Schedule 5.12(b).

**5.13** Financial Advisors.  Except as set forth on Schedule 5.13, no Person has acted, directly or indirectly, as a broker, finder or financial advisor for any Seller in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment from the Sellers in respect thereof.

**5.14** Financial Statements; Benchmark List.  The Sellers have delivered to Purchaser true and correct copies of the unaudited consolidated balance sheet of the Business as of February 29, 2024 and the related unaudited statement of operations for the two-month period then ended.  The financial statements referred to in the foregoing sentence are collectively referred to as the "Financial Statements." The Financial Statements have been prepared from the books and records of the Sellers on an accrual basis consistent with the Sellers' internal accounting practices.  Such Financial Statements were prepared in accordance with GAAP.  The Sellers have delivered to Purchaser a true, correct and complete list of its Inventories and Equipment dated as of February 29, 2024 (the "Benchmark List"), and the Benchmark List have been prepared from the books and records of the Sellers consistent with the Sellers' internal accounting practices and were in prepared in accordance with GAAP, if applicable.  The list of Inventories and Equipment submitted by the Sellers to the Bankruptcy Court shall be substantially similar to the Benchmark List.

**5.15** "AS IS" TRANSACTION.  PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, NOTWITHSTANDING THE REPRESENTATIONS AND WARRANTIES EXPRESSLY PROVIDED IN THIS ARTICLE V, THE CONSENT OF A PARTY TO THE CLOSING SHALL CONSTITUTE A WAIVER BY SUCH PARTY OF ANY CONDITIONS TO CLOSING NOT SATISFIED AS OF THE CLOSING DATE, AND PURCHASER FURTHER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE PURCHASED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE PURCHASED ASSETS AS PURCHASER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE PURCHASED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE V, PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS.  ACCORDINGLY, UPON THE CLOSING DATE, PURCHASER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

**5.16**     No Material Adverse Effect.  Since the date of the Agreement, there has not been any Material Adverse Effect, and no event has occurred or circumstance exists that would reasonably be expected to have a Material Adverse Effect.

**5.17**     No Other Representations or Warranties; Schedules.  Except for the representations and warranties contained in this Article V (as modified by the Schedules hereto), no Seller nor any other Person makes any other express or implied representation or warranty with respect to any Seller, the Business, the Purchased Assets, the Assumed Liabilities or the transactions contemplated by this Agreement, and the Sellers disclaim any other representations or warranties, whether made by any Seller, any Affiliate of the Sellers or any of their respective officers, directors, employees, agents or representatives.  Except for the representations and warranties contained in this Article V (as modified by the Schedules hereto), the Sellers (i) expressly disclaim and negate any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Purchased Assets (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) and (ii) disclaim all liability and responsibility for any representation, warranty, projection, forecast, statement, or information of any kind or description made, communicated, or furnished (orally or in writing) to Purchaser or its Affiliates or representatives (including any opinion, information, projection, marketing materials, confidential information memorandum or advice that may have been or may be provided to Purchaser by any director, officer, employee, agent, consultant, or representative of the Sellers or any of their Affiliates).  The disclosure of any matter or item in any Schedule hereto shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would result in a Material Adverse Effect.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to the Sellers that:

**6.1**     Organization and Good Standing.  Purchaser is a corporation duly organized, validly existing and in good standing under the laws of Germany and has all requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.

**6.2**     Authorization of Agreement.  Purchaser has full power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or that has been or is to be executed by Purchaser in connection with the consummation of the transactions contemplated hereby and thereby (the "Purchaser Documents"), and to consummate the transactions contemplated hereby and thereby.  Purchaser has provided to the Sellers documentary evidence demonstrating the foregoing.  The execution, delivery and performance by Purchaser of this Agreement and each Purchaser Document have been duly authorized by all necessary action on behalf of Purchaser and no other action on the part of Purchaser is necessary to authorize the execution and delivery of this Agreement and the Purchaser Documents by Purchaser and the consummation of the transaction contemplated hereby and thereby by Purchaser.  This Agreement has been, and each Purchaser Document will be at or prior to the Closing, duly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other Parties hereto and thereto) this Agreement constitutes, and each Purchaser Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

**6.3** <u>Conflicts; Consents of Third Parties</u>.

**(a)** Except as set forth on <u>Schedule 6.3(a)</u>, none of the execution and delivery by Purchaser of this Agreement or the Purchaser Documents, the consummation of the transactions contemplated hereby or thereby, or the compliance by Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination or cancellation under any provision of (i) the organizational documents of Purchaser, (ii) any Contract or Permit to which Purchaser is a party or by which Purchaser or its properties or assets are bound, (iii) any Order of any Governmental Body applicable to Purchaser or by which any of the properties or assets of Purchaser are bound or (iv) any applicable Law, other than, in the case of clauses (ii), (iii) and (iv), such conflicts, violations, defaults, terminations or cancellations that would not have a material adverse effect on the ability of Purchaser to consummate the transactions contemplated by this Agreement.

**(b)** Except for the PRC Overseas Investment Approvals, no consent, waiver, approval, Order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Purchaser in connection with the execution and delivery of this Agreement or Purchaser Documents, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Purchaser of any other action contemplated hereby or thereby, or for Purchaser to conduct the Business, except where the failure of which to obtain or make would not have a material adverse effect on the ability of Purchaser to consummate the transactions contemplated by this Agreement.

**6.4** <u>Litigation</u>.  There are no Legal Proceedings pending or, to the knowledge of Purchaser, threatened against Purchaser, or to which Purchaser is otherwise a party before any Governmental Body, expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or to consummate the transactions hereby.  Purchaser is not subject to any Order of any Governmental Body except to the extent the same would not reasonably be expected to have a material adverse effect on the ability of Purchaser to perform its obligations under this Agreement or to consummate the transactions contemplated hereby.

**6.5** <u>Financial Advisors</u>.  Purchaser does not have any obligation to pay any broker, finder or financial advisor for Purchaser any fee or commission or like payment in connection with the transactions contemplated by this Agreement.

**6.6** <u>Financial Capability; Equity Commitment Letter</u>.  Purchaser (i) at the Closing will have, sufficient funds available to pay the portion of the Purchase Price payable in cash and any expenses incurred by Purchaser in connection with the transactions contemplated by this Agreement, (ii) at the Closing will have, the resources and capabilities (financial or otherwise) to perform its obligations hereunder, and (iii) has not incurred any obligation, commitment, restriction or Liability of any kind, which would impair or adversely affect such resources and capabilities.  Concurrently with the signing of this Agreement, Purchaser has delivered to the Sellers a true, correct and complete copy of the executed equity commitment letter set forth on <u>Exhibit E</u> (the "<u>Equity Commitment Letter</u>") from Shang Gong Group Co., Ltd. (the "Investor") pursuant to which, and subject to the terms and conditions thereof, the Investor has caused such committed to invest the amounts set forth therein (the "Equity Financing"). As of the date hereof, the Equity Commitment Letter (and each of the respective obligations and commitments contained therein) is in full force and effect and has not been withdrawn, terminated or rescinded in any respect or otherwise amended, supplemented or modified in any respect, and, to the Purchaser's knowledge, no such withdrawal, termination, rescission, amendment, supplement or modification is presently contemplated. Assuming the due authorization, execution and delivery by each other party thereto, the Equity Commitment Letter is a legal, valid and binding obligation of the Purchaser and the Investor, subject to applicable bankruptcy,

