## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SEAPLANE DEBTOR 1, INC., *et al.*, | Case No. 24-10703 (CTG) |
| Debtors.[1] | (Jointly Administered) |
| | **Related Docket No.: 543** |
| | **Hearing Date: Nov. 4, 2024 at 2:00 p.m. (ET)** |
| | **Obj. Deadline: Oct. 28, 2024 at 4:00 p.m. (ET) for the U.S. Trustee** |

## UNITED STATES TRUSTEE'S OBJECTION TO THE
## THIRD AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION FOR SEAPLANE
## DEBTOR 1, INC. (F/K/A/ ICON AIRCRAFT, INC.) AND ITS DEBTOR AFFILIATES

Andrew R. Vara, the United States Trustee for Region Three (the "U.S. Trustee"), through his undersigned counsel, hereby objects (this "Objection") to the *Third Amended Joint Chapter 11 Plan of Liquidation for Seaplane Debtor 1, Inc. (f/k/a Icon Aircraft, Inc.) and its Debtor Affiliates* [D.I. 543] (the "Plan"), and in support of this Objection respectfully states:

## PRELIMINARY STATEMENT

1. The Court should deny confirmation of the Plan because the Plan's third-party release provisions are contrary to United States Supreme Court precedent and applicable state law for the following independent reasons:

   a. The Plan extracts non-consensual third-party releases from holders of claims or interests who vote to accept or reject the Plan and who do not check an opt-out box on a ballot.

---

[1] The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Seaplane Debtor 1, Inc. (f/k/a ICON Aircraft, Inc.) (7443); Seaplane Debtor 2, Inc. (f/k/a IC Technologies Inc.) (7918); Seaplane Debtor 3, LLC (f/k/a ICON Flying Club, LLC) (6101); and Seaplane Debtor 4, LLC (f/k/a Rycon LLC) (5297). The Debtors' service address is c/o Armanino LLP, 231 Market Place, Suite 373, San Ramon, CA 94583-4743, Attn: Thomas McCabe, Chief Restructuring Officer.

The logic of the Court's recent decision in *Smallhold* means that much of the Plan's third-party release provisions in these cases cannot stand. However, for the reasons set forth below, the U.S. Trustee respectfully requests that the Court further consider whether the act of voting on a chapter 11 plan while remaining silent regarding the third-party release (that is, not opting out of the third-party release on the ballot) constitutes consent.

b.   The Plan extracts non-consensual third-party releases from holders of classified, non-voting claims deemed to accept the Plan that do not file an objection to the third-party release.

c.   The Plan apparently extracts non-consensual third-party releases from holders of unclassified, non-voting administrative and priority claims that do not file an objection to the third-party release.

d.   The Plan extracts non-consensual third-party releases from Affiliates and Related Parties of the Releasing Parties (solely to the extent that they may assert Claims or Causes of Action derivatively which belong to another Releasing Party), many of which have not received notice or an opportunity to indicate whether they assent to the granting of the third-party releases.

2.     In addition, the Court should not confirm the Plan because, taken together, the Plan's injunction and third-party release provisions grant the liquidating Debtors a discharge in violation of section 1141(d)(3) of the Bankruptcy Code.

3.     Accordingly, and for the additional reasons set forth herein, the U.S. Trustee respectfully requests that the Court deny final approval of the disclosure statement and deny confirmation of the Plan.

## **JURISDICTION AND STANDING**

4.     This Court has jurisdiction to hear and determine Plan confirmation and this Objection pursuant to: (i) 28 U.S.C. § 1334; (ii) applicable order(s) of the United States District Court of the District of Delaware issued pursuant to 28 U.S.C. § 157(a); and (iii) 28 U.S.C. § 157(b)(2).

5.     Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of chapter 11 cases filed in this judicial district. The duty is part of the U.S.

Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the Courts. *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

6.      The U.S. Trustee has standing to be heard on Plan confirmation and this Objection pursuant to 11 U.S.C. § 307. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest).

## BACKGROUND[2]

### A.      The Chapter 11 Cases

7.      On April 4, 2024, ICON Aircraft, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (this "Court"), thereby commencing the above-captioned jointly administered chapter 11 cases (collectively, the "Chapter 11 Cases").

8.      The Debtors continue to manage and operate their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

9.      On May 13, 2024, the Debtors filed their *Chapter 11 Plan of Reorganization – Joint Chapter 11 Plan of Liquidation for ICON Aircraft, Inc. and its Debtor Affiliates* [D.I. 196] along with the *Disclosure Statement for Joint Chapter 11 Plan of Liquidation for ICON Aircraft, Inc. and its Debtor Affiliates* [D.I. 197] and the *Motion to Approve – Debtors' Motion for Entry of an*

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

*Order (I) Conditionally Approving the Disclosure Statement, (II) Scheduling the Combined Hearing, (III) Establishing Notice and Objection Procedures for Confirmation of Plan and Final Approval of Adequacy of Disclosures, (IV) Establishing Solicitation, Voting, and Related Procedures, (V) Approving Related Dates, Deadlines, and Procedures, and (VI) Granting Related Relief* [D.I. 198].

10.     On May 31, 2024, the Debtors filed the *Amended Joint Chapter 11 Plan of Liquidation*. D.I. 238.

11.     On June 3, 2024, the Debtors filed the *Further Amended Joint Chapter 11 Plan of Liquidation*. D.I. 243. Also on June 3, the Court entered an order conditionally approving the Further Amended Plan and the Disclosure Statement for solicitation purposes. D.I. 248.

12.     On July 3, 2024, the Debtors filed the Plan Supplement. D.I. 340.

13.     On October 11, 2024, the Debtors filed the Plan. D.I. 543.

14.     As of the date hereof, no trustee or examiner has been requested and no committee has been appointed in the Chapter 11 Cases.

**B.     The Plan**

15.     The Plan includes the following provisions relevant to this Objection.[3]

16.     Article I.A. Item 95 defines the term Related Party:

"Related Party" means each of, and in each case in its capacity as such, current and former directors, managers, officers, the Special Committee, committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners,

---

[3] Upon information and belief, further revisions will be made to the Plan and filed with the Court prior to the Confirmation Hearing as negotiations between the parties in interest are ongoing. The provisions contained in the Objection are as they appear in D.I. 543, the last-filed version of the Plan as of the day prior to filing the Objection. The version of the Plan filed at D.I. 543 varies from the version of the Plan that was solicited. The U.S. Trustee reserves all rights to raise additional objections and arguments with respect to the provisions set forth in any further revised plan.

principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees.

17.     Article I.A. Item 96 defines Release Opt-Out:

"Release Opt-Out" means the item set forth in each of the Ballots and Notice of Non-Voting Status Packages, which permit both those Holders of Claims and Interests entitled to vote on the Plan and those not entitled to vote on the Plan the right to opt out of the Third Party Release set forth in Article IX.B herein.

18.     Article I.A. Item 97 defines Released Party:

"Released Party" means each of, and in each case solely in its capacity as such: (a) the Debtors; (b) the DIP Secured Parties but solely in their capacity as DIP Secured Parties and in no other capacity, including in their capacity as counterparties to the IP Agreement; (c) the Derivative Litigation Plaintiffs; and (d) each Related Party of the Debtors or the Derivative Litigation Plaintiffs, including any professional retained by the Debtors, DIP Secured Parties, or the Derivative Litigation Plaintiffs, in connection with these Chapter 11 Cases. Notwithstanding the foregoing, the definition of "Released Party" shall not include any Non-Released Parties. However, Kirk Hawkins and PDSTI, including its current and former directors, officers, and employees, shall not be a Released Party.

19.     Article I.A. Item 98 defines Releasing Parties:

"Releasing Parties" means, collectively, and in each case solely in their respective capacities as such: (a) the DIP Secured Parties; (b) the Committee, if any; (c) all Holders of Claims deemed hereunder to have accepted the Plan that have not filed an objection to the release contained in Article IX herein prior to the Voting Deadline; (d) all Holders of a Claim that vote to accept or reject the Plan and do not timely submit a Release Opt-Out; (e) each current and former Affiliate of each Person or Entity in clauses (a) through (d) solely to the extent such Affiliate may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an Entity in clauses (a) through (e); and (g) each Related Party of each Entity in clauses (a) through (e) solely to the extent such Related Party may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an Entity in clauses (a) through (e). However, Kirk Hawkins shall not be deemed a Releasing Party under this Plan.

20.     Article IX.A provides for releases by the Debtors (the "<u>Debtor Releases</u>"):

As of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code and for good and valuable consideration, each Released Party is deemed released by the Debtors and their estates from any and all claims and Causes of Action, whether known or unknown, including any claims and Causes of Action that the Debtors or their estates would have been legally entitled to assert in their own right including any claims or Causes of Action that could be asserted derivatively or on behalf of the Debtors (or their estates), that such Entity would have been legally entitled to assert (whether individually or collectively), based on, or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof, or otherwise), any securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, any avoidance actions, these Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Sale Motion, the Plan, the Plan Supplement, or any other transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Sale, the Plan, the Plan Supplement, these Chapter 11 Cases, the filing of these Chapter 11 Cases, the pursuit of the Confirmation Order, the pursuit of the Sale Order, the pursuit of Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence or omission taking place on or before the Effective Date; provided, that this provision shall not operate to waive or release any Claims or Causes of Action related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual intentional fraud, willful misconduct, or gross negligence of such Person. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (1) any post Effective Date obligations of any party or entity under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; (2) any obligations under or in respect of the Sale Order; or (3) the Retained Causes of Action, if any. For the avoidance of doubt, nothing in these releases by the Debtors is a release of direct claims of third parties against any non-Debtor parties. Each Person and Entity deemed to grant the Debtors releases shall be deemed to have granted such releases notwithstanding that such Person or Entity may hereafter discover facts in addition to, or different from, those which such Person or Entity now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and such Person or Entity expressly waives any and all rights that such Person or Entity may have under any statute or common law principle, including, without limitation, section 1542 of the California Civil Code, to the extent such section is applicable, which would limit the effect of such releases to those claims or Causes of Action actually known or suspected to exist on the Effective Date. Section 1542 of the California Civil Code generally provides as follows: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE

MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE
DEBTOR OR RELEASED PARTY."

21.    Article IX. B. provides for Releases by Holders of Claims and Interests (the "Third-
Party Release[s]," and collectively, with the Debtor Releases, the "Releases") (emphasis added):

***As of the Effective Date, each Releasing Party is deemed to have released each
Released Party from any and all claims and Causes of Action***, whether known or
unknown, including any claims and Causes of Action that the Debtors or their
estates would have been legally entitled to assert in their own right including any
claims or Causes of Action that could be asserted derivatively or on behalf of the
Debtors (or their estates), that such Entity would have been legally entitled to assert
(whether individually or collectively), ***based on, relating to, or in any manner
arising from, in whole or in part,*** the Debtors (including the management,
ownership or operation thereof, or otherwise), any securities issued by the Debtors
and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, any
avoidance actions, these Chapter 11 Cases, the formulation, preparation,
dissemination, negotiation, or filing of the Disclosure Statement, the Sale Motion,
the Plan, the Plan Supplement, or any other transaction, contract, instrument,
release, or other agreement or document created or entered into in connection with
the Sale, the Plan, the Plan Supplement, these Chapter 11 Cases, the filing of these
Chapter 11 Cases, the pursuit of the Confirmation Order, the pursuit of the Sale
Order, the pursuit of Consummation, the administration and implementation of the
Plan, including the distribution of property under the Plan or any other related
agreement, ***or upon any other related act or omission, transaction, agreement,
event, or other occurrence or omission taking place on or before the Effective
Date***; provided, that this provision shall not operate to waive or release any Claims
or Causes of Action related to any act or omission that is determined in a Final
Order by a court of competent jurisdiction to have constituted actual intentional
fraud, willful misconduct, or gross negligence of such Person; provided further, that
notwithstanding anything to the contrary in the Disclosure Statement and Plan, this
provision shall not apply with respect to any unimpaired Claim until such
unimpaired Claim has been paid in full in the Allowed amount of such Claim
determined in accordance with applicable law, or on terms agreed to between the
Holder of such Claim and the Debtors or the Plan Administrator, as applicable, at
which time this provision shall apply in all respects as to the applicable unimpaired
Claim. Notwithstanding anything to the contrary in the foregoing, the releases set
forth above do not release (1) any post Effective Date obligations of any party or
entity under the Plan or any document, instrument, or agreement (including those
set forth in the Plan Supplement) executed to implement the Plan; (2) any
obligations under or in respect of the Sale Order; or (3) the Retained Causes of
Action, if any. Each Person and Entity deemed to grant the releases described in
this Section shall be deemed to have granted such releases notwithstanding that
such Person or Entity may hereafter discover facts in addition to, or different from,
those which such Person or Entity now knows or believes to be true, and without

regard to the subsequent discovery or existence of such different or additional facts, and such Person or Entity expressly waives any and all rights that such Person or Entity may have under any statute or common law principle, including, without limitation, section 1542 of the California Civil Code, to the extent such section is applicable, which would limit the effect of such releases to those claims or Causes of Action actually known or suspected to exist on the Effective Date. Section 1542 of the California Civil Code generally provides as follows: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

22.     Article IX.D. provides for an Injunction to enforce the Releases (emphasis added):

Except as otherwise provided in the Plan or the Confirmation Order, **all Entities who have held, hold, or may hold claims, Interests, Causes of Action, or liabilities that**: (1) are subject to compromise and settlement pursuant to the terms of the Plan; (2) **have been released pursuant to the Plan**; (3) were purchased and released by the Purchaser in connection with the Sale; (4) are subject to exculpation pursuant to the Plan; or (5) are otherwise satisfied, stayed, released, or terminated pursuant to the terms of the Plan, **are permanently enjoined and precluded, from and after the Effective Date, from commencing or continuing in any manner, any action or other proceeding**, including on account of any Claims, Interests, Causes of Action, or liabilities that have been compromised or settled against the Debtors or any Entity so released or exculpated (or the property or estate of any Entity, directly or indirectly, so released or exculpated) **on account of, or in connection with or with respect to, any released, settled, compromised, or exculpated claims, Interests, Causes of Action, or liabilities, including being permanently enjoined and precluded, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Plan Administrator, the Litigation Trust, the Released Parties, or Exculpated Parties (as applicable):** (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or Interests; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estate of such Entities on account of or in connection with or with respect to any such claims or Interests; (4) asserting any right of setoff or subrogation of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or Interests unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding any other indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to

applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or Interests released or settled pursuant to the Plan. Upon the Bankruptcy Court's entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of this Plan by the Debtors, the Plan Administrator, the Litigation Trust, and their respective affiliates, employees, advisors, officers and directors, or agents.

## OBJECTION

**A.    The Plan is Not Confirmable Because It Proposes Non-Consensual Third-Party Releases.**

23.    Non-consensual third-party releases are not authorized under the Bankruptcy Code. *Harrington v. Purdue Pharma L.P.*, 603 U.S. __, 144 S. Ct. 2071, 2082-88 (2024).

24.    Contract principles govern whether a release is consensual. *See In re Smallhold, Inc.,* No. 24-10267, 2024 WL 4296938, at *11 (Bankr. D. Del. Sept. 25, 2024); *In re SunEdison, Inc.*, 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017). That is because a third-party release is essentially a settlement between a non-debtor claimant and another non-debtor.

25.    Whether parties have reached an agreement — including an agreement not to sue — is governed by state law.  The only exception is if there is federal law that preempts applicable state contract law. *See, e.g., Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.,* 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a statute provides the rule of decision or authorizes a federal court to supply one, 'state law must govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471-72 (1965)).

26.    No federal law applies to the question of whether the non-debtor Releasing Parties have agreed to release the non-debtor Released Parties. The Bankruptcy Code does not apply to agreements between non-debtors. And no Code provision authorizes courts, as part of an order confirming a chapter 11 plan, to "deem" a non-debtor to have consented to an agreement to release

claims against other non-debtors where consent would not exist under state law. Nor does 11 U.S.C. § 105(a) confer any power to override state law. Rather, section 105(a) "serves only to carry out authorities expressly conferred elsewhere in the code." *Purdue Pharma L.P.,* 144 S. Ct. at 2082 n.2 (quotation marks omitted). Bankruptcy courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor do they possess a "roving commission to do equity." *In re Dairy Mart Convenience Stores, Inc.,* 351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted). Thus, the state-law definition of consent is not diluted or transformed by the Code.

27.     Indeed, even as to a debtor, it is well settled that whether parties have entered a valid settlement agreement is governed by state law. *See Houston v. Holder (In re Omni Video, Inc.),* 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy law fails to address the validity of settlements and this gap should be filled by state law."); *De La Fuente v. Wells Fargo Bank, N.A. (In re De La Fuente),* 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009) ("Where the United States is not a party, it is well established that settlement agreements in pending bankruptcy cases are considered contract matters governed by state law."); s*ee also Travelers Cas. & Sur. Co. of America v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 450-51 (2007) ("[T]he basic federal rule in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law.") (quotation marks omitted); *Butner v. United States*, 440 U.S. 48, 54 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.").

28.     Because the Bankruptcy Code does not govern relationships between claim holders and non-debtor third-parties, state contract principles are the source of authority when considering whether a release is consensual. *See, e.g.*, *In re Smallhold, Inc.*, 2024 WL 4296938, at *11 (requiring "some sort of affirmative expression of consent that would be sufficient as a matter of

contract law"); *Patterson v. Mahwah Bergen Retail Grp., Inc.*, 636 B.R. 641, 684-85 (E.D. Va. 2022) (describing bankruptcy courts in the District of New Jersey as "look[ing] to the principles of contract law rather than the bankruptcy court's confirmation authority to conclude that the validity of the releases requires affirmative consent"); *In re SunEdison, Inc.*, 576 B.R. at 458 ("Courts generally apply contract principles in deciding whether a creditor consents to a third-party release."); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 506 (Bankr. D.N.J. 1997) (holding that a third-party release "is no different from any other settlement or contract"); *id.* at 507 (holding that "the validity of the release … hinge[s] upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order") (internal quotation marks omitted) (alterations in original). As one court recently held, because "nothing in the bankruptcy code contemplates (much less authorizes) it … any proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent." *In re Tonawanda Coke Corp.*, 662 B.R. 220, 222 (Bankr. W.D.N.Y. 2024) (cleaned up) (quoting and citing *Purdue Pharma L.P.*, 144 S. Ct. at 2086). Accordingly, "any such consensual agreement would be governed by state law." *Id.*

29.     Here, the Debtors do not meet the state-law burden of establishing that the Releasing Parties will expressly consent to release their property rights nor to having that release memorialized in the Plan.

30.     The "general rule of contracts is that silence cannot manifest consent." *Patterson*, 636 B.R. at 686. "Acceptance by silence is exceptional. Ordinarily an offeror does not have power to cause the silence of the offeree to operate as acceptance." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

31.     "[T]he exceptional cases where silence is acceptance fall into two main classes: those where the offeree silently takes offered benefits, and those where one party relies on the other party's manifestation of intention that silence may operate as acceptance. Even in those cases the contract may be unenforceable under the Statute of Frauds." *Id.*

32.     Thus, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak." *Id.*; *see also Patterson*, 636 B.R. at 686 (discussing how contract law does not support consent by failure to opt out). Further, "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." RESTATEMENT (SECOND) OF CONTRACTS § 69, cmt. c (1981); *see also Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1227-28 (9th Cir. 2022) ("[E]ven though the offer states that silence will be taken as consent, silence on the part of the offeree cannot turn the offer into an agreement, as the offerer cannot prescribe conditions so as to turn silence into acceptance.") (quotation marks omitted).

33.     Using Delaware common law as a point of reference, silence does not equal consent except under limited circumstances not applicable here. *See, e.g.*, *Hornberger Mgmt. Co. v. Haws & Tingle Gen. Contractors, Inc.*, 768 A.2d 983, 991 (Del. Super. Ct. 2000) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 69 (1981)). Delaware follows the "mirror image" rule, requiring the acceptance to be identical to the offer. *See Urban Green Techs., LLC v. Sustainable Strategies 2050 LLC*, No. N13C-12-115, 2017 WL 527565, at *3 (Del. Super. Ct. Feb. 8, 2017); *see also Patterson*, 636 B.R. at 686 (contract law does not support consent by failure to opt out).

34.     As this Court has held, applicable state contract law cannot be disregarded on a default theory, applied by some courts, that creditors who remain silent forfeit their rights against non-debtors because they received notice of the non-debtor release, just as they would forfeit their

right to object to a plan if they failed timely to do so. *See In re Smallhold, Inc.,* 2024 WL 4296938, at *8-*11 (abrogating *In re Arsenal Intermediate Holdings, LLC,* No. 23-10097, 2023 WL 2655592 (Bankr. D. Del. Mar. 27, 2023)). This Court explained in *Smallhold* that the Supreme Court's *Purdue* decision undermined the fundamental premise of such a theory — that a bankruptcy proceeding legally could lead to the destruction of creditors' rights against non-debtors, so they had best pay attention lest they risk losing those rights. *Id.* at *1-*2; *see also id.* at *10 ("The possibility that a plan might be confirmed that provided a nonconsensual release was sufficient to impose on the creditor the duty to speak up if it objected to what the debtor was proposing."). Thus, *Smallhold* held that "it is no longer appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release." *Id.* at *10.

35.     The *Smallhold* decision provided an illustration that makes obvious why consent cannot be found based merely on a failure to object or opt out, even if there is clear notice of a non-debtor release:

> Consider, for example, a plan of reorganization that provided that each creditor who failed to check an "opt out" box on a ballot was required to make a $100 contribution to the college education fund for the children of the CEO of the debtor. Just as in the case of Party A's letter to Party B, no court would find that in these circumstances, a creditor that never returned a ballot could properly be subject to a legally enforceable obligation to make the $100 contribution.

*Id.* at *2 (footnote omitted). Cases that impose a non-debtor release based merely on the failure to object or opt out fail to "provide[] any limiting principle that would distinguish the third-party release from the college education fund plan. And after *Purdue Pharma*, there is none." *Id.* Thus, "ordinary contract principles" apply to determine whether there is consent to a non-debtor release. *Id.* at *3.

36.     As discussed above, consent arises when two sets of parties affirmatively assent to something. *See* 1 VOSS ON DELAWARE CONTRACT LAW § 2.05 (citing *Loveman v. The NuSmile,*

*Inc.*, C.A. No. 08C-08-223 MJB, memo. op. at \*7 (Del. Super. Ct. Mar. 31, 2009) (Brady, J.)). A party seeking to include non-debtor releases in a bankruptcy plan must show that they are consensual. To do so, state law requires that mutually agreeing third parties must come forward, state their consent affirmatively, and ask the court to memorialize their consent in a plan. Nothing in the Code authorizes bankruptcy courts to extinguish claims by inferring consent outside the bounds of state law.

37.     The Debtors propose that the Third-Party Releases in the Plan, which benefit numerous non-debtors that are Released Parties, bind: (a) the DIP Secured Parties; (b) the Committee, if any; (c) all Holders of Claims deemed to have accepted the Plan that have not filed an objection to the release contained in Article IX thereof prior to the Voting Deadline; (d) all Holders of a Claim that vote to accept or reject the Plan and do not timely submit a Release Opt-Out; (e) each current and former Affiliate of each Person or Entity in clauses (a) through (d) solely to the extent such Affiliate may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an Entity in clauses (a) through (e); and (f) each Related Party of each Entity in clauses (a) through (e) solely to the extent such Related Party may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an Entity in clauses (a) through (e). D.I. 543, Art. I.A. Item 98.

38.     The Plan would extract non-consensual third-party releases from holders of claims or interests who vote to accept or reject the Plan that fail to check an opt-out box on a ballot or opt-out form.

39.     But affirmative consent — something more than the failure to opt out — is required to support a consensual third-party release. *See In re Tonawanda Coke Corp.,* 662 B.R. at 222; *Patterson,* 636 B.R. at 686. Failing to "opt out" of an offer is not a manifestation of consent unless

one of the exceptions to the rule that silence is not consent applies, such as conduct by the offeree that manifests an intention that silence means acceptance or taking the offered benefits. For example, the *Patterson* court, in applying black-letter contract principles to opt-out releases in a chapter 11 plan, found that contract law does not support consent by failure to opt-out. *Patterson*, 636 B.R. at 686. "Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent." *Id*. at 688.

40.    The Ninth Circuit's decision in *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279 (9th Cir. 2017), cited with approval by the Third Circuit in *Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-18 (3d Cir. 2017), illustrates the point. In *Norcia*, a consumer bought a Samsung phone from a Verizon Wireless store and signed the Verizon Wireless Customer Agreement. *Norcia*, 845 F.3d at 1282. Among the contents of the phone's box was a Samsung "Product Safety & Warranty Information" brochure that contained an arbitration provision, which "stated that purchasers could opt out of the arbitration agreement by providing notice to Samsung within 30 calendar days of purchase, either through email or by calling a toll-free telephone number." *Id*. It also stated that opting out would not affect the warranty coverage. *Id*. The customer did not take any steps to opt out. *Id.* When the customer later sued Samsung, Samsung argued that the arbitration provision applied. *Id*. at 1282-83.

41.    The *Norcia* court rejected the argument that the customer agreed to the arbitration provision by signing his contract with Verizon: "The Customer Agreement is an agreement between Verizon Wireless and its customer. Samsung is not a signatory." 845 F.3d at 1290. That is even more true in the context of a chapter 11 plan. Not only are the non-debtor Released Parties not signatories to it, a chapter 11 plan is a creature of the Bankruptcy Code specifically for determining how the debtor will pay its creditors, not for resolving claims between non-debtors.

As the Ninth Circuit has explained, "[w]hen a bankruptcy court discharges the debtor, it does so by operation of the bankruptcy laws, not by consent of the creditors. … [T]he payment which effects a discharge is not consideration for any promise by the creditors, much less for one to release non-party obligators." *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1085 (9th Cir. 2020) (quotation marks omitted).

42.    The Ninth Circuit in *Norcia* further held that the customer's failure to opt out did not constitute consent to arbitrate. Unsurprisingly — because there was no applicable federal law — the court applied the "general rule," applicable under California law, that "silence or inaction does not constitute acceptance of an offer." 845 F.3d at 1284 (quotation marks omitted); *accord Southern Cal. Acoustics Co. v. C.V. Holder, Inc.*, 456 P.2d 975, 978 (Cal. 1969). The customer did not agree to arbitrate because he did not "sign the brochure or otherwise act in a manner that would show his intent to use his silence, or failure to opt out, as a means of accepting the arbitration agreement." *Norcia*, 845 F.3d at 1285 (quotation marks omitted). This was true, even though the customer did take action to accept the offered contract from Verizon Wireless. "Samsung's offer to arbitrate all disputes with [the customer] cannot be turned into an agreement because the person to whom it is made or sent makes no reply, even though the offer states that silence will be taken as consent, unless an exception to this general rule applies." *Id*. at 1286 (quotation marks and citation omitted).

43.    The Ninth Circuit explained that exceptions to this rule exist when the offeree has a duty to respond or when the offeree retains the offered benefits but held neither exception applied. *Norcia*, 845 F.3d at 1284-85. There was no state law imposing a duty on the customer to act in response to the offer, the parties did not have a prior course of dealing that might impose

such a duty, and the customer did not retain any benefits by failing to act given that the warranty applied whether or not he opted out of the arbitration provision. *Id*. at 1286.

44.    Here, too, the Debtors' creditors have not signed an agreement to release the non-debtor releasees. Nor may consent be inferred from their silence because they have no duty to respond to the offer of a non-debtor release and they have not retained any benefits offered in exchange for it.

45.    The U.S. Trustee recognizes that this Court in *Smallhold* found that the act of voting on a plan combined with a failure to opt out can constitute consent to a non-debtor release. *See In re Smallhold, Inc.,* 2024 WL 4296938, at *14. However, the U.S. Trustee respectfully submits that, in finding that voting on a plan without opting out constitutes "an affirmative step" necessary to infer consent (*id*.), the Court erred by failing to consider whether any of the exceptions to the state-law rule that silence is not consent apply in this context. As discussed below, while voting is an "affirmative step" with respect to the debtor's plan, it is not a "*manifestation of intention* that silence may operate as acceptance" of an offer to release claims against non-debtors for the reasons discussed above. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981) (emphasis added). Creditors have no affirmative obligation to act on a plan, either to vote or to opt out. *See, e.g.*, 11 U.S.C. § 1126(a) (providing that creditors "may" vote on a plan); *In re SunEdison, Inc.*, 576 B.R. at 460–61 (holding creditors have no duty to speak regarding a plan that would allow a court to infer consent from silence). Further, because impaired creditors have a federal right to vote on a chapter 11 plan (11 U.S.C. § 1126(a)), merely exercising that right does not manifest consent to release claims against non-debtors. Thus, the act of voting on a plan without taking an additional step to opt out is still merely silence with respect to the non-debtor release.

46.     Notably, the Ninth and Second Circuit cases *Smallhold* cited do not support the conclusion that the act of voting on a chapter 11 plan while remaining silent regarding the non-debtor release constitutes consent. *In re Smallhold, Inc.*, 2024 WL 4296938, at *14 n.60 (citing *Berman v. Freedom Financial Network*, 30 F.4th 849, 856 (9th Cir. 2022); *Meyer v. Uber Technologies, Inc.*, 868 F.3d 66, 75 (2d Cir. 2017)). Those cases emphasize the importance of notice as a prerequisite to consent and explain the requirements for when someone can be deemed on "inquiry notice" of terms they did not read. *See Berman*, 30 F.4th at 856; *Meyer*, 868 F.3d at 75. But whether there is sufficient notice is a distinct question from whether there has been a manifestation of an intent to accept an offer. *See, e.g., Meyer*, 868 F.3d at 74 ("[A]n offeree, *regardless of apparent manifestation of his consent*, is not bound by inconspicuous contractual provisions of which he is unaware, contained in a document whose contractual nature is not obvious.") (internal quotation marks omitted; emphasis added).  While notice of a contractual term is certainly a necessary precondition to finding consent, notice is not alone sufficient. *See, e.g., id.*; *see also Norcia*, 845 F.3d at 1284; RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). There must also be a manifestation of consent. *See, e.g., Berman*, 30 F.4th at 85; *see also Norcia*, 845 F.3d at 1284; RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

47.     As explained by the Restatement, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction" — in this case, the freedom to vote on a chapter 11 plan — "or impose on him any duty to speak," such as by checking an opt out box or returning an opt out form. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). Voting on a plan while failing to opt out thus cannot be equated with affirmative conduct manifesting consent to the nondebtor release. Just like the hypothetical creditors in *Smallhold* could not be forced to contribute $100 to a college fund to benefit the debtor's CEO's children merely because they failed

to return a ballot with an "opt out" box (*In re Smallhold, Inc.*, 2024 WL 4296938, at *2), creditors who actually cast such a ballot should not be forced to make such a contribution merely because they failed to check that "opt out" box. As confirmed above, state law affords no basis to conclude that consent to release *third-party* claims can properly be inferred from nothing more than a mere failure to check an opt-out box on a ballot expressing the party's views about the proposed treatment of its claims against the *debtor*.

48.     Thus, the Third-Party Releases render the Plan facially unconfirmable for several reasons.  *First*, the Plan imposes non-debtor releases on those who vote to accept or reject the Plan but do not opt out. But voting for or against a plan without checking an opt-out box does not constitute the affirmative consent necessary to reflect acceptance of an offer to enter a contract to release claims against non-debtors. *See* RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

49.     As an initial matter, merely voting for a plan without checking an opt-out box does not constitute the affirmative consent necessary to reflect acceptance of an offer to enter a contract to release claims against non-debtors. *See, e.g., In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D.N.J. 2007) ("[A] consensual release cannot be based solely on a vote in favor of a plan."); *In re Arrowmill Dev. Corp.*, 211 B.R. at 507 (holding that, because consensual releases are premised on the party's agreement to the release, "it is not enough for a creditor to abstain from voting for a plan, or even to simply vote 'yes' as to a plan").

50.     Creditors who vote for a plan are not "silently tak[ing] offered benefits" from the released non-debtors, such that consent may be inferred. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).  The only benefits received are through distributions from the debtor's chapter 11 plan. Because creditors are entitled to whatever distributions the Plan allocates them regardless

of whether they opt out of the nondebtor releases, consent to the nondebtor release cannot be inferred from acceptance of those benefits. *See Norcia*, 845 F.3d at 1286 (holding customer did not retain any benefits when warranty applied regardless of failure to opt out). Further, acceptance of a "benefit" — distributions under the plan — that the offeror had no right to refuse the offeree does not manifest acceptance of the offer. *See Railroad Mgmt. Co., L.L.C. v. CFS La. Midstream Co.*, 428 F.3d 214, 223 (5th Cir. 2005) ("In the absence of any evidence that Strong had the right to exclude CFS from the property in question or that CFS accepted any service or thing of value from Strong, no reasonable jury could conclude that CFS's failure to remove its pipeline upon Strong's demand constituted consent to a contract.").

51.    Nor does voting on the chapter 11 plan "manifest [an] intention that silence may operate as acceptance" of an offer to release claims against non-debtors. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). As previously confirmed, impaired creditors have a federal right under the Bankruptcy Code to vote on a chapter 11 plan pursuant to section 1126(a). Merely exercising that right does not manifest consent to release claims against non-debtors. Rather, voting on a chapter 11 plan is governed by the Bankruptcy Code, and a favorable vote reflects only approval of the plan's treatment of the voters' claims *against the debtor*.

52.    And as in *Norcia*, creditors have no state law duty to respond to an offer to release non-debtors such that their silence can be understood as consent, nor have they any prior course of dealing with the released non-debtors that would impose such a duty. *See Norcia*, 845 F.3d at 1285-86. Nor do creditors have any affirmative obligation to act on a plan, either to vote or to opt out. *See, e.g.*, 11 U.S.C. § 1126(a) (providing that creditors "may" vote on a plan); *SunEdison, Inc.*, 576 B.R. at 460–61 (holding creditors have no duty to speak regarding a plan that would allow a court to infer consent from silence).  A claimant's vote in favor of a plan while remaining

silent regarding a non-debtor release thus does not fit within the exception to the general rule that consent cannot be inferred from silence.

53.     As explained in *Arrowmill*, a voluntary release arises only "because the *creditor agrees*" to it.  211 B.R. at 507 (emphasis in original).  Because "a creditor's approval of the plan cannot be deemed an act of assent having significance beyond the confines of the bankruptcy proceedings," "it is not enough for a creditor … to simply vote 'yes' as to a plan."  *Id.* (quotation marks omitted); *accord Congoleum Corp.*, 362 B.R. at 194; *In re Digital Impact, Inc.*, 223 B.R. 1, 14 (Bankr. N.D. Okla. 1998).  Rather, a creditor must "unambiguously manifest[] assent to the release of the nondebtor from liability on its debt." *Arrowmill*, 211 B.R. at 507.

54.     Similarly, the *Patterson* court, in applying black-letter contract principles to opt-out releases in a chapter 11 plan, held that the failure to opt out of a third-party release does not constitute the requisite affirmative consent to bind the releasing party under contract law. *Patterson*, 636 B.R. at 686. "Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent." *Id*. at 688.

55.     Because merely voting to approve a plan does not manifest consent to a non-debtor release, such a vote plus a failure to opt out is still nothing more than silence with respect to the offer to release claims against non-debtors. That is not consent, unless one of the exceptions to the rule that silence is not consent applies. And as discussed above, no such exception applies here.

56.      For the same reasons, releases cannot be imposed on those who vote to reject the plan but do not opt out.  It is implausible to suggest that a party returning a ballot rejecting the plan but neglecting to opt out of the third-party release is evidencing consent to the third-party release. Not only is there no "mutual agreement" as to the Plan, much less the Third-Party Release, the

creditor has expressly stated its rejection of the Plan. As the court in *In re Chassix Holdings, Inc.*, reasoned, "a creditor who votes to reject a plan should also be presumed to have rejected the proposed third-party releases that are set forth in the plan. *The additional 'opt out' requirement, in the context of this case, would have been little more than a Court-endorsed trap for the careless or inattentive creditor*." 533 B.R. 64, 79 (Bankr. S.D.N.Y. 2015) (emphasis added).

57.     Whether or not a creditor votes to accept or reject the Plan, such creditors may not have understood the solicitation package and may not have possessed the time or financial resources to engage counsel, never imagining that their rights against non-debtors could be extinguished through the bankruptcy of these Debtors. "[A]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." *Norcia*, 845 F.3d at 1285 (quotation marks omitted).

58.     *Second,* contrary to this Court's decision in *Smallhold*, the Plan provides that holders of claims that are deemed to accept the Plan but do not either opt out of, or object to, the releases contained in the Plan shall also be stripped of their direct claims against non-debtors.

59.     For the reasons discussed above, no consent can be inferred from this silence. Further, such creditors should not be forced to incur the time and expense to file an objection to the Plan in order to avoid impairment of their rights.

60.     This Court has held that releases cannot be imposed on those who do not vote merely because they do not object.  *See In re Smallhold, Inc.,* 2024 WL 4296938, at *2 ("After *Purdue Pharma*, a third-party release is no longer an ordinary plan provision that can properly be entered by 'default' in the absence of an objection."). There is no basis to infer that a party who

has no right to vote on the Plan is consenting to a third-party release simply because that party does not also file an objection.

61.     Even where there are conspicuous warnings in the disclosure statement or opt-out form that silence or inaction will constitute consent to a release, that is not sufficient to recast a party's silence into consent to the non-debtor release. *See SunEdison*, 576 B.R. at 458-61.  Just as creditors have no federal or state law duty to vote on a plan, they also have no obligation to read a plan, much less object to a plan. And creditors who do not intend to, or have no right to, vote in the first place are unlikely to file an objection to any plan terms, which they reasonably expect do not affect them. "Charging all inactive creditors with full knowledge of the scope and implications of the proposed third-party releases, and implying a 'consent' to the third-party releases based on the creditors' inaction, is simply not realistic or fair and would stretch the meaning of 'consent' beyond the breaking point."  *In re Chassix*, 533 B.R. at 88. This is especially true as to creditors who are inactive because they are not even allowed to vote on the Plan. Moreover, as this Court explained in *Smallhold*: "It is reasonable to require creditors to pay attention to what the debtor is doing in bankruptcy as it relates to the creditor's rights against the debtor. But as to the creditor's rights against third parties – which belong to the creditor and not the bankruptcy estate – a creditor should not expect that those rights are even subject to being given away through the debtor's bankruptcy." 2024 WL 4296938, at *12. Here, it's especially egregious to expect "deemed to accept" parties to go through the time and expense of filing an objection simply to protect rights that should not be abrogated in the first place.

62.     As this Court noted in *Emerge*, "[a] party's receipt of a notice imposing an artificial opt-out requirement, the recipient's possible understanding of the meaning and ramifications of such notice, and the recipient's failure to opt-out simply do not qualify" as consent through a

party's silence or inaction. *In re Emerge Energy Servs., LP*, No. 19-11563, 2019 WL 7634308, at *18 (Bankr. D. Del. Dec. 5, 2019) (Owens, J.).

63.     The Debtors may try to distinguish these cases from *Emerge* based on the argument that *Emerge* dealt with creditors and shareholders who were receiving no distribution under the plan, while here, this provision affects those who are unimpaired under the Plan. But the Court's decision in *Emerge* was not expressly limited to such a factual situation. To the contrary, the Court's recognition that failure to return a ballot or opt-out election form can be due to "carelessness, inattentiveness, or mistake," rather than constituting the manifestation of an intent to agree to a third-party release, would be applicable regardless of whether a creditor or interest holder was to receive a distribution under a plan.

64.     Indeed, recipients of mailings regarding the Debtors' bankruptcy cases have no reason to expect that an offer to contract with non-debtors will be included in the plan solicitation or notices. As the Third Circuit has explained, there can be no presumption that someone has agreed to contractual provisions of which they are "on notice," unless "there is a reasonable basis to conclude that consumers will have understood the document contained a bilateral agreement." *See Noble*, 682 F. App'x at 117-118; *see also Norcia*, 845 F.3d at 1289 ("[N]o contract is formed when the writing does not appear to be a contract and the terms are not called to the attention of the recipient.") (quotation marks omitted).

65.     *Third*, the non-consensual Third-Party Releases will apparently be imposed on holders of administrative claims and priority tax claims. D.I. 543, Art. I.A, Item 98 (defining "Releasing Party" to include "all Holders of Claims deemed hereunder to have accepted the Plan that have not filed an objection to the release contained in Article IX herein prior to the Voting Deadline"). The claims to be released include direct claims that unimpaired parties hold against

numerous non-debtors. The scope of the release of their direct claims against non-debtors is far

broader than the claims upon which they will be paid. The release covers:

> any and all claims and Causes of Action, whether known or unknown, including
> any claims and Causes of Action that the Debtors or their estates would have been
> legally entitled to assert in their own right including any claims or Causes of Action
> that could be asserted derivatively or on behalf of the Debtors (or their estates), that
> such Entity would have been legally entitled to assert (whether individually or
> collectively), based on,relating to, or in any manner arising from, in whole or in
> part, the Debtors (including the management, ownership or operation thereof, or
> otherwise), any securities issued by the Debtors and the ownership thereof, the
> Debtors' in- or out-of-court restructuring efforts, any avoidance actions, these
> Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing
> of the Disclosure Statement, the Sale Motion, the Plan, the Plan Supplement, or any
> other transaction, contract, instrument, release, or other agreement or document
> created or entered into in connection with the Sale, the Plan, the Plan Supplement,
> these Chapter 11 Cases, the filing of these Chapter 11 Cases, the pursuit of the
> Confirmation Order, the pursuit of the Sale Order, the pursuit of Consummation,
> the administration and implementation of the Plan, including the distribution of
> property under the Plan or any other related agreement, or upon any other related
> act or omission, transaction, agreement, event, or other occurrence or omission
> taking place on or before the Effective Date; *provided*, that this provision shall not
> operate to waive or release any Claims or Causes of Action related to any act or
> omission that is determined in a Final Order by a court of competent jurisdiction to
> have constituted actual intentional fraud, willful misconduct, or gross negligence
> of such Person; *provided further*, that notwithstanding anything to the contrary in
> the Disclosure Statement and Plan, this provision shall not apply with respect to
> any unimpaired Claim until such unimpaired Claim has been paid in full in the
> Allowed amount of such Claim determined in accordance with applicable law, or
> on terms agreed to between the Holder of such Claim and the Debtors or the Plan
> Administrator, as applicable, at which time this provision shall apply in all respects
> as to the applicable unimpaired Claim. Notwithstanding anything to the contrary in
> the foregoing, the releases set forth above do not release (1) any post Effective Date
> obligations of any party or entity under the Plan or any document, instrument, or
> agreement (including those set forth in the Plan Supplement) executed to implement
> the Plan; (2) any obligations under or in respect of the Sale Order; or (3) the
> Retained Causes of Action, if any.

*Id*. at Art. IX.B (emphasis removed).

66.     So, for example, a taxing authority whose priority claim against the Debtors is

proposed to be paid in full under the Plan (as required by the Code) could later be subject to an

argument by a Released Party that it has no obligation to pay taxes in connection with revenue

received from transactions with the Debtors because, under the Plan, the taxing authority has been deemed to release the Released Party for all claims related in any manner to the Debtors.

67.     *Fourth*, the non-consensual Third-Party Releases will apparently be imposed on Affiliates[4] and Related Parties,[5] solely to the extent that they may assert Claims or Causes of Action derivatively which belong to another Releasing Party.  Plan Art. I.A.98.

68.     In *Folger Adam Security, Inc. v. DeMatteis/MacGregor*, 209 F.3d 252 (3d Cir. 2000), the Third Circuit ruled that "[d]ue process requires notice reasonably calculated, under all the circumstances, to apprize interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 265 (quotations and citations omitted).

69.     The Debtors' proposed solicitation procedures did not provide notice to the Affiliates and Related Parties that is "reasonably calculated, under all the circumstances, to apprize [them] of the pendency of the action and afford them an opportunity to present their objections" to having Third-Party Releases extracted from them. *Id.* In fact, most, if not all, of the Affiliates and Related Parties will receive no notice at all, because they are not themselves creditors or

---

[4] The Plan defines "Affiliate" as "any 'affiliate,' as defined in section 101(2) of the Bankruptcy Code, as if such entity was a debtor in a case under the Bankruptcy Code."  D.I. 543, Art. I.A.3.

[5] The Plan defines "Related Parties" as

> each of, and in each case in its capacity as such, current and former directors, managers, officers, the Special Committee, committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such Person's or Entity's respective heirs, executors, estates, and nominees.

D.I. 543, Art. I.A.95.

interest holders of the Debtors. Therefore, the Court should deny confirmation unless the Plan is modified so that no Affiliates and Related Parties are deemed to give releases to non-debtors. *See In re Boy Scouts of America and Delaware BSA, LLC*, Case No. 20-10343 (LSS), 2022 WL 3030138, at \*128 (Bankr. D. Del. July 29, 2022) (Court was unable to find that the twenty-two categories of "Related Releasing Parties" received notice, and because Court had concluded that "a request for opt-out consent must be grounded in adequate notice, it is inconsistent to permit releases from persons who do not receive notice by virtue of creditor (or shareholder) status."); *see also Patterson v. Mahwah Bergen Ret. Grp., Inc.*, No. 3:21CV167 (DJN), 2022 WL 135398, at \*7 (E.D. Va. Jan. 13, 2022) (in vacating the Bankruptcy Court's order confirming the plan, the District Court noted that "[t]he Bankruptcy Court did not order that any notice or opt-out forms be sent to all of the Releasing Parties, including the current and former employees, consultants, accountants or attorneys of Debtors, their affiliates, lenders, creditors or interest holders.").

70.    In sum, there will be no affirmative consent to Third-Party Releases given by the numerous persons and entities on whom such releases will be imposed.  Such releases are therefore non-consensual.

71.    This Court also may not approve the injunction enforcing the "opt out" or "failed to object" release by parties in interest against non-debtors because *Purdue* clearly stands for the proposition that non-consensual third-party releases and injunctions are not permitted by the Bankruptcy Code. *See Purdue Pharma L.P.*, 144 S.Ct. at 2088. As the *Purdue* court noted, the Bankruptcy Code allows courts to issue an injunction in support of a non-consensual, third-party release in exactly one context: asbestos-related bankruptcies, and these cases are not asbestos-related. *See id.* at 2085 (citing 11 U.S.C. § 524(e)). Even if non-debtor releases are consensual, there is no Code provision that authorizes chapter 11 plans or confirmation orders to include

injunctions to enforce them. Further, such an injunction is not warranted by the traditional factors that support injunctive relief. Parties seeking an injunction "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also Purdue Pharma*, 144 S. Ct. at 2085 (noting that an injunction is an "extraordinary remedy"); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("An injunction should issue only where the intervention of a court of equity 'is essential in order effectually to protect property rights against injuries otherwise irremediable.'") (quoting *Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919)); *Fechter v. HMW Indus., Inc.*, 879 F.2d 1111, 1119 (3d Cir. 1989) ("We have long followed the principle that equitable remedies are available once legal remedies are found to be inadequate.") (citing *Weinberger*). For example, if the release is truly consensual, there is no threatened litigation and no need for an injunction to prevent irreparable harm to either the estates or the released parties. A consensual release may serve as an affirmative defense in any ensuing, post-effective date litigation between the third party releasees and releasors, but there is no reason for this Court to be involved with the post-effective date enforcement of those releases. Moreover, this injunction essentially precludes any party deemed to consent to this release from raising any issue with respect to the effectiveness or enforceability of the release (such as mistake or lack of capacity) under applicable non-bankruptcy law.

**B.    The Plan is Not Confirmable Because It Provides a Discharge to the Liquidating Debtors.**

72.    The Plan is also unconfirmable for the separate and independent reason that it will grant the Debtors a discharge in violation of section 1141(d)(3) of the Bankruptcy Code.

73.     Section 1129(a)(1) of the Bankruptcy Code provides that the Court shall confirm a plan only if the plan "complies with the applicable provisions of" title 11. 11 U.S.C. § 1129(a)(1).

74.     Section 1141(d)(3) of the Bankruptcy Code provides that:

The confirmation of a plan does not discharge a debtor if—

> (A)    the plan provides for the liquidation of all or substantially all of the property of the estate;
>
> (B)    the debtor does not engage in business after consummation of the plan; and
>
> (C)    the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title.

11 U.S.C. § 1141(d)(3).

75.     The Plan would grant the Debtors a discharge because they are included in the definition of "Released Party." D.I. 543, Art. I.A, Item 97 (defining "Released Party" to include, among others, "the Debtors"). Thus, the Debtors will receive the releases embodied in Article IX.B of the Plan (quoted above in <u>Section A</u>). *Id.* at Art. XII.B ("As of the Effective Date, each Releasing Party is deemed to have released each Released Party from any and all claims and Causes of Action[.]") (emphasis removed). In addition, Article IX.D of the Plan would establish an injunction to enforce this discharge as to the Debtors. *Id.* at Art. IX.D.

76.     However, the Debtors are not eligible for a discharge because the elements of section 1141(d)(3) are satisfied.

77.     First, the Plan provides for the liquidation of all or substantially all of the Debtors' assets. *Id.* at Art. IV.C (describing the Court-approved sale of substantially all of the Debtors' assets to the Purchaser pursuant to an Asset Purchase Agreement) and Art. IV.D (describing the Plan Administrator's responsibilities including "liquidating any remaining assets (except the Litigation Trust Assets)").

78.     Second, the Debtors will not engage in business after consummation of the Plan. *Id.* at Art. IV.D (providing that the Plan Administrator's responsibilities will include, among other things, "wind[ing] down the affairs and operations of the Debtors and their Estates, including, but not limited to: (1) liquidating any remaining assets (except the Litigation Trust Assets); (2) prosecuting the Retained Causes of Action, if any, and any other claims or Causes of Action of the Debtors preserved herein (except the Litigation Trust Assets); (3) Claims reconciliation and Allowance; and (4) making distributions to Holders of Allowed Claims in accordance with the terms of this Plan."). Fundamentally, the Plan is about monetizing assets – not engaging in business.

79.     Third, the Debtors, as corporations, would not be eligible for a discharge pursuant to section 727(a)(1) of the Bankruptcy Code if they were chapter 7 debtors. That is because section 727(a)(1) provides that the Court shall grant a debtor a discharge unless the debtor is not an individual. *See, e.g.*, *In re Flintkote Co.*, 486 B.R. 99, 129 n.80 (Bankr. D. Del. 2012) ("Section 1141(d)(3)(C) is always satisfied for corporate debtors, as they cannot receive discharges in chapter 7.").

80.     Accordingly, the Debtors are not eligible for a discharge pursuant to section 1141(d)(3) of the Bankruptcy Code. Because the Plan would grant the Debtors a discharge pursuant to Article IX.B and Article IX.D, among others, the Plan violates section 1141(d)(3), fails to satisfy section 1129(a)(1), and, consequently, is unconfirmable.

## **RESERVATION OF RIGHTS**

81.     The U.S. Trustee leaves the Debtors to their burden of proof and reserves any and all rights, remedies and obligations to, among other things, complement, supplement, augment, alter or modify this Objection and reservation of rights, assert any objection, file any appropriate

motion, or conduct any and all discovery as may be deemed necessary or as may be required and to assert such other grounds as may become apparent upon further factual discovery.

**WHEREFORE**, the U.S. Trustee respectfully requests that the Court enter an order: (i) denying confirmation of the Plan; and (ii) granting such other and further relief as the Court deems just and equitable.

Dated: October 28, 2024                         Respectfully submitted,

                                                **ANDREW R. VARA**
                                                **UNITED STATES TRUSTEE**
                                                **REGIONS 3 AND 9**

                                        By:  */s/ Malcolm M. Bates*
                                                Joseph F. Cudia
                                                Malcolm M. Bates
                                                Trial Attorneys
                                                United States Department of Justice
                                                Office of the United States Trustee
                                                J. Caleb Boggs Federal Building
                                                844 N. King Street, Room 2207, Lockbox 35
                                                Wilmington, DE 19801
                                                Telephone: (302) 573-6491
                                                Email:   Joseph.Cudia@usdoj.gov
                                                         Malcolm.M.Bates@usdoj.gov

**<u>CERTIFICATE OF SERVICE</u>**

 I, Malcolm M. Bates, hereby certify that on October 28, 2024, I caused to be served a copy of this Objection by electronic service on the registered parties via the Court's CM/ECF system and courtesy copies were sent via email to parties in interest.

Dated: October 28, 2024       */s/ Malcolm M. Bates*

             Malcolm M. Bates