## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SEAPLANE DEBTOR 1, INC., *et al.*,[1] | Case No. 24-10703 (CTG) |
| Debtors. | (Jointly Administered) |
| | **Ref Nos. 196, 243 & 543** |

### DECLARATION OF THOMAS G. FITZGERALD, INDEPENDENT DIRECTOR AND SOLE MEMBER OF THE SPECIAL COMMITTEE OF THE BOARD OF DIRECTORS OF SEAPLANE DEBTOR 1, INC. AND ITS DEBTOR AFFILIATES, IN SUPPORT OF APPROVAL OF THE DISCLOSURE STATEMENT ON A FINAL BASIS AND CONFIRMATION OF THE FOURTH AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION FOR SEAPLANE DEBTOR 1, INC. (F/K/A ICON AIRCRAFT, INC.) AND ITS DEBTOR AFFILIATES UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

I, Thomas G. FitzGerald, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am an independent director of the Board of Directors (the "Board") of Seaplane Debtor 1, Inc., the lead debtor for the debtors and debtors in possession (the "Debtors") in the above-captioned Chapter 11 Cases.  I also serve as the sole member of the Special Committee of the Board (the "Special Committee").

2.      I am over the age of 18 years and am authorized to submit this declaration on behalf of the Debtors.  If called to testify, I could and would testify competently to the facts set forth herein.

---

[1]     The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Seaplane Debtor 1, Inc. (7443); Seaplane Debtor 2, Inc. (7918); and Seaplane Debtor 3, LLC (6101); and Seaplane Debtor 4, LLC (5297).  The Debtors' service address is 2141 ICON Way, Vacaville, CA 95688.

3.    I submit this declaration in support of final approval of the *Second Amended Disclosure Statement for Joint Chapter 11 Plan of Liquidation for Icon Aircraft, Inc. and Its Debtor Affiliates* [D.I. 243] (as modified, amended, or supplemented from time to time, the "<u>Disclosure Statement</u>") and the request for entry of an order confirming the *Fourth Amended Joint Chapter 11 Plan of Liquidation for Seaplane Debtor 1, Inc. (f/k/a ICON Aircraft, Inc.) and its Debtor Affiliates* [D.I. 579] (as may be amended, supplemented, or modified from time to time, the "<u>Plan</u>").[2]

4.    Unless otherwise indicated, all facts set forth in this declaration are based upon information learned during (i) the Special Committee's due diligence and analysis of certain potential claims and causes of action held by the Debtors' Estates, (ii) discussions with the Debtors' professionals, and/or (iii) information supplied to me in my capacities as a director and the sole member of the Special Committee through discussions with fellow members of the Board or the Debtors' officers and advisors.  I am generally familiar with the terms of the Plan, the documents attached as exhibits to the Plan, the Disclosure Statement, the *Declaration of Adam Fialkowski of Stretto, Inc. with Respect to the Tabulation of Votes on the Further Amended Joint Chapter 11 Plan of Liquidation for ICON Aircraft, Inc. and its Debtor Affiliates* [D.I. 397], the *Declaration of Thomas M. McCabe in Support of Confirmation of the Fourth Amended Joint Chapter 11 Plan of Liquidation for Seaplane Debtor 1, Inc. (f/k/a ICON Aircraft, Inc.) and its Debtor Affiliates*, the *Findings of Fact, Conclusions of Law, and Order Confirming the Fourth Amended Joint Chapter 11 Plan of Liquidation For Seaplane Debtor 1, Inc. (F/K/A Icon Aircraft, Inc.) And its Debtor Affiliates* (the "<u>Confirmation Order</u>") [D.I. 578].  Based on my discussions

---

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

with the Debtors' advisors, I am also generally familiar with the requirements for confirmation of the Plan under section 1129 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>").

5.      In conferring with Debtors' legal counsel, and based on my involvement with these Chapter 11 Cases as a member of the Board, I believe that the Debtors proposed the Plan in good faith, and, as detailed more fully below, the Plan satisfies the requirements of sections 1123 and 1129 of the Bankruptcy Code.  It is also my understanding, after reviewing the liquidation analysis in the Disclosure Statement (as amended and supplemented, the "<u>Liquidation Analysis</u>"), that the Plan is in the best interests of the Debtors' Estates and creditors.

**I.      Case Background**

6.      On April 4, 2024 (the "<u>Petition Date</u>"), the Debtors commenced these Chapter 11 Cases in the United States Bankruptcy Court for the District of Delaware (the "<u>Court</u>") to pursue a value-maximizing sale process, implement an orderly wind down of the Debtors' affairs, and liquidate and distribute the Debtors' assets.

7.      On October 28, 2024, the Debtors filed the Plan.  The Plan will be funded by the proceeds of the sale to SG Investment America, Inc. (the "<u>Purchaser</u>") pursuant to that certain Asset Purchase Agreement by and among the Debtors and the Purchaser, dated as of May 1, 2024 (as may be amended or modified from time to time in accordance with the terms thereof and the Sale Order (as defined below), the "<u>Purchase Agreement</u>"), as was approved in the *Order (A) Authorizing and Approving The Debtors' Entry into the Purchase Agreement and Backup Purchase Agreement, (B) Authorizing the Sale of the Purchased Assets of the Debtors Free and Clear of All Claims, (C) Approving the Assumption and Assignment of the Assumed Contracts, and (D) Granting Related Relief* [D.I. 290] (the "<u>Sale Order</u>") as well as the proceeds from the

settlement with the Derivative Litigation Plaintiffs,[3] as set forth in the *Debtors' Motion for Entry of an Order, Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019, Approving the Settlement Regarding Certain Disputes with the Derivative Litigation Plaintiffs* (the "9019 Motion") [D.I. 542].

## II.    Personal Background, Professional Experience, and Qualifications

8.    I submit this declaration relying on my experience in corporate restructuring, including, without limitation, insolvency, liquidations, asset dispositions, capital markets, forensic accounting, and corporate finance—a career spanning over thirty years.  I also rely on my experience in past and current fiduciary roles, which include both individual appointments as well as roles related to my employment with Drivetrain LLC ("Drivetrain"), a New York–based boutique fiduciary services firm specializing in designated fiduciary roles as post-bankruptcy liquidating trustees, litigation trustees, plan administrators, and wind-down officers, among others.

9.    I graduated from Fordham University in New York in 1989 with a Bachelor of Science in Finance and began my career at Price Waterhouse in its Reorganization & Litigation Services Group in New York, where I spent two years performing forensic accounting functions for banks, creditors, and debtor companies in liquidations, chapter 11 bankruptcy proceedings, and various other stages of restructurings.  This position frequently required me to conduct due diligence, complete valuation and accounting support work, assess sale values and liquidation values, perform liquidation services, and assist legal teams in complex intercreditor litigations.

10.    From 1991 to 1995, I served as a Vice President and Financial Analyst at Smith Management Company, Inc., a family office in New York that specialized in investments in

---

[3]    "Derivative Litigation Plaintiffs" shall have the meaning ascribed to it in the *Verified Statement of Paul, Weiss, Rifkind, Wharton & Garrison LLP and Landis Rath & Cobb LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019* [D.I. 111].

distressed and troubled companies.  In this role, I managed secondary investments in secured and unsecured bank loans, public and privately traded notes and bonds, common stock, options, warrants, beneficial interests in liquidating trusts, whole companies, and real estate assets across many different sectors.  I also managed a portfolio of various types of claims against distressed companies that were either restructuring or liquidating.

11.     During this time, I was the designated representative of Smith Management Company, Inc. in connection with its appointment by the U.S. Trustee to serve on the Official Committee of Unsecured Creditors of National Vulcanized Fiber (NVF, Corp.) in its chapter 11 proceedings, which proceedings resulted in the sale of the company and its assets.  Additionally, I served on the board of directors of U.S. Medical Products, a publicly traded medical device manufacturer specializing in prosthetic knee and hip implants.

12.     From 1996 to 1998, I worked at BT Alex Brown, Inc., the broker dealer arm of Bankers Trust Corporation in New York, as a Vice President and Securities Analyst on their loan and high yield bond syndication and trading desk.  Here, I held FINRA Series 7 and 63 registrations.  In this position, I was responsible for the financial analysis and client coverage of numerous, public and private securities, bank loans, and claims of companies in various stages of default, distress, and liquidation and operating across many sectors.

13.     In 1999, BT Alex Brown Inc. was acquired by Deutsche Bank, where I worked until 2005 in the Global Distressed Products Trading Group, a group comprising more than 100 professionals in New York, London, Tokyo and Singapore that focused on troubled and distressed investments across all sectors and asset classes.  I held the position of Managing Director and Co-Head of the North American Distressed Debt Research Team.  During this time, I regularly served

on ad hoc bondholder committees and secured lender groups and was involved in complex restructurings and chapter 11 proceedings.

14.     I spent 2006 to 2008 as a Managing Director and Portfolio Manager for JPMorgan Chase Bank in the Proprietary Positioning Business (PPB), an investment team focused on distressed debt, credit arbitrage, and equity arbitrage, including investments in secured bank loans, public and private bonds, common shares, and credit derivatives.

15.     From 2009 to 2019, I worked at Macquarie Group as a senior managing director, in several different roles, including in the Global Markets Group, Credit Solutions Group, and Global Principal Finance Group. While at Macquarie, I served on the Board of Directors of Crystal Screens Media, Inc., a special purpose entity formed to foreclose on film assets through an Article 9 Uniform Commercial Code foreclosure in California. I also served on the board of directors (in a non-voting capacity) of Travel Sentry, Inc., a consumer licensing company based in Geneva, Switzerland. I also served as the designated representative of an affiliate of Macquarie Group in connection with its appointment by the Office of the United States Trustee for the Southern District of New York to serve on the Official Committee of Unsecured Creditors of Relativity Media LLC and its affiliates during their chapter 11 proceedings. I was elected Chairman of the creditor committee by its members, and in that capacity was involved in the liquidation of the company's assets.

16.     In 2019, I joined Drivetrain LLC. I presently reside in and work out of Miami, Florida. During this time, I have represented Drivetrain in the following matters:

      a.     Court-appointed, post-bankruptcy plan administrator for Akorn, Inc., a U.S.-based pharmaceutical manufacturer, and its debtor affiliates in chapter 11 proceedings in the Bankruptcy Court. My duties as Plan Administrator include the liquidation,

settlement, and reconciliation of claims, distribution of funds to creditors, filing federal and state tax returns, and winding down the affairs of domestic and international entities;

b.  Court-appointed, post-bankruptcy liquidating trustee of the SBGI Liquidating Trust in accordance with the joint plan of liquidation of Sequential Brands Group, Inc., a global licensor of consumer brands, and its debtor affiliates in the Bankruptcy Court.  During those chapter 11 proceedings, the majority of the debtors' assets were sold in court-supervised auctions.  As Liquidating Trustee, I am responsible for the liquidation of the Liquidating Trust's assets, which include royalty collections and account receivable collections, the management of ongoing trademark infringement litigation, the wind-down of certain remaining corporate entities, and the liquidation, settlement, and reconciliation of claims;

c.  Court-appointed, post-bankruptcy litigation trustee of the Cyber Litigation Trust in accordance with the plan of liquidation of Cyber Litigation, Inc. (formerly NS8, Inc.), a venture-stage cyber-fraud prevention company, in its chapter 11 case in the Bankruptcy Court.   The assets of the company were liquidated during the proceeding, and the remaining litigation assets (i.e., causes of action) of the company were transferred to the Cyber Litigation Trust, which was formed as part of the chapter 11 plan.  My duties as Litigation Trustee include managing ongoing litigation, scheduling and attending mediations, filing complaints, engaging in settlement discussions, managing the liquidation, settlement, and reconciliation of claims, filing state and federal tax returns, and distributing available funds to beneficiaries of the trust; and

    d.   Court-appointed, post-bankruptcy general unsecured creditors trustee for the Old Market GUC Recovery Trust in accordance with the joint chapter 11 plan of Old Market Group Holdings Corp., a U.S.-based supermarket chain, and its debtor affiliates in their chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York. My duties in that role included the liquidation, settlement, and reconciliation of claims and the distribution of funds to creditors.

17.    From 2020 to 2021, I served in an individual capacity as the sole director and sole special committee member of the board of directors of Wave Computing, Inc., a Silicon Valley–based, venture capital-backed, global processor technology company. The company filed a chapter 11 case in the United States Bankruptcy Court for the Northern District of California (San Jose Division), and was successfully sold through a sale under section 363 of the Bankruptcy Code.

18.    In 2022 and 2023, in an individual capacity, I served as the sole independent director and sole special committee member of the boards of directors of Tricida, Inc., a clinical-stage pharmaceutical company aimed at slowing the progression of chronic kidney disease and Ventec Life Systems, Inc., a private, venture-stage medical device manufacturer specializing in the design and manufacture of portable ventilators. Tricida, Inc. faced a liquidity crisis and was sold pursuant to a chapter 11 filing. Ventec Life Systems, Inc., faced an inability to raise further capital; the board hired bankers to run a thorough sale process, and the company was sold as a going-concern to a strategic competitor, avoiding an imminent bankruptcy filing.

19.    Currently, I serve on the board of directors of Treehouse Real Estate Investment Trust, Inc., where I am also a member of its Audit Committee and chairman of its Governance and Nominating Committee. I am also an independent director of England Holdings 3, Inc.

**III.     The Special Committee Claims Investigation and Settlement**

      **A.     The Special Committee Investigation**

      20.    In January 2024, the Board formed a special committee (the "Special Committee"), authorized by the Board to evaluate, negotiate, deem advisable, approve, execute, consummate and implement, or reject, strategic options with respect to the Debtors to the maximum extent permitted by the Debtors' charter, bylaws, stockholders agreement and the other organizational documents.  Specifically, the Special Committee was authorized to evaluate and move forward with a sale, financing, intellectual property licensing, business combination with a special purpose acquisition company, restructuring, reorganization, recapitalization, bankruptcy, insolvency or other transaction deemed necessary or desirable by the Special Committee; provided that the decision to file for bankruptcy remained a decision requiring the approval of the full Board. Accordingly, the Board appointed me to serve as an independent director of the Board and sole member of the Special Committee.

      21.    Following the Petition Date, the Special Committee, through its counsel— Young Conaway Stargatt & Taylor, LLP ("Young Conaway") — undertook a comprehensive investigation (the "Investigation") to evaluate any claims or causes of action of the Debtors against, among others, current and former directors and officers, including the claims raised by the Derivative Litigation Plaintiffs in the lawsuit in Delaware Chancery Court (the "Derivative Litigation Claims") and those claims raised by Kirk Hawkins in the Superior Court of California (the "Hawkins Claims").  As a result of both this Investigation and the regularly scheduled and property noticed meetings of the Special Committee that I attended, I am generally familiar with the Debtors' history, business, financial condition, and governance.

      22.    Based on Young Conaway's due diligence and preliminary analysis, the Special Committee considered numerous possible estate causes of action, but ultimately for the reasons

explained in the *Declaration of Thomas G. FitzGerald in Support of Debtors' Motion for Entry of an Order Pursuant to Section 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019, Approving the Settlement Regarding Certain Disputes with the Derivative Litigation Plaintiffs* [D.I. 542], the Special Committee determined that it was in the best interest of the Debtors, their Estates, and their creditors to enter the settlement (the "Settlement") set forth in the 9019 Motion and structured in the Plan.

**B.    The Settlement**

23.    Following extensive negotiations and mediation by and between the Debtors, the Derivative Litigation Plaintiffs, and Mr. Kirk Hawkins ("Hawkins"), the parties reached a comprehensive settlement as reflected in the 9019 Motion and Plan.  In sum, the Settlement resolves all disputes with the Derivative Litigation Plaintiffs and Hawkins, including with respect to the Plan, by agreement among the parties (i) if the assignment of the Derivative Litigation Claims is consummated, to a private sale and assignment by the Debtors of the Derivative Litigation Claims to the Derivative Litigation Plaintiffs, for the price of $2.5 million and the assumption of significant unsecured claims, pursuant to section 363 of the Bankruptcy Code or (ii) if the assignment of the Derivative Litigation Claims is not consummated, to support the confirmation of a mutually-agreed liquidating chapter 11 plan that includes the establishment of a litigation trust to pursue the Derivative Litigation Claims, under which the Derivative Litigation Plaintiffs can either:  (a) sponsor such chapter 11 plan on terms satisfactory to the parties, including a contemplated cash payment to the estate, and obtain the right to appoint the majority of the litigation trust oversight board, or (b) not sponsor the chapter 11 plan and jointly choose an independent litigation trustee with the Debtors.

**IV.     The Disclosure Statement Should Be Approved on a Final Basis**

24.     The Disclosure Statement contains the necessary information for Holders of Claims entitled to vote to make an informed decision about whether to vote to accept or reject the Plan, including, among other things: (i) the Plan, including a summary, the procedures for voting on the Plan and projected recoveries thereunder; (ii) the statutory requirements for confirming the Plan; (iii) the Debtors' organizational structure, business operations, and financial obligations; (iv) the events leading to the filing of the Debtors' Chapter 11 Cases; (v) the major events during these Chapter 11 Cases, including significant pleadings filed in the Debtors' Chapter 11 Cases and certain relief granted by the Court; (vi) the classification and treatment of Claims and Interests under the Plan, including the identification of the Holders of Claims entitled to vote on the Plan; (vii) the means for implementation of the Plan, the provisions governing distributions to certain Holders of Claims pursuant to the Plan, the procedures for resolving Disputed Claims and other significant aspects of the Plan; (h) certain risk factors that Holders of Claims should consider before voting to accept or reject the Plan (Section XIV); and (i) certain United States federal income tax consequences of the Plan.

25.     Accordingly, I believe that the Disclosure Statement contains "adequate information," and satisfied Section 1125 of the Bankruptcy Code, and should be approved on a final basis.

**V.     The Plan Satisfies the Bankruptcy Code's Requirements for Confirmation.**

**A.     The Plan Satisfies Section 1129(a)(1) of the Bankruptcy Code.**

1.      **The Plan's Classification of Claims and Equity Interests Complies with Section 1122 of the Bankruptcy Code.**

26.     Through discussions with the Debtors' advisors and my familiarity with the Plan, I understand that the Plan designates claims against the Debtors into nine (9) Classes, as set forth in Article III of the Plan, in addition to Administrative Claims, Professional Fee Claims, Priority Tax Claims, and U.S. Trustee Statutory Fees, which are unclassified.  Through these discussions, I understand that the Claims assigned to each particular Class in the Plan are substantially similar to the other Claims in such Class and the separate classification of Claims against the Debtors is based upon the legal or factual nature of those Claims and other relevant criteria.  In addition, I am advised by the Debtors' professional advisors that the classification scheme is rational and complies with the Bankruptcy Code.  I understand that, generally, the Plan incorporates a classification and distribution scheme that, through my discussions with the Debtors' advisors, follows the statutory priorities prescribed in the Bankruptcy Code, and that the Debtors separately classified Claims based on a number of factors, including whether a particular Class comprises Claims or Interests, whether the Claims in a Class are unsecured or secured, whether such claims arise under debt instruments or otherwise, and the potential distribution date of such claims.  The Plan's classification scheme was not promulgated for any improper purpose and is necessary to implement the Plan.  Accordingly, based upon the foregoing, I believe that the Plan satisfies section 1122(a) of the Bankruptcy Code.

2.      **The Plan Complies with the Requirements of Section 1123(a) of the Bankruptcy Code.**

27.     The Special Committee has been advised by the Debtors' professionals that the Plan complies with each of the seven requirements of section 1123(a) of the Bankruptcy Code.

a.      Section 1123(a)(1) of the Bankruptcy Code.  Based upon discussions with the Debtors' professionals and my familiarity with the Plan, I understand that the Plan

designates Classes of Claims and Interests as required under section 1123(a)(1) of the Bankruptcy Code.

b.    <u>Sections 1123(a)(2)–(4) of the Bankruptcy Code</u>.  Based upon discussions with the Debtors' professionals and my familiarity with the Plan, I understand that Article III of the Plan (i) identifies each Class of Claims that is not Impaired under the Plan, and sets forth the treatment of Impaired Claims pursuant to sections 1123(a)(2) and (3) of the Bankruptcy Code, and (ii) provides for the same treatment of each Claim in each respective Class (unless otherwise agreed to by a Holder of a particular Claim or Interest) as required under section 1123(a)(4) of the Bankruptcy Code.

c.    <u>Section 1123(a)(5) of the Bankruptcy Code</u>.  Based upon discussions with the Debtors' professionals and my familiarity with the Plan, I believe that the Plan provides adequate means for its implementation, as required by section 1123(a)(5) of the Bankruptcy Code.  Through these discussions, I also understand that the Plan provides for:  (i) the wind down and dissolution of the Debtors; (ii) the appointment of a Plan Administrator; (iii) the appointment of a Litigation Trustee to the extent the litigation trust path of the Settlement is pursued; (iv) the sources of consideration for Plan distributions, including the funding of the Wind Down Budget; (v) the treatment of Executory Contracts; (vi) the settlement and discharge of Claims and Interests; (vii) the preservation and vesting in the Litigation Trust of certain Retained Causes of Action, including the Derivative Litigation Claims, to the extent the litigation trust path of the Settlement is pursued; and (ix) the taking of all necessary and appropriate actions by the Debtors to effectuate the transactions under and in connection with the Plan.

d.      Section 1123(a)(6) of the Bankruptcy Code.  Based upon discussions with the Debtors' professionals and my familiarity with the Plan, it is my understanding that Section 1123(a)(6) is inapplicable to the Plan.

e.      Section 1123(a)(7) of the Bankruptcy Code.  Based upon discussions with the Debtors' professionals and my familiarity with the Plan, I understand that, as of the Effective Date, the existing Board shall be deemed to have resigned and the employees or officers of the Debtors terminated without any further action required.   It is my understanding from these discussions that from and after the Effective Date, the Plan Administrator shall be authorized to act on behalf of the Estates, to the extent the litigation trust path of the Settlement is pursued, the Litigation Trustee shall be authorized to act on behalf of the Litigation Trust.  The identity of the Plan Administrator and the Litigation Trustee, along with the nature of any compensation for such person or persons, has been or will be disclosed in the Plan Supplement.  Based upon discussions with the Debtors' professionals, I believe that any provisions of the Plan governing the manner of selection of any trustee or fiduciary under the Plan are consistent with the interests of creditors and equity security holders and with public policy in accordance with section 1123(a)(7) of the Bankruptcy Code.

**3.      The Plan Complies with Section 1123(b) of the Bankruptcy Code**

28.     The Special Committee has been advised by the Debtors' professionals that section 1123(b) of the Bankruptcy Code sets forth permissive provisions that may be incorporated into a chapter 11 plan, and, as discussed in more detail below, I believe that the Plan is consistent with section 1123(b).

a.      Section 1123(b)(1) of the Bankruptcy Code.  It is my understanding, based on discussions with the Debtors' professionals and my familiarity with the Plan, that as permitted by section 1123(b)(1) of the Bankruptcy Code, Article III of the Plan provides that (i) Classes 1, 2, and 4 are Unimpaired, and (ii) Classes 3, 5, 6, 7, 8, and 9 are Impaired.

b.      Section 1123(b)(2) of the Bankruptcy Code.  Based on discussions with the Debtors' professionals and my familiarity with the Plan, I understand that Article V of the Plan provides that, pursuant to, and subject to the requirements of, sections 365 and 1123 of the Bankruptcy Code, as of the Effective Date, the Debtors shall be deemed to have rejected each Executory Contract and Unexpired Lease to which they are a party (other than the Insurance Policies) without the need for any further notice to, action, order or approval of the Court, unless such Executory Contract was previously assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court.  The Confirmation Order will constitute an order of the Court approving the above-described rejections. Through discussions with the Debtors' professionals, I also understand that the Debtors believe that rejecting the Executory Contracts and Unexpired Leases is in the best interests of its estate because the Plan provides that the Debtors' Estates will wind down after the Effective Date.  Accordingly, I believe the Debtors exercised sound business judgment in determining to reject the Executory Contracts under the Plan.  Accordingly, I believe the Plan satisfies sections 1123(b)(2) and 365(a) of the Bankruptcy Code.

c.      Section 1123(b)(3) of the Bankruptcy Code.  I understand that the Plan contains certain release, exculpation, and injunction provisions, which are addressed above.

i. <u>Debtor Releases</u>.  Article IX.A of the Plan (the "<u>Debtor Releases</u>") provides for certain releases of Causes of Action held by the Debtors against the Released Parties.  It is my belief that the Debtor Releases were instrumental in formulating and obtaining support for the Plan, which is the result of, among other things, extensive arm's length and good faith negotiations and mediation.

ii. Many of the Released Parties, including the officers and directors, have served the Debtors during these Chapter 11 Cases, and I believe that they have worked tirelessly to maximize value for the benefit of all stakeholders.

iii. Based on my participation in the Plan process, consideration of the information provided to me by the Debtors' legal and other advisors, and overall professional experience, I believe that the Debtor Releases are essential components of the Plan, constitute a sound exercise of the Debtors' business judgment, and are supported by fair, sufficient, and adequate consideration.  I believe the Debtor Releases are necessary conditions to implementing the Plan and create a structure to enable the Plan Administrator to make certain distributions expeditiously upon the Effective Date.  I believe that without the Debtor Releases, the Debtors would neither have been able to secure the significant benefits provided by the Plan, nor build consensus around the Plan.

iv.  <u>Releases by Holders of Claims and Interests</u>.  Article IX.B of the

Plan provides for releases of Causes of Action held by (a) the DIP

Secured Parties, (b) all Holders of a Claims deemed to have

accepted the Plan that have not filed an objection to the release

contained in Article IX herein prior to the Voting Deadline, (c) all

Holders of a Claim that vote to accept or reject the Plan and do not

timely submit a Release Opt-Out, (d) each current and former

Affiliate of each Person or Entity in clauses (a) through (c) solely to

the extent such Affiliate may assert Claims or Causes of Action on

behalf of or in a derivative capacity by or through an Entity in

clauses (a) through (d), and (e) each Related Party of each Entity in

clauses (a) through (d) solely to the extent such Related Party may

assert Claims or Causes of Action on behalf of or in a derivative

capacity by or through an Entity in clauses (a) through (d)

(the "<u>Releasing Parties</u>").  It is my belief that the releases provided

by the Releasing Parties were instrumental in formulating and

obtaining support for the Plan, which is the result of, among other

things, extensive arm's length and good faith negotiations and

mediation.  Accordingly, the releases provided by the Releasing

Parties are fair and necessary to the implementation of the Plan.

v.  <u>Exculpation</u>.  Article IX.C of the Plan provides for exculpation of

the Exculpated Parties, which parties have fiduciary obligations to

the Debtors' Estates, except in cases involving actual fraud, willful

misconduct, or gross negligence by such parties (as determined by a Final Order from a Court of competent jurisdiction).  Based upon my (a) review of the Plan, (b) personal knowledge of the circumstances leading up to its development, (c) involvement in these Chapter 11 Cases, and (d) discussions with the Debtors' legal advisors, I believe that the exculpation provisions are proper and an integral part of the Plan.  Nonetheless, the exculpation is important in that it removes the threat of certain litigation against the Exculpated Parties, who have played critical roles in, and made contributions to, the Debtors' restructuring efforts, including these Chapter 11 Cases, and that such contributions represent good and valuable consideration to the Debtors, their Estates, and their creditors.

vi. <u>Injunction</u>.  Article IX.D of the Plan implements an injunction regarding the Plan's release and exculpation provisions.  As set forth more fully therein, it permanently enjoins Entities from taking certain actions against the Debtors, the Plan Administrator, the Litigation Trust, the Released Parties, and the Exculpated Parties with respect to matters that (a) are subject to compromise and settlement pursuant to the terms of the Plan, (b) have been released pursuant to the Plan, (c) were purchased and released by the Purchaser in connection with the Sale, (d) are subject to exculpation pursuant to the Plan, or (e) are otherwise satisfied, stayed, released

or terminated pursuant to the Plan.  It is my belief that the injunction is a necessary and critical component of the Plan, as it ensures that the release and exculpation provisions contained in the Plan can be effectuated.  Accordingly, the injunction provision is appropriate and should be approved.

vii.  <u>Discharge</u>.  It is my understanding, based on Article IX.E of the Plan, that because the Debtors are not liquidating, they are not entitled to a discharge of obligations with regard to any Holders of Claims or Interests.

viii.  <u>Release of Liens</u>.  Article IX.F of the Plan implements a release of all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates. It is my belief that the release of liens was the result of, among other things, extensive arm's length and good faith negotiations and mediation. Accordingly, the release of liens is fair and necessary to the implementation of the Plan.

d.  <u>Section 1123(b)(5) of the Bankruptcy Code</u>.  It is my understanding, based on discussions with the Debtors' professionals and my familiarity with the Plan, that Article III of the Plan modifies or leaves unaffected, as the case may be, the rights of certain Holders of Claims, as permitted by section 1123(b)(5) of the Bankruptcy Code.

e.  <u>Section 1123(b)(6) of the Bankruptcy Code</u>.  Based on discussions with the Debtors' professionals and my familiarity with the Plan, I understand that Article IX

contains release, exculpation, and injunctive provisions that are not inconsistent with the applicable provisions of the Bankruptcy Code and are essential to an orderly liquidation.

**B.    The Plan Satisfies Section 1129(a)(2) of the Bankruptcy Code.**

29.    To the best of my knowledge and belief, based upon discussions with the Debtors' advisors, I believe that, as required by section 1129(a)(2) of the Bankruptcy Code, the Debtors have complied with the applicable provisions of the Bankruptcy Code, including sections 1125 and 1126 of the Bankruptcy Code, regarding disclosure and plan solicitation.

**C.    The Debtors Proposed the Plan in Good Faith in Compliance
with Section 1129(a)(3) of the Bankruptcy Code.**

30.    Based on discussions with the Debtors' professionals and my involvement in these Chapter 11 Cases, I believe the Debtors proposed the Plan in good faith and not by any means forbidden by law, with the legitimate and honest purposes of maximizing the value of the Debtors' Estates, effectuating a comprehensive and feasible liquidation, and maximizing the recoveries of all creditor constituencies.  As also described in the First Day Declaration, the Debtors pursued these Chapter 11 Cases only after failed alternatives, which had severely harmed the Debtors' access to capital and negatively impacted the Debtors' financial condition and prospects as a going concern.  The Plan (including all documents necessary to effectuate the Plan) was negotiated extensively, at arm's-length, and in good faith among representatives of the Debtors, the Derivative Litigation Plaintiffs, and Hawkins, all of whom have worked diligently to effectuate the Debtors' liquidation in an efficient manner to preserve and enhance the value of the Debtors' Estates.  The Debtors, Derivative Litigation Plaintiffs, and Hawkins each support confirmation of the Plan.  I believe that absent the concessions and contributions made by each of these parties that are embodied in the Plan, the recovery to unsecured creditors would have been materially less than those provided under the Plan.  Furthermore, I understand that no party in

interest has objected to the Plan on the basis that it was proposed in bad faith.  Finally, based on my discussions with the Debtors' professionals, it is my understanding that none of the transactions contemplated by the Plan are forbidden by law.  Based upon the foregoing, I believe the Plan represents the best result the Debtors could have achieved under the circumstances, with the best possible outcome for all interested parties, and is consistent with the purposes of the Bankruptcy Code, and therefore, the Plan has been proposed in good faith and satisfies section 1129(a)(3) of the Bankruptcy Code.

      **D.**      **The Plan Complies with Bankruptcy Code Section 1129(a)(4).**

      31.      Based upon discussions with the Debtors' professionals and my familiarity with the Plan, I understand that, under Article II.C of the Plan, Retained Professionals requesting payment of Professional Fee Claims must file a fee application for final allowance of its Professional Fee Claim no later than forty-five (45) days after the Effective Date.  Any objections to any Professional Fee Claim must be filed and served no later than twenty-one (21) days after the filing of the final fee application with respect to the applicable Professional Fee Claim.  Any such objections that are not consensually resolved may be set for hearing after notice.  Accordingly, I believe that the Plan satisfies section 1129(a)(4) of the Bankruptcy Code.

      **E.**      **The Debtors Have Complied with Bankruptcy Code Section 1129(a)(5).**

      32.      It is my understanding that the identity and affiliations of the person or persons proposed to serve as Plan Administrator commencing on the Effective Date has been or will be fully disclosed in the Plan Supplement, and it is my understanding, and based upon discussions with Debtors' counsel, that the appointment to such offices of such persons is consistent with the interests of the Debtors' creditors and equity security holders and with public policy.  Further, the identity of any insider who will be employed or retained by the Plan Administrator, if any, and the

nature of such insider's compensation, to the extent applicable, also has been or will be fully disclosed. Accordingly, I believe the Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code.

**F.      The Plan Does Not Contain Any Rate Changes Subject to Bankruptcy Code Section 1129(a)(6).**

33.      The Plan does not provide for any rate changes by the Debtors. Therefore, section 1129(a)(6) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases.

**G.      The Plan Is in the Best Interests of All Creditors and Equity Security Holders under 1129(a)(7) of the Bankruptcy Code.**

34.      I have been advised by the Debtors' professionals that the Bankruptcy Code requires that, with respect to the Impaired Classes of Claims that are entitled to vote (Class 3 and Class 5), each Holder of such Claim or Interest must either (i) accept the Plan or (ii) receive or retain property under the Plan of a value that is not less than the amount that such Holder would receive or retain in a chapter 7 liquidation. For the purposes of determining whether the Plan meets this requirement, the Debtors, with the assistance of their legal and financial advisors, prepared the Liquidation Analysis, which I have reviewed and hereby incorporate by reference.

35.      I understand that the Liquidation Analysis demonstrates that the liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code will not result in a better recovery for Holders of Claims as compared to the recoveries provided to Holders of such Claims under the Plan.

36.      Through discussions with the Debtors' professionals, I believe that the assumptions, methodologies, and estimates in the Liquidation Analysis are reasonable and appropriate in the context of these Chapter 11 Cases. In light of the foregoing, it is my belief that the Plan satisfies the requirements of section 1129(a)(7).

**H.**    **The Plan Has Been Accepted by Impaired Voting Classes and Complies with Section 1129(a)(8) of the Bankruptcy Code.**

37.    Based on my discussions with Debtors' legal advisors, I understand that Classes 1, 2 and 4 are deemed to accept the Plan, and Classes 3 and 5 voted to accept the Plan pursuant to section 1126(c) of the Bankruptcy Code. I further understand that Classes 6, 7, 8 and 9 are Impaired, but are not entitled to vote on the Plan, and are deemed to reject the Plan. With respect to such Classes, the Debtors are seeking to confirm the Plan under section 1129(b), as set forth below.

**I.**    **The Plan Provides for Payment in Full of All Allowed Priority Claims and Complies with Section 1129(a)(9) of the Bankruptcy Code.**

38.    Based upon discussions with the Debtors' professionals and my familiarity with the Plan, I understand that, except to the extent that the holder of a particular Allowed Claim has agreed to a different treatment of such Claim, Article II of the Plan provides for the treatment required by section 1129(a)(9) of the Bankruptcy Code for each of the various claims specified in sections 507(a)(1)–(8) of the Bankruptcy Code.

**J.**    **The Plan Satisfies Bankruptcy Code Section 1129(a)(10).**

39.    Based upon discussions with the Debtors' professionals, it is my understanding that two (2) Impaired Classes voted to accept the Plan in the requisite number and amount, without including any acceptance of the Plan by an insider. Specifically, Holders of Claims in Class 5 (General Unsecured Claims), who are Impaired under the Plan, voted to accept the Plan. No votes have been received from the Holders of Claims in Class 3 (Noteholder Claims), and therefore Class 3 is deemed to accept the Plan. Accordingly, based upon the foregoing, it is my belief that the Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

23

**K.**     **The Plan is Feasible and Satisfies Section 1129(a)(11).**

40.     I am advised by the Debtors' professionals that section 1129(a)(11) of the Bankruptcy Code requires that the Court determine that the Plan is feasible prior to confirmation, *i.e.*, it is not likely to be followed by liquidation or the need for further financial reorganization. I understand that, in the context of the Plan, the feasibility test requires that the Court determine whether the Plan may be implemented and has a reasonable likelihood of success.

41.     It is my belief that the Plan is feasible in that, at a minimum, there are adequate means of implementation. The Plan provides for reasonable procedures, by which, the Debtors and the Plan Administrator may make the necessary distributions under the Plan. Therefore, I believe the Plan is feasible because it: (i) provides the financial wherewithal necessary to implement the Plan; and (ii) offers reasonable assurance that the Plan is workable and has a reasonable likelihood of success. Accordingly, based upon the foregoing, it is my belief that the Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code.

**L.**     **Bankruptcy Code Section 1129(a)(12) is Satisfied.**

42.     I understand that Article II.E of the Plan provides for the payment of fees under 28 U.S.C. § 1930, and that such fees due and owing to the U.S. Trustee shall be paid on the Effective Date and shall be paid after the Effective Date if and when due and payable until these Chapter 11 Cases are closed, dismissed, or converted to a case under chapter 7 of the Bankruptcy Code. Accordingly, I believe that the Plan complies with section 1129(a)(12) of the Bankruptcy Code.

**M.**     **Sections 1129(a)(13)–1129(a)(16) Are Inapplicable.**

43.     Based upon discussions with the Debtors' professionals, it is my understanding that sections 1129(a)(13)–1129(a)(16) are inapplicable to the Plan.

**N.    The Plan Satisfies the "Cramdown" Requirements for Non-Accepting Classes under the Bankruptcy Code Section 1129(b).**

44.    Through discussions with the Debtors' advisors, I understand that, pursuant to section 1129(b) of the Bankruptcy Code, a plan may be confirmed notwithstanding the deemed rejection by a class of claims or equity interests (i.e., "crammed down") so long as the plan satisfies all the requirements of section 1129(a) of the Bankruptcy Code and the plan does not discriminate unfairly and is fair and equitable as to such non-accepting class or classes.  For the reasons discussed below, I believe that the Plan may be confirmed as to Classes 6, 7, 8 and 9, which are deemed to reject the Plan (each, a "Rejecting Class" and together, the "Rejecting Classes") pursuant to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code.

**1.    The Plan Does Not Discriminate Unfairly.**

45.    It is my belief, after consultation with the Debtors' professionals, that the Plan does not discriminate unfairly against any Class of Claims.  Each Rejecting Class is classified separately because it is legally distinct from other Classes, and all Claims of a similar legal nature are classified together and afforded the same treatment under the Plan.

46.    Accordingly, given the distinctly different legal and economic character from the other Claims, it is my belief, after consultation with the Debtors' professionals that Rejecting Classes are not similarly situated to any other Classes of Claims or Interests, or to the extent that they are, the same treatment is being provided.  Therefore, the Plan does not discriminate unfairly with respect to any Impaired Classes of Claims or Interests.  I thus believe that the Plan does not discriminate unfairly in contravention of section 1129(b)(1) of the Bankruptcy Code.

**2.    The Plan Is Fair and Equitable.**

47.    I have been advised that sections 1129(b)(2)(B) and 1129(b)(2)(C) of the Bankruptcy Code provide that a plan is fair and equitable with respect to a class of impaired

32320374.1

25

dissenting unsecured claims or equity interests if it provides that any holder of a claim or equity interest in a class junior to such dissenting class of claims or equity interests will not receive or retain under the plan on account of such junior claim or equity interest any property.  It is my understanding, after consultation with the Debtors' professionals, that that no Holder of a Claim or Interest in a Class junior to any of the Rejecting Classes will receive or retain any property under the Plan on account of such junior Claim or Interest.  It is my further understanding that no Holder of a Claim or Interest in a Class senior to Holders in the Rejecting Classes will receive or retain any property under the Plan in an amount in excess of such Holder's Claims or Interests. For these reasons, I believe the Plan is "fair and equitable" and, therefore, consistent with the requirements of section 1129(b) of the Bankruptcy Code.

**O.    The Debtors Complied with Bankruptcy Code Section 1129(d).**

48.    Through discussions with the Debtors' professionals and my familiarity with the Plan, I understand that the purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933, and no governmental unit or any other entity has thus far lodged an objection to the Plan on these grounds.  Therefore, I believe the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

**P.    Modifications to the Plan Should be Permitted Without the Need for Further Solicitation of Votes on the Plan.**

49.    I have been advised that section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation so long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.  I have also been advised that Rule 3019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") provide that modifications after a plan has been accepted will be deemed accepted by all creditors and equity security holders who previously accepted the plan, if the court finds that the proposed

modifications do not adversely change the treatment of the claim of any creditor or interest of any equity security holder.

50.     Since the commencement of solicitation, the Debtors modified the Plan to incorporate the Settlement.  None of the modifications adversely affect the treatment of any party-in-interest without their consent as, in all instances, the same Retained Causes of Action remain retained unless the Derivative Litigation Plaintiffs choose the assignment option where the Derivative Litigation Claims will be sold and the treatment to creditors under the Plan, as modified, have improved.  I understand the additional changes to the Plan include, among other things, including a non-voting Convenience Claims Class (Class 4) and establishing a Litigation Trust.  Accordingly, I believe no further solicitation is required.

## VI.     The Exercise of the Debtors' Business Judgment in Allowing Claims and Formulating the Plan Is Appropriate.

51.     From the outset of these Chapter 11 Cases, the Debtors, in conjunction with their advisors, have engaged with various stakeholders to reach the best outcome for the Debtors' Estates and their creditor constituencies.  The Debtors and their advisors have negotiated tirelessly with these parties for several months to secure important concessions and maximize value for the estate, including by obtaining voting support to approve the Plan.  These concessions and contributions have allowed the Debtors to propose a plan of liquidation that provides for the efficient and prompt distribution of estate assets to the Debtors' creditor constituencies.  The Plan is the product of months of diligence and negotiations, and I believe it implements a value-maximizing liquidation that will inure to the benefit of the Debtors and all stakeholders.

## VII.    Cause Exists to Waive the Stay of the Confirmation Order.

52.     I have been advised that Bankruptcy Rule 3020(e) generally provides a fourteen (14)-day stay of the effectiveness of an order confirming a chapter 11 plan, unless the Court orders

otherwise.  I understand a stay of such order will delay the Debtors' implementation of the Plan, extending the time that the Debtors must remain in chapter 11.  The Plan (including all documents necessary to effectuate the Plan) is the product of extensive, good-faith negotiations among the Debtors and their key stakeholders.  I believe that extending the length of time that the Debtors remain in chapter 11 would only serve to increase the administrative and professional costs incurred by the Debtors' Estates, a cost which the Debtors cannot bear.  For all of these reasons, I believe the Court should grant the Debtors' request to waive the stay imposed by the Bankruptcy Rules so that the Court's order confirming the Plan may be effective immediately upon its entry.

## VIII.   Conclusion

53.     In light of the foregoing, and based upon discussions with the Debtors' professionals and my familiarity with the Plan, I believe that the Plan complies with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of Bankruptcy Practice, and Procedure of the United States Bankruptcy Court for the District of Delaware, and other applicable non-bankruptcy laws as they have been explained to me, and was proposed in good faith and negotiated at arm's length.

54.     I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information, and belief, and respectfully request, and as set forth above, that the Plan should be confirmed and that all of the actions and transactions contemplated by the Plan should be approved.

Executed this 28th day of October, 2024.          */s/ Thomas G. FitzGerald*
                                                                                 Thomas G. FitzGerald, Independent Director

32320374.1