## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SEAPLANE DEBTOR 1, INC., *et al.*,[1] | Case No. 24-10703 (CTG) |
| Debtors. | (Jointly Administered) |
| | **Related Docket Nos. 542, 543** |

### PDSTI'S OMNIBUS OBJECTION TO (I) DEBTORS' MOTION FOR ENTRY OF AN ORDER, PURSUANT TO SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019, APPROVING THE SETTLEMENT REGARDING CERTAIN DISPUTES WITH THE DERIVATIVE LITIGATION PLAINTIFFS AND (II) CONFIRMATION OF THE DEBTORS THIRD AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION

PK Investment Co., Ltd., PK Capital L.P., Pudong Science and Technology Investment (Cayman) Co. Ltd., and Unimax Asset Holdings Ltd. (collectively, "PDSTI"), by and through their undersigned counsel, files this omnibus objection (the "Omnibus Objection") to (i) the *Debtors' Motion for Entry of an Order, Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019, Approving the Settlement Regarding Certain Disputes with the Derivative Litigation Plaintiffs* (the "Settlement Motion") [D.I. 542] and (ii) the confirmation of the *Third Amended Joint Chapter 11 Plan of Liquidation for Seaplane Debtor 1, Inc. (F/K/A Icon Aircraft,*

---

[1] The Debtors in these Chapter 11 Cases, together with the last four digits of each Debtor's federal tax identification number, are: Seaplane Debtor 1, Inc. (f/k/a ICON Aircraft, Inc.) (7443); Seaplane Debtor 2, Inc. (f/k/a IC Technologies Inc.) (7918); Seaplane Debtor 3, LLC (f/k/a ICON Flying Club, LLC) (6101); and Seaplane Debtor 4, LLC (f/k/a Rycon LLC) (5297). The Debtors' service address is c/o Armanino LLP, 231 Market Place, Suite 373, San Ramon, CA 94583-4743, Attn: Thomas McCabe, Chief Restructuring Officer.

*Inc.) and its Debtor Affiliates* (the "Third Amended Plan") [D.I. 543][2] and, in support thereof, states the following:

## PRELIMINARY STATEMENT

1.      The Debtors seek this Court's approval of a settlement—embodied in the Third Amended Plan—which is not in the best interests of creditors in these Chapter 11 Cases. Under the Settlement Term Sheet (as defined in the Settlement Motion),[3] the Derivative Litigation Plaintiffs—who are not creditors and only hold equity in Debtor Seaplane Debtor 1, Inc.—will effectively control the liquidation.

2.      In connection with executing the Settlement Term Sheet, the Debtors filed the Third Amended Plan, which resulted in substantial changes to the previously solicited plan that give the Derivative Litigation Plaintiffs undue influence on the Debtors' liquidation. The Debtors propose to give all but one of the Derivative Litigation Plaintiffs releases, transfer the Derivative Litigation Claims against PDSTI to the Derivative Litigation Plaintiffs, and grant the Derivative Litigation Plaintiffs approval over any further modifications to the Third Amended Plan, Confirmation Order, and control over a Litigation Trust. The Debtors traded this away in exchange for *possibly* $2,500,000 and the "assumption" of certain claims. Put bluntly, the Debtors have made a bad deal which does not benefit unsecured creditors in these Chapter 11 Cases. To the contrary, this proposed settlement only benefits one constituency—the Derivative Litigation Plaintiffs.

3.      As set forth herein, the Settlement Motion should be denied for several reasons. First, the Settlement Motion must be evaluated under Section 363 of the Bankruptcy Code. The

---

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Third Amended Plan.

[3] The Settlement Term Sheet was filed at D.I. 544.

Debtors have made no showing that these standards have been met as the Settlement Term Sheet is not the highest and best offer for the Derivative Litigation Claims (let alone the other rights the Derivative Litigation Plaintiffs are obtaining). Second, evaluating the Settlement Motion pursuant to Bankruptcy Rule 9019 must be under enhanced scrutiny because the Derivative Litigation Plaintiffs are insiders. The Debtors have not met their burden for a number of reasons, most importantly, that the Settlement Term Sheet is not in the best interest of creditors. Significantly, PDSTI has made a superior offer for the Derivative Litigation Claims and the Court should deny the Settlement Motion.

4.      Putting aside the infirmities with the settlement, the Third Amended Plan is separately unconfirmable for several reasons. The Debtors' material modifications to a plan which was already solicited and voted on are improper. Under the circumstances, the creation of a "convenience class" has resulted in unfair classification and discrimination in violation of the Bankruptcy Code. Confirmation of the Third Amended Plan should be denied.

5.      Additionally, on October 28, 2024, as PDSTI was finalizing this Omnibus Objection, the Debtors filed a further amended plan. *See Fourth Amended Joint Chapter 11 Plan of Liquidation for Seaplane Debtor 1, Inc. (F/K/A Icon Aircraft, Inc.) and its Debtor Affiliates* (the "Fourth Amended Plan") [D.I. 579]. Upon an initial review, the Fourth Amended Plan contains substantial revisions from the Third Amended Plan. Most notably, the Fourth Amended Plan permits the Derivative Litigation Plaintiffs to determine whether to move forward with and fund the Purchase Option (as defined below) by November 25, 2024, three weeks after the Confirmation Hearing. The Court should not approve the material contingencies which may significantly affect creditor recovery which are contained in the Fourth Amended Plan. PDSTI reserves all rights to further object to the Fourth Amended Plan.

## ARGUMENT

**I.    The Court Should Not Approve the Settlement Motion as the Debtors Have Not Satisfied the Standards for Approval of a Settlement or Transfer of Assets**

6.    Upon the filing of the Chapter 11 Cases, control of the Derivative Litigation Claims transferred to the Debtors.[4] The Debtors, through the Special Committee, conducted an investigation of these claims.[5] PDSTI participated in this investigation by producing documents and a witness interview.[6] Before the investigation was complete, the Derivative Litigation Plaintiffs filed a motion seeking relief from the automatic stay and standing to continue to prosecute the Derivative Litigation Claims in the Delaware Court of Chancery.[7] Both the Debtors[8] and PDSTI[9] objected to the Standing Motion and the Court entered a stipulation regarding discovery and supplemental briefing.[10] Importantly, the Debtors and the Derivative Litigation

---

[4] *See In re Ambac Fin. Grp., Inc.*, 487 Fed. App'x 663, 665 (2d Cir. 2012) ("[W]hile normally the fiduciary obligation of officers, directors and shareholders 'is enforceable directly . . . through a stockholder's derivative action, it is, in the event of bankruptcy of the corporation, enforceable by the trustee . . . .") (citation omitted).

[5] Upon information and belief, the Special Committee also investigated claims against Kirk Hawkins and the other Derivative Litigation Plaintiffs. *See Emergency Motion of the Debtors for an Order Adjourning the Hearing and Preliminary Objection Regarding the Derivative Litigation Plaintiff's Motion for Stay Relief* [D.I. 342] (the "Debtors Stay Objection") ¶ 42.

[6] PDSTI made at least eight productions in total and produced documents comprising over 43,322 pages.

[7] *See Motion of the Derivative Litigation Plaintiffs for Immediate Stay Relief and Authorization to Continue Prosecuting the Derivative Claims in Delaware Chancery Court* [D.I. 320] (the "Standing Motion").

[8] *See* Debtors Stay Objection.

[9] *See PDSTI's Objection to the Motion of the Derivative Litigation Plaintiffs for Immediate Stay Relief and Authorization to Continue Prosecuting the Derivative Claims in Delaware Chancery Court* [D.I. 341] (the "PDSTI Stay Objection").

[10] *Order Approving Stipulation with Respect to the Resolution of Certain Disputes with the Derivative Litigation Plaintiffs and Kirk Hawkins, in his Individual Capacity* [D.I. 440].

Plaintiffs had essentially completed the entire schedule other than supplemental briefing and a hearing before the Court when they reached a settlement.

7.      This settlement essentially provides that the Derivative Litigation Plaintiffs have two options. Regardless of either option, the Derivative Litigation Plaintiffs receive releases under the Third Amended Plan.

8.      In short, the first option (the "Purchase Option") provides that:

    a.      The Derivative Litigation Plaintiffs can acquire the Derivative Litigation Claims by paying $2,500,000 and "assuming" certain unsecured "claims."

    b.      These claims are listed on Exhibit B to the Settlement Motion and are perplexing to say the least. There are 23 "Assumed Claims," and of them, all but nine are Derivative Litigation Plaintiffs or their counsel, Paul, Weiss, Rifkind, Wharton & Garrison LLP. Of the remaining nine claims, one was filed after the bar date, and thus, may be subject to disallowance. Under the Purchase Option, the Derivative Litigation Plaintiffs are effectively proposing to assume eight claims, which in the aggregate total approximately $3.3 million.[11]

    c.      The $2,500,000 purchase price is to be used to fund a convenience class under the Third Amended Plan for claims under $100,000.

9.      Relevant here, the second option (the "Litigation Trust Option") provides that:

    a.      A Litigation Trust will be created. The Litigation Trust will be overseen by a Litigation Trust Oversight Board consisting of five members, of whom three will be appointed by the Derivative Litigation Plaintiffs.

    b.      The Derivative Litigation Claims will become Litigation Trust Assets.

    c.      The beneficiaries of the Litigation Trust will be holders of claims in Class 4 (Convenience Class), Class 5 (General Unsecured Claims), and Class 8 (Interests).

10.     Therefore, under either option, the Derivative Litigation Plaintiffs will control the Derivative Litigation Claims, effectively obtaining the relief sought in the Standing Motion.

---

[11] However, on information and belief, the Derivative Litigation Plaintiffs have been contacting these claimants and offering these creditors a small percentage of the face value of their claims.

11. Because the Purchase Option involves the transfer of the Debtors' assets, it must be evaluated under both Bankruptcy Rule 9019 and Section 363 of the Bankruptcy Code.[12]

### A. The Settlement Motion Should be Evaluated Pursuant to Section 363 of the Bankruptcy Code

12. Though styled as a motion for approval of a settlement pursuant to Bankruptcy Rule 9019, the Settlement Motion should be considered pursuant to Section 363 of the Bankruptcy Code as it is primarily the transfer of an asset (the Derivative Litigation Claims), not the settlement of claims. *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 394 (3d Cir. 1996) (noting that "[s]ettlement agreements frequently involve the disposition of assets of the estate" and Section 363 may apply in such circumstances); *In re Mickey Thompson Ent. Grp., Inc.*, 292 B.R. 415, 421–22 & n.7 (B.A.P. 9th Cir. 2003) (discussing the interplay between Bankruptcy Rule 9019 and Section 363 of the Bankruptcy Code and holding "the inescapable fact in this case is that the label 'compromise' does not accurately characterize the transaction"); *In re Diocese of Camden*, 653 B.R. 722, 734–35 (Bankr. D.N.J. 2023) ("When a cause of action . . . is sold to a present or potential defendant, the transaction must be evaluated both under the sound business judgment test of section 363 and the fair and equitable test governing compromises under Rule 9019.").

13. "The import of Section 363 is that a trustee is prohibited from acting unilaterally; this schema is intended to protect both debtors and creditors (as well as trustees) by subjecting a trustee's actions to complete disclosure and review by the creditors of the estate and by the

---

[12] The Settlement Term Sheet provides that the Derivative Litigation Plaintiffs would notify the Debtors on or before October 26, 2024 at 12:00 p.m. (ET) whether they would pursue the Purchase Option. Upon information and belief, the Derivative Litigation Plaintiffs did not meet this deadline; nevertheless, the Debtors are continuing discussions with the Derivative Litigation Plaintiffs. The fact that the Derivative Litigation Plaintiffs did not proceed with the Purchase Option further demonstrates that the proposed settlement is of no benefit to the estate and prevented the Debtors from pursuing a better deal which would maximize value for creditors.

bankruptcy court." *In re Martin*, 91 F.3d at 395. Pursuant to Section 363 of the Bankruptcy Code, a debtor-in-possession is entitled to "use, sell, or lease, other than in the ordinary course of business, property of the estate" after "notice and a hearing . . . ." 11 U.S.C. § 363(b)(1). "In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions." *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999). "In evaluating whether a sound business purpose justifies sale of property under Section 363, courts consider a variety of factors—including the proportionate value of the asset to the bankruptcy estate as a whole; the amount of elapsed time since the filing; the effect of a proposed distribution; the difference between the proceeds to be realized versus the appraised value of the property; and whether the asset is increasing or decreasing in value—which essentially represent a 'business judgment' test." *In re Culp*, 545 B.R. 827, 844 (D. Del. 2016), *aff'd*, 681 Fed. App'x 140 (3d Cir. 2017).

14.     "Courts generally consider four factors in considering whether sound business judgment exists: (1) whether there is a sound business reason for the sale; (2) whether the sale is proposed in good faith; (3) whether adequate and reasonable notice has been afforded; and (4) whether a fair and reasonable purchase price is offered." *In re Sea Oaks Country Club, LLC*, Nos. 20-17229 (CMG), 20-17228 (CMG), 2020 WL 6588412, at *10 (Bankr. D.N.J. Nov. 10, 2020). An important factor in evaluating the sale process is Courts also consider other factors such as whether "the assets been aggressively marketed in an active market." *In re Gulf Coast Oil Corp.*, 404 B.R. 407, 424 (Bankr. S.D. Tex. 2009). *See, e.g.*, *In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008) (denying approval of sale where the proponents failed to establish "the dearth of evidence of marketing").

15.     Regarding price, "a debtor must demonstrate that the proposed purchase price is not only the highest offer, but the highest and best offer." *In re Fam. Christian, LLC*, 533 B.R. 600, 627 (Bankr. W.D. Mich. 2015). Thus, "the debtor's duty, and the primary concern of the bankruptcy court, is to ensure that the sale maximizes the value of the asset sold." *Id.* When considering whether an offer is "highest and best," "[d]ebtors are permitted, and in fact are encouraged, to evaluate other factors such as contingencies, conditions, timing, or other uncertainties in an offer that may render it less appealing." *Id.* at 622–23.

16.     Where a proposed Section 363 transaction involves insiders, courts apply enhanced scrutiny. *Old Cold, LLC*, 558 B.R. 500, 521 (B.A.P. 1st Cir. 2016), *aff'd sub nom. In re Old Cold LLC*, 879 F.3d 376 (1st Cir. 2018); *In re Tidal Constr. Co., Inc.*, 446 B.R. 620, 624 (Bankr. S.D. Ga. 2009). "In applying heightened scrutiny, courts are concerned with the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration." *In re Residential Cap., LLC*, No. 12-12020, 2013 WL 3286198, at *19 (Bankr. S.D.N.Y. June 27, 2013) (quoting *In re Innkeepers USA Tr.*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010)).

**B.     Bankruptcy Rule 9019 Standard**

17.     Though settlements in bankruptcy are favored, "the unique nature of the bankruptcy process means that judges must carefully examine settlements before approving them." *In re Nutraquest, Inc.*, 434 F.3d 639, 644 (3d Cir. 2006). "In evaluating a proposed settlement, the bankruptcy court must balance 'the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal.'" *In re NovaPro Holdings, LLC*, No. 14-10895-LSS, 2019 WL 1324950, at *4 (D. Del. Mar. 25, 2019), *aff'd*, 815 F. App'x 655 (3d Cir. 2020) (quoting *Martin*, 91 F.3d at 393). The following factors are considered in the Third Circuit:

"(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *In re Boy Scouts of Am. & Delaware BSA, LLC*, 650 B.R. 87, 148 (D. Del. 2023) (quoting *Martin*, 91 F.3d at 393). "It remains a court's duty to ensure that compromises are fair and equitable, [as are] the other aspects of reorganizations . . . Under the fair and equitable standard, we look to the fairness of the settlement to other persons, i.e., the parties who did not settle." *In re Key3Media Grp., Inc.*, 2006 WL 2842462, at *2 (D. Del. Oct. 2, 2006) (internal quotation marks omitted) (relying on *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968)).

18.     "In evaluating the fairness of a settlement, the court does not have to be convinced that the settlement is the best possible compromise, but only that the settlement falls within a reasonable range of litigation possibilities. Therefore, the settlement need only be above the 'lowest point in the range of reasonableness.'" *In re Trib. Co.*, 464 B.R. 126, 158 (Bankr. D. Del. 2011) (quoting *In re Washington Mut., Inc.*, 442 B.R. 314, 328 (Bankr. D. Del. 2011)). At bottom, "the role of the court in deciding whether to exercise its discretion and approve or disapprove a proposed compromise (with some deference to the judgment of the trustee) is to insure that the bankruptcy estate—*i.e.*, the interest of creditors—is not adversely affected by the proposed settlement with a particular creditor or third party." *In re Nationwide Sports Distribs., Inc.*, 227 B.R. 455, 461 (Bankr. E.D. Pa. 1998). "The bankruptcy court considers 'all relevant information that will enable it to determine what course of action will be in the best interest of the estate.'" *In re NovaPro Holdings, LLC*, 2019 WL 1324950, at *4 (quoting *In re Key3Media Grp., Inc.*, 336 B.R. 87, 92 (Bankr. D. Del. 2005)). "The burden is on the proponent to establish that the settlement may be approved." *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 136 (Bankr. D.N.J. 2010).

19.    Where, as here, the proposed settlement involves an insider, the transaction is subject to enhanced scrutiny. *See, e.g.*, *Schubert v. Lucent Techs. Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 412 (3d Cir. 2009) ("A claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts.") (quoting *Fabricators, Inc. v. Tech. Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1465 (5th Cir. 1991)); *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 498 (Bankr. S.D.N.Y. 1991) ("Lastly, this agreement was negotiated by Debtors with an insider. We subjected the agreement to closer scrutiny because it was negotiated with an insider, and hold that closer scrutiny of insider agreements should be added to the cook book list of factors that Courts use to determine whether a settlement is fair and reasonable."); *In re Ninety-Five/Two Fifteen Ctr. Part II, LLC*, No. 19-16396-MKN, 2020 WL 6600062, at *7 (Bankr. D. Nev. June 16, 2020) ("Settlement encompassing disputes and claims brought by insiders are subject to closer scrutiny than those involving unrelated entities."). "In applying heightened scrutiny, courts are concerned with the integrity and entire fairness of the transaction at issue, typically examining whether the process and price of a proposed transaction not only appear fair but are fair and whether fiduciary duties were properly taken into consideration." *In re Innkeepers USA Tr.*, 442 B.R. at 231.

### C.    The Settlement is Not in the Estate's Best Interest Under Section 363 of the Bankruptcy Code or Bankruptcy Rule 9019

20.    Under the circumstances, the Debtors have not met their burden to approve the Settlement Motion under either Section 363 of the Bankruptcy Code or Bankruptcy Rule 9019. *In re Diocese of Camden*, 653 B.R. at 735 ("the movant has the burden of proof under both [Bankruptcy] Rule 9019 and section 363 of the Bankruptcy Code."). Under either standard, the Debtors must show that "the value of the asset in question must be compared to the price being

paid in order to determine whether the settlement and sale is reasonable." *Id.* They have failed to do so.

21.    Regarding approval under Section 363, the Debtors have failed to establish that there was a sound business reason to sell the Derivative Litigation Claims rather than treat them the same as other Retained Causes of Action under the Second Amended Plan. Moreover, there is *zero* evidence that the Debtors marketed these claims for sale other than to the Derivative Litigation Plaintiffs or PDSTI.[13] More importantly, the Derivative Litigation Plaintiffs' offer is not the highest and best offer because, as detailed below, PDSTI's offer is superior in terms of creditor recovery. *See In re Exaeris, Inc.*, 380 B.R. at 745 ("It is the burden of the proponents of the Sale to establish that the price is fair which would require information on the value of the assets being sold, including the business, claims being released, inventory and the like."). Additionally, the settlement fails to take into account the interests of the largest creditor in this case—PDSTI.[14]

22.    The Debtors have also failed to meet their burden under Bankruptcy Rule 9019 for both the Purchase Option and Litigation Trust Option. Under the first *Martin* factor, the Debtors were likely to succeed in litigating the Standing Motion for the reasons set forth in the Debtors Stay Objection and the PDSTI Stay Objection—namely, the Derivative Litigation Plaintiffs did not make a *prima facie* case under the *Cybergenics* standard, the Derivative Litigation Plaintiffs had no interest in the claims without the complete recharacterization or subordination of PDSTI's claims, and the improper conduct of the Derivative Litigation Plaintiffs. *See* Settlement Motion ¶

---

[13] The Debtors could have, for example, marketed the claims to litigation funders.

[14] Though PDSTI may be the only party objecting, the Court should still consider the interests of the other creditors who may be affected. *See In re Boston & Providence R.R. Corp.*, 673 F.2d 11, 13 (1st Cir. 1982) (per curiam) ("[T]he court must act independently, out of its own initiative, for the benefit of all creditors. This obligation prevails even where the creditors are silent . . . .").

28 (noting that "the Debtors believe that they would ultimately prevail [with respect to the Standing Motion, Disclosure Statement, and Plan]" against the Derivative Litigation Plaintiffs).

23.     The second *Martin* factor is not applicable.

24.     The third *Martin* factor illustrates why the Settlement Motion should not be granted. The Debtors and the Derivative Litigation Plaintiffs were near the conclusion of litigating the Standing Motion. Discovery and expert reports were complete. The sole items remaining were any supplemental briefing and a hearing before the Court. It is difficult to justify settling at the eleventh hour when the vast majority of expenses had already been incurred and the scheduled hearing was weeks away.

25.     As described in greater detail regarding PDSTI's proposal, the proposed settlement fails the fourth *Martin* factor because it is not in the best interest of creditors.

26.     There are also other issues with the proposed settlement:

a.      **The "lock up" provision is improper**. The Settlement Term Sheet contains provisions that the Debtors cannot solicit better offers for the Derivative Litigation Claims but may exercise a so-called "Debtor Fiduciary Pivot." This provision is particularly problematic given that the Debtors failed to market the Derivative Litigation Claims to third parties, which may have constrained the Debtors' ability to obtain the highest and best price (in violation of their fiduciary duties), regardless of any fiduciary out. *See In re Innkeepers USA Tr.*, 442 B.R. at 235 ("In a bankruptcy case, it is 'Bankruptcy 101' that a debtor and its board of directors owe fiduciary duties to the debtor's creditors to maximize the value of the estate, and each of the estates in a multi-debtor cases.").

b.      **The breakup fee is inappropriate and unenforceable**. Relatedly, the settlement contemplates a breakup fee of $500,000 if the settlement with the Derivative Litigation Plaintiffs is not entered into because the Debtors exercise their fiduciary out. However, because the Settlement Term Sheet has not been approved by the Court, it is not enforceable. The Third Circuit has explicitly banned this type of arrangement. *In re Roth Am., Inc.*, 975 F.2d 949, 954 (3d Cir. 1992) (holding that, pursuant to Section 363, "notice and a hearing in the bankruptcy court on that agreement [including a break-up fee] was required for it to be enforceable"). *See also In re O'Brien Env't Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999) ("[T]he allowability of break-up fees, like that of other administrative expenses, depends upon the

requesting party's ability to show that the fees were actually necessary to preserve the value of the estate. Therefore, we conclude that the business judgment rule should not be applied as such in the bankruptcy context."). Thus, not only is the breakup fee improper on its face, it most likely interfered with the Debtors' ability to properly consider PDSTI's proposal.[15] That is, the Debtors not have evaluated PDSTI's proposal on the assumption that by choosing it, they would have had to pay the Derivative Litigation Plaintiffs the $500,000 break-up fee, essentially requiring PDSTI to top the Derivative Litigation Plaintiffs' proposal by at least $500,000. The break-up fee is particularly inappropriate and problematic here as the Derivative Litigation Plaintiffs' settlement merely gives them the *option* to acquire the Derivative Litigation Claims.

c.    **There is no basis for releasing claims against the Derivative Litigation Plaintiffs**. The Debtors retained causes of action against the Derivative Litigation Plaintiffs. *See* Plan Supplement [D.I. 340]. The Settlement Term Sheet and Third Amended Plan now release all Derivative Litigation Plaintiffs other than Kirk Hawkins. This is despite previously indicating that claims against the Derivative Litigation Plaintiffs were being investigated. *See, e.g.*, Debtors Stay Objection ¶¶ 42–43. The Debtors have provided no information regarding the release of claims against the Derivative Litigation Plaintiffs, such as, for instance, how the $2,500,000 was allocated between acquiring the Derivative Litigation Claims and obtaining a release.

d.    **The Litigation Trust Option gives the Derivative Litigation Plaintiffs improper control over the Litigation Trust.** As will be discussed in further detail regarding the Third Amended Plan, the proposed settlement's Litigation Trust Option is objectionable. In short, if the Derivative Litigation Plaintiffs pursue the Litigation Trust Option, they will be granted outsized rights under the Third Amended Plan. Though they are equity holders (thus in Class 8 under the Third Amended Plan), they will have effective control over the Litigation Trust. This is particularly problematic because the Third Amended Plan preserves claims against Kirk Hawkins— one of the Derivative Litigation Plaintiffs—creating a "fox guarding the henhouse" scenario, where the Derivative Litigation Plaintiffs appear to be able to block pursuit of claims against Mr. Hawkins. Moreover, the proposed beneficiaries of this Litigation Trust include the Derivative Litigation Plaintiffs, which violates the absolute priority rule. The Settlement Term Sheet and Third Amended Plan utterly fail to recognize that even if the Derivative Litigation Claims are successfully prosecuted and a judgment is entered against PDSTI, PDSTI's claims must still be equitably subordinated and/or recharacterized *before* the Derivative Litigation

---

[15] To the extent that the Derivative Litigation Plaintiffs later seek payment of the break-up fee as an administrative expense claim, PDSTI reserves all rights to object.

Plaintiffs would obtain a recovery. This is in addition to payment in full of all other creditors.

**D.      PDSTI's Proposal is Superior and Better to Advance All Creditors' and the Estates' Interests**

27.      PDSTI's proposal brings better and fairer recovery to *all* creditors and is in the best interests of the Debtors' estate. As part of the settlement proposal, PDSTI agreed to (i) make a cash contribution of $3,000,000 to all creditors; and (ii) subordinate all recoveries that it would otherwise receive under the Plan. As such, all creditors other than PDSTI could at least recover the full amount of $3,000,000. For the reasons set forth below, the Derivative Litigation Plaintiffs' proposal (as detailed below) relies upon an improper classification to ensure that PDSTI does not receive a distribution of the $2,500,000 being proposed under the Purchase Option. Because this is improper, PDSTI (and the other holders of unsecured claims) should be entitled to distributions of this amount, which would dramatically reduce the amount available to non-PDSTI creditors. The Convenience Class is an impermissible gerrymander which benefits the Convenience Class to the detriment of other creditors with claims over $100,000, and thus cannot be approved. *See, e.g.*, *In re Mavrode*, 205 B.R. 716, 721 (Bankr. D.N.J. 1997) ("It is the duty of the bankruptcy court to ensure that the proposed settlement will not result in further injury to the other creditors. A proposed settlement will necessarily fail where one creditor benefits at the other creditors' expense.").

28.      The Debtors have not reconciled the claims register for these Chapter 11 Cases, but it is clear there are creditors other than PDSTI and Feiren who would be prejudiced by this settlement and would benefit from PDSTI's proposal. For example, Co-Production International Inc. has filed a proof of claim in the amount of approximately $1.2 million and CIBanco, S.A., has filed a proof of claim in the amount of approximately $838,000, and they therefore, under the Third Amended Plan, hold General Unsecured Claims. Similarly situated creditors are left with a lose-

14

lose scenario under the Derivative Litigation Plaintiffs' proposal —either they agree to reduce their claim to $100,000 and participate in the Convenience Class, accept the Derivative Litigation Plaintiffs' lowball offers, or they share in the Debtors' remaining assets (which includes any cash remaining after the payment of professional fees and fees due to the U.S. Trustee and certain Retained Causes of Action which have not been assigned a value).[16] These remaining assets may end up being virtually worthless, resulting in no recovery. Even if they do have value, without the equitable subordination or recharacterization of PDSTI's claims, holders of General Unsecured Claims will recover far less if the Settlement Motion is approved.

29.     Under PDSTI's proposal, recovery is increased both in terms of the amount of cash available to general unsecured creditors, but also the voluntary subordination of PDSTI's claims. When evaluated under Section 363 and Bankruptcy Rule 9019, there can be no conclusion other than PDSTI's offer is the highest and best offer and in the best interest of all creditors.

## II.    The Court Should Not Confirm the Third Amended Plan

30.     Nearly five months ago, the Court entered the *Order (I) Conditionally Approving the Disclosure Statement, (II) Scheduling the Combined Hearing, (III) Establishing Notice and Objection Procedures for Confirmation of Plan and Final Approval of Adequacy of Disclosures, (IV) Establishing Solicitation, Voting, and Related Procedures, (V) Approving Related Dates, Deadlines, and Procedures, and (VI) Granting Related Relief* [D.I. 248] (the "Solicitation Order"). Following entry of the Solicitation Order, the Debtors solicited the *Second Amended Joint Chapter 11 Plan of Liquidation for Icon Aircraft, Inc. and its Debtor Affiliates* (the "Second Amended Plan") [D.I. 243-A] and parties were also sent the accompanying disclosure statement (the "Disclosure Statement") [D.I. 243-B]. The Second Amended Plan classified the claims of PDSTI

---

[16] *See* Plan Supplement [D.I. 340].

and Feiren into "Class 3 – Noteholder Claims." All other general unsecured claims were placed into "Class 4 – General Unsecured Claims." Both Class 3 and Class 4's treatment under the Second Amended Plan was their *pro rata* share of the "Plan Assets." The Debtors filed a Plan Supplement on July 3, 2024.[17]

31.     A hearing to consider confirmation of the Second Amended Plan was scheduled for July 22, 2024, but was later rescheduled to October 1, 2024.[18] One of the reasons the Confirmation Hearing was adjourned was because the Debtors had obtained the requisite number of votes to confirm the Second Amended Plan under the procedures set forth in the Solicitation Order, but Hawkins had voted to reject and filed a motion for temporary allowance of his unliquidated and disputed claim.[19] If the motion were granted, Hawkins, an insider and member of the Derivative Litigation Plaintiffs, would be able to singlehandedly assure that the Second Amended Plan was not confirmed.

32.     In connection with the Settlement Motion, the Debtors filed the Third Amended Plan. The Debtors did not re-solicit the Third Amended Plan. The Debtors also did not provide an updated liquidation analysis.

33.     The Third Amended Plan contained substantial changes to many aspects of the Second Amended Plan.[20] These changes include, *inter alia*:

---

[17] *See* Plan Supplement [D.I. 340].

[18] *See Notice of Adjournment of Combined Hearing to Consider Confirmation of the Plan and Final Approval of the Related Disclosure Statement* [D.I. 354].

[19] *See Motion of Kirk Hawkins for Entry of an Order Temporarily Allowing Class 4 General Unsecured Claim in its Liquidated Amount Solely for Voting Purposes Pursuant to Bankruptcy Rule 2018* [D.I. 335].

[20] *See Notice of Filing of Blackline of Amended Chapter 11 Plan of Liquidation for Seaplane Debtor 1, Inc. and its Debtor Affiliates* [D.I. 545].

a.    Modifying the classification of claims such that "Class 4 – Convenience Claims" consisting of claims under $100,000 was created and all other general unsecured claims were placed in "Class 5 – General Unsecured Claims."

b.    Providing that the Derivative Litigation Plaintiffs would have consent rights with respect to the Confirmation Order and any further amendments to the Third Amended Plan.

c.    Providing releases for all Derivative Litigation Plaintiffs other than Hawkins.

d.    In the event that that the Derivative Litigation Plaintiffs do not fund the Purchase Option, a Litigation Trust would be established.

  (i)    The Litigation Trust Assets include the Derivative Litigation Claims.

  (ii)    The Litigation Trust Beneficiaries include holders of claims in Class 4 (Convenience Class), Class 5 (General Unsecured Claims), and Class 8 (Interests).[21]

  (iii)    A Litigation Trust Oversight Board would be created and consist of five members. The Derivative Litigation Plaintiffs would be entitled to appoint three members of the Litigation Trust Oversight Board. The other two members include another minority shareholder and the Plan Administrator (who is also subject to the consent of the Derivative Litigation Plaintiffs).

34.    Under the terms of the Third Amended Plan, holders of claims in Class 3 (Noteholders Claims) and Class 5 (General Unsecured Claims) will still receive their *pro rata* share of the "Plan Assets." Holders of claims in Class 4 (Convenience Claims) will either be paid in full, or if the aggregate amount of claims in Class 4 is more than $2,500,000, they will share in this amount on a *pro rata* basis.

---

[21] Also, pursuant to the Third Amended Plan, the Derivative Litigation Plaintiffs' interests are deemed allowed.

A.     **The Court Should Not Confirm the Third Amended Plan as it Violates Sections 1129(a)(1), 1122(A) and 1123(A)(4) of the Bankruptcy Code**

35.     Section 1129(a)(1) of the Bankruptcy Code requires that a plan "complies with the applicable provisions of this title." 11 U.S.C. § 1129(a)(1). A plan proponent bears the burden of proof for each of the requirements of confirmation of a chapter 11 plan. *In re Washington Mut.*, 442 B.R. at 328.

36.     Section 1123(a)(4) of the Bankruptcy Code provides that "a plan shall . . . provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). This equal treatment provision requires that "all members of the class must receive equal value . . . [and] each member of the class must pay the same consideration for its distribution." *In re Quigley Co. Inc.*, 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007); *see also In re W.R. Grace & Co.*, 475 B.R. 34, 121 (D. Del. 2012) ("Federal case law construing [Section 1123(a)(4)] has interpreted equal treatment to mean that: (1) all class members must be subject to the same process for claim satisfaction; (2) all class members' claims must be of 'equal value' through the application of the same pro rata distribution or payment percentage procedures to all claims.") (internal citation omitted), *aff'd*, 729 F.3d 332 (3d Cir. 2013). Courts have frequently refused to confirm plans that defeat the goal of equal treatment of similarly situated creditors. *See, e.g.*, *In re 222 Liberty Assocs.*, 108 B.R. 971, 990 (Bankr. E.D. Pa. 1990) ("Whenever a plan proponent manipulates classification solely to defeat the Code's goal of equal treatment of similarly situated creditors, such a plan may not be confirmed.").

37.     Here, the Debtors have provided no justification for the changes contained in the Third Amended Plan. Nor have the Debtors solicited approval of the Third Amended Plan, filed any of the new Plan Supplement documents, or filed an updated liquidation analysis. The latter is

crucial to creditors, PDSTI, and the Court, so that parties can evaluate PDSTI's proposal versus the Derivative Litigation Plaintiffs' proposal.

38.     Additionally, if the Derivative Litigation Plaintiffs pursue the Purchase Option, separate classification of holders of claims in Class 4 (Convenience Class Claims) and Class 5 (General Unsecured Claims) is improper. Holders of claims in Class 3 (Noteholders Claims) and Class 5 (General Unsecured Claims) share in the "Plan Assets"—and may receive nothing—while holders of claims in Class 4 (Convenience Claims) will purportedly be paid in full. This newly created Class 4 contains the vast majority by number of unsecured claims in this case. This completely belies the reason for convenience classes in chapter 11 plans. *See In re Washington Mut.*, 442 B.R. at 360 n.46 ("A plan may provide for a 'convenience' class of unsecured claims that are less than (or reduced to) a specific amount, but that class usually receives payment in full to avoid the administrative burden of calculating and paying very small amounts to creditors.").

39.     The Third Amended Plan also unfairly discriminates in favor of holders of claims in Class 4, to the detriment of holders of claims in Classes 3 and 5. The Convenience Class gets paid *in full* at the Effective Date while the other unsecured creditors receive nothing and have to wait for an uncertain period of time for an unknown recovery. It is well-recognized that a distribution earlier is much more valuable than a distribution that is merely illusory and delayed. *See, e.g.*, *In re DeLeo*, No. 21-20025, 2022 WL 1072857, at *6 (Bankr. D. Me. Apr. 8, 2022) ("A distribution on the first day following confirmation is different from a distribution seven years later (even if the deferred stream of payments is brought to present value with a rate of interest). The point here is that risk matters when thinking about fairness and the balancing of debtor and creditor interests that must occur in any chapter 11 case."). And those general unsecured creditors

left out of the Convenience Class never had the opportunity to vote on the Third Amended Plan, even though the amended plan potentially changes their recovery profile substantially.

40.    PDSTI is the largest unsecured creditor in this case. All of PDSTI's claims were classified in Class 3 (Noteholders Claims). However, not all of PDSTI's claims are similar. PDSTI executed promissory notes directly with the Debtors which are partially related to the Derivative Litigation Claims. However, PDSTI is also the successor in interest to a claim of East West Bank, a third party. *See* Claim No. 68. This claim should have been classified in Class 5 (General Unsecured Claims) as it is substantially similar to the other claims in Class 5 and there is no rational basis to separately classify this claim. The Debtors have provided no basis for this classification, and the only reason PDSTI can infer for this classification scheme is so that the Debtors can use Class 5 to effectuate a cramdown of the Third Amended Plan. *In re Coram Healthcare Corp.*, 315 B.R. 321, 350 (Bankr. D. Del. 2004) ("[C]lassification of claims should not be permitted solely on the basis of how the plan proponent thinks the creditor will vote. That is gerrymandering.").

41.    The Debtors were offered a better proposal from PDSTI which is fair and equitable to all creditors, under which the Debtors can consummate a plan without discrimination disguised by the artifice of a "convenience class." Here, one class of unsecured creditors is getting *full* recovery, but another class of unsecured creditors is getting recovery as low as zero percent. "Where there are no subordination agreements involved, the analysis is simple: look at the difference between the recovery percentage under the plan of a preferred class and that of a dissenting class." *In re Trib. Co.*, 972 F.3d 228, 243 (3d Cir. 2020). The eleventh-hour creation of the "convenience class" does not withstand basic scrutiny and must be rejected as inconsistent with the Bankruptcy Code's plan confirmation requirements.

42.     The provisions of the Third Amended Plan regarding the Litigation Trust are also wholly inappropriate. The Debtors have given Derivative Litigation Plaintiffs, equity holders (not creditors), control of the liquidation process if they go forward with the Litigation Trust Option. The Third Amended Plan explicitly provides[22] that the Derivative Litigation Plaintiffs will share in the proceeds of the Litigation Trust in violation of the absolute priority rule[23] and will receive a release. All of these provisions are wholly inappropriate given that the Debtors explicitly retained causes of action against the Derivative Litigation Plaintiffs.

43.     For these reasons, the Court should deny confirmation of the Third Amended Plan.

## RESERVATION OF RIGHTS

44.     PDSTI reserves the right to supplement this Omnibus Objection based upon further amendments made to the Third Amended Plan or Settlement Term Sheet. PDSTI further reserves its rights to supplement this Omnibus Objection based upon any Confirmation Order proposed in connection with the Third Amended Plan or any briefing in support of confirmation of the Third Amended Plan.

## CONCLUSION

For the reasons set forth herein, PDSTI respectfully requests that the Court deny confirmation of the Third Amended Plan and deny the Settlement Motion.

---

[22] The Third Amended Plan's definition of "Litigation Trust Beneficiaries" includes "Holders of (a) all Allowed General Unsecured Claims (including such claims in an amount of $100,000 or less) if the Derivative Litigation Plaintiffs do not sponsor the Plan; and (b) Allowed Interests . . . ." Third Amended Plan at 14.

[23] *See, e.g.*, *In re Paragon Offshore plc*, 597 B.R. 748, 760 (D. Del. 2019) ("Pursuant to the absolute priority rule, [the debtor's] equity holders cannot recover any proceeds . . . until the secured and unsecured creditors in line in front of them have been paid in full."), *aff'd*, Nos. 19-1627, 19-1628, 2022 WL 1055574 (3d Cir. Apr. 8, 2022).

Dated: October 28, 2024
        Wilmington, Delaware

Respectfully submitted,

*/s/ Stephen J. Astringer*

**KOBRE & KIM LLP**
Jacob R. Kirkham (No. 5768)
Stephen J. Astringer (No. 6375)
600 North King Street, Suite 501
Wilmington, Delaware 19801
Telephone: (302) 518-6451
Facsimile: (302) 518-6461
jacob.kirkham@kobrekim.com
stephen.astringer@kobrekim.com

-and-

Daniel J. Saval (admitted *pro hac vice*)
800 Third Avenue
New York, New York 10022
Telephone: (212) 488-1259
Facsimile: (212) 488-1220
daniel.saval@kobrekim.com

*Counsel to Counsel to PK Investment Co.,*
*Ltd., PK Capital L.P., Pudong Science and*
*Technology Investment (Cayman) Co. Ltd.,*
*and Unimax Asset Holdings Ltd.*