insolvency, reorganization, moratorium, fraudulent transfer and similar laws of general applicability relating to or affecting creditors' rights or by general equity principles. As of the date hereof, there are no side letters or other agreements, contracts or arrangements relating to the Equity Financing or the Equity Commitment Letter, including any that could affect the conditionality or availability of the Equity Financing, to which the Purchaser, the Investor or any of their respective Affiliates is a party. Assuming the accuracy of the representations and warranties in Article V in all material respects, the compliance and performance by the Sellers of their covenants and agreements set forth in this Agreement in all material respects, to the knowledge of the Purchaser, as of the date of this Agreement, no event has occurred which, with or without notice, lapse of time or both, would or would reasonably be expected to (x) constitute a default or breach on the part of the Purchaser or the Investor under any term of the Equity Commitment Letter, (y) result in a failure of any condition of the Equity Commitment Letter, or (z) result in any portion of the Equity Financing contemplated thereby to be unavailable in an amount equal to the Required Amount. Assuming (i) the Equity Financing is funded in accordance with the Equity Commitment Letter and (ii) the satisfaction of the conditions to the Purchaser's obligation to consummate the Closing (other than those conditions that by their nature are to be satisfied at Closing), the aggregate net proceeds of the Equity Financing will be sufficient for the satisfaction of all of the Purchaser's obligations under this Agreement to be satisfied at or after Closing on the terms contemplated hereby, including the payment of the aggregate Purchase Price and Assumed Liabilities and the payment of all associated fees, costs and expenses and all other amounts, in each case, required to be paid by the Purchaser pursuant to this Agreement and the transactions contemplated hereby (the "Required Amount"). There are no conditions precedent or other contingencies related to the funding or investing, as applicable, of the full amount of the Equity Financing in an amount equal to the Required Amount or that would permit the parties thereunder to reduce the total amount of the Equity Financing to an amount less than the Required Amount, in each case other than as expressly set forth in the Equity Commitment Letter. Assuming the satisfaction of the conditions to the Purchaser's obligation to consummate the Closing (other than those conditions that by their nature are to be satisfied at the Closing), as of the date hereof, the Purchaser does not have any reason to believe that any of the conditions to the Equity Financing will not be satisfied or that the full amount of the Equity Financing will not be available to the Purchaser on the date of the Closing or of any fact, occurrence or condition that makes any of the assumptions or statements set forth in the Equity Commitment Letter inaccurate in any material respect.

      **6.7**   <u>Condition of the Business</u>. Notwithstanding anything contained in this Agreement to the contrary, Purchaser acknowledges, understands and agrees that the Sellers are not making any representations or warranties whatsoever, express or implied, beyond those expressly given by the Sellers in <u>Article V</u> hereof (as modified by the Schedules hereto, as supplemented or amended), and Purchaser acknowledges and agrees that, except for the representations and warranties contained in <u>Article V</u> hereof (as modified by the Schedules hereto, as supplemented or amended), the Purchased Assets and the Business are being transferred on a "where is" and, as to condition, "as is" basis. Any claims Purchaser may have for breach of representation or warranty shall be based solely on the representations and warranties of the Sellers set forth in <u>Article V</u> hereof (as modified by the Schedules hereto, as supplemented or amended). Purchaser further represents that no Seller nor any of their Affiliates nor any other Person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Sellers, the Business, the Purchased Assets, the Assumed Liabilities or the transactions contemplated by this Agreement not expressly set forth in this Agreement, and none of the Sellers, any of their Affiliates or any other Person will have or be subject to any liability to Purchaser or any other Person resulting from the distribution to Purchaser or its representatives or Purchaser's use of, any such information, including any confidential information memorandum distributed on behalf of the Sellers relating to the Business or any other publications or data room or due diligence information provided to Purchaser or its representatives, or any other document or information in any form provided to Purchaser or its representatives in connection with the sale of the Purchased Assets and the transactions contemplated hereby. Purchaser acknowledges that it is able to fend for itself, can bear the economic risk of its purchase

of the Purchased Assets and assumption of the Assumed Liabilities, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of such purchase.

## ARTICLE VII
## BANKRUPTCY COURT MATTERS

**7.1**    Competing Bids.  This Agreement and the transactions contemplated hereby are subject to the Sellers' right and ability to consider higher and/or otherwise better competing bids with respect to the Business and the Purchased Assets, pursuant to the Bidding Procedures.  In accordance with the Bidding Procedures, the Sellers have the right to, and may cause their representatives and Affiliates to, (a) initiate contact with any Person (in addition to Purchaser and its Affiliates and representatives) in connection with any sale or other disposition of the Purchased Assets; (b) respond to any request for information or due diligence inquiry, or make management available for such purposes, to any such Person; and (c) furnish any information with respect to, or assist or participate in, or facilitate in any other manner, any effort or attempt by any Person to do or seek to do any of the foregoing. For the avoidance of doubt, the Sellers shall be entitled to take such actions as may be required in connection with the discharge of their fiduciary duties in the Bankruptcy Cases (including soliciting higher or better offers for the Purchased Assets).

**7.2**    Bankruptcy Court Filings.  The Sellers shall use commercially reasonable efforts to make any filings, take all actions and obtain any and all relief from the Bankruptcy Court that is necessary or appropriate to consummate the transactions contemplated by this Agreement and the Ancillary Agreements. Purchaser agrees that it will promptly take such actions as are reasonably requested by the Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and that the Purchase Price was not controlled by an agreement in violation of section 363(n) of the Bankruptcy Code.  In the event the entry of the Sale Order shall be appealed, the Sellers and Purchaser shall use their respective reasonable best efforts to defend such appeal.

**7.3**    Adequate Assurances.  With respect to each Purchased Contract and each Personal Property Lease and Real Property Lease constituting a Purchased Asset, Purchaser shall timely provide adequate assurance of the future performance by it of such Purchased Contract, Personal Property Lease or Real Property Lease.  Purchaser agrees that it will promptly take such actions as are reasonably requested by the Sellers to assist in obtaining the entry of the Sale Order and a finding by the Bankruptcy Court of adequate assurance of future performance by Purchaser.

**7.4**    Purchaser Deposit.

**(a)**    Prior to or simultaneously with the execution of this Agreement, Sellers' Representative and Purchaser shall enter into an escrow agreement with Young Conaway Stargatt & Taylor, LLP (the "Escrow Agent") substantially in the form of Exhibit G hereto (the "Escrow Agreement"). Without limiting the generality of the foregoing, the Escrow Agreement shall provide, *inter alia*, that the Purchaser Deposit can only be released to the Sellers directly from the Escrow Account (a) upon the Closing in accordance with the terms and conditions of this Agreement; or (b) before the Closing but no earlier than June 6, 2024, if and only if (i) the Closing does not happen by or before June 6, 2024 due to any reason other than the Sellers' material and uncured breach of this Agreement, (ii) the Sellers have provided supporting documents to the reasonable satisfaction of Purchaser evidencing that the loan amount under the DIP Facility has been exhausted, and (iii) the Sellers have obtained prior written consent of the Purchaser, which consent shall be at the Purchaser's sole discretion.  In the event of clause (b) in the precedent

sentence, the Sellers may use all or a portion of the Purchaser Deposit for working capital purposes.  The fees and expenses of the Escrow Agent shall be paid for by the Purchaser.

(b)  The sum of One Million and Three Hundred Thousand Dollars ($1,300,000) (the "Purchaser Deposit") shall be initiated by Purchaser or a designated party of the Purchaser concurrently with the execution of this Agreement via wire transfer of immediately available funds into an escrow account which account is to be managed by the Escrow Agent.  Purchaser's and Sellers' right to retain and the Sellers' right to access the Purchaser Deposit in the Escrow Account shall be governed by Section 4.7 and Section 7.4 of this Agreement and the Escrow Agreement.  On the Closing Date, the full amount of the Purchaser Deposit and all interest and other amounts earned thereon, if any, shall be applied to the Purchase Price.

(c)  The Purchaser Deposit deposited in the Escrow Account shall be and shall remain the property of Purchaser until after Closing.  The Purchaser Deposit will not be used for any other purpose, except as explicitly provided under Section 4.7 and Section 7.4 of this Agreement.

## ARTICLE VIII
### COVENANTS

**8.1**  Due Diligence; Access to Information.  The Sellers agree to reasonably cooperate with the Purchaser after the signing of this Agreement for the Purchaser to conduct legal, financial and accounting due diligence on the Business, the Purchased Assets and/or the Assumed Liabilities (the "Due Diligence"). Without limiting the generality of the foregoing, within five (5) Business Days after the signing of this Agreement, the Sellers shall provide the Purchaser a list of Owned Intellectual Property, with reasonable details, including without limitation, the status, application date, registration number, publication number, grant date, register number of granting, next payment due, and other information thereof as may be reasonably requested by the Purchaser.  The Sellers agree that, prior to the Closing Date, Purchaser shall continue to be entitled, through its officers, employees and representatives (including, without limitation, legal advisors and accountants), to make such investigation of the properties (including environmental site assessments), businesses and operations of the Business and such examination of the books and records of the Business, the Purchased Assets and the Assumed Liabilities as is reasonable (and reasonably requested) and to make extracts and copies of such books and records.  Any such investigation and examination shall be conducted in a reasonable manner (and shall not interfere with the operations of the Sellers or the Business), during regular business hours upon reasonable advance notice and under reasonable circumstances and shall be subject to any applicable restrictions under applicable Law.  The Sellers shall use their commercially reasonable efforts to cause the officers, employees, consultants, agents, accountants, attorneys and other representatives of the Sellers to cooperate with Purchaser and Purchaser's representatives in connection with such investigation and examination, and Purchaser and Purchaser's representatives shall cooperate with the Sellers and the Sellers' representatives and Purchaser and Purchaser's representatives shall, at the discretion of the Sellers, take measures to minimize any disruption to the Business.  Notwithstanding anything herein to the contrary, no such investigation or examination shall be permitted to the extent that it would require any Seller to disclose information subject to attorney-client privilege or breach any obligation of confidentiality.

**8.2**  Conduct of the Business Pending the Closing.

(a)  Prior to the Closing, except (1) as set forth on Schedule 8.2(a), (2) to the extent as required by applicable Law, (3) as otherwise expressly contemplated by this Agreement, (4) actions taken by any Seller that are reasonable or prudent for such Seller to take in connection with events surrounding any earthquake, hurricane, flood, other natural disaster, hostility, national calamity, act of war, acts of God, political condition, sabotage or terrorism or military action or any escalation or worsening of any such

hostility, national calamity, act of war, act of God, political condition, sabotage or terrorism, military action, epidemic, pandemic, public health emergency or other force majeure event, or (5) with the prior written consent of Purchaser which consent shall not be unreasonably withheld, conditioned or delayed, the Sellers shall, provided that such conduct would not result in a Default or Event of Default under the Budget or the DIP Order:

      **(i)** use commercially reasonable efforts to conduct the Business only in the Ordinary Course of Business as in effect on the date hereof (taking into account such Seller's status as a debtor-in-possession);

      **(ii)** use commercially reasonable efforts to (A) preserve the present business operations, organization and goodwill of the Business, and (B) preserve the present relationships with customers and suppliers of the Business;

      **(iii)** otherwise report periodically (in no event more than once every ten (10) days unless agreed to by the Sellers) to Purchaser concerning the status of the Business, including the material operations thereof and finances related thereto;

      **(iv)** use commercially reasonable efforts to maintain the material Purchased Assets in a state of repair and condition that complies with applicable Law and is consistent with the Ordinary Course of Business;

      **(v)** use commercially reasonable efforts to keep in full force and effect all material rights relating to the Business consistent with the Ordinary Course of Business;

      **(vi)** comply with all applicable Law;

      **(vii)** use commercially reasonable efforts to continue in full force and effect material insurance coverage consistent with the Ordinary Course of Business;

      **(viii)** use commercially reasonable efforts to cooperate with Purchaser and assist Purchaser in identifying the Permits required by Purchaser to operate the Business from and after the Closing Date and either transferring existing Permits of such Seller to Purchaser, where permissible, or obtaining new Permits for Purchaser, in each case at Purchaser's sole cost and expense;

      **(ix)** use commercially reasonable efforts to cooperate with and assist Purchaser in the exploration and/or operation of the Business and the Purchased Assets by Purchaser upon and after the Closing Date, including without limitation, matters relating to employment of certain employees of the choice by Purchaser that are not Transferred Employees with employment terms and conditions to the reasonable satisfaction of Purchaser; and

      **(x)** upon request from time to time, use commercially reasonable efforts to execute and deliver all documents, make all truthful oaths, testify in any proceedings and do all other acts that may be reasonably necessary to consummate the transactions contemplated hereunder, all without further consideration, including without limitation, collaborate with and assist the Purchaser to take control of and transport, if needed, all the Purchased Assets upon the Closing.

      **(b)** Except (1) as set forth on <u>Schedule 8.2(b)</u>, (2) to the extent as required by applicable Law, (3) as otherwise contemplated, required or permitted by this Agreement, (4) in the Ordinary Course of Business, (5) actions taken by any Seller that are reasonable or prudent for such Seller to take in connection with events surrounding any earthquake, hurricane, flood, other natural disaster, hostility,

national calamity, act of war, acts of God, political condition, sabotage or terrorism or military action or any escalation or worsening of any such hostility, national calamity, act of war, act of God, political condition, sabotage or terrorism, military action, epidemic, pandemic, public health emergency or other force majeure event, or (6) with the prior written consent of Purchaser (which consent shall not be unreasonably withheld, delayed or conditioned), the Sellers shall not, solely as it relates to the Business, the Purchased Assets and/or the Assumed Liabilities:

   **(i)**  (A) increase the annual level of compensation of any director or executive officer of any Seller, except as set forth in <u>Schedule 8.2(b)(i)</u>, (B) increase the annual level of compensation payable or to become payable by any Seller to any of their respective directors or executive officers, (C) grant any bonus, benefit or other direct or indirect compensation to any director or executive officer except in the Ordinary Course of Business, or (D) increase the coverage or benefits available under any (or create any new) Employee Benefit Plan;

   **(ii)**  subject any of the material Purchased Assets to any Lien, except for Permitted Exceptions;

   **(iii)**  sell, assign, license, transfer, convey, lease or otherwise dispose of any material Purchased Assets (except in the Ordinary Course of Business or for the purpose of disposing of obsolete or worthless assets); *provided, however*, notwithstanding anything to the contrary contained under this Agreement, any sale, assignment, license, transfer, convey, lease or otherwise disposal of any or any portion of the Equipment and Owned Intellectual Property shall require prior written consent of Purchaser (which consent shall be at Purchaser's sole discretion);

   **(iv)**  waive or release any material right of any Seller that constitutes a Purchased Asset except in the Ordinary Course of Business;

   **(v)**  enter into, materially modify or terminate any labor or collective bargaining agreement or, through negotiation or otherwise, make any material commitment or incur any material liability to any labor organization with respect to any Purchased Asset;

   **(vi)**  make any Material Decision outside of the Ordinary Course of Business;

   **(vii)**  make any material tax election inconsistent past practice or material change in any accounting method used by such Seller other than required by GAAP, in each case, to the extent it would impact the Business or the Purchased Assets after the Closing; or

   **(viii)**  agree to do anything prohibited by this <u>Section 8.2</u>.

Notwithstanding anything to the contrary herein, after June 14, 2024, this <u>Section 8.2</u> (except for Sections 8.2(b)(ii) through (iv)) shall not apply to the Sellers' reasonable actions taken for purposes of reducing or eliminating operational expenses (including related to payrolls) or professional fees.

  **8.3**  <u>Consents</u>.  Purchaser and Sellers shall use their reasonable best efforts to obtain at the earliest practicable date all consents and approvals required of them to consummate the transactions contemplated by this Agreement, including, without limitation, the consents and approvals referred to in <u>Section 5.3(b)</u> and <u>Section 6.3(b)</u> hereof; <u>provided,</u> <u>however</u>, neither Sellers nor Purchaser shall be obligated to pay any consideration therefor to any third party from whom consent or approval is requested or to initiate any litigation or Legal Proceedings to obtain any such consent or approval.

**8.4**     Further Assurances.  Each of Purchaser and each Seller shall, at its own expense, use its reasonable best efforts to (i) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement, including with respect to Purchaser taking actions (and causing the Investor and Purchaser's other Affiliates to take all actions) required to obtain the PRC Overseas Investment Approvals and the Equity Financing, (ii) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement, including with respect to Purchaser taking actions (and causing the Investor and Purchaser's other Affiliates to take all actions) required to obtain the PRC Overseas Investment Approvals, (iii) with respect to the Purchaser, subject to the terms and conditions of the Equity Commitment Letter, (a) maintain in effect the Equity Commitment Letter until the Closing, (b) enforce (including through specific performance, litigation or other appropriate proceedings) its rights under the Equity Commitment Letter, (c) negotiate and enter into definitive agreements with respect to the Equity Financing on the terms and conditions contained in the Equity Commitment Letter, (d) satisfy on or prior to the Closing Date (or obtain the waiver of) all conditions in the Equity Commitment Letter, and (e) cause (including through litigation pursued in good faith) the Investor to fund the Equity Financing at the Closing, and (iv) cooperate in connection with the transfer, collection or similar realization of the Purchased Assets for the benefit of Purchaser, including by making regulatory or other filings. Notwithstanding anything contained in this Agreement to the contrary, the Sellers shall be entitled to take such actions as are required in connection with the discharge of their fiduciary duties during the Bankruptcy Cases (including soliciting higher or better offers for the Purchased Assets). The Purchaser shall not agree to any amendments or modifications to, or grant any waivers of, any condition or other provision or remedy under the Equity Commitment Letter without the prior written consent of the Sellers (which may be granted or withheld in the Sellers' sole discretion).  The Purchaser shall not release or consent to the termination of the obligations of the Investor under the Equity Commitment Letter.  The Purchaser shall give the Sellers written notice as soon as reasonably practicable, but in any event within two (2) Business Days, of (A) any breach or threatened breach of which the Purchaser is or becomes aware by the Investor under the Equity Commitment Letter, (B) if the Purchaser obtains knowledge that the Equity Commitment Letter ceases to be in full force and effect and the legal, valid, binding and enforceable obligations of the Purchaser or of the Investor, (C) if the Purchaser receives (1) any notice or (2) other communication, in each case from the Investor with respect to (y) any actual or potential breach, default, termination or repudiation by any party to the Equity Commitment Letter or (z) material dispute or disagreement between or among any parties to the Equity Commitment Letter or (D) if the Purchaser receives (1) any notice or (2) other communication on the basis of which the Purchaser reasonably believes in good faith that it is reasonably likely that the Investor will fail to fund the Equity Financing or reduce the amount of the Equity Financing.  The Purchaser shall otherwise keep the Sellers reasonably informed on a reasonably current basis and in reasonable detail of the status of the Equity Financing.

**8.5**     Confidentiality.  Purchaser acknowledges and agrees that is should be bound by that certain Confidentiality Agreement, by and between the Company and Shang Gong Group Co., Ltd, dated as of March 29, 2024 (the "Confidentiality Agreement") as if it were Recipient thereto and that all information provided to it in connection with this Agreement, including under Section 8.1, and the consummation of the transactions contemplated hereby, is subject to the terms of the Confidentiality Agreement.

**8.6**     Preservation of Records.

**(a)**     The Sellers (subject to their fiduciary duties including the option to convert the Bankruptcy Cases to Chapter 7) and Purchaser agree that each of them shall, and shall cause their respective successors to, (i) preserve and keep the books and records relating to the Purchased Assets held by them or any of their Affiliates for a period of three (3) months from the Closing Date, and (ii) make such books and records (as well as any former employees of any Seller that are then employed by Purchaser) available to the other (and such Party's respective estates, successors and assignees, as applicable, and any

representative of any of the foregoing Persons) as may be reasonably required by such other Party in connection with, among other things, any insurance claims by, Legal Proceedings, Tax audits or examinations involving or governmental investigations of such other Party or any of their respective Affiliates, or in order to enable any such other Party to comply with its obligations under this Agreement, any Ancillary Agreement or the Bankruptcy Cases; provided, however, that this Section 8.6 shall not apply to any Seller upon liquidation of such Seller.  Each Party (and its respective estates, successors and assignees, as applicable, and any representative of any of the foregoing Persons) shall be entitled to inspect and make copies of any such books and records held by the other Party.  In the event any Seller or Purchaser wishes to destroy such books and records or the Sellers move to convert the Bankruptcy Cases to cases under Chapter 7 of the Bankruptcy Code, in each case, before or within three (3) months from the Closing Date, it shall first give ten (10) days' prior written notice to the other Party (and its respective successors and representatives appointed by the Bankruptcy Court, if any) and the other Party (and its respective estates, successors and assignees, as applicable, and any representative of any of the foregoing Persons) shall have the right, at their option and expense, upon prior written notice within such ten (10) day period, to take possession of the records within ten (10) days after the date of such notice.

(b)      Access pursuant to this Section 8.6 shall be afforded by the Party in possession of such records, upon receipt of reasonable advance notice, during normal business hours and at the expense of Purchaser; provided, however, that (i) any review of such records shall be conducted in such a manner as not to interfere unreasonably with the operation of the business of any Party, (ii) no Party shall be required to take any action that would constitute a waiver of the attorney-client privilege or breach an obligation of confidentiality, and (iii) no Party shall be required to supply the other Party with any information which such Party is under a legal obligation not to supply.  Each Party shall be solely responsible for any costs or expenses incurred by such Party pursuant to this Section 8.6(b).

8.7      Further Disclosure.  From time to time prior to the Closing Date, each Seller shall promptly disclose in writing to Purchaser any matter hereafter arising which, if existing or occurring at the date of this Agreement, would have been required to be disclosed as an exception to the representations and warranties of such Seller.  No such disclosure shall have the effect of curing any misrepresentation or breach of any warranty without the written consent of Purchaser.

8.8      Publicity.  Neither the Sellers nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Party, which approval will not be unreasonably withheld, conditioned or delayed, unless, in the sole judgment of Purchaser or the Sellers, disclosure is otherwise required by applicable Law, by the rules of any stock exchange or listing agency that are applicable to such Party and/or its Affiliates, or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or pursuant to any contractual reporting requirements to which any Seller may be subject, provided, however, that the Party intending to make such release shall use its reasonable best efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Party with respect to the text thereof.

8.9      Use of Name.  The Sellers agree that they shall (i) immediately after the Closing Date, cease to make any use of the names set forth on Schedule 8.9 hereto or any Marks, Internet domain names, identifying symbols, emblems, signs or insignia related thereto or containing or comprising the foregoing, including any name or Mark confusingly similar thereto (collectively, the "Seller Marks"), and (ii) immediately after the Closing, cease to hold themselves out as having any affiliation with the Business.

8.10      Schedules.  The Sellers may, at their option, include in the Schedules items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish

any standard of materiality or to define further the meaning of such terms for purposes of this Agreement. Information disclosed in the Schedules shall constitute a disclosure for all purposes under this Agreement to the extent reasonably apparent notwithstanding any reference to a specific section, and all such information shall be deemed to qualify this entire Agreement and not just such section.

**8.11**    No Control.  Except as permitted by the terms of this Agreement, prior to the Closing, Purchaser shall not directly or indirectly control, supervise, direct or interfere with, or attempt to control, supervise, direct or interfere with, the Business or any operations or affairs of any Seller (including, without limitation, with respect to the Purchased Assets).  Until the Closing, the operations and affairs of the Business and the Purchased Assets are under the Sellers' complete control, except as otherwise expressly provided in this Agreement.

**8.12**    Letters of Credit.  At the Closing and in accordance with the terms of the DIP Facility, Purchaser shall either (i) replace the Letters of Credit then outstanding with new letters of credit in form and substance, and from an issuer, reasonably acceptable to the DIP Agent or (ii) provide to the DIP Agent (x) "back to back" letters of credit in form and substance, and from an issuer, reasonably acceptable to the DIP Agent, or (y) an amount in cash to cash collateralize the Letters of Credit in an amount to be determined pursuant to the terms of the DIP Facility and/or related Documents or as may otherwise be agreed by Purchaser and the DIP Agent.

**8.13**    WARN Act.  Purchaser shall be responsible for (and shall indemnify and hold the Sellers harmless from and against) all Liabilities for any and all WARN Act notices, payments, fines or assessments, including reasonable attorneys' fees incurred by the Sellers in connection therewith, with respect to the employment, discharge or layoff of any Employees.

**8.14**    Section 363(b)(1)(A).  Purchaser shall honor and observe any and all policies of the Sellers in effect on the Petition Date prohibiting the transfer of personally identifiable information about individuals and otherwise comply with the requirements of Section 363(b)(1)(A) of the Bankruptcy Code or similar provision in any Confirmation Order.

# ARTICLE IX
## EMPLOYEES AND EMPLOYEE BENEFITS

**9.1**    Transferred Employees.  Each Seller shall terminate the employment of all of its Transferred Employees contemporaneous with the Closing.  Purchaser shall offer all Transferred Employees at-will employment on terms and conditions established by Purchaser, with such employment to commence immediately after the Closing, subject to Purchaser's standard hiring procedures and criteria. Those employees to whom offers of employment are made and who commence employment as of the Closing Date shall be collectively referred to as the "Transferred Employees", a list of such Transferred Employees, if any, shall be provided by Purchaser to the Sellers no later than 3 Business Days before the Closing Date. Notwithstanding anything to the contrary contained under this Agreement, at any time before the Closing, the Purchaser shall have the right, at its sole discretion, and the Sellers shall use commercial reasonable efforts to collaborate with and assist the Purchaser, to discuss and negotiate with any or all of Sellers' employees of the Purchaser's choice regarding the employment of such employees after the Closing under the employment terms and conditions (including without limitation, the employee benefits) to the satisfaction of the Purchaser.

**9.2**    Employee Benefits.

**(a)**    Benefits.  Purchaser shall provide, or cause to be provided, to each Transferred Employee for a period of one (1) year following the Closing Date or such longer period of time required by

applicable law (i) base salary or wages, (ii) commissions, bonus and incentive pay opportunities, (iii) severance benefits and (iv) other aggregate employee benefits that in each case are no less favorable than those provided to such Transferred Employee immediately prior to the Closing Date; provided, however, that Purchaser shall not have any obligation to issue, or adopt any plans or arrangements providing for the issuance of, shares of capital stock, warrants, options or other rights in respect of any shares of capital stock of any entity or any securities convertible or exchangeable into such shares pursuant to any such plans or arrangements; provided, further, that no plans or arrangements of the Sellers providing for such issuance shall be taken into account in determining whether employee benefits are no less favorable than those provided prior to the Closing Date.

(b)      For purposes of eligibility, vesting and benefit accrual (other than accruals under a defined benefit pension plan) under the employee benefit plans of Purchaser providing benefits to Transferred Employees following the Closing (the "Purchaser Plans"), Purchaser shall credit each Transferred Employee with his or her years of service with any Seller and any predecessor entities, to the same extent as such Transferred Employee was entitled immediately prior to the Closing to credit for such service under any similar Employee Benefit Plan.  Purchaser Plans shall not deny Transferred Employees coverage on the basis of pre-existing conditions and shall credit such Transferred Employees for any deductibles and out-of-pocket expenses paid in the year of initial participation in Purchaser Plans.

(c)      As soon as practicable (but no later than thirty (30) days) after the Closing Date, Purchaser shall establish or designate an individual account plan for the benefit of Transferred Employees (the "Purchaser's 401(k) Plan"), shall take all necessary action, if any, to qualify such plan under the applicable provisions of the Code and shall make any and all filings and submissions to the appropriate governmental agencies required to be made by it in connection with the transfer of assets described below and shall take all actions necessary and appropriate to accept eligible rollover distributions in the form of cash (or promissory notes representing outstanding loans of the Transferred Employees) for Transferred Employees from the ICON Aircraft, Inc. 401(k) Plan.

(d)      Purchaser shall be responsible for and pay all medical, life insurance, disability and other welfare plan expenses and benefits for each Transferred Employee with respect to claims incurred by such Transferred Employees or their covered dependents prior to, on or after the Closing Date.

(e)      With respect to any accrued but unused vacation time and sick leave to which any Transferred Employee is entitled pursuant to the vacation and sick leave policy applicable to such Transferred Employee immediately prior to the Closing Date, Purchaser shall allow such Transferred Employee to use such accrued vacation and sick leave following the Closing Date. Purchaser shall permit each Transferred Employee to accrue additional vacation and sick leave in accordance with the vacation and sick leave policy of Purchaser.

(f)      Nothing herein expressed or implied is intended to (i) require the continued employment or any person for any designated period, (ii) constitute an amendment to any Employee Benefit Plan, or otherwise prohibit the amendment or termination of any Employee Benefit Plan, or (iii) confer on any person other than the Parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Article IX.

(g)      Nothing contained in this Section 9.2 or elsewhere in this Agreement shall be construed to prevent the termination of employment of any individual Transferred Employee or any change in the employee benefits available to any individual Transferred Employee in a manner consistent with Section 9.2(a).

## ARTICLE X
## CONDITIONS TO CLOSING

**10.1**    Conditions Precedent to Obligations of Purchaser.    The obligation of Purchaser to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser in whole or in part to the extent permitted by applicable Law):

(a)    (i) the representations and warranties of the Sellers set forth in Section 5.1 (Organization and Good Standing), Section 5.2 (Authorization of Agreement) and Section 5.4 (Title to Purchased Assets) (collectively, the "Sellers Core Representations") shall be true and correct in all material respects at and as of the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date); (ii) the representations and warranties of the Sellers set forth in Article V other than the Sellers Core Representations (without giving effect to any "materiality," "Material Adverse Effect" or similar qualifiers) shall be true and correct at and as of the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date); provided, however, that in the event of a breach of a representation or warranty described in this clause (ii), the condition set forth in this Section 10.1(a)(ii) shall be deemed satisfied unless the effect of all such breaches of representations and warranties taken together result in or would reasonably be expected to result in a Material Adverse Effect, and (iii) Purchaser shall have received a certificate signed by an authorized officer of the Sellers, dated the Closing Date, to the foregoing effect;

(b)    the Sellers shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them prior to the Closing Date, including without limitation, Section 8.2(b)(iii), and Purchaser shall have received a certificate signed by an authorized officer of the Sellers, dated the Closing Date, to the forgoing effect;

(c)    from the date of this Agreement, there shall not have occurred any Material Adverse Effect; provided, however, that notwithstanding anything to the contrary contained under this Agreement, if upon the Closing, the value of the Inventory diminishes by no less than 10% as compared with the value of the Inventory as set forth under the Benchmark List (such inventory value is attached hereto as Exhibit F), the Purchaser shall be entitled to reduce the Purchase Price by 70% of the diminished value;

(d)    the Purchaser or its applicable Affiliate(s) shall have obtained the PRC Overseas Investment Approvals;

(e)    the Sale Order shall include an express finding by the Bankruptcy Court that Purchaser is a buyer in good faith under Bankruptcy Code section 363(m); and

(f)    the Sale Order shall specifically include the following provision or similar provisions: to the extent permitted by applicable laws, this Order transfers all governmental permits and rights to operate the business and to build, sell and use the facilities and equipment necessary to operate and sell the products produced by the Purchaser.

**10.2**    Conditions Precedent to Obligations of the Sellers.    The obligations of the Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by the Sellers in

whole or in part to the extent permitted by applicable Law, provided that any such waiver does not materially and adversely affect the Sellers' estates):

(a) (i) the representations and warranties of Purchaser set forth in <u>Section 6.1</u> (Organization and Good Standing), <u>Section 6.2</u> (Authorization of Agreement) and <u>Section 6.6</u> (Financial Capacity) (collectively, the "<u>Purchaser Core Representations</u>") shall be true and correct in all material respects at and as of the date hereof and as of the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date); (ii) the representations and warranties of Purchaser set forth in <u>Article VI</u> other than the Purchaser Core Representations (without giving effect to any "materiality," "Material Adverse Effect" or similar qualifiers) shall be true and correct at and as of the date hereof and as of the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on and as of such earlier date); <u>provided</u>, <u>however</u>, that in the event of a breach of a representation or warranty described in this clause (ii), the condition set forth in this <u>Section 10.2(a)(ii)</u> shall be deemed satisfied unless the effect of all such breaches of representations and warranties taken together result in or would reasonably be expected to result in a material adverse effect on the ability of Purchaser to consummate the transactions in a timely manner, and (iii) the Sellers shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect;

(b) Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date, and the Sellers shall have received a certificate signed by an authorized officer of Purchaser, dated the Closing Date, to the foregoing effect; and

(c) the Sale Order shall have become a Final Order.

**10.3** <u>Conditions Precedent to Obligations of Purchaser and the Sellers</u>. The respective obligations of Purchaser and the Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Purchaser and the Sellers in whole or in part to the extent permitted by applicable Law):

(a) there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby, nor shall there be any statute, rule, regulation, Order or other law promulgated, enacted, entered, enforced or deemed applicable to the Parties which makes the consummation of the transactions contemplated by this Agreement illegal, void or rescinded; and

(b) the Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not have been stayed or vacated.

**10.4** <u>Frustration of Closing Conditions</u>. Neither the Sellers nor Purchaser may rely on the failure of any condition set forth in <u>Section 10.1</u>, <u>10.2</u> or <u>10.3</u>, as the case may be, if such failure was primarily caused by such Party's failure to comply with any provision of this Agreement.

## ARTICLE XI
## NO SURVIVAL

**11.1** <u>No Survival of Representations and Warranties</u>. The Parties agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and none of the Parties

shall have any liability to each other after the Closing for any breach thereof. The Parties agree that the covenants contained in this Agreement to be performed prior to the Closing shall terminate at the Closing, and that the covenants contained in this Agreement to be performed in any part at or after the Closing shall survive the Closing hereunder for the duration of the contemplated performance in respect of such covenant, and each Party shall be liable to the other after the Closing for any breach thereof during such period.

## ARTICLE XII
## TAXES

**12.1**    Transfer Taxes.    Sellers shall be responsible for (and shall indemnify and hold harmless the Purchaser and its directors, officers, employees, Affiliates, agents, attorneys, successors and permitted assigns against) any sales, use, stamp, documentary stamp, filing, recording, transfer or similar fees or taxes or governmental charges (including any interest, fine, penalty, additions to Tax or additional amount thereon) payable in connection with the transactions contemplated by this Agreement solely to the extent not exempt in accordance with Section 1146 of the Bankruptcy Code ("Transfer Taxes").  To the extent that any Transfer Taxes are required to be paid by Purchaser (or such Transfer Taxes are assessed against Purchaser), Sellers shall promptly reimburse the Purchaser for, and the Purchaser shall be entitled to deduct from the Purchase Price, such Transfer Taxes.  Purchaser shall use commercially reasonable efforts to take actions reasonably requested by the Sellers to mitigate or otherwise reduce (and shall not take any actions which would increase or fail to mitigate or reduce) all such Transfer Taxes through securing exemptions therefrom or reductions thereto, and shall continue to reasonably cooperate with the Sellers post-Closing to reduce the liability for, or to increase the amount or availability of any refund of, any such Transfer Taxes.

**12.2**    Purchase Price Allocation.

**(a)**    As promptly as reasonably practicable, but in any event within thirty (30) days following the Closing, Purchaser shall prepare and deliver to the Sellers a proposed allocation of the Purchase Price (including the Assumed Liabilities properly included therein) among the Purchased Assets in accordance with Section 1060 of the Code and Treasury Regulations thereunder (and any similar provision of state, local or foreign law, as applicable) (the "Proposed Allocation").  The Sellers shall have thirty (30) days (the "Review Period") to review and object to the Proposed Allocation.  On or prior to the last day of the Review Period, the Sellers may object to the Proposed Allocation by delivering to Purchaser a written statement setting forth the Sellers' objections in reasonable detail, indicating each disputed item or amount and the basis for Sellers' disagreement therewith (the "Allocation Dispute Notice").  If the Sellers fail to deliver the Allocation Dispute Notice before the expiration of the Review Period, the Proposed Allocation shall be deemed to have been accepted by the Sellers and become final and binding.  If the Sellers deliver the Allocation Dispute Notice before the expiration of the Review Period, Purchaser and the Sellers shall negotiate in good faith to resolve any such objections within thirty (30) days (the "Resolution Period") following the delivery of the Allocation Dispute Notice, and if resolution of such dispute is reached, the agreed upon allocation shall become final and binding.  If Purchaser and the Sellers are unable to completely resolve any such objections within thirty (30) days, the unresolved issues (and only the unresolved issues) (the "Allocation Dispute") shall promptly be submitted for resolution to a recognizable, reputable and impartial certified public accounting firm that is mutually acceptable to Purchaser and the Sellers (the "Neutral Firm").  If Purchaser and the Sellers cannot agree on a Neutral Firm within ten (10) days of the expiration of the Resolution Period, the Los Angeles office of the American Arbitration Association shall choose a recognized, reputable and impartial certified public accounting firm to act as the Neutral Firm.  The Neutral Firm shall be instructed to resolve any outstanding Allocation Dispute; provided, that, the Neutral Firm's determination of any amount subject to the Allocation Dispute shall be (x) no less than the lesser of the amounts claimed by Purchaser and the Sellers, respectively, or (y) no greater than the greater of the amounts claimed by Purchaser and the Sellers, respectively.  The Parties shall instruct the Neutral Firm to render its determination with respect to the entire Allocation Dispute within thirty (30) days

of the referral of the Allocation Dispute thereto, and the determination of the Neutral Firm shall be final and binding upon the Parties for all purposes of this Agreement. The fees and expenses of the Neutral Firm shall be borne by Purchaser. The final and binding allocation determined hereunder is hereinafter referred to as the "Final Allocation."

(b)    The Sellers and Purchaser agree to cooperate with each other in preparing IRS Form 8594 (including any subsequent adjustments required thereto) in a manner consistent with such Final Allocation, and to furnish the other with a copy of such form prepared in draft form within a reasonable period before its filing due date.  If such Final Allocation is disputed by any Tax Authority or other Governmental Body, Purchaser or any Seller receiving notice of such dispute will promptly notify the other Party and the Parties will use their reasonable best efforts to sustain the Final Allocation.  Neither Purchaser nor the Sellers shall take any position (including in any Tax Returns, reports, audits or otherwise) that is inconsistent with the Final Allocation, unless otherwise required pursuant to a final determination by a court of competent jurisdiction or pursuant to a closing agreement with the IRS entered into pursuant to Section 7121 of the Code.  The purchase price allocation determined in connection with this Section 12.2 shall be utilized for tax reporting purposes only.  For the avoidance of doubt, such allocation shall not be binding upon any Party for purposes other than tax reporting or used as evidence, or for any other purpose, in connection with any dispute regarding valuation.

12.3    Income Tax Treatment.  The Sellers and Purchaser will treat the transactions contemplated hereunder as taxable sales of assets for all federal, state and local Income Tax purposes.

12.4    Cooperation.  The Sellers, on the one hand, and Purchaser, on the other hand, will provide each other with such cooperation and information as either of them may reasonably request of the other in connection with filing any Tax Return, amended Tax Return or claim for refund, determining a liability for Taxes or a right to a refund of Taxes, or participating in or conducting any audit or other proceeding in respect of Taxes.

12.5    Audits, Claims and Proceedings.  The Sellers shall have the right to control the conduct of the defense of any audit, claim, proceeding, investigation, or other controversy relating to Excluded Taxes (each, a "Tax Claim").

## ARTICLE XIII
## MISCELLANEOUS

13.1    Expenses.  Except as otherwise provided in this Agreement and whether or not the transactions contemplated hereby are consummated, each of Sellers and Purchaser shall bear their own respective expenses (including all compensation and expenses of counsel, financial advisors, consultants, actuaries and independent accountants) incurred in connection with the negotiation and execution of this Agreement and each Ancillary Agreement and the consummation of the transactions contemplated hereby and thereby.

13.2    Reserved.

13.3    Submission to Jurisdiction; Consent to Service of Process.

(a)    Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to interpret and/or enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the

Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court, including to the entry by the Bankruptcy Court of Final Orders in any such proceedings, and shall receive notices at such locations as indicated in <u>Section 13.7</u> hereof; <u>provided</u>, <u>however</u>, that if the Bankruptcy Cases have been closed, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the District of Delaware or any appellate court from any thereof, for the resolution of any such claim or dispute.  The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(b)     Each of the Parties hereby consents to process being served by any Party in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of <u>Section 13.7</u>.

**13.4**     <u>WAIVER OF RIGHT TO TRIAL BY JURY</u>.  EACH PARTY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, MATTER OR PROCEEDING REGARDING THIS AGREEMENT OR ANY PROVISION HEREOF.

**13.5**     <u>Entire Agreement; Amendments and Waivers</u>.  This Agreement (including the schedules and exhibits hereto), the Ancillary Agreements and the Confidentiality Agreement represent the entire understanding and agreement among the Parties with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

**13.6**     <u>Governing Law</u>.

(a)     THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND, WHERE STATE LAW IS IMPLICATED, THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING AS TO MATTERS OF CONSTRUCTION, VALIDITY, AND PERFORMANCE.

(b)     THE SELLERS AND PURCHASER AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (i) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT TO THIS AGREEMENT; OR (ii) THE PURCHASED ASSETS AND ASSUMED LIABILITIES ASSUMED PURSUANT TO OR ARISING OUT OF THIS AGREEMENT OR ANY ANCILLARY DOCUMENT EXECUTED PURSUANT TO THIS AGREEMENT, AND PURCHASER EXPRESSLY CONSENTS TO AND AGREES NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION.

**13.7**    Notices.  All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile or electronic mail (with written confirmation of transmission) or (iii) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses and facsimile numbers (or to such other address or facsimile number as a Party may have specified by notice given to the other Party pursuant to this provision):

> **If to the Sellers, to:**
> ICON Aircraft, Inc.
> 2141 ICON Way
> Vacaville, CA 95688
> Attention: Jerry Meyer
> E-mail:  jerry.meyer@iconaircraft.com
>
> ***With a copy (which shall not constitute notice) to:***
> Sidley Austin LLP
> 555 California Street, Suite 2000
> San Francisco, CA 94104
> Attention:  Vijay S. Sekhon and Sam Newman
> E-mail:  vsekhon@sidley.com and snewman@sidley.com
>
> **If to Purchaser, to:**
> SG Investment America, Inc.
> Facsimile: +49 521 9252402
> Attention: MD
> E-mail: vorstand@duerkopp-adler.com
>
> ***With a copy to:***
> Procopio, Cory, Hargreaves & Savitch LLP
> 525 B Street, Suite 2200
> San Diego, CA 92101
> Attention: William Smelko and Julian Zou
> E-mail:  bill.smelko@procopio.com and julian.zou@procopio.com

**13.8**    Severability.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

**13.9**    Binding Effect; Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.  Nothing in this Agreement shall create or be deemed to create any third-party beneficiary rights in any Person or entity not a Party except as provided below.  No assignment of this Agreement or of any rights or obligations hereunder may be made by either the Sellers or Purchaser (by operation of law or otherwise) without the prior written consent of the other Parties and any attempted assignment without the required consents shall be void and without effect.  No assignment of any obligations hereunder shall relieve the Parties of any such obligations.  Upon

any such permitted assignment, the references in this Agreement to any such permitted assignor shall apply to any such permitted assignee unless the context otherwise requires.

**13.10**    Release.  Effective as of the Closing, Purchaser and its Affiliates hereby irrevocably release and forever discharge the Sellers, their Affiliates, their respective successors and assigns and all officers, directors, partners, members, shareholders, employees, agents, and legal counsel of each of them (collectively, the "Seller Released Parties") from any and all Liabilities, actions, rights of action, contracts, indebtedness, obligations, claims, causes of action, suits, damages, demands, costs expenses and attorneys' fees whatsoever, of every kind and nature, known or unknown, disclosed or undisclosed, accrued or unaccrued, existing at any time, in all circumstances, that Purchaser or its Affiliates and all such Persons' respective successors and assigns, had, have or may have in the future against any of the Seller Released Parties; provided, however, that the foregoing shall not release any Seller of its obligations under this Agreement.  Without limiting the generality of the foregoing, Purchaser and its Affiliates waive any and all rights or benefits that he, she or it may now have, or in the future may have, under any law of any jurisdiction relating to the release of unknown claims against the Seller Released Parties, including, without limitation, Section 1542 of the California Civil Code, which provides that:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

**13.11**    Non-Recourse.  The Parties acknowledge that (i) no direct or indirect equity holder or lender of any Seller, (ii) no member of any board of managers or special committee of any Seller or any Affiliate of any Seller and (iii) no past, present or future director, officer, committee member, employee, incorporator, member, partner or direct or indirect equity holder or lender of any Seller (such Persons described in clauses (i)-(iii) above, the "Non-Recourse Parties") is a party to this Agreement or any Seller Document.  The Parties further acknowledge that none of the Non-Recourse Parties, whether individually or collectively, shall have any liability whatsoever of any kind or description for any obligations or liabilities of any Seller under this Agreement or any Seller Document or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby or thereby.  Accordingly, the Parties hereby agree that in the event (a) there is any alleged breach or alleged default or breach or default by any Party under this Agreement or any of the Seller Documents or (b) any Party has or may have any claim arising from or relating to the terms of this Agreement or any Seller Document, no Party shall, or shall have any right to, commence any proceedings or otherwise seek to impose any Liability or obligation whatsoever of any kind or description on or against the Non-Recourse Parties, whether collectively or individually, by reason of such alleged breach, default or claim.

**13.12**    Counterparts; Electronic Signatures.  This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by electronic means (such as by facsimile or .PDF) will be effective as delivery of a manually executed counterpart to this Agreement.

**13.13**    No Interpretation Against Drafter.  This Agreement is the product of negotiations among the Parties, each of which is represented by legal counsel, and any rules of construction relating to interpretation against the drafter of an agreement shall not apply to this Agreement and are expressly waived by each Party.

**13.14**  Appointment of Sellers' Representative.  Each Seller does hereby irrevocably appoint the Company as its true and lawful attorney-in-fact and agent (the "Sellers' Representative"), with full power of substitution or re-substitution, to act solely and exclusivity on behalf of such Seller with respect to any matters relating to this Agreement and any related agreements (such appointment being coupled with an interest and irrevocable).  Purchaser shall, to the extent it elects to rely on such actions, if any, taken or authorized by the Sellers' Representative, be entitled to rely on all such actions as being the binding acts of any Seller.

[SIGNATURE PAGES FOLLOW]

44

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**SELLERS:**

**ICON AIRCRAFT, INC.**

By:_____
Name: Thomas McCabe
Title: Chief Restructuring Officer

**IC TECHNOLOGIES, INC.**

By:_____
Name: Thomas McCabe
Title: Chief Restructuring Officer

**ICON FLYING CLUB, LLC**

By:_____
Name: Thomas McCabe
Title: Chief Restructuring Officer

**RYCON LLC**

By:_____
Name: Thomas McCabe
Title: Chief Restructuring Officer

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**PURCHASER**:

**SG INVESTMENT AMERICA, INC.**


By:_____
Name: Yongwu Chen
Title: CEO

**ANNEX 1**
**APPLICABLE SUBSIDIARIES OF THE COMPANY**

- IC Technologies, Inc., a Delaware corporation
- ICON Flying Club, LLC, a Delaware limited liability company
- Rycon LLC, a Delaware limited liability company

## EXHIBIT A
## FORM OF BILL OF SALE

**EXHIBIT B**
**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

**EXHIBIT C**
**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT (INTELLECTUAL PROPERTY)**

**EXHIBIT D**
**FORM OF BIDDING PROCEDURES**

**EXHIBIT E**
**FORM OF EQUITY COMMITMENT LETTER**

**EXHIBIT F**
**INVENTORY VALUE ON BENCHMARK LIST**

**EXHIBIT G**
**FORM OF ESCROW AGREEMENT**

# EXHIBIT B

**Blackline**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| ICON AIRCRAFT, INC., *et al.*,[1] | Case No. 24-10703 (CTG) |
| Debtors. | (Jointly Administered) |
| | **Docket Ref. Nos. 83, 101, 191, 203 & 204** |

**ORDER APPROVING DESIGNATION OF**
**STALKING HORSE AND ~~(D)~~ GRANTING RELATED RELIEF**

Upon consideration of the motion (the "Motion"),[2] of the Debtors in the above-captioned

chapter 11 cases (these "Chapter 11 Cases"), seeking, pursuant to sections 105 and 363 of title

11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 2002,

6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and

Rules 2002-1, and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United

States Bankruptcy Court for the District of Delaware (the "Local Rules"), an order (this "Order")

approving the Debtors' designation of the SG Investment America, Inc. (the "Stalking Horse

Bidder") as the stalking horse bidder and the Asset Purchase Agreement, attached hereto as

**Exhibit 1** (the "Stalking Horse APA"), as the stalking horse bid (the "Stalking Horse Bid"); and

---

[1]  The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: ICON Aircraft, Inc. (7443); Rycon LLC (5297); IC Technologies Inc. (7918); and ICON Flying Club, LLC (6101).  The Debtors' service address is 2141 ICON Way, Vacaville, CA 95688.

[2]  Capitalized terms not otherwise defined in this Order shall have the meanings given to them in the *Debtors' Motion for Entry of (I) an Order (A) Approving Certain Bidding Procedures and the Form and Manner of Notice Thereof, (B) Scheduling an Auction and a Hearing on the Approval of the Sale of All or Substantially All of the Debtors' Assets, (C) Establishing Certain Assumption and Assignment Procedures and Approving the Manner of Notice Thereof, and (D) Granting Related Relief; and (II) an Order (A) Authorizing and Approving the Debtors' Entry into an Asset Purchase Agreement, (B) Authorizing the Sale of All or Substantially All of the Debtors' Assets Free and Clear of All Encumbrances, (C) Approving the Assumption and Assignment of the Assumed Contracts, and (D) Granting Related Relief* [Docket No. 83] (the "Motion") or the Bidding Procedures, as applicable.

this Court having reviewed the Motion, the *Notice of Filing of Stalking Horse Supplement* [Docket No. 101] (the "Stalking Horse Supplement") and any objections filed thereto; and this Court having considered the statements of counsel, the First Day Declaration, the Gupta Declaration filed in support of the Motion, and the revised Order and Stalking Horse Bid; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT**:[3]

A.      This Court has jurisdiction over this matter and over the property of the Debtors and their bankruptcy estates pursuant to 28 U.S.C. §§ 157(a) and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.   This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M), (N), and (O).   The statutory predicates for the relief sought herein are sections 105 and 363of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 9014. Venue of these Chapter 11 Cases and this matter is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      The Debtors have offered good and sufficient reasons for, and the best interest of their estates will be served by, this Court authorizing, but not directing, the Debtors to designate the Stalking Horse Bidder on the terms set forth in the Stalking Horse APA, all in accordance with the *Order (A) Approving Certain Bidding Procedures and the Form and Manner of Notice Thereof, (B) Scheduling an Auction and a Hearing on the Approval of the Sale of all or Substantially All of the Debtors' Assets, (C) Establishing Certain Assumption and Assignment*

---

[3]     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.   To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.   To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.   All findings of fact and conclusions of law announced by the Court at the Bidding Procedures Hearing are hereby incorporated herein to the extent not inconsistent herewith.

*Procedures and Approving the Manner of Notice Thereof, and (D) Granting Related Relief*
[Docket No. 191] (the "<u>Bidding Procedures Order</u>").

C.      Notice of the designation of the Stalking Horse Bidder was (a) appropriate and reasonably calculated to provide all interested parties with timely and proper notice; (b) in accordance with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules; and (c) adequate and sufficient under the circumstances of these Chapter 11 Cases, such that no other or further notice is required.  A reasonable opportunity to be heard regarding the relief provided herein has been afforded to all interested persons and entities.

D.      The Debtors have properly filed and noticed the approval of the Stalking Horse Bidder.  The issuance and immediate effectiveness of this Order as of the date hereof is supported by evidence of compelling business justifications and other circumstances demonstrating that the relief granted by this Order is necessary to prevent immediate and irreparable harm to the Debtors and their estates.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.      The Debtors are authorized, but not directed, to designate the Stalking Horse Bidder on the terms set forth in the Stalking Horse Bid.

2.      The Debtors are authorized, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, to enter into and perform under the Stalking Horse APA, subject to the solicitation of higher or otherwise better offers and the entry of the Sale Order.  The Stalking Horse APA is authorized and approved, substantially in the form attached hereto as **Exhibit 1**, as the Stalking Horse Bid.  The Stalking Horse Bidder shall be deemed a Qualified Bidder, and the Stalking Horse Bid shall be deemed a Qualified Bid, for all purposes under the Bidding Procedures Order.

3.      The Stalking Horse APA shall be binding and enforceable on the parties thereto in accordance with its terms and subject to entry of the Sale Order.  The failure to describe specifically or include any provision of the Stalking Horse APA in the Stalking Horse Supplement or herein shall not diminish or impair the effectiveness of such provision as to such parties.

4.      Notwithstanding anything to the contrary in this Order, including the authorizations in paragraph 3 above, the approval of the Sale of the Assets (whether to the Stalking Horse Bidder or any other party) remains subject to the Court's approval of the Sale and entry of the Sale Order.  All parties' rights related to the Sale and entry of the Sale Order, including but not limited to the Derivative Litigation Plaintiffs'[4] rights to object to the Sale based on the Stalking Horse Bidder's or any other bidder's insider status, are fully preserved.

---

[4]     "Derivative Litigation Plaintiff" shall have the meaning ascribed to it in the *Verified Statement of Paul, Weiss, Rifkind, Wharton & Garrison LLP and Landis Rath & Cobb LLP Pursuant to Federal Rules of Bankruptcy Procedure 2019* [Docket No. 111].

5.    ~~4.~~ All objections to the entry of this Order or to the relief provided herein that have not been withdrawn, waived, resolved, or settled are hereby denied and overruled.

6.    ~~5.~~ The requirements set forth in Local Rules 6004-1 and 9013-1 are hereby satisfied, modified, or waived.

7.    ~~6.~~ Notwithstanding any applicability of Bankruptcy Rule 6004(h), 6006(d), 7052 or 9014, this Order shall be immediately effective and enforceable upon its entry.  All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

8.    ~~7.~~ This Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order.

**Exhibit 1**

**Stalking Horse APA**

| Summary report: Litera Compare for Word 11.4.0.111 Document comparison done on 5/17/2024 2:23:24 PM | |
|---|---|
| **Style name:** Sidley Default | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** nd://4885-8433-4527/1/ICON - Order Approving Designation of Stalking Horse Bidder.docx | |
| **Modified DMS:** nd://4885-8433-4527/2/ICON - Order Approving Designation of Stalking Horse Bidder.docx | |
| **Changes:** | |
| Add | 10 |
| Delete | 5 |
| Move From | 0 |
| Move To | 0 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 15 |