## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SEAPLANE DEBTOR 1, INC., *et al.*,[1] | Case No. 24-10703 (CTG) |
| Debtors. | (Jointly Administered) |

**DEBTORS' MEMORANDUM OF LAW IN SUPPORT
OF APPROVAL OF THE DISCLOSURE STATEMENT
ON A FINAL BASIS AND CONFIRMATION OF THE FOURTH
AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION FOR SEAPLANE
DEBTOR 1, INC. (F/K/A ICON AIRCRAFT, INC.) AND ITS DEBTOR AFFILIATES
AND OMNIBUS REPLY TO OBJECTIONS TO CONFIRMATION AND 9019 MOTION**

**YOUNG CONAWAY
STARGATT & TAYLOR, LLP**
Sean M. Beach (No. 4070)
Ashley E. Jacobs (No. 5635)
S. Alexander Faris (No. 6278)
Jared W. Kochenash (No. 6557)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile:  (302) 571-1253



Dated: November 1, 2024

**SIDLEY AUSTIN LLP**
Samuel A. Newman (admitted *pro hac vice*)
1999 Avenue of the Stars, Floor 19
Los Angeles, California 90067
Telephone: (310) 595-9500
Facsimile:  (310) 595-9501

*and*

Jeri Leigh Miller (admitted *pro hac vice*)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
Facsimile:  (213) 981-3400

*and*

Nathan Elner (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599

*Counsel for Debtors and Debtors in Possession*

---

[1]   The Debtors in these chapter 11 cases, together with the last four digits of each Debtor's federal tax identification number, are: Seaplane Debtor 1, Inc. (f/k/a ICON Aircraft, Inc.) (7443); Seaplane Debtor 2, Inc. (f/k/a IC Technologies Inc.) (7918); Seaplane Debtor 3, LLC (f/k/a ICON Flying Club, LLC) (6101); and Seaplane Debtor 4, LLC (f/k/a Rycon LLC) (5297). The Debtors' service address is c/o Armanino LLP, 231 Market Place, Suite 373, San Ramon, CA 94583-4743, Attn: Thomas McCabe, Chief Restructuring Officer.

## <u>Table of Contents</u>

Preliminary Statement ................................................................................................ 1

Argument ...................................................................................................................... 2

Case Background and Objections ................................................................................ 3

    A.  Procedural History ............................................................................................ 3

    B.  Settlements with the Derivative Litigation Plaintiffs .................................... 7

    C.  Plan Solicitation and Notification Process .................................................... 9

    D.  Confirmation Objections ................................................................................ 11

The Disclosure Statement Should Be Approved on a Final Basis .............................. 12

The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code ......... 15

    A.  The Plan Complies with Section 1129(a)(1) of the Bankruptcy Code ........ 15

        1.  The Plan Properly Classifies Creditor's Claims Under Section 1122 of the Bankruptcy Code ......................................................................... 15

        2.  The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code .......................................................... 18

        3.  The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code ...................................................... 21

    B.  The Plan Complies with Section 1123(d) of the Bankruptcy Code ............ 34

    C.  The Plan Complies with Section 1129(a)(2) of the Bankruptcy Code ........ 34

        1.  The Debtors Complied with Section 1125 of the Bankruptcy Code ............... 35

        2.  The Debtors Complied with Section 1126 of the Bankruptcy Code ............... 36

    D.  The Plan Was Proposed in Good Faith and Therefore Complies with Section 1129(a)(3) of the Bankruptcy Code ................................................. 37

    E.  The Plan Provides that the Payment of Debtors' Professional Fees and Expenses Are Subject to Court Order in Compliance with Section 1129(a)(4) .............................. 38

    F.  The Plan Does Not Require Additional Disclosures Regarding Directors, Officers, or Insiders and Therefore Complies with Section 1129(a)(5) .......................... 39

    G.  The Plan Does Not Require Governmental Regulatory Approval and Therefore Complies with Section 1129(a)(6) .................................................................. 39

    H.  The Plan Is in the Best Interest of Creditors and Therefore Complies with Section 1129(a)(7) .................................................................................... 40

    I.  The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code .............................................................. 42

    J.  The Plan Provides for Payment in Full of All Allowed Priority Claims in Compliance with Section 1129(a)(9) of the Bankruptcy Code ..................... 42

    K.  At Least One Class of Impaired, Non-Insider Claims Accepted the Plan in Compliance with Section 1129(a)(10) of the Bankruptcy Code ................... 44

L. The Plan Is Feasible in Compliance with Section 1129(a)(11) of the Bankruptcy Code .......................................................................................................... 44

M. All Statutory Fees Have or Will Be Paid in Compliance with Section 1129(a)(12) .. 47

N. The Debtors Have No Retiree Benefit Obligations (Section 1129(a)(13)) ................. 47

O. Sections 1129(a)(14), (a)(15) and (a)(16) Do Not Apply to the Plan ......................... 47

P. The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code ........................................................................................................ 48

    1. The Plan is Fair and Equitable and Thus Satisfies Section 1129(b)(2)(B) of the Bankruptcy Code .......................................................................... 49

    2. The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes that Have Not Voted to Accept the Plan in Accordance with Section 1129(b)(1) of the Bankruptcy Code ..................................................... 50

Q. The Debtors Complied with Sections 1129(d) and (e) of the Bankruptcy Code ........ 51

R. Modifications to the Plan ............................................................................................. 51

S. Good Cause Exists to Waive the Stay of the Proposed Confirmation Order ............. 53

The Objections to the Plan Should Be Overruled .......................................................... 54

A. The U.S. Trustee's Objection Should Be Overruled ................................................... 54

    1. The Third-Party Releases Are Appropriate and Lawful. ................................. 54

    2. The Injunction Provision is Appropriate and Integral to the Plan. .................. 59

    3. The Debtors Will Not Receive a Discharge. ................................................... 60

B. PDSTI's Objection Should Be Overruled. ................................................................. 60

    1. The Debtors' Settlement with the Derivative Litigation Plaintiffs is in the Best Interests of Creditors and the Estates. ...................................................... 61

    2. The Plan Complies with Sections 1129(a)(1), 1121(a), and 1123(a)(4) of the Bankruptcy Code. ....................................................................................... 64

C. The Debtors Are Working to Consensually Resolve the WF Objection. .................... 67

D. The Debtors Are Reviewing the SGIA Objection. ..................................................... 67

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
  377 U.S. 476 (1964) ........................................................................................30

*Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
  526 U.S. 434 (1999)....................................................................................40, 49

*Beal Bank, S.S.B. v. Jack's Marine, Inc. (In re Beal Bank, S.S.B.)*,
  201 B.R. 376 (E.D. Pa. 1996) ....................................................................52, 64

*Boston Post Road Ltd. P'ship v. F.D.I.C. (In re Boston Post Road Ltd. P'ship)*,
  21 F.3d 477 (2nd Cir. 1994) ..........................................................................16

*Century Glove, Inc. v. First Am. Bank of N.Y.*,
  860 F.2d 94 (3d Cir. 1988) .............................................................................13

*Cosoff v. Rodman (In re W.T. Grant Co.)*,
  699 F.2d 599 (2d Cir. 1983)............................................................................23

*Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*,
  116 F.3d 790 (5th Cir. 1997) ..........................................................................37

*First Am. Bank of N.Y. v. Century Glove, Inc.*,
  81 B.R. 274 (D. Del. 1988) .............................................................................13

*Harrington v. Purdue Pharma, L.P., et al. (In re Purdue Pharma L.P.)*,
  144 S. Ct. 2071 (2024) .............................................................................29, 55

*In re 203 N. LaSalle St. Ltd. P'ship.*,
  190 B.R. 567 (Bankr. N.D. Ill. 1995) ............................................................50

*In re Abeinsa Holding, Inc.*,
  562 B.R. 265 (Bankr. D. Del. 2016) ..............................................................25

*In re Adelphia Communications Corp.*,
  368 B.R. 140 (Bankr. S.D.N.Y. 2007)......................................................16, 40

*In re Aleris Int'l, Inc.*,
  2010 WL 3492664 (Bankr. D. Del. May 13, 2010)........................................34

*In re Am. Cap. Equip., LLC,*
    688 F.3d 145 (3d Cir. 2012)................................................................45

*In re Ambanc La Mesa L.P.,*
    115 F.3d 650 (9th Cir. 1997) ........................................................48, 50

*In re Armstrong World Indus., Inc.,*
    348 B.R. 111 (D. Del. 2006)........................................................15, 16

*In re Arsenal Intermediate Holdings, LLC,*
    No. 23-10097 (CTG), 2023 WL 2655592 (Bankr. D. Del. Mar. 27, 2023)...........................56

*In re Aztec Co.,*
    107 B.R. 585 (Bankr. M.D. Tenn. 1989) ..............................................50

*In re Barakat,*
    99 F.3d 1520 (9th Cir. 1996) ............................................................16

*In re Blackhawk Mining LLC,*
    No. 19-11595 (LSS) (Bankr. D. Del. Aug. 29, 2019)...........................................28, 29

*In re BowFlex Inc.,*
    No. 24-12364 (ABA) (Bankr. D.N.J. Aug. 19, 2024) [Docket No. 614] .................57, 58, 59

*In re Burns & Roe Enters., Inc., No. 08-4191 (GEB),*
    2009 WL 438694 (D. N.J. Feb. 23, 2009) ........................................52, 64

*In re Capmark Fin. Grp. Inc.,*
    No. 09-13684 (CSS), 2011 WL 6013718 (Bankr. D. Del. Oct. 5, 2011) ...............................45

*In re Casa Systems, Inc.,*
    No. 24-10695 (KBO) (Bankr. D. Del. June 6, 2024) [Docket No. 421] ...............................60

*In re Century Glove, Inc.,*
    Civ. A. Nos. 90-400 and 90-401, 1993 WL 239489 (D. Del. Feb. 10, 1993) .................37, 40

*In re Chapel Gate Apartments, Ltd.,*
    64 B.R. 569 (Bankr. N.D. Tex. 1986)......................................................38

*In re Checkout Holding Corp.,*
    No. 18-12794 (KG) (Bankr. D. Del. Jan. 31, 2019) ........................................28, 29

*In re Coram Healthcare Corp.,*
    315 B.R. 321 (Bankr. D. Del. 2004) ...............................................23, 50

*In re Dex One Corp.,*
    No. 13-10533 (KG) (Bankr. D. Del. Apr. 29, 2013)...............................................53

*In re: ECE Wind-down LLC,*
   No. 22-10320 (JTD) (Dec. 21, 2022) Dkt. No. 520 ........................................................ 16, 65

*In re Enron Corp.,*
   326 B.R. 497 (S.D.N.Y. 2005) ................................................................................................ 31

*In re Exaeris, Inc.,*
   380 B.R. 741 (Bankr. D. Del. 2008) ...................................................................................... 23

*In re FAH Liquidating Corp.,*
   No. 13-13087 (KG) (Bankr. D. Del. July 28, 2014) ............................................................. 31

*In re Federal–Mogul Global Inc.,*
   2007 Bankr. LEXIS 3940 (Bankr. D. Del. 2007) ............................................................ 52, 64

*In re Finlay Enters., Inc.,*
   No. 09-14873 JMP, 2010 WL 6580628 (Bankr. S.D.N.Y. June 29, 2010) ............................ 46

*In re Fisker Inc.,*
   No. 24-11390 (TMH) (Bankr. D. Del. Octo. 16, 2024) [Docket No. 722] ................ 57, 58, 59

*In re Flintkote Co.,*
   486 B.R. 99 (Bankr. D. Del. 2012) ........................................................................................ 45

*In re Freymiller Trucking, Inc.,*
   190 B.R. 913 (Bankr. W.D. Okla. 1996) ................................................................................ 50

*In re Future Energy Corp.,*
   83 B.R. 470 (Bankr. S.D. Ohio 1988) .................................................................................... 38

*In re Gatehouse Media, Inc.,*
   No. 13-12503 (MFW) (Bankr. D. Del. Nov. 6, 2013) ........................................................... 53

*In re Genesis Health Ventures, Inc.,*
   266 B.R. 591 (Bankr. D. Del. 2001) ...................................................................................... 15

*In re Geokinetics Inc.,*
   No. 13-10472 (KJC) (Bankr. D. Del. Apr. 25, 2013) ........................................................... 53

*In re Global Safety Textiles Holdings LLC,*
   No. 09-12234 (KG), 2009 WL 6825278 (Bankr. D. Del. Nov. 30, 2009) ......................... 52, 64

*In re GSE Envtl., Inc.,*
   No. 13-11126 (MFW) (Bankr. D. Del. July 25, 2014) .......................................................... 53

*In re Heritage Highgate, Inc.,*
   679 F.3d 132 (3d Cir. 2012) .................................................................................................. 45

*In re Heritage Org., L.L.C.*,
   375 B.R. 230 (Bankr. N.D. Tex. Aug. 31, 2007) ................................................................46

*In re Horsehead Holding Corp.*,
   No. 16-10287 (CSS) (Bankr. D. Del. Sep. 9, 2016) ................................................................29

*In re Hyatt*,
   509 B.R. 707 (Bankr. D.N.M. 2014) ................................................................16

*In re Indianapolis Downs, LLC*,
   486 B.R. 286 (Bankr. D. Del. 2013) ................................................................24, 25, 29, 54

*In re Insys Therapeutics, Inc., et al.*,
   No. 19-11292 (KG) (Bankr. D. Del. Dec. 4, 2019) ................................................................16, 65

*In re Integrated Resources, Inc.*,
   147 B.R. 650 (S.D.N.Y. 1992) ................................................................34

*In re Invitae*,
   No. 24-11363 (MBK) (Bankr. D.N.J. Aug. 2, 2024) ................................................................29

*In re Jersey City Med. Ctr.*,
   817 F.2d 1055 (3d Cir. 1987) ................................................................16, 65

*In re Joann Inc.*,
   No. 24-10418 (CTG) (Bankr. D. Del. Apr. 25, 2024) [Docket No. 303] ................................................................59

*In re Johns-Manville Corp.*,
   68 B.R. 618 (Bankr. S.D.N.Y. 1986) ................................................................50

*In re Kreider*,
   No. 05-15018 (ELF), 2006 WL 3068834 (Bankr. E.D. Pa. Sept. 27, 2006) ................................................................45

*In re Laboratory Partners, Inc.*,
   No. 13-12769 (PJW) (Bankr. D. Del. July 10, 2014) ................................................................31

*In re Lapworth*,
   1998 WL 767456 (DWS) (Bankr. E.D. Pa. Nov. 2, 1998) ................................................................34

*In re Lason, Inc.*,
   300 B.R. 227 (Bankr. D. Del. 2003) ................................................................41

*In re Lernout & Hauspie Speech Prods., N.V.*,
   301 B.R. 651 (Bankr. D. Del. 2003) ................................................................50

*In re Lisanti Foods, Inc.*,
   329 B.R. 491 (D.N.J. 2005) ................................................................13, 38

*In re Mallinckrodt PLC*,
    639 B.R. 837 (Bankr. D. Del. 2022) ................................................................16, 29, 65

*In re Masten Space Systems, Inc.*,
    No. 22-10657 (BLS) (Nov. 9, 2022) ......................................................................16, 65

*In re Master Mortg. Inv. Fund, Inc.*,
    168 B.R. 930 (Bankr. W.D. Mo. 1994) ........................................................................24

*In re Metrocraft Pub. Serv., Inc.*,
    39 B.R. 567 (Bankr. N.D. Ga. 1984) ...........................................................................14

*In re Millennium Lab Holdings II, LLC.*,
    945 F.3d 126 (3d Cir. 2019) ........................................................................................29

*In re Monnier Bros.*,
    755 F.2d 1336 (8th Cir. 1985) .....................................................................................13

*In re NanoString Technologies, Inc.*,
    No. 24-10160 (CTG) (Bankr. D. Del. June 18, 2024) [Docket No. 659] ........................58, 59

*In re NII Holdings, Inc.*,
    288 B.R. 356 (Bankr. D. Del. 2002) .............................................................................37

*In re Nutritional Sourcing Corp.*,
    398 B.R. 816 (Bankr. D. Del. 2008) .............................................................................15

*In re One Aviation Corp.*,
    No. 18-12309 (CSS) (Bankr. D. Del. Sep. 18, 2019) ..................................................28, 29

*In re PC Liquidation Corp.*,
    383 B.R. 856 (E.D.N.Y. 2008) ....................................................................................13

*In re PBS Brand Co., LLC*,
    No. 20-13157 (JKS) (Bankr. D. Del. Apr. 28, 20231) [Docket 552] .....................................65

*In re Phoenix Petroleum, Co.*,
    278 B.R. 385 (Bankr. E.D. Pa. 2001) .......................................................................13, 14

*In re Physiotherapy Holdings, Inc.*,
    No. 13-12965 (KG) (Bankr. D. Del. Dec. 23, 2013) .........................................................53

*In re Premier Int'l Holdings, Inc.*,
    2010 WL 2745964 (CSS) (Bankr. D. Del. Apr. 29, 2010) ..................................................32

*In re Prime Core Techs., Inc.*,
    No. 23-11161 (JKS) (Bankr. D. Del. Dec. 21, 2023) [Docket No. 644] ...............................65

*In re Prussia Assocs.*,
  322 B.R. 572 (Bankr. E.D. Pa. 2005) ....................................................................45

*In re PWS Holding Corp.*,
  228 F.3d 224 (3d Cir. 2000)...........................................................................32, 37

*In re River Village Assoc.*,
  181 B.R. 795 (E.D. Pa. 1995) ..............................................................................13

*In re S&W Enter.*,
  37 B.R. 153 (Bankr. N.D. Ill. 1984) ....................................................................15

*In re Samson Resources Corp.*,
  No. 14-11934 (CSS) (Bankr. D.Del. Feb. 13, 2017) .......................................28, 29

*In re Scioto Valley Mortg. Co.*,
  88 B.R. 168 (Bankr. S.D. Ohio 1988) ..................................................................14

*In re Sea Garden Motel & Apartments*,
  195 B.R. 294 (D. N.J. 1996) ................................................................................45

*In re SL Liquidation LLC*,
  No. 23-10207 (TMH) (Bankr. D. Del. Nov. 22, 2023) [Docket No. 713] ............65

*In re Smallhold, Inc.*,
  No. 24-10267 (CTG) (Bankr. D. Del. Sept. 25, 2024) [Docket No. 288] ..................... *passim*

*In re Source Home Entm't, LLC*,
  No. 14-11553 (KG) (Bankr. D. Del, Feb. 20, 2015).............................................53

*In re Spansion, Inc.*
  2010 WL 2905001 (Bankr. D. Del. April 16, 2010)..............................................32

*In re Spansion, Inc.*,
  426 B.R. 114 (Bankr. D. Del. 2010) .........................................................23, 29, 54

*In re TK Holdings Inc.*,
  No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) ......................................28, 29

*In re Tribune Co.*,
  464 B.R. 126 (Bankr. D. Del. 2011) .....................................................................45

*In re Tricida, Inc.*,
  No. 23-10024 (JTD) (Bankr. D. Del. May, 23, 2023) [Docket No. 515] .................58, 59, 60

*In re Unichem Corp.*,
  72 B.R. 95 (Bankr. N.D. Ill. 1987) ......................................................................13

*In re U.S. Brass Corp.*,
    194 B.R. 420 (Bankr. E.D. Tex. 1996) ...................................................14

*In re U.S. Truck Co.*,
    47 B.R. 932 (E.D. Mich. 1985).........................................................45

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012)..........................................................37, 45

*In re W.R. Grace & Co.*,
    729 F.3d 311 (3d Cir. 2013)...........................................................16

*In re Wash. Mut., Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) ...................................... *passim*

*In re World Health Alts., Inc.*,
    344 B.R. 291 (Bankr. D. Del. 2006) ...................................................23

*In re Zenith Elecs. Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) ..........................................24, 25, 54

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
    987 F.2d 154 (3d Cir. 1993)........................................................16, 48, 65

*Kane v. Johns-Manville Corp.*,
    843 F.2d 636 (2d Cir. 1988)...........................................................45

*Myers v. Martin (In re Martin)*,
    91 F.3d 389 (3d Cir. 1996)..........................................................61, 62

*Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*,
    25 F.3d 1132 (2d Cir. 1994)...........................................................35

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
    848 F.2d 414 (3d Cir. 1988) ...........................................................13

*Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*,
    761 F.2d 1374 (9th Cir. 1985) .........................................................45

*Singer v. Olympia Brewing Co.*,
    878 F.2d 596 (2d Cir. 1989) ...........................................................30

*United States v. Energy Res.*,
    495 U.S. 545 (1990) ................................................................45

*Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*,
    844 F.2d 1142 (5th Cir. 1988) .........................................................13

*United States v. Occidental Chem. Corp.*,
   200 F.3d 143 (3d Cir. 1999) ................................................................30

*United States v. Tex.*,
   507 U.S. 529 (1993) .........................................................................30

**Statutes**

11 U.S.C. § 101(31) ...........................................................................39

11 U.S.C. § 365 ...........................................................................22, 34

11 U.S.C. § 503 ...............................................................................42

11 U.S.C. § 507 ...........................................................................43, 47

11 U.S.C. § 1114 ..............................................................................47

11 U.S.C. § 1122 ........................................................................ *passim*

11 U.S.C. § 1123 ........................................................................ *passim*

11 U.S.C. § 1125 ........................................................................ *passim*

11 U.S.C. § 1126 ........................................................................ *passim*

11 U.S.C. § 1127 ..............................................................................51

11 U.S.C. § 1129 ........................................................................ *passim*

11 U.S.C. § 1141 ..............................................................................60

**Other Authorities**

Bankruptcy Rule 3017 .........................................................................34

Bankruptcy Rule 3018 .........................................................................34

Bankruptcy Rule 3019 ..................................................................52, 53, 64

Bankruptcy Rule 3020 .........................................................................53

Bankruptcy Rule 6004 .........................................................................53

Bankruptcy Rule 6006 .........................................................................53

Bankruptcy Rule 9019 .................................................................... *passim*

Seaplane Debtor 1, Inc. (f/k/a ICON Aircraft, Inc.), along with its debtor subsidiaries, as debtors and debtors in possession (the "Debtors") in the above-captioned chapter 11 cases (these "Chapter 11 Cases"), submit this memorandum of law (this "Memorandum") in support of confirmation of the *Fourth Amended Joint Chapter 11 Plan of Liquidation for Seaplane Debtor 1, Inc. (f/k/a ICON Aircraft, Inc.) and its Debtor Affiliates* [Docket No. 579] (as modified, amended, or supplemented from time to time hereafter, the "Plan"),[1] and in response to the objections thereto. As demonstrated below, the Plan satisfies the requirements of sections 1125 and 1129 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code")[2] and should be confirmed. In support of confirmation of the Plan and in response to the Objections (as defined below), the Debtors respectfully state as follows:

**Preliminary Statement**

1.      The Debtors' Plan comes at the culmination of an orderly and efficient chapter 11 process that saw the Debtors sell substantially all of the Debtors' assets and effectuate a value-maximizing process. The Plan provides for the best possible outcome for creditors and equity holders and is the result the extraordinary efforts of the Debtors' directors, officers, and professionals to create value for the benefit of the Estates. For the reasons stated herein and in the Declarations (as defined below), the Debtors respectfully request the Court approve the Disclosure Statement on a final basis, confirm the Plan, and enter the Proposed Confirmation Order (as defined below).

2.      Following mediation and extensive negotiations with the Derivative Litigation Plaintiffs (as defined below), the Debtors stand poised to confirm a value-maximizing Plan. The

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan or the Proposed Confirmation Order (as defined herein), as applicable.

[2]    A detailed description of the Debtors, their business, and the facts and circumstances surrounding these Chapter 11 Cases, is set forth in greater detail in the *Declaration of Thomas M. McCabe in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Docket No. 2]. On April 4, 2024 (the "Petition Date"), the Debtors filed voluntary petitions for relief with the United States Bankruptcy Court for the District of Delaware (the "Court"). The Debtors continue to operate their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee of creditors has been appointed in these Chapter 11 Cases.

32341934.1

1

Plan represents the culmination of the Debtors' efforts in these Chapter 11 Cases.  Overall, the Plan provides the best possible outcome for creditors and exhibits the unceasing efforts of the Debtors' directors, officers, and other professionals to create value for the benefit of the Estates.

3.      The Plan reflects compromises by numerous parties in interest and, if confirmed, will facilitate, among other things: (a) the orderly and expedient distribution of the Debtors' assets to creditors; (b) the incorporation of the Debtors' settlement with the Derivative Litigation Plaintiffs over the Derivative Litigation Claims (each as defined below), which avoids costly, fact-intensive and time-consuming litigation with respect thereto; and (c) the wind-down and dissolution of the Debtors' Estates.

4.      As described more fully herein, four (4) objections to confirmation were filed (collectively, the "Objections").  For the reasons stated herein and in the Declarations (as defined below), the Debtors ask this Court to overrule the remaining Objections in their entirety and enter the proposed order confirming the Plan (the "Proposed Confirmation Order").

## Argument

5.      This Memorandum is divided into three parts.  Part I sets forth the procedural history of these Chapter 11 Cases, including the Plan, the Disclosure Statement (as defined below), the Debtors' solicitation efforts and voting results, and a brief summary of the various Objections filed in response to the Plan.  Part II establishes the Plan's compliance with the applicable confirmation requirements, including that certain of the discretionary contents of the Plan, including the Plan's release provisions, are appropriate and should be approved.  Part III provides the legal basis on which the remaining Objections to the Plan should be overruled.

6.      In further support of confirmation, the Debtors submit the following declarations (collectively, the "Declarations"):

> a.      the *Declaration of Adam Fialkowski of Stretto, Inc. with Respect to the Tabulation of Votes on the Further Amended Joint Chapter 11 Plan of Liquidation for ICON Aircraft, Inc. and its Debtor Affiliates* [Docket No. 397] (the "Initial Voting Report");

b.    the *Declaration of Thomas M. McCabe in Support of Confirmation of the Fourth Amended Joint Chapter 11 Plan of Liquidation for Seaplane Debtor 1, Inc. (f/k/a ICON Aircraft, Inc.) and its Debtor Affiliates* [Docket No. 582] (the "McCabe Declaration");

c.    the *Declaration of Thomas G. Fitzgerald, Independent Director and Sole Member of the Special Committee of the Board of Directors of Seaplane Debtor 1, Inc. and its Debtor Affiliates, in Support of Approval of the Disclosure Statement on a Final Basis and Confirmation of the Fourth Amended Joint Chapter 11 Plan of Liquidation for Seaplane Debtor 1, Inc. (f/k/a ICON Aircraft, Inc.) and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 583] (the "FitzGerald Declaration"); and

d.    the *Supplemental Declaration of Adam Fialkowski of Stretto, Inc. with Respect to the Tabulation of Votes on the Further Amended Joint Chapter 11 Plan of Liquidation for Seaplane Debtor 1, Inc. (f/k/a ICON Aircraft, Inc.) and its Debtor Affiliates* [Docket No. 594] (the "Supplemental Voting Report", and together with the Initial Voting Report, the "Voting Report").

7.    For the reasons stated herein and in light of the evidentiary support offered in the Declarations and to be further offered at the Confirmation Hearing, the Debtors respectfully request that the Court find that the Debtors have satisfied their burden under the Bankruptcy Code and confirm the Plan.

## Case Background and Objections

### A. Procedural History

8.    Since the Petition Date, the Debtors have engaged in a multi-faceted process to maximize the value of the Debtors' Estates for their stakeholders, as discussed further below. *First*, the Debtors conducted an auction and closed the sale of substantially all of the Debtors' assets. *Second*, the Debtors engaged in months-long negotiations with the Derivative Litigation Plaintiffs,[3] resulting in the resolution of all disputes between the Debtors and the Derivative Litigation Plaintiffs.

9.    On May 13, 2024, the Debtors filed with this Court the *Joint Chapter 11 Plan of Liquidation for ICON Aircraft, Inc. and its Debtor Affiliates* [Docket No. 196] and the *Disclosure*

---

[3]    As used herein, the term "Derivative Litigation Plaintiffs" has the meaning set forth in the *Verified Statement of Paul, Weiss, Rifkind, Wharton & Garrison LLP and Landis Rath & Cobb LLP Pursuant to Federal Rule of Bankruptcy Procedure 2019* [Docket No. 111].

*Statement for Joint Chapter 11 Plan of Liquidation for ICON Aircraft, Inc. and its Debtor Affiliates* [Docket No. 197], along with the Disclosure Statement Motion (as defined below)[4] pursuant to which the Debtors sought a combined hearing on final approval of the adequacy of the Disclosure Statement (as defined below) and the confirmation of the Plan and the related solicitation and voting procedures.

10.     On May 31, 2024, the Debtors filed the *Notice of Filing of (I) Amended Joint Chapter 11 Plan of Liquidation for ICON Aircraft, Inc. and its Debtor Affiliates; (II) Amended Disclosure Statement for Joint Chapter 11 Plan of Liquidation for ICON Aircraft, Inc. and its Debtor Affiliates; and (III) Blacklines Thereof* [Docket No. 238], which included the *Amended Joint Chapter 11 Plan of Liquidation for ICON Aircraft, Inc. and its Debtor Affiliates* and the *Amended Disclosure Statement for Joint Chapter 11 Plan of Liquidation for ICON Aircraft, Inc. and its Debtor Affiliates* attached thereto as Exhibit A and Exhibit B, respectively.

11.     On June 3, 2024, the Debtors filed the *Notice of Filing of (I) Further Amended Joint Chapter 11 Plan of Liquidation for ICON Aircraft, Inc. and its Debtor Affiliates; (II) Further Amended Disclosure Statement for Joint Chapter 11 Plan of Liquidation for ICON Aircraft, Inc. and its Debtor Affiliates; and (III) Blacklines Thereof* [Docket No. 243], which included the *Second Amended Joint Chapter 11 Plan of Liquidation for ICON Aircraft, Inc. and its Debtor Affiliates* and the *Second Amended Disclosure Statement for Joint Chapter 11 Plan of Liquidation for ICON Aircraft, Inc. and its Debtor Affiliates* (as modified, amended, or supplemented from time to time "Disclosure Statement") attached thereto as Exhibit A and Exhibit B, respectively.

12.     On June 3, 2024, the Court entered the Disclosure Statement Order[5] which, among other things: (a) conditionally approved the Disclosure Statement for solicitation purposes only;

---

[4]     *See Debtors' Motion for Entry of Order (I) Conditionally Approving the Disclosure Statement, (II) Scheduling the Combined Hearing, (III) Establishing Notice and Objection Procedures for Confirmation of Plan and Final Approval of Adequacy of Disclosures, (IV) Establishing Solicitation, Voting, and Related Procedures, (V) Approving Related Dates, Deadlines, and Procedures, and (VI) Granting Related Relief* [Docket No. 198] (the "Disclosure Statement Motion").

[5]     *See Order (I) Conditionally Approving the Disclosure Statement, (II) Scheduling the Combined Hearing, (III) Establishing Notice and Objection Procedures for Confirmation of Plan and Final Approval of Adequacy of Disclosures, (IV) Establishing Solicitation, Voting, and Related Procedures, (V) Approving Related Dates,*

(b) established July 10, 2024, at 4:00 p.m. (prevailing Eastern Time), as the deadline to object to the Plan and final approval of the adequacy of the disclosures in the Disclosure Statement;[6] (c) approved the solicitation, voting, and tabulation procedures; (d) approved the form and manner of the Combined Hearing Notice (as defined in the Disclosure Statement Order); and (e) approved other related dates, deadlines, and procedures.  The Debtors caused Stretto, Inc. (the "Notice and Claims Agent"), on or about June 6, 2024, to serve the Solicitation Packages (as defined in the Disclosure Statement Order), including the Combined Hearing Notice, in accordance with the terms of the Disclosure Statement Order.[7]  The Debtors caused the Publication Notice (as defined in the Disclosure Statement Order) to be published in *The New York Times* (national edition) and the *Sacramento Bee* on June 10, 2024, and June 11, 2024, respectively.[8]

13.     On June 18, 2024, the Court approved the sale of substantially all the Debtors' assets (the "Sale") to SG Investment America, Inc. ("SGIA" or the "Purchaser") pursuant to the *Order (A) Authorizing and Approving the Debtors' Entry into the Purchase Agreement and Backup Purchase Agreement, (B) Authorizing the Sale of the Purchased Assets of the Debtors Free and Clear of All Claims, (C) Approving the Assumption and Assignment of the Assumed Contracts, and (D) Granting Related Relief* [Docket No. 296] (the "Sale Order"), in accordance with the terms of that certain Asset Purchase Agreement by and between the Debtors and the Purchaser dated as of May 1, 2024 (as may be amended, modified, or supplemented, the "APA").  Pursuant to the terms of the APA, the Purchaser took possession of the Purchased Assets and assumed the Assumed Liabilities (each as defined in the APA) on June 26, 2024.

---

*Deadlines, and Procedures, and (VI) Granting Related Relief* [Docket No. 248] (the "Disclosure Statement Order").

[6]     The deadline for the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") and PK Investment Co., Ltd., PK Capital L.P., Pudong Science and Technology Investment (Cayman) Co. Ltd., and Unimax Asset Holdings Ltd. (collectively, "PDSTI") to object to the Plan and final approval of the Disclosure Statement was October 28, 2024.

[7]     *See Affidavit of Service* [Docket No. 269].

[8]     *See Affidavit of Publication of the Notice of (I) Conditional Approval of Disclosure Statement and (II) the Hearing to Consider (A) Final Approval of the Disclosure Statement as Containing Adequate Information, (B) Confirmation of the Joint Chapter 11 Plan of Liquidation for ICON Aircraft, Inc. and its Debtor Affiliates, and (C) Related Voting and Objection Deadlines* [Docket No. 275].

14.  On July 3, 2024, the Debtors filed the *Notice of Filing Plan Supplement* [Docket No. 340] (the "Initial Plan Supplement"), which included the: (a) identity and compensation of the Plan Administrator; (b) the Plan Administrator Agreement; (c) the identity and compensation of insiders employed by the Plan Administrator; and (d) a list of Retained Causes of Action.

15.  On October 11, 2024, the Debtors filed the *Third Amended Joint Chapter 11 Plan of Liquidation for Seaplane Debtor 1, Inc. (f/k/a Icon Aircraft, Inc.) and its Debtor Affiliates* [Docket No. 543] (the "Third Amended Plan").

16.  On October 28, 2024, the Debtors filed the *Fourth Amended Joint Chapter 11 Plan of Liquidation for Seaplane Debtor 1, Inc. (f/k/a Icon Aircraft, Inc.) and its Debtor Affiliates* [Docket No. 579].

17.  On October 28, 2024, the Debtors filed the *Notice of Filing of Amended Plan Supplement* [Docket No. 586] (the "Second Plan Supplement" and, together with the Initial Plan Supplement, the "Plan Supplement"), which included revised versions of: (a) identity and compensation of the Plan Administrator; (b) the Plan Administrator Agreement; and (c) the identity and compensation of insiders employed by the Plan Administrator.  The Second Plan Supplement also included a Litigation Trust Agreement.

18.  The deadline for all Holders of Claims entitled to vote on the Plan to cast their ballots was July 10, 2024 at 4:00 p.m. (prevailing Eastern Time).  The deadline for the U.S. Trustee and PDSTI to object to the Plan and final approval of the Disclosure Statement was October 28, 2024.  The Confirmation Hearing is scheduled for November 4, 2024 at 2:00 p.m. (prevailing Eastern Time).[9]

---

[9]  Pursuant to the Disclosure Statement Order, the Confirmation Hearing was originally scheduled for July 22, 2024. The Confirmation Hearing was adjourned to November 4, 2024 pursuant to the *Notice of Further Adjournment of Combined Hearing to Consider Confirmation of the Plan and Final Approval of the Related Disclosure Statement* [Docket No. 540].

### B.  Settlements with the Derivative Litigation Plaintiffs

19.     The Plan embodies a good-faith compromise and settlement of all claims or controversies held by the Debtors, the Derivative Litigation Plaintiffs and the DIP Secured Parties (but only in their capacity as DIP Secured Parties and not in any other capacity) that are settled by the Plan.  In furtherance of this goal, the Debtors negotiated and executed a settlement between the Debtors and the Derivative Litigation Plaintiffs.

20.     On June 4, 2021, the Derivative Litigation Plaintiffs filed a lawsuit in Delaware Chancery Court (the "Derivative Litigation"),[10] against certain other shareholders, directors, and the president of the Debtors (collectively, the "Derivative Litigation Defendants"), asserting direct and derivative claims regarding breach of fiduciary duties, unjust enrichment, fraudulent inducement, misappropriation of technology, and self-dealings (the "Derivative Litigation Claims").  The Debtors were named as a nominal defendant solely in connection with the derivative claims.

21.     On June 26, 2024, the Derivative Litigation Plaintiffs filed the *Motion of the Derivative Litigation Plaintiffs for Immediate Stay Relief and Authorization to Continue Prosecuting the Derivative Claims in Delaware Chancery Court* [Docket No. 320] (the "Standing Motion").  On July 5, 2024, the Debtors filed a preliminary objection to the Standing Motion [Docket No. 342] (the "Preliminary Standing Motion Objection").

22.     Over the course of these chapter 11 cases, the Debtors and the Derivative Litigation Plaintiffs participated in active negotiations with respect to the Derivative Litigation, including prosecution of the Derivative Litigation Claims.  Specifically, the parties exchanged information and materials, as well as participated in mediation.  In connection with the Derivative Litigation Claims, the Special Committee of the board of directors undertook a review of the Derivative Litigation Claims and potential defenses and counter claims the Debtors' estates may have had against the Derivative Litigation Plaintiffs.  As part of that review, the Debtors' advisors studied

---

[10]   *See Asset Mgmt. Co. Venture Fund, L.P., et al. v. Shanghai Pudong Science & Tech. Inv. Co., Ltd.*, Case No. 2021- 0475-JTL (Del. Ch. Ct. June 4, 2021).

related documents, correspondence by and among the parties, and other materials, as well as researched and analyzed the applicable law governing Derivative Litigation Claims.

23.     On August 16, 2024, the Court entered an *Order Approving Stipulation with Respect to the Resolution of Certain Disputes with the Derivative Litigation Plaintiffs and Kirk Hawkins, in his Individual Capacity* [Docket No. 440] outlining a schedule for discovery, supplemental briefing, and the hearing relating to, among other things, the Standing Motion, the Preliminary Standing Motion Objection, the Plan, and the prosecution of the Derivative Litigation Claims (collectively, the "Disputed Issues").

24.     On September 16, 2024, the Debtors and the Derivative Litigation Plaintiffs participated in a mediation before Chief Judge Ashely Chan of the United States Bankruptcy Court for the Eastern District of Pennsylvania regarding the Disputed Issues and continued settlement discussions post-mediation.  As a result of the significant efforts of Judge Chan as well as the Debtors, and the Derivative Litigation Plaintiffs (together, the "Parties"), the Parties reached an agreement regarding resolution of the Disputed Issues, which is reflected in the terms of the settlement (the "Settlement") reached between the Debtors and the Derivative Litigation Plaintiffs included in the *Debtors' Motion for Entry of an Order, Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019, Approving the Settlement Regarding Certain Disputes with the Derivative Litigation Plaintiffs* [Docket No. 542] (the "9019 Motion").  A hearing is set for November 4, 2024 at 2:00 p.m. (prevailing Eastern Time).

25.     The Settlement, as discussed in more detail in the 9019 Motion, resolves all disputes with the Derivative Litigation Plaintiffs and Mr. Hawkins, including with respect to the Plan, by agreement among the parties to a path with three potential scenarios, depending on whether certain conditions are met.  In sum, the Settlement resolves all disputes with the Derivative Litigation Plaintiffs and Hawkins, including with respect to the Plan, by agreement among the parties (a) if the assignment of the Derivative Litigation Claims is consummated, to a private sale and assignment by the Debtors of the Derivative Litigation Claims to the Derivative Litigation Plaintiffs, for the price of $2.5 million and the assumption of significant unsecured claims,

pursuant to section 363 of the Bankruptcy Code or (b) if the assignment of the Derivative Litigation Claims is not consummated, to support the confirmation of a mutually-agreed liquidating chapter 11 plan that includes the establishment of a litigation trust to pursue the Derivative Litigation Claims, under which the Derivative Litigation Plaintiffs can either: (i) sponsor such chapter 11 plan on terms satisfactory to the parties, including a contemplated cash payment to the estate, and obtain the right to appoint the majority of the litigation trust oversight board, or (i) not sponsor the chapter 11 plan and jointly choose an independent litigation trustee with the Debtors.

26.    The Debtors believe that entry into the Settlement reflects the sound exercise of their business judgment and is well within the lowest bounds of reasonableness, particularly considering the significant risks and costs to the estates of litigating the Disputed Issues to uncertain outcome.[11]

### C.  Plan Solicitation and Notification Process

27.    In compliance with the Bankruptcy Code, only Holders of Claims in Impaired Classes receiving or retaining property on account of such Claims were entitled to vote on the Plan.[12]  Holders of Claims and Interests were not entitled to vote if their rights are Unimpaired or if their rights are Impaired and they are deemed to reject the Plan.[13]  The following Classes of Claims and Interests were *not* entitled to vote on the Plan, and the Debtors did not solicit votes from Holders of such Claims and Interests:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

---

[11]    *See Declaration of Thomas G. Fitzgerald in Support of Debtors' Motion for Entry of an Order, Pursuant to Section 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019, Approving the Settlement Regarding Certain Disputes with the Derivative Litigation Plaintiffs* [Docket No. 542-7], ¶¶ 9–14.

[12]    *See* 11 U.S.C. § 1126.

[13]    *See* Plan, Art. III.A.

| 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 4 | Convenience Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 6 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 9 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

28.    The Debtors solicited votes on the Plan only from Holders of Claims in Impaired Classes receiving or retaining property on account of such Claims.  The voting results, as reflected in the Supplemental Voting Report, are summarized as follows:

| Total Ballots Received | | | |
| --- | --- | --- | --- |
| Accept | | Reject | |
| Number (% of Number) | Amount (% of Amount) | Number (% of Number) | Amount (% of Amount) |
| Class 3 – Noteholder Claims | | | |
| 0 (0%) | 0 (0.00%) | 3 (100.0%) | $137,383,374.93 (100.0%) |
| Class 5 – General Unsecured Claims[14] | | | |
| 32 (94.1%) | $5,598,184.72 (99.99996%) | 2 (5.9%) | $2.00 (0.00004%) |

29.    As set forth above and in the Voting Reports, Holders of Claims in Classes 3 and 5 were entitled to vote to accept or reject the Plan (collectively, the "Voting Classes").  Class 5 voted to accept the Plan.[15]  As a direct result of the Debtors' efforts to engage their key constituencies, the Plan enjoys the support of the Debtors' key stakeholders, including sufficient Holders in the Impaired Classes entitled to vote upon the Plan.[16]

---

[14]    The Initial Voting Report refers to solicitation of Class 4 (General Unsecured Claims).  The Plan now contemplates an additional Class, Class 4 (Convenience Claims), and therefore the General Unsecured Claims Class is now Class 5.  There were no other changes to solicitation outside the renumbering of this Class 5.

[15]    *See* Initial Voting Report ¶¶ 13–14; Supplemental Voting Report ¶ 4.

[16]    *Id.*

30.     As set forth in the Voting Reports, Holders of Claims and Interests in Classes 1–9 were also entitled to opt-out of the definition of "Releasing Parties," as set forth in the Plan.  If a Holder of a Claim or Interest opted to execute the Release Opt-Out, delivered either in conjunction with the Solicitation Packages or the Notice of Non-Voting Status Packages, as applicable, such Release Opt-Out was returned to the Notice and Claims Agent, who reflected this decision in the Initial Voting Report and Supplemental Voting Report.[17]  Notice of the Release Opt-Out and the opportunity to opt out of the release was adequate as to each of the Holders of Claims and Interests.

31.     In total, the Notice and Claims Agent received twenty-seven (27) Release Opt-Out forms from Holders of Claims and Interests.[18]  Based on these results, along with the manner of solicitation and distribution described herein, the Debtors submit that the notice provided to all Classes adequately satisfied the requirements of the Bankruptcy Code.

### D.  Confirmation Objections

32.     On October 28, 2024, the U.S. Trustee filed the UST Objection.[19]  The U.S. Trustees primarily objects to the Debtors' Third-Party Release (as defined below) as set forth in Article IX.B of the Plan, arguing that these are prohibited non-consensual releases.  The U.S. Trustee further contends that the Plan discharges the liquidating Debtors in violation of the Bankruptcy Code.

33.     On October 28, 2024, PDSTI filed the PDSTI Objection.[20]  PDSTI alleges that the (a) Debtors failed to solicit approval of the Third Amended Plan or provide justifications for the changes contained in the Third Amended Plan, (b) the classification of claims is improper, (c) the Plan unfairly discriminates in favor of certain Holders of Claims, and (d) the Plan violates the

---

[17]   Initial Voting Report ¶ 16; Supplemental Voting Report ¶ 6.

[18]   Supplemental Voting Report, Ex. B.

[19]   *See United States Trustee's Objection to the Third Amended Joint Chapter 11 Plan of Liquidation for Seaplane Debtor 1, Inc. (F/K/A/ Icon Aircraft, Inc.) and Its Debtor Affiliates* [Docket No. 581] (the "UST Objection").

[20]   *See PDSTI'S Omnibus Objection to (I) Debtors' Motion for Entry of an Order, Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019, Approving the Settlement Regarding Certain Disputes with the Derivative Litigation Plaintiffs and (II) Confirmation of the Debtors Third Amended Joint Chapter 11 Plan of Liquidation* [Docket No. 584] (the "PDSTI Objection").

absolute priority rule.  The PDSTI Objection also objects to the Debtors' 9019 Motion alleging that the Settlement is not in the estates' best interest and that PDSTI offered a superior proposal.

34.    On October 30, 2024, Wells Fargo Bank, N.A. ("Wells Fargo") filed the WF Objection.[21]  Wells Fargo seeks to preserve its rights pending satisfaction of its secured claim.

35.    On October 31, 2024, SGIA filed the SGIA Objection.  The Debtors are reviewing the objection.

36.    For the reasons set forth in Part III herein, the Court should overrule the Objections in their entirety, approve the Plan, and enter the Proposed Confirmation Order.

**The Disclosure Statement Should Be Approved on a Final Basis**

37.    Pursuant to section 1125 of the Bankruptcy Code, the proponent of a proposed chapter 11 plan must provide "adequate information" regarding that plan to holders of impaired claims and interests entitled to vote on the plan.[22]  Specifically, section 1125(a)(1) of the Bankruptcy Code states, in relevant part, as follows:

> "[A]dequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan[.][23]

38.    The primary purpose of a disclosure statement is to provide all material information that creditors and interest holders affected by a proposed plan need to make an informed decision

---

[21]    *See Limited Objection of Wells Fargo Bank, N.A. to the Fourth Amended Joint Chapter 11 Plan of Liquidation for Seaplane Debtor 1, Inc. (f/k/a Icon Aircraft, Inc.) and Its Debtor Affiliates* [Docket No. 592] (the "WF Objection").

[22]    11 U.S.C. § 1125.

[23]    11 U.S.C. § 1125(a)(1).

regarding whether or not to vote for the plan.[24]  Congress intended that such informed judgments

would be needed to both negotiate the terms of, and vote on, a plan of reorganization.[25]

39.     "Adequate information" is a flexible standard, based on the facts and circumstances

of each case.[26]  Courts in the Third Circuit and elsewhere acknowledge that determining what

constitutes "adequate information" for the purpose of satisfying section 1125 of the Bankruptcy

Code resides within the broad discretion of the court.[27]

40.     In making a determination as to whether a disclosure statement contains adequate

information as required by section 1125 of the Bankruptcy Code, courts typically look for

disclosures related to topics such as: (a) the events that led to the filing of a bankruptcy petition;

(b) the relationship of the debtor with its affiliates; (c) a description of the available assets and

their value; (d) the company's anticipated future; (e) the source of information stated in the

---

[24]   *See, e.g.*, *Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 100 (3d Cir. 1988) ("[Section] 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote."); *In re Monnier Bros.*, 755 F.2d 1336, 1342 (8th Cir. 1985) ("The primary purpose of a disclosure statement is to give the creditors the information they need to decide whether to accept the plan."); *In re Phoenix Petroleum, Co.*, 278 B.R. 385, 392 (Bankr. E.D. Pa. 2001) ("[T]he general purpose of the disclosure statement is to provide 'adequate information' to enable 'impaired' classes of creditors and interest holders to make an informed judgment about the proposed plan and determine whether to vote in favor of or against that plan."); *In re Unichem Corp.*, 72 B.R. 95, 97 (Bankr. N.D. Ill. 1987) ("The primary purpose of a disclosure statement is to provide all material information which creditors and equity security holders affected by the plan need in order to make an intelligent decision whether to vote for or against the plan").

[25]   *Century Glove*, 860 F.2d at 100.

[26]   11 U.S.C. § 1125(a)(1) ("'[A]dequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . "); *see also Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and circumstances of each case."); *First Am. Bank of N.Y. v. Century Glove, Inc.*, 81 B.R. 274, 279 (D. Del. 1988) (noting that adequacy of disclosure for a particular debtor will be determined based on how much information is available from outside sources); S. Rep. No. 95-989, at 121 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5907 ("The information required will necessarily be governed by the circumstances of the case.").

[27]   *See, e.g.*, *In re River Village Assoc.*, 181 B.R. 795, 804 (E.D. Pa. 1995) ("[T]he Bankruptcy Court is thus given substantial discretion in considering the adequacy of a disclosure statement."); *Tex. Extrusion Corp. v. Lockheed Corp.* (*In re Tex. Extrusion Corp.*), 844 F.2d 1142, 1157 (5th Cir. 1988) ("The determination of what is adequate information is subjective and made on a case by case basis. This determination is largely within the discretion of the bankruptcy court."); *Phoenix Petroleum Co.*, 278 B.R. at 393 (same); *In re PC Liquidation Corp.*, 383 B.R. 856, 865 (E.D.N.Y. 2008) ("The standard for disclosure is, thus, flexible and what constitutes 'adequate information' in any particular situation is determined on a case-by-case basis, with the determination being largely within the discretion of the bankruptcy court."); *In re Lisanti Foods, Inc.*, 329 B.R. 491, 507 (D.N.J. 2005), *aff'd*, 241 F. App'x 1 (3d Cir. 2007). ("The information required will necessarily be governed by the circumstances of the case.").

disclosure statement; (f) the debtor's condition while in chapter 11; (g) claims asserted against the debtor; (h) the estimated return to creditors under a chapter 7 liquidation; (i) the future management of the debtor; (j) the chapter 11 plan or a summary thereof; (k) financial information, valuations, and projections relevant to a creditor's decision to accept or reject the chapter 11 plan; (l) information relevant to the risks posed to creditors under the plan; (m) the actual or projected realizable value from recovery of preferential or otherwise avoidable transfers; (n) litigation likely to arise in a non-bankruptcy context; and (o) tax attributes of the debtor.[28]  Disclosure regarding all topics is not necessary in every case.[29]

41.    The Disclosure Statement provides "adequate information" to allow Holders of Claims in the Voting Classes to make an informed decision about whether to vote to accept or reject the Plan.  Specifically, the Disclosure Statement contains a number of categories of information that courts consider "adequate information," including, among other things: (a) the Plan, including a summary, the procedures for voting on the Plan and projected recoveries thereunder; (b) the statutory requirements for confirming the Plan; (c) the Debtors' organizational structure, business operations, and financial obligations; (d) the events leading to the filing of the Debtors' Chapter 11 Cases; (e) the major events during these Chapter 11 Cases, including significant pleadings filed in the Debtors' Chapter 11 Cases and certain relief granted by the Court; (f) the classification and treatment of Claims and Interests under the Plan, including the identification of the Holders of Claims entitled to vote on the Plan; (g) the means for implementation of the Plan, the provisions governing distributions to certain Holders of Claims pursuant to the Plan, the procedures for resolving Disputed Claims and other significant aspects of the Plan; (h) certain risk factors that

---

[28]    *See, e.g.*, *In re U.S. Brass Corp.*, 194 B.R. 420, 424–25 (Bankr. E.D. Tex. 1996) (listing factors courts have considered in determining the adequacy of information provided in a disclosure statement); *In re Scioto Valley Mortg. Co.*, 88 B.R. 168, 170–71 (Bankr. S.D. Ohio 1988) (same); *In re Metrocraft Pub. Serv., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984) (same).

[29]    *See U.S. Brass Corp.*, 194 B.R. at 424; *see also Phoenix Petroleum Co.*, 278 B.R. at 393 ("[C]ertain categories of information which may be necessary in one case may be omitted in another; no one list of categories will apply in every case.").

Holders of Claims should consider before voting to accept or reject the Plan (Section XIV); and (i) certain United States federal income tax consequences of the Plan.[30]

42.     Accordingly, the Debtors respectfully submit that the Disclosure Statement contains "adequate information" and satisfies section 1125 of the Bankruptcy Code, and the Disclosure Statement should be approved on a final basis.

### The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code

43.     To confirm the Plan, the Court must find that the Debtors have satisfied the provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.[31]  As set forth herein, the Plan fully complies with all relevant sections of the Bankruptcy Code—including sections 1122, 1123, 1125, 1126, and 1129—as well as the Bankruptcy Rules and applicable non-bankruptcy law.

### A.      The Plan Complies with Section 1129(a)(1) of the Bankruptcy Code

44.     Under section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."[32]  The legislative history of section 1129(a)(1) of the Bankruptcy Code explains that this provision also encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the contents of a plan, respectively.[33]  As explained below, the Plan complies with the requirements of sections 1122, 1123, and 1129 of the Bankruptcy Code, as well as other applicable provisions.

### 1.      The Plan Properly Classifies Creditor's Claims Under Section 1122 of the Bankruptcy Code

45.     The classification requirement of section 1122(a) of the Bankruptcy Code provides, in pertinent part, as follows:

---

[30]   *See* FitzGerald Dec. ¶ 24.

[31]   *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120, n.15 (D. Del. 2006); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 616 n.23 (Bankr. D. Del. 2001).

[32]   11 U.S.C. § 1129(a)(1).

[33]   S. Rep. No. 95-989, at 126, reprinted in 1978 U.S.C. C.A.N. 5787, 5912 (1978); H.R. Rep. No. 95-595, at 412, reprinted in 1978 U.S.C. C.A.N. 5963, 6368 (1977); *In re S&W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [section 1129(a)(1)] reveals that although its scope is certainly

> Except as provided in subsection (b) of this section, a plan may place
> a claim or an interest in a particular class only if such claim or
> interest is substantially similar to other claims or interests of such
> class.[34]

46.    Although section 1122(a) of the Bankruptcy Code requires that all claims or

interests in a class be substantially similar to all other claims or interests in the class, it "does not

expressly require that all substantially similar claims or interests be placed in the same class."[35]

Courts in this jurisdiction, as well as others, frequently recognize the significant flexibility that

plan proponents have to place similar claims in different classes, provided there is a legitimate

business justification to do so.[36]   Grounds justifying separate classification, including separate

classification of unsecured claims, include: (a) where members of a class possess different legal

rights; and (b) where there is a good business reason for separate classification.[37]

---

broad, the provisions it was most directly aimed at were [s]ections 1122 and 1123."); *see also In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008).

[34]    11 U.S.C. § 1122(a).

[35]    *In re Hyatt*, 509 B.R. 707, 714–15 (Bankr. D.N.M. 2014) (citing *In re City of Colorado Springs Spring Creek Gen. Improvement Dist.,* 187 B.R. 683, 687 (Bankr. D. Colo. 1995)) (observing that "[t]here is no requirement [in subsection (a)] that all substantially similar claims be placed in the same class . . . "); *see also Armstrong World Indus.*, 348 B.R. at 159.

[36]    *See, e.g.*, *In re W.R. Grace & Co.*, 729 F.3d 311, 326 (3d Cir. 2013) (citing *In re AOV Indus., Inc.*, 792 F.2d 1140, 1150 (D.C. Cir. 1986)) (concluding that when analyzing whether claims are "substantially similar," the proper focus is on "the legal character of the claim as it relates to the assets of the debtor"); *Armstrong World Indus.*, 348 B.R. at 159 ("A classification structure satisfies section 1122 of the Bankruptcy Code when a reasonable basis exists for the structure, and the claims or interests within each particular class are substantially similar.") (citations omitted); *see also In re Barakat*, 99 F.3d 1520, 1526 (9th Cir. 1996) (separate classification of similar claims requires a "legitimate business or economic justification"); *Boston Post Road Ltd. P'ship v. F.D.I.C. (In re Boston Post Road Ltd. P'ship)*, 21 F.3d 477, 483 (2nd Cir. 1994) ("the debtor must adduce credible proof of a legitimate reason for separate classification of similar claims."); *In re Adelphia Communications Corp.*, 368 B.R. 140, 246–247 (Bankr. S.D.N.Y. 2007) ("Although section 1122(a), by its terms, doesn't require that all similarly-situated claims be classified together, caselaw has made clear that separate classification of substantially similar unsecured claims is permissible only when there is a reasonable basis for doing so or when the decision to separately classify 'does not offend one's sensibility of due process and fair play.'") (quoting *In re One Times Square Assocs. Ltd. P'ship*, 159 B.R. 695, 703 (Bankr. S.D.N.Y. 1993)).

[37]    *See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158–59 (3d Cir. 1993) (holding that, as long as each class represents a voting interest that is "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed," the classification is proper); *In re Mallinckrodt PLC*, 639 B.R. 837, 858 (Bankr. D. Del. 2022) (permitting the separate classification of unsecured noteholders where the two groups had divergent debt structuring rights); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1061 (3d Cir. 1987) (approving classification of general unsecured creditors into different classes: doctors' indemnification claims, medical malpractice claims, employee benefit claims and trade claims); *In re ECE Wind-down LLC*, No. 22-10320 (JTD) (Dec. 21, 2022) [Docket No. 520] (approving plan with separate classification

47.    The Plan's classification of Claims and Interests satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places the Claims and Interests into nine (9) separate Classes, with Claims and Interests in each Class differing from the Claims and Interests in each other Class in a legal or factual manner, or based on other relevant criteria.[38]  Specifically, the Plan provides for the separate classification of Claims and Interests into the following Classes:

a.    <u>Class 1</u>: Other Secured Claims;
b.    <u>Class 2</u>: Other Priority Claims;
c.    <u>Class 3</u>: Noteholder Claims;
d.    <u>Class 4</u>: Convenience Claims;
e.    <u>Class 5</u>: General Unsecured Claims;
f.    <u>Class 6</u>: Intercompany Claims
g.    <u>Class 7</u>: Section 510(b) Claims
h.    <u>Class 8</u>: Interests
i.    <u>Class 9</u>: Intercompany Interests

48.    Claims and Interests assigned to each particular Class described above are substantially similar to the other Claims and Interests in such Class.[39]  In addition, valid business, legal, and factual reasons justify the separate classification of the particular Claims or Interests into the Classes set forth in the Plan, and the classification scheme was not implemented for any improper purpose and does not unfairly discriminate between or among the Holders of the Claims or Interests.[40]  Specifically, the Plan separately classifies the Claims because each Holder of such Claim may hold (or may have held at the time the Plan was filed) rights in the Estate that were legally dissimilar to the Claims in other Classes.[41]

49.    For example, debt and equity are separately classified, and secured debt is separately classified from unsecured debt.  Other aspects of the classification scheme reasonably recognize the different legal or factual nature of the Claims and Interests.  Finally, each Claim or

---

of general unsecured claims); *In re Masten Space Systems, Inc.,* No. 22-10657 (BLS) (Nov. 9, 2022) [Docket No. 226] (same); *In re Insys Therapeutics, Inc., et al.*, No. 19-11292 (KG) (Bankr. D. Del. Dec. 4, 2019) [Docket No. 1115] (same).

[38]    *See* Plan, Art. III.

[39]    *See* FitzGerald Declaration ¶ 26.

[40]    *See id.*

[41]    *See id.*

Interest in each particular Class is substantially similar to every other Claim or Interest in that Class.  Accordingly, the Claims or Interests assigned to each particular Class described above are substantially similar to the other Claims or Interests in each such Class and the distinctions among Classes are based on valid business, factual, and/or legal distinctions.  The Debtors thus submit that the Plan fully complies with and satisfies section 1122 of the Bankruptcy Code.

**2.      The Plan Satisfies the Mandatory Plan Requirements of Section 1123(a) of the Bankruptcy Code**

50.      Section 1123(a) of the Bankruptcy Code sets forth seven criteria that every chapter 11 plan must satisfy.  The Plan satisfies each of these requirements, and no party has asserted otherwise.

**a.      Designation of Classes of Claims and Interests (Section 1123(a)(1))**

51.      For the reasons set forth above, Article III of the Plan properly designates classes of Claim and Interests and thus satisfies the requirements of section 1122 of the Bankruptcy Code.[42]

**b.      Specification of Unimpaired Classes (Section 1123(a)(2))**

52.      Section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any class of claims or interests that is not impaired under the plan."[43]  The Plan meets this requirement by identifying each Class in Article III that is Unimpaired.[44]

---

[42]   *Id.* ¶ 27(a).

[43]   11 U.S.C. § 1123(a)(2).

[44]   *See* Plan, § III.A; FitzGerald Decl. ¶ 27(b).

### c.    Treatment of Impaired Classes (Section 1123(a)(3))

53.    Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan."[45]  The Plan meets this requirement by setting forth the treatment of each Class in Article III that is Impaired.[46]

### d.    Equal Treatment Within Classes (Section 1123(a)(4))

54.    Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."[47]  The Plan meets this requirement because holders of Allowed Claims or Interests will receive the same rights and treatment as other holders of Allowed Claims or Interests within such holders' respective Class.[48]

### e.    Means for Implementation (Section 1123(a)(5))

55.    Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation.[49]  The Plan satisfies this requirement because Article IV of the Plan, as well as other provisions thereof, provide for the means by which the Plan will be implemented.[50]

56.    Among other things, Article IV of the Plan provides for: (a) the wind down and dissolution of the Debtors; (b) the appointment of a Plan Administrator; (c) the appointment of a Litigation Trustee to the extent the litigation trust path of the Settlement is pursued; (d) the sources of consideration for Plan distributions, including the funding of the Wind Down Budget; (e) the treatment of Executory Contracts; (f) the settlement and discharge of Claims and Interests; (g) the preservation and vesting in the Litigation Trust of certain Retained Causes of Action, including

---

[45]    11 U.S.C. § 1123(a)(3).

[46]    *See* Plan, § III.A; FitzGerald Decl. ¶ 27(b).

[47]    11 U.S.C. § 1123(a)(4).

[48]    *See* FitzGerald Decl. ¶ 27(b).

[49]    11 U.S.C. § 1123(a)(5).

[50]    *See* FitzGerald Decl. ¶ 27(c).

the Derivative Litigation Claims, to the extent the litigation trust path of the Settlement is pursued; and (h) the taking of all necessary and appropriate actions by the Debtors to effectuate the transactions under and in connection with the Plan.[51]  Accordingly, the Plan complies with section 1123(a)(5) of the Bankruptcy Code, and no party has asserted otherwise.

### f.    Issuance of Non-Voting Securities (Section 1123(a)(6))

57.    Section 1123(a)(6) of the Bankruptcy Code requires that a debtor's corporate constituent documents prohibit the issuance of nonvoting equity securities.[52]  The Plan is a liquidating plan pursuant to which the Debtors' assets will be liquidated and distributed by the Debtors, Plan Administrator, or the Litigation Trustee, as applicable, in accordance with the terms of the Plan and the Plan Administrator Agreement and the Litigation Trust Agreement, as applicable.  As such, the Plan does not provide for the issuance of non-voting equity securities, the Plan satisfies section 1123(a)(6) of the Bankruptcy Code, and no party has asserted otherwise.[53]

### g.    Directors and Officers (Section 1123(a)(7))

58.    Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selection of any director, officer, or trustee, or any other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy."[54] In accordance with Article IV.I of the Plan, on the Effective Date and following satisfaction of the Debtors' distribution and funding requirements set forth in the Plan, the Debtors shall have no further duties or responsibilities in connection with implementation of this Plan, and the directors and officers of the Debtors shall be deemed to have resigned and the employees of the Debtors terminated.  From and after the Effective Date, the Plan Administrator shall be authorized to act on behalf of the Estates, and to the extent the litigation trust path of the Settlement is pursued, the Litigation Trustee shall be authorized to act on behalf of the Litigation Trust.

---

[51]    *See* Plan, Art. IV.

[52]    11 U.S.C. § 1123(a)(6).

[53]    FitzGerald Decl. ¶ 27(d).

[54]    11 U.S.C. § 1123(a)(7).

59.     The identity of the Plan Administrator, along with the nature of any compensation for such person or persons, has been in the Plan Supplement.  The identity and compensation of the Litigation Trustee (if any) has been or will be disclosed in accordance with the terms of the Proposed Confirmation Order and Plan.  The appointment of the Litigation Trustee (if any) and the Plan Administrator, as applicable, is consistent with the interests of creditors and with public policy.[55]  Accordingly, the Plan satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code, and no party has asserted otherwise.

### 3.     The Plan Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code

60.     Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.  Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may: (a) impair or leave unimpaired any class of claims or interests; (b) modify or leave unaffected the rights of holders of secured or unsecured claims; (c) provide for the settlement or adjustment of claims against or interests in a debtor or its estate or the retention and enforcement by a debtor, trustee, or other representative of claims or interests; (d) provide for the assumption or rejection of executory contracts and unexpired leases; (e) provide for the sale of all or substantially all of the property of a debtor's estate, and the distribution of the proceeds of such sale among holders of claims or interests; or (f) "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."[56]

### a.     Impairment and Unimpairment of Classes (Section 1123(b)(1))

61.     The Plan satisfies the requirements of section 1123(b)(1), and no party has asserted otherwise.  Article III leaves each Class of Claims and Interests Impaired or Unimpaired, respectively.[57]

---

[55]    *See* FitzGerald Decl. ¶ 27(e); Plan, Art. IV.I.

[56]    *See* U.S.C. § 1123(b)(1)–(6).

[57]    Plan, Art. III.A; FitzGerald Decl. ¶ 28(a).

b.    **Treatment of Executory Contracts and Unexpired Leases (Section 1123(b)(2))**

62.    The Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.  Article V of the Plan provides for the automatic rejection of the Debtors' Executory Contracts and Unexpired Leases (other than the D&O Policies and as otherwise provided in the Plan) not previously rejected, assumed, or assumed and assigned during these Chapter 11 Cases under section 365 of the Bankruptcy Code, nor scheduled to be assumed under the Plan, the Plan Supplement, or the Sale Orders.  The Debtors determined, in their sound business judgment, that all of the Executory Contracts and Unexpired Leases other than the D&O Policies should be automatically rejected upon the Effective Date as they failed to provide any benefit to the Estate or to parties in interest as part of the liquidation.[58]  Accordingly, the Plan satisfies the requirements of Bankruptcy Code section 1123(b)(2), and no party has asserted otherwise.[59]

c.    **The Plan Settlement of Claims and Controversies Is Fair and Equitable and Should be Approved**

63.    The Plan provides for the good faith compromise and settlement of numerous Claims, Causes of Action, and controversies held by the Debtors, the Derivative Litigation Plaintiffs, and the DIP Secured Parties, all of which are designed to achieve a beneficial and efficient resolution of the Chapter 11 Cases for all parties in interest.  In addition, the Proposed Confirmation Order incorporates the Settlement with the Derivative Litigation Plaintiffs.  Accordingly, except as otherwise set forth in the Plan or herein, and in consideration for the distribution and other benefits provided under the Plan, including various release, exculpation, and injunction provisions, the Plan shall constitute a good-faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan.  Each component of the Plan is an integral, integrated, and inextricably linked part of the settlement contemplated thereunder, is fair equitable,

---

[58]    *See* FitzGerald Decl. ¶ 28(b).

[59]    *Id.*

and reasonable, and is in the best interest of the Debtors, their Estates, creditors, and all parties in interest.[60]

64.     The compromises set forth in the Plan are critical to bringing closure to these and other matters addressed in the Plan and to providing timely distributions to creditors on account of their Claims.   They were negotiated in good faith and at arms'-length following extensive negotiations and mediations with the relevant creditor parties.   Accordingly, such compromises and settlements should be approved through the Proposed Confirmation Order.

### d.     The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b) of the Bankruptcy Code

65.     The Plan also includes certain releases, an exculpation provision, and an injunction provision.   These discretionary provisions are proper because, among other things, they comply with the Bankruptcy Code and are in the best interests of the Debtors' Estates.[61]

### i.     The Debtors Release Is Appropriate

66.     Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[62]   Further, a debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[63]   Article IX.A of the Plan provides for releases by the Debtors and their Estates, as of the Effective Date, of, among things, certain Claims, rights, and causes of

---

[60]   *Id.* ¶¶ 5, 28(c).

[61]   *Id.* ¶ 28(c).

[62]   *See In re Coram Healthcare Corp.*, 315 B.R. 321, 334–35 (Bankr. D. Del. 2004) (holding that standards for approval of settlement under section 1123 of the Bankruptcy Code are generally the same as those under Bankruptcy Rule 9019).   Generally, courts in the Third Circuit approve a settlement by the debtor if the settlement "exceed[s] the lowest point in the range of reasonableness."   *In re Exaeris, Inc.*, 380 B.R. 741, 746– 47 (Bankr. D. Del. 2008) (citation omitted); *see also Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983) (examining whether settlement "fall[s] below the lowest point in the range of reasonableness") (alteration in original) (citation omitted); *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (stating that settlement must be within reasonable range of litigation possibilities).

[63]   *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010); *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'") (internal citations omitted).

action that the Debtors or their Estates may have against the Released Parties (the "Debtors Release").[64]

67.     Courts in this jurisdiction generally analyze five factors when determining the propriety of a debtor release, commonly known as the *Zenith* or *Master Mortgage* factors.[65]  The analysis includes an inquiry into whether there is: (1) identity of interest between the debtor and non-debtor; (2) substantial contribution to the plan by the non-debtor; (3) the necessity of the release to the reorganization; (4) overwhelming acceptance of the plan and release by creditors and interest holders; and (5) payment of all or substantially all of the claims of the creditors and interest holders.[66]  These factors are "neither exclusive nor conjunctive requirements" but rather serve as guidance to courts in determining fairness of a debtor's releases.[67]

68.     The Debtors Release meets the applicable standard because it is fair, reasonable, and in the best interests of the Debtors' Estates.  As described in the FitzGerald Declaration,[68] and as an analysis of the *Zenith* factors demonstrates, the Debtors Release embodied in Article IX.A of the Plan should be approved.  The Debtors Release is consistent with *Zenith* for the following reasons:

> ***First***, an identity of interest exists between the Debtors and the parties to be released.  Each of the Released Parties, as a stakeholder and critical participant in the Plan process, shares a common goal with the Debtors in seeing the Plan succeed and would have been unlikely to participate in the negotiations and compromises that led to the ultimate formation of the

---

[64]  "Released Party" means each of, and in each case solely in its capacity as such: (a) the Debtors; (b) the DIP Secured Parties but solely in their capacity as DIP Secured Parties and in no other capacity, including in their capacity as counterparties to the IP Agreement; (c) the Derivative Litigation Plaintiffs; and (d) each Related Party of the Debtors or the Derivative Litigation Plaintiffs, including any professional retained by the Debtors, DIP Secured Parties, or the Derivative Litigation Plaintiffs, in connection with these Chapter 11 Cases. Notwithstanding the foregoing, the definition of "Released Party" shall not include any Non-Released Parties. However, Kirk Hawkins and PDSTI, including its current and former directors, officers, and employees, shall not be a Released Party.  *See* Plan, Art. I.A.103.

[65]  *See In re Indianapolis Downs, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013) (citing *In re Zenith Elecs. Corp*., 241 B.R. 92, 105 (Bankr. D. Del. 1999)); *In re Master Mortg. Inv. Fund, Inc*., 168 B.R. 930, 937 (Bankr. W.D. Mo. 1994).

[66]  *See In re Washington Mut., Inc*., 442 B.R. 314, 346 (Bankr. D. Del. 2011) (citing *Zenith*, 241 B.R. at 110 and *Master Mortg.*, 168 B.R. at 937).

[67]  *Id*. (citing *Master Mortg*., 168 B.R. at 935).

[68]  *See* FitzGerald Decl. ¶ 28(c)(i)–(iv).

Plan without the Debtors Release.  Like the Debtors, these parties seek to confirm the Plan and implement the liquidation contemplated thereunder.[69]  Moreover, with respect to certain of the releases—*e.g.*, those releasing the Debtors' current and former directors and officers—there is a clear identity of interest supporting the release because the Debtors owe certain indemnification obligations to such parties pursuant to the Debtors' governance documents and the Plan, which would otherwise increase the claims pool and delay distributions to Holders of Allowed Claims to the detriment of all parties in interest.[70]  Thus, a lawsuit commenced by the Debtors (or derivatively on behalf of the Debtors) against certain individuals would effectively be a lawsuit against the Debtors itself.

***Second***, the substantial contributions are clear.  The Released Parties played an integral role in the formation of the Plan and have expended significant time and resources analyzing and negotiating the issues present in these Chapter 11 Cases.  As Delaware bankruptcy courts have recognized, a wide variety of acts may illustrate a substantial contribution to a debtor's reorganization.[71]  Moreover, the Released Parties have expended time and resources analyzing and negotiating the issues raised by the Derivative Litigation Plaintiffs and negotiating the value-maximizing resolutions set forth in the 9019 Motion and the Plan.[72]  Here, the value contributed by the Released Parties is substantial and without the contributions of each of the Released Parties, it is unlikely the 9019 Motion, the Plan, or the transactions contemplated therein would have been possible.

- With respect to the Derivative Litigation Plaintiffs (excluding Kirk Hawkins), this Released Party provided substantial consideration to these Chapter 11 Cases and the resolutions set forth in the Proposed Confirmation Order, including, among other things: (1) potentially providing cash through the purchase of the Derivative Litigation Claims or sponsorship of the Plan; and (2) agreeing to vote for and otherwise support the Plan.

- The DIP Secured Parties contributed a $9 million term loan facility, in addition to prepetition facilities, to fund these Chapter 11 Cases.  The DIP Secured Parties' contributions were instrumental to the success of these Chapter 11 Cases and provided a path for the Debtors to achieve a successful restructuring.

---

[69]   *See In re Abeinsa Holding, Inc.,* 562 B.R. 265, 284 (Bankr. D. Del. 2016) (finding that "there is an identity of interest between the debtors and the released parties arising out the shared common goal of confirming and implementing the Plan."); *see also Zenith*, 241 B.R. at 110 (concluding that certain releasees who "were instrumental in formulating the Plan" shared an identity of interest with the debtor "in seeing that the Plan succeed and the company reorganize").

[70]   *See Indianapolis Downs*, 486 B.R. at 303 ("An identity of interest exists when, among other things, the debtor has a duty to indemnify the nondebtor receiving the release.").

[71]   *See id.* at 304 (finding that the non-debtor party had substantially contributed by performing services for the debtors post-petition without receiving compensation); *Wash. Mut.*, 442 B.R. at 347 (finding substantial contribution required the contribution of "cash or anything else of a tangible value to the [plan of reorganization] or to creditors"); *Zenith*, 241 B.R. at 111 (finding that prepetition contribution of work in negotiating a plan constituted adequate consideration for debtor's release).

[72]   *See* FitzGerald Decl. ¶ 28(c)(i)–(iv).

- With respect to the Debtors' current and former officers, these Released Parties engaged in the performance of roles related to the Debtors' chapter 11 process beyond their compensated duties, including, among other things: (1) assisting Debtors professionals in the preparation of sale materials pre- and post-petition; (2) responding to due diligence inquiries at all hours, day, night, or weekend; (3) assisting in the design and implementation of the liquidation strategy; (4) assisting in the implementation of a successful bankruptcy sale of the Debtors' assets; (5) assisting in the maximization of value in the bankruptcy sale through support in negotiations; (6) active participation in negotiations with creditors; (7) active engagement in numerous meetings, negotiations, and implementations in the chapter 11 case that are outside of stated officer role or duties in an effort to minimize professional cost and maximize value for the estate; and (8) forbearance from new and additional professional and financial opportunities through the completion of the Debtors' ongoing Chapter 11 Cases.

- With respect to the Debtors' current and former directors, these Released Parties engaged in the performance of certain non-compensated duties, in addition to preexisting compensated duties, including, among other things: (1) weekly, and sometimes bi-weekly board meetings with no commiserate increase in pay despite the substantial additional time involved; (2) active engagement in and approval of all aspects of the chapter 11 process, including the filing for bankruptcy, the sale of the Debtors' assets, the approval of the Debtors' Disclosure Statement and Plan, and the Settlement; and (3) consideration cooperation with the special committee's investigation into potential Causes of Action that could provide additional recoveries to unsecured creditors.  In addition, Mr. FitzGerald undertook substantial additional responsibility through his work on the Special Committee in its role in investigating potential causes of action.[73]

*Third*, the Debtors Release is essential to the Debtors' Plan of liquidation because it constitutes an integral term of the Plan.  The Debtors Release under the Plan incorporates the release agreed to in the Settlement and releases the Debtors from, among other things, any and all claims and Causes of Action, whether known or unknown, including any claims and Causes of Action that the Debtors or their estates would have been legally entitled to assert in their own right including any claims or Causes of Action that could be asserted derivatively or on behalf of the Debtors (or their estates), that such Entity would have been legally entitled to assert (whether individually or collectively), based on, or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof, or otherwise), any securities issued by the Debtors and the ownership thereof, the Debtors' in- or out-of-court restructuring efforts, any avoidance actions, these Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Sale Motion, the Plan, the Plan Supplement, or any other transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Sale, the Plan, the Plan Supplement, these Chapter 11 Cases, the filing of these Chapter 11 Cases, the pursuit of the Confirmation Order, the

---

[73] *See* FitzGerald Decl. ¶¶ 20–22.

pursuit of the Sale Order, the pursuit of Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence or omission taking place on or before the Effective Date, excepting the Retained Causes of Action and any Claims or Causes of Action related to any act or omission determined in a Final Order by a court of competent jurisdiction to have constituted actual intentional fraud, willful misconduct, or gross negligence.

Absent the Debtors Release, it is highly unlikely the Released Parties would have agreed to support the Plan and it is possible that the claims pool would have been substantially increased through the filing of Claims for indemnification or contribution by the officers and directors of the Debtors, which would also meaningfully delay distributions to Holders of Allowed Claims.  As described above, each of the Released Parties contributed substantial value to these Chapter 11 Cases, and they did so with the understanding that they would receive releases from the Debtors.  In the absence of these parties' support, the Debtors would not have been in a position to maximize the value of its assets in the Sale, to negotiate a settlement with the Derivative Litigation Plaintiffs, or to confirm the Plan. The Debtors Release is therefore an essential element of the Debtors' Plan, albeit in liquidation and not reorganization.

*Fourth*, as evidenced by the Voting Reports and noted herein, the Plan, and thus the Debtors Release, was resoundingly approved, as evidenced by the overwhelming acceptance of the Plan by Class 5.[74]  In fact, of 37 voting creditors, only 5 rejected the Plan.[75]  Creditors in Class 5 representing 99.99 percent by amount of voted claims and 94.1 percent by number in the aggregate voted to accept the Plan.[76]  Given the critical nature of the Debtors Release, these figures evidence the Debtors' key stakeholders' support for the Debtors Release and the Plan.  Even if the Court determined that this support does not constitute "overwhelming acceptance," as noted above, these factors are neither exclusive nor conjunctive.[77]

*Fifth*, the Plan provides for meaningful recoveries under the circumstances for all creditors potentially giving up colorable claims under the releases.  As demonstrated by the liquidation analysis filed at Docket No. 237, as amended in Docket No. 247 (the "Liquidation Analysis"), the ranges of recoveries for all Holders of Claims are as high under the Plan than they would have been in a chapter 7 liquidation scenario.[78] Additionally, the Debtors Release ensures that creditors can receive meaningful distributions in a timely manner, while retaining potentially valuable Retained Causes of Action for potential additional recoveries.  The transactions set forth in the Plan maximize value and provide meaningful recoveries for all stakeholders under the circumstances.

---

[74]    *See* Supplemental Voting Report, Ex. A.

[75]    *Id.*

[76]    *See id.*

[77]    *See Washington Mut.*, 442 B.R. at 346.

[78]    *See* McCabe Decl. ¶ 14.

69.     For the reasons set forth above, and as supported by the FitzGerald Declaration, the *Zenith* factors supports approval of the Debtors Release.  Moreover, the breadth of the Debtors Release is consistent with those regularly approved in this jurisdiction and others.[79]  The Debtors have satisfied the business judgment standard in granting the Debtors Release under the Plan.  The Debtors Release easily meets the applicable standard because it is fair, reasonable, and in the best interests of the Debtors' Estate and critically, is supported by 99.9% of the Debtors' creditors who accepted the Plan.  Thus, the Court should approve the Debtors Release in the Plan, and no party has asserted otherwise.

### ii.  The Third-Party Release is Wholly Consensual and Appropriate under the Facts and Circumstances of this Case

70.     Article IX.B of the Plan provides for the release of each Released Party from Causes of Action—other than the Retained Causes of Action—of the Debtors and certain non-debtor Releasing Parties[80] (the "<u>Third-Party Release</u>").  These releases have the same subject matter nexus as the Debtors Release described above.

71.     The provisions of the Plan, including the Third-Party Release, were heavily negotiated, and the Third-Party Release is integral to the Plan.[81] Absent the Third-Party Release, it is unlikely the Debtors would have been able to bring their key stakeholder groups to the

---

[79]   *See, e.g.*, *In re One Aviation Corp.*, No. 18-12309 (CSS) (Bankr. D. Del. Sep. 18, 2019) (approving Plan providing for definition of Released Parties including, among others, the debtors' directors and officers); *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. Aug. 29, 2019) (same); *In re Checkout Holding Corp.*, No. 18-12794 (KG) (Bankr. D. Del. Jan. 31, 2019) (same); *In re TK Holdings Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) (same); *In re Samson Resources Corp.*, No. 14-11934 (CSS) (Bankr. D.Del. Feb. 13, 2017) (same).

[80]   "<u>Releasing Parties</u>" means, means, collectively, and in each case solely in their respective capacities as such: (a) the DIP Secured Parties; (b) the Committee, if any; (c) all Holders of Claims deemed hereunder to have accepted the Plan that have not filed an objection to the release contained in Article IX herein prior to the Voting Deadline; (d) all Holders of a Claim that vote to accept or reject the Plan and do not timely submit a Release Opt-Out; (e) each current and former Affiliate of each Person or Entity in clauses (a) through (d) solely to the extent such Affiliate may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an Entity in clauses (a) through (e); and (g) each Related Party of each Entity in clauses (a) through (e) solely to the extent such Related Party may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an Entity in clauses (a) through (e).  However, Kirk Hawkins shall not be deemed a Releasing Party under this Plan. Plan, Art. I.A.104.

[81]   *See* FitzGerald Decl. ¶ 28)(c)(iv).

bargaining table or effectuate the value-maximizing transactions contemplated by the Plan.[82] Moreover, the Third-Party Release is a permissible consensual release consistent with Third Circuit law and similar to releases that bankruptcy courts in this and other districts have regularly approved in other chapter 11 plans when, as here, they are consensual.[83] The Third-Party Release is consensual, consistent with established Third Circuit law, and integral to the Plan, and therefore should be approved.[84]

72.     Although the United States Supreme Court has limited the availability of third-party releases,[85] those limitations only apply to certain *non-consensual* third-party releases—*i.e.*, releases that occur despite the affected party's effort to object or opt out.[86] Conversely, courts generally approve third-party releases that are consensual, recognizing that these are essentially settlements between releasing and released parties that evince these parties' intent to be bound.

73.     In this District, courts have held that "creditors [who] were clearly and conspicuously informed that voting on the plan (whether the creditor voted to accept or reject it) would constitute a release unless the creditor opted out."[87] Thus, "the affirmative act of voting,

---

[82] *See id.*

[83] *See Indianapolis Downs*, 486 B.R. at 304–05 (approving third-party release that applied to unimpaired holders of claims deemed to accept the plan as consensual); *Spansion*, 426 B.R. at 144 (same); *Wash. Mut.*, 442 B.R. at 352 (observing that consensual third-party releases are permissible); *see also In re One Aviation Corp.*, No. 18-12309 (CSS) (Bankr. D. Del. Sep. 18, 2019) (approving Plan providing for definition of Released Parties including, among others, the Debtors' directors and officers); *In re Blackhawk Mining LLC*, No. 19-11595 (LSS) (Bankr. D. Del. Aug. 29, 2019) (same); *In re Checkout Holding Corp.*, No. 18-12794 (KG) (Bankr. D. Del. Jan. 31, 2019) (same); *In re TK Holdings Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) (same); *In re Samson Resources Corp.*, No. 14-11934 (CSS) (Bankr. D. Del. Feb. 13, 2017) (same); *In re Horsehead Holding Corp.*, No. 16-10287 (CSS) (Bankr. D. Del. Sep. 9, 2016) (same); *In re Invitae*, No. 24-11363 (MBK) (Bankr. D.N.J. Aug. 2, 2024) (approving a Plan providing for releases of certain directors and officers).

[84] *See* FitzGerald Decl. ¶ 28)(c)(iv).

[85] *Harrington v. Purdue Pharma, L.P., et al.* (*In re Purdue Pharma L.P.*), 144 S. Ct. 2071 (2024) ("[T]he bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants.").

[86] *Purdue Pharma*, 144 S. Ct. at 2087. ("Nothing in what we have said should be construed to call into question *consensual* third-party releases offered in connection with a bankruptcy reorganization plan.") (emphasis added). Historically, the Third Circuit approved even *non-consensual* third-party releases so long as those were fair to the releasing parties. *See In re Millennium Lab Holdings II, LLC.*, 945 F.3d 126 (3d Cir. 2019); *In re Mallinckrodt PLC*, 639 B.R. 837 (Bankr. D. Del. 2022).

[87] *In re Smallhold, Inc.*, No. 24-10267 (CTG), at 6 (Bankr. D. Del. Sept. 25, 2024) [Docket No. 288].

coupled with clear and conspicuous disclosure and instructions about the consequences of the vote and a simple mechanism for opting out, is a sufficient expression of consent to bind the creditor to the release under ordinary contract principles."[88]  Thus, "[a]fter *Purdue Pharma . . .* affirmative consent is required."

74.     The Debtors' Releasing Parties includes all Holders of a Claim that vote to accept or reject the Plan and do not timely submit a Release Opt-Out and all Holders of Claims deemed to have accepted the Plan that have not filed an objection to the release contained in Article IX herein prior to the Voting Deadline (*i.e.*, the Deemed Accepting Classes).[89]  All parties had ample opportunity to evaluate the Third-Party Release or object to the Plan.  All parties in interest were provided extensive notice of these Chapter 11 Cases, the Plan, the deadline to object to confirmation of the Plan, and the deadline to execute the Release Opt-Out.  Moreover, the Disclosure Statement, the Combined Hearing Notice, the Notice of Non-Voting Status Packages, and the ballots provided recipients, with timely, sufficient, appropriate, and adequate notice of the Third-Party Release.[90]  The Debtors required all Holders of Claims or Interests to either timely submit an executed Release Opt-Out form or file an objection to the Third-Party Release in order to provide such releases.[91]

75.     When multiple parties share liability for a single, indivisible injury, American courts have followed the common law "one satisfaction" rule.[92]  The Bankruptcy Code does not preclude the application of this common law rule.[93]  Holders of Claims who are deemed to have

---

[88]   *Id.* at 19.

[89]   Plan, Art. I.A.104.

[90]   *See* Disclosure Statement § X.B.2; Disclosure Statement Order ¶¶ E, H, J, 3 and Exs. 1, 2-A, 2-B, 3-A, 3-B.

[91]   *See* Plan, Art. I.A.104, IX.B.

[92]   *See, e.g., Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 512 (1964) ("[F]ull satisfaction received from one tort-feasor prevents further recovery against another."); *United States v. Occidental Chem. Corp.*, 200 F.3d 143, 149–50 (3d Cir. 1999) (affirming application of one satisfaction rule); *Singer v. Olympia Brewing Co.*, 878 F.2d 596, 600 (2d Cir. 1989) ("[A] plaintiff is entitled to only one satisfaction for each injury.").

[93]   *See United States v. Tex.*, 507 U.S. 529, 534 (1993) ("[S]tatutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident.").

accepted the Plan will be paid in full and final satisfaction of their Claims.[94]   These Deemed

Accepting Classes are getting paid in full.   These Classes should not be allowed to assert the same

Claims against non-debtors for the same injury in violation of the one satisfaction rule.   Thus, the

Debtors' Third-Party Release reflect the application of the one satisfaction rule as the Holders who

will be paid in full and final satisfaction of their Claims cannot assert these same claims against a

non-debtor.

76.     Thus, the Debtors assert that the Third-Party Release is consensual, consistent with

established Third Circuit law, and integral to the Plan and therefore should be approved.[95]

### iii. The Exculpation Provision Is Appropriate

77.     Article IX.C of the Plan provides for the exculpation of the Exculpated Parties.[96]

The exculpation is fair and appropriate under both applicable law[97] and the facts and circumstances

of these Chapter 11 Cases.   The exculpation provision is important to the Plan in that it removes

the threat of certain litigation against the Exculpated Parties, who have played critical roles in, and

made contributions to, the Debtors' restructuring efforts, including the Chapter 11 Cases, and that

such contributions represent good and valuable consideration to the Debtors, their Estates, and

their creditors.[98]

78.     Courts evaluate the appropriateness of exculpation provisions based on a number

of factors, including whether the plan was proposed in good faith, whether liability is limited, and

whether the exculpation provision was necessary for plan negotiations.[99]   Exculpation provisions

---

[94]   *See* Plan, Arts. II—III.

[95]   *See* FitzGerald Decl. ¶ 28(c)(iv).

[96]   "Exculpated Parties" means in each case in its capacity as such, (a) the Debtors; (b) the Debtors' directors and officers during these Chapter 11 Cases; (c) the Committee, if any; and (d) the Retained Professionals.

[97]   *See In re Laboratory Partners, Inc.*, No. 13-12769 (PJW) (Bankr. D. Del. July 10, 2014) (finding that exculpation was appropriately extended to secured lender who funded the chapter 11 case); *In re FAH Liquidating Corp.*, No. 13-13087 (KG) (Bankr. D. Del. July 28, 2014) (finding that exculpation as applied to a non-debtor Plan Sponsor was appropriate under section 1123(b)).

[98]   FitzGerald Decl. ¶ 28(c)(v).

[99]   *See, e.g., In re Enron Corp.*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (evaluating the exculpation clause based on the manner in which the clause was made a part of the agreement, the necessity of the limited liability to the plan negotiations, and that those who participated in proposing the plan did so in good faith).

that are limited to claims not involving actual fraud, willful misconduct, or gross negligence, are customary and generally approved in this district under appropriate circumstances.[100]  Unlike third-party releases, exculpation provisions do not affect the liability of third parties *per se*, but rather set a standard of care of gross negligence or willful misconduct in future litigation by a non-releasing party against an "exculpated party" for acts arising out of the debtor's restructuring.[101]

79.    The Exculpated Parties have participated in good faith in formulating and negotiating the Sale of the Debtors' assets and the Plan as it relates to the Debtors, and they should be entitled to protection from exposure to any lawsuits filed by disgruntled creditors or other unsatisfied parties.[102]  Moreover, the exculpation provision and the liability standard it sets represent a conclusion of law that flows logically from certain findings of fact that the Court must reach in confirming the Plan as it relates to the Debtors.  As discussed above, this Court must find, under section 1129(a)(2), that the Debtors have complied with the applicable provisions of the Bankruptcy Code.  Additionally, this Court must find, under section 1129(a)(3), that the Plan has been proposed in good faith and not by any means forbidden by law.  These findings apply to the Debtors and, by extension, to the Debtors' officers, directors, employees, and professionals.  Accordingly, and under the facts and circumstances of these Chapter 11 Cases, the Court should approve the exculpation provision, and no party has asserted otherwise.

### iv.  The Injunction Provision Is Appropriate

80.    The injunction provision set forth in Article IX.D of the Plan merely implements the Plan's release and exculpation provisions, in part, by permanently enjoining all entities from

---

[100]  *See Wash. Mut.*, 442 B.R. at 350-51 (holding that an exculpation clause that encompassed "the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the [c]ommittees and their members, and the [d]ebtors' directors and officers" was appropriate).

[101]  *See In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (finding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code"); *see also In re Premier Int'l Holdings, Inc.*, 2010 WL 2745964, at *10 (CSS) (Bankr. D. Del. Apr. 29, 2010) (approving a similar exculpation provision as that provided for under the Plan); *In re Spansion Inc.*, 2010 WL 2905001, at *16 (Bankr. D. Del. April 16, 2010) (same).

[102]  *See* FitzGerald Decl. ¶ 28(c)(v).

commencing or maintaining any action against the Debtors, the Exculpated Parties, or the Released Parties, other than the Retained Causes of Action, on account of or in connection with or with respect to any such claims or interests released or subject to exculpation.  Thus, the injunction provision is a key provision of the Plan because it enforces the release and exculpation provisions that are centrally important to the Plan.[103]  As such, to the extent the Court finds that the exculpation and release provisions are appropriate, the Debtors respectfully submit that the injunction provision must also be appropriate.  Moreover, this injunction provision is narrowly tailored to achieve its purpose and is not opposed by any party.  Thus, the injunction provision should be approved.

### e.    The Plan's Retention of the Retained Causes of Action Is Appropriate

81.    The Retained Causes of Action are essential to the Plan and appropriate under the facts and circumstances of these Chapter 11 Cases.  Accordingly, such Retained Causes of Action should be approved, and no party asserts otherwise.

### f.    The Plan Complies with the Additional Provision of Section 1123(b)

82.    The Plan is consistent with section 1123(b)(5) of the Bankruptcy Code.[104] Article III of the Plan modifies or leaves unaffected, as is applicable, the rights of certain Holders of Claims or Interests, as permitted by section 1123(b)(5) of the Bankruptcy Code.[105]  Additionally, the other discretionary provisions in the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1123(b)(6) of the Bankruptcy Code.[106]  Accordingly, the Plan satisfies the requirements of Bankruptcy Code section 1123(b)(5) and (b)(6), and no party has asserted otherwise.

---

[103]    FitzGerald Decl. ¶ 28(c)(vi).

[104]    11 U.S.C. § 1123(b)(5).

[105]    FitzGerald Decl. ¶ 28(d).

[106]    *Id.* ¶ 28(e).

**B.      The Plan Complies with Section 1123(d) of the Bankruptcy Code**

83.      Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and nonbankruptcy law."[107]

84.      The Plan complies with section 1123(d) of the Bankruptcy Code.  Article V of the Plan provides for the automatic rejection of the Debtors' Executory Contracts and Unexpired Leases (other than the D&O Policies and as otherwise provided in the Plan) not previously rejected, assumed, or assumed and assigned during these Chapter 11 Cases under section 365 of the Bankruptcy Code, nor scheduled to be assumed under the Plan, the Plan Supplement, or the Sale Orders.  The Debtors' determinations regarding the assumption and rejection of Executory Contracts and Unexpired Leases are based on and within the sound business judgment of the Debtors, are necessary to the implementation of the Plan, and are in the best interests of the Debtors, their Estates, Holders of Claims, and other parties in interest in these Chapter 11 Cases.[108]

**C.      The Plan Complies with Section 1129(a)(2) of the Bankruptcy Code**

85.      The Debtors have satisfied section 1129(a)(2) of the Bankruptcy Code, which requires the plan proponent to comply with the applicable provisions of the Bankruptcy Code.[109] The legislative history to section 1129(a)(2) provides that section 1129(a)(2) is intended to encompass the disclosure and solicitation requirements set forth in section 1125 and the plan acceptance requirements set forth in section 1126 of the Bankruptcy Code.[110]  As set forth below, the Debtors have complied with these provisions, including sections 1125 and 1126 of the

---

[107]   *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (citations omitted).

[108]   *See* FitzGerald Decl. ¶ 28(b).

[109]   *See* 11 U.S.C. § 1129(a)(2).

[110]   *See In re Lapworth*, 1998 WL 767456, at *3 (DWS) (Bankr. E.D. Pa. Nov. 2, 1998) ("The legislative history of § 1129(a)(2) specifically identifies compliance with the disclosure requirements of § 1125 as a requirement of § 1129(a)(2)."); *In re Aleris Int'l, Inc.*, 2010 WL 3492664, at *20 (Bankr. D. Del. May 13, 2010) ("[S]ection 1129(a)(2) of the Bankruptcy Code reflects that this provision is intended to encompass the solicitation and disclosure requirements under sections 1125 and 1126 of the Bankruptcy Code."); S. Rep. No. 989, 95th Cong., 2d Sess., at 126 (1978); H.R. Rep. No. 595, 95th Cong., 1st Sess., at 412 (1977).

Bankruptcy Code, as well as Bankruptcy Rules 3017 and 3018, by distributing the Disclosure Statement and soliciting acceptances of the Plan through their Notice and Claims Agent in accordance with the Disclosure Statement Order.[111]

### 1.    The Debtors Complied with Section 1125 of the Bankruptcy Code

86.    Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan of reorganization "unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."[112] Section 1125 ensures that parties in interest are fully informed regarding the debtor's condition so that they may make an informed decision whether to approve or reject the plan.[113]

87.    Section 1125 is satisfied here.  Before the Debtors solicited votes on the Plan, the Court conditionally approved the Disclosure Statement in accordance with section 1125(a)(1).[114] The Court also approved the contents of the solicitation materials provided to Holders of Claims entitled to vote on the Plan, the non-voting materials provided to parties not entitled to vote on the Plan, and the relevant dates for voting and objecting to the Plan and final approval of the Disclosure Statement.[115]  As stated in the Initial Voting Report, the Debtors, through the Notice and Claims Agent, complied with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code.[116]  The Debtors also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular class.  Here, the Debtors caused

---

[111]    *See* FitzGerald Dec. ¶ 29.

[112]    11 U.S.C. § 1125(b).

[113]    *See Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994) (finding that section 1125 of the Bankruptcy Code obliges a debtor to engage in full and fair disclosure that would enable a hypothetical reasonable investor to make an informed judgment about the plan).

[114]    *See generally* Disclosure Statement Order.

[115]    *See generally id.*

[116]    *See* Initial Voting Report ¶¶ 5–18.

the Disclosure Statement to be transmitted to all parties entitled to vote on the Plan and parties deemed to reject the Plan.[117]

88.     Based on the foregoing, the Debtors submit that they have complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order, and no party has asserted otherwise.

### 2.    The Debtors Complied with Section 1126 of the Bankruptcy Code

89.     Section 1126 of the Bankruptcy Code provides that only holders of allowed claims and equity interests in impaired classes that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject a plan.[118]  The Debtors did not solicit votes on the Plan from the Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), and Class 4 (Convenience Claims) as such Classes are Unimpaired under the Plan (the "Deemed Accepting Classes").[119]  Pursuant to section 1126(f) of the Bankruptcy Code, holders of Claims in the Unimpaired Classes are conclusively presumed to have accepted the Plan and, therefore, were not entitled to vote on the Plan.  The Debtors also did not solicit votes from Class 6 (Intercompany Claims), Class 7 (Section 510(b) Claims), Class 8 (Interests), and Class 9 (Intercompany Interests) as such Classes are Impaired under the Plan and not expected to receive any recovery on account of their Claims or Interests (the "Deemed Rejecting Classes").[120]  Pursuant to section 1126(g) of the Bankruptcy Code, holders of Claims and Interests in the Deemed Rejecting Classes are deemed to have rejected the Plan and, therefore, were not entitled to vote on the Plan.

90.     Accordingly, the Debtors solicited votes only from the Voting Classes, constituting Holders of Claims in Classes 3 and 5 because each of these Classes is Impaired and entitled to

---

[117]  *Id.*

[118]  *See* 11 U.S.C. § 1126.

[119]  *See* Plan, § III.A.

[120]  *Id.*

receive a distribution under the Plan.[121]   With respect to the Voting Classes of Claims, section

1126(c) of the Bankruptcy Code provides that:

> A class of claims has accepted a plan if such plan has been accepted
> by creditors, other than any entity designated under subsection (e)
> of [section 1126], that hold at least two-thirds in amount and more
> than one-half in number of the allowed claims of such class held by
> creditors, other than any entity designated under subsection (e) of
> [section 1126], that have accepted or rejected such plan.[122]

91.     The Voting Reports, summarized in Part I above, reflects the results of the voting

process in accordance with section 1126 of the Bankruptcy Code.[123]   Based on the foregoing, the

Debtors submit that they have satisfied the requirements of section 1129(a)(2), and no party has

asserted otherwise.

### D.     The Plan Was Proposed in Good Faith and Therefore Complies with Section 1129(a)(3) of the Bankruptcy Code

92.     Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be

"proposed in good faith and not by any means forbidden by law."[124]   Where a plan satisfies the

purposes of the Bankruptcy Code and has a good chance of succeeding, the good faith requirement

of section 1129(a)(3) of the Bankruptcy Code is satisfied.[125]   To determine whether a plan seeks

relief consistent with the Bankruptcy Code, courts consider the totality of the circumstances

surrounding the development of the plan.[126]

---

[121]   *See generally* Initial Voting Report; Supplemental Voting Report; Plan, Art. III.

[122]   11 U.S.C. § 1126(c).

[123]   *See generally* Initial Voting Report, Ex. A; Supplemental Voting Report, Ex. A.

[124]   11 U.S.C. § 1129(a)(3).

[125]   *E.g.*, *PWS Holding Corp.*, 228 F.3d at 242 (quoting *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 150 n.5 (3d Cir. 1986)); *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*, 116 F.3d 790, 802 (5th Cir. 1997) (quoting *Brite* v. *Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*, 764 F.2d 406, 408 (5th Cir. 1985)); *In re Century Glove, Inc.*, Civ. A. Nos. 90-400 and 90-401, 1993 WL 239489, at *4 (D. Del. Feb. 10, 1993); *In re NII Holdings, Inc.*, 288 B.R. 356, 362 (Bankr. D. Del. 2002).

[126]   *E.g., T-H New Orleans*, 116 F.3d at 802 (quoting *In re Sun Country Dev., Inc.*, 764 F.2d at 408); *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012); *Century Glove*, 1993 WL 239489, at *4.

93.    The Plan was proposed with honesty, good intentions, and with the goal of maximizing stakeholder recoveries.   Throughout these Chapter 11 Cases, the Debtors, their directors, and their management team have upheld their fiduciary duties to stakeholders and protected the interests of all constituents.   The Plan facilitates transactions that will provide significant value to the Debtors' stakeholders compared to the alternative of a chapter 7 liquidation.[127]   Importantly, the Plan is supported by the Debtors' key economic stakeholders. Accordingly, the Plan and the Debtors' conduct satisfy section 1129(a)(3) of the Bankruptcy Code, and no party has asserted otherwise.

E.    **The Plan Provides that the Payment of Debtors' Professional Fees and Expenses Are Subject to Court Order in Compliance with Section 1129(a)(4)**

94.    Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses paid by the plan proponent, by the debtor, or by a person receiving distributions of property under the plan, be subject to approval by the Court as reasonable.   Courts have construed this section to require that all payments of professional fees paid out of estate assets be subject to review and approval by the Court as to their reasonableness.[128]

95.    The Plan satisfies section 1129(a)(4) of the Bankruptcy Code.[129]   All payments made or to be made by the Debtors for services or for costs or expenses in connection with these Chapter 11 Cases prior to the Confirmation Date, including all Professional Fee Claims, have been approved by, or are subject to approval of, the Court.[130]   Article II.C.1 of the Plan provides that all final requests for payment of Professional Fee Claims shall be filed no later than forty-five (45) days after the Effective Date for determination by the Court, after notice and a hearing, in

---

[127]    *See* McCabe Decl. ¶¶ 12–16.

[128]    *In re Lisanti Foods, Inc.*, 329 B.R. 491, 503 (D.N.J. 2005) ("Pursuant to § 1129(a)(4), a [p]lan should not be confirmed unless fees and expenses related to the [p]lan have been approved, or are subject to the approval, of the Bankruptcy Court"), *aff'd*, 241 F. App'x 1 (3d Cir. 2007); *In re Future Energy Corp.*, 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988*); In re Chapel Gate Apartments, Ltd.*, 64 B.R. 569, 573 (Bankr. N.D. Tex. 1986) (noting that before a plan may be confirmed, "there must be a provision for review by the Court of any professional compensation").

[129]    *See* FitzGerald Decl. ¶ 31.

[130]    *See* Plan, Art. II.

accordance with the procedures established by the Court, except as such procedures have been otherwise modified by the Plan.[131]  Accordingly, the Plan fully complies with the requirements of section 1129(a)(4) of the Bankruptcy Code, and no party has asserted otherwise.

**F.    The Plan Does Not Require Additional Disclosures Regarding Directors, Officers, or Insiders and Therefore Complies with Section 1129(a)(5)**

96.    The Bankruptcy Code requires the plan proponent to disclose the affiliation of any individual proposed to serve as a director or officer of the debtor or a successor to the debtor under the plan.[132]  Section 1129(a)(5)(A)(ii) further requires that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.[133]

97.    Here, Article IV.I of the Plan provides for the dissolution of the Debtors and the resignation of the existing directors and officers of the Debtors.[134]  As such, section 1129(a)(5) of the Bankruptcy Code is inapplicable to the Plan.

98.    In addition, section 1129(a)(5)(B) also requires a plan proponent to disclose the identity of any "insider" (as defined by 11 U.S.C. § 101(31)) to be employed or retained by the reorganized debtor and the nature of any compensation for such insider.[135]  Here, the Plan provides that the Debtors shall be, subject to the terms of the Plan, deemed dissolved on the Effective Date.[136]  Moreover, the Plan Supplement provides the identity and compensation of insiders employed by the Plan Administrator.  Accordingly, the requirements of section 1129(a)(5) of the Bankruptcy Code are satisfied, and no party has asserted otherwise.

**G.    The Plan Does Not Require Governmental Regulatory Approval and Therefore Complies with Section 1129(a)(6)**

---

[131]    *Id.*

[132]    11 U.S.C. § 1129(a)(5)(A)(i).

[133]    *Id.* § 1129(a)(5)(A)(ii).

[134]    *See* Plan, Art. IV.I.

[135]    *Id.* § 1129(a)(5)(B).

[136]    Plan, Art. IV.I.

99.     Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the plan.  Section 1129(a)(6) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases, and no party has asserted otherwise.

### H.     The Plan Is in the Best Interest of Creditors and Therefore Complies with Section 1129(a)(7)

100.     Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests test," provides, in relevant part:

> With respect to each impaired class of claims or interests—
> (A)     each holder of a claim or interest of such class—
>     (i)     has accepted the plan; or
>     (ii)     will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [the Bankruptcy Code] on such date . . . .

101.     The best interests test applies to individual dissenting holders of impaired claims and interests rather than classes, and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's plan of reorganization.[137]    As section 1129(a)(7) of the Bankruptcy Code makes clear, the best interests test applies only to holders of non-accepting impaired claims or interests.  Class 5 (General Unsecured Claims) has voted to accept the Plan.  Class 3 voted to reject the Plan, and the Deemed Rejecting Classes did not vote on the Plan.  Accordingly, to satisfy the best interests test, the Debtors must demonstrate that each

---

[137]    *Bank of Am. Nat. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan.**");** *Century Glove*, 1993 WL 239489, at *7; *Adelphia Commc'ns. Corp.*, 368 B.R. at 251 (stating that section 1129(a)(7) is satisfied when an impaired holder of claims would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation").

Holder of a Claim in Class 3 and the Deemed Rejecting Classes, will receive at least as much under the Plan as that Holder would receive in a chapter 7 liquidation.[138]

102.    The Plan satisfies section 1129(a)(7) of the Bankruptcy Code and the best interests test.[139]  As set forth in the McCabe Declaration[140] the Debtors, with the assistance of their restructuring advisors, prepared the Liquidation Analysis [Docket No. 237, as amended in Docket No. 247].[141]  The Liquidation Analysis compares the projected range of recoveries that would result from the liquidation of the Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to Holders of Allowed Claims and Interests under the Plan.[142] The Liquidation Analysis is based on the value of the Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date.[143]

103.    Based on the unaudited Liquidation Analysis, and the assumptions included therein, the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code would be no greater than the value of distributions under the Plan.[144]  As a result, Holders of Claims and Interests in all Impaired Classes will recover at least as much as a result of confirmation of the Plan as they would recover through a hypothetical chapter 7 liquidation.[145]  Based on the recoveries set forth above, the Plan satisfies the best interests test as required by the Bankruptcy Code, and no party has asserted otherwise.

---

[138]    *See In re Lason, Inc.*, 300 B.R. 227, 232 (Bankr. D. Del. 2003) ("Section 1129(a)(7)(A) requires a determination whether 'a prompt chapter 7 liquidation would provide a better return to particular creditors or interest holders than a chapter 11 reorganization.'") (internal citations omitted).

[139]    *See* FitzGerald Decl. ¶¶ 34–36.

[140]    *See generally* McCabe Decl. ¶¶ 12–16.

[141]    *See id.* ¶¶ 5, 12-16.

[142]    *See id.* ¶¶ 13–14.

[143]    *See id.*

[144]    *See id.* ¶ 16.

[145]    *See id.*

I.    **The Plan Is Confirmable Notwithstanding the Requirements of Section 1129(a)(8) of the Bankruptcy Code**

104.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or interests must either accept a plan or be unimpaired under a plan.[146]  Holders of Claims and Interests in the Deemed Rejecting Classes are deemed to have rejected the Plan and, thus, were not entitled to vote.  Class 3 voted to reject the Plan.  Consequently, while the Plan does not satisfy section 1129(a)(8) of the Bankruptcy Code with respect to the Deemed Rejecting Classes and Class 3, the Plan is confirmable nonetheless because it satisfies sections 1129(a)(10) and 1129(b) of the Bankruptcy Code, as discussed below.[147]

J.    **The Plan Provides for Payment in Full of All Allowed Priority Claims in Compliance with Section 1129(a)(9) of the Bankruptcy Code**

105.    Section 1129(a)(9) of the Bankruptcy Code requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments.  In particular, pursuant to section 1129(a)(9)(A) of the Bankruptcy Code, holders of claims of a kind specified in section 507(a)(2) of the Bankruptcy Code—administrative claims allowed under section 503(b) of the Bankruptcy Code—must receive on the effective date cash equal to the allowed amount of such claims.[148]  Section 1129(a)(9)(B) of the Bankruptcy Code requires that each holder of a claim of a kind specified in section 507(a)(1) or (4) through (7) of the Bankruptcy Code—generally wage, employee benefit, and deposit claims entitled to priority—must receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim (if such class has accepted the plan), or cash of a value equal to the allowed amount of such claim on the effective date of the plan (if such class has not accepted the plan).[149]  Finally, section 1129(a)(9)(C) of the Bankruptcy Code provides that the holder of a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code—*i.e.*, priority

---

[146]  11 U.S.C. § 1129(a)(8).

[147]  *See* FitzGerald Decl. ¶¶ 37, 39.

[148]  11 U.S.C. § 1129(a)(9)(A).

[149]  *Id.* § 1129(a)(9)(B).

tax claims—must receive cash payments over a period not to exceed five years from the petition date, the present value of which equals the allowed amount of the claim.[150]

106.    The Plan satisfies section 1129(a)(9) of the Bankruptcy Code.[151] *First*, Article II.A of the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because it provides that each Holder of an Allowed Administrative Claim shall receive payment as follows: (1) if an Administrative Claim is Allowed on or prior to the Effective Date, on the Effective Date (or, if not then due, when such Allowed Administrative Claim becomes due or as soon as reasonably practicable thereafter); (2) if such Administrative Claim is not Allowed as of the Effective Date, thirty (30) days after the date on which an order allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; or (3) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.[152]  Any such objections that are not consensually resolved may be set for hearing after notice.[153]  Further, the Plan and Proposed Confirmation Order provide for the establishment of the Disputed Claims Reserve that shall be used to fund Claims that may become Allowed Claims after the Effective Date, consistent with the terms of the Plan and Confirmation Order.[154]

107.    *Second*, the Plan satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no holders of the types of Claims specified by 1129(a)(9)(B) are Impaired under the Plan and such Claims have been paid in the ordinary course.

108.    *Third*, Article II.D of the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because it provides that holders of Allowed Priority Tax Claims payment in full in Cash on the Effective Date or otherwise receive treatment consistent with the Bankruptcy Code.[155]  The

---

[150]  *Id.*  §§ 507(a)(1)–(7), 1129(a)(9)(C).

[151]  *See* FitzGerald Decl. ¶ 38.

[152]  Plan, Art. II.A.

[153]  *See id.*

[154]  *See* Plan, Art. VII.H.

[155]  *See* Plan, Art. II.D.

Plan thus satisfies each of the requirements of section 1129(a)(9) of the Bankruptcy Code, and no party has asserted otherwise.

**K.    At Least One Class of Impaired, Non-Insider Claims Accepted the Plan in Compliance with Section 1129(a)(10) of the Bankruptcy Code**

109.    Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan, "without including any acceptance of the plan by any insider," as an alternative to the requirement under section 1129(a)(8) of the Bankruptcy Code that each class of claims or interests must either accept the plan or be unimpaired under the plan.[156]

110.    Class 5, an Impaired Class, voted to accept the Plan independent of any insiders' votes.[157] Thus, the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code, and no party has asserted otherwise.[158]

**L.    The Plan Is Feasible in Compliance with Section 1129(a)(11) of the Bankruptcy Code**

111.    Section 1129(a)(11) of the Bankruptcy Code requires that the Court find that a plan is feasible as a condition precedent to confirmation.  Specifically, the Court must determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.[159]

---

[156]   11 U.S.C. § 1129(a)(10).

[157]   *See* Initial Voting Report, Ex. A; Supplemental Voting Report, Ex. A.

[158]   *See* FitzGerald Decl. ¶ 39.

[159]   11 U.S.C. § 1129(a)(11).

112.    To demonstrate that a plan is feasible, it is not necessary for a debtor to guarantee success.[160]  Rather, a debtor must provide only a reasonable assurance of success.[161]  There is a relatively low threshold of proof necessary to satisfy the feasibility requirement.[162]  The feasibility test set forth in section 1129(a)(11) does not require the Debtors to "prove" that the Plan will succeed.  The Debtors need only demonstrate that the Plan has "a reasonable likelihood of success" or a "reasonable probability" that the provisions of the Plan may be performed.[163]

113.    The purpose of the feasibility test under section 1129(a)(11) is to "prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation."[164]  The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds.[165]  Bankruptcy courts have found that feasibility is established where a debtor has "sufficient resources" to meet its obligations under a liquidating plan, including its "obligations to pay for the costs of administering and fully

---

[160]    *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) ("[T]he feasibility standard is whether the plan offers a reasonable assurance of success. Success need not be guaranteed."); *In re Flintkote Co.*, 486 B.R. 99, 139 (Bankr. D. Del. 2012); *W.R. Grace & Co.*, 475 B.R. at 115; *In re U.S. Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985) ("'Feasibility' does not, nor can it, require the certainty that a reorganized company will succeed."), *aff'd sub nom. Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck Co.)*, 800 F.2d 581 (6th Cir. 1986).

[161]    *Kane*, 843 F.2d at 649; *Flintkote Co.*, 486 B.R. at 139; *W.R. Grace & Co.*, 475 B.R. at 115; *see also Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) (citations omitted) (holding that "[t]he purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation"); *accord In re Capmark Fin. Grp. Inc.*, No. 09-13684 (CSS), 2011 WL 6013718, at *61 (Bankr. D. Del. Oct. 5, 2011) (same).

[162]    *See, e.g., In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) (quoting approvingly that "[t]he Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility") (internal citations omitted); *In re Sea Garden Motel & Apartments*, 195 B.R. 294, 305 (D. N.J. 1996); *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011), *overruled in part on other grounds*, 464 B.R. 208 (Bankr. D. Del. 2011).

[163]    *See United States v. Energy Res.*, 495 U.S. 545, 549 (1990); *Kane*, 843 F.2d at 649; *In re Am. Cap. Equip., LLC*, 688 F.3d 145, 156 (3d Cir. 2012) (noting that section 1129(a)(11) "does not require a plan's success to be guaranteed"); *In re Heritage Highgate, Inc.*, 679 F.3d 132, 142 (3d Cir. 2012) (quoting *In re TCI 2 Holdings, LLC*, 428 B.R. at 148).

[164]    *Pizza of Haw*, 761 F.2d at 1382; *In re Kreider,* No. 05-15018 (ELF), 2006 WL 3068834, at *5 (Bankr. E.D. Pa. Sept. 27, 2006).

[165]    *See U.S. Truck*, 47 B.R. at 944.

consummating the Plan and closing the Chapter 11 Cases."[166]  Other courts have said that, to demonstrate that a liquidating plan is feasible, a plan proponent need only show that "the successful performance of [the plan's] terms is not dependent or contingent upon any future, uncertain event."[167]

114.    Here, the Plan is feasible.[168]  The Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code by providing for a clear path to emergence from these Chapter 11 Cases and the ability of the Debtors to satisfy their obligations under the Plan.  The Debtors project that all Allowed priority and Allowed Administrative Claims under the Plan will be satisfied as outlined in the Plan and Confirmation Order.  As explained in the FitzGerald Declaration, the Plan provides the financial wherewithal necessary to implement the Plan and offers reasonable assurance that the Plan is workable and has a reasonable likelihood of success.[169] The Debtors will continue this process following the Effective Date, under the guidance of the Litigation Trustee (if any) and the Plan Administrator.

115.    Moreover, the value of the Debtors' Estate under the Plan includes, among other things, the Debtors' Cash on hand as of the Effective Date and all other Plan Assets.[170]  The Debtors project that the distributable value of the Estate will be sufficient to satisfy all Allowed Priority Tax Claims, Allowed Administrative Claims, DIP Claims, Statutory Fees, and provide a recovery to the Allowed Claims in Classes 3 and 5, consistent with the Plan and the Proposed Confirmation Order.  Accordingly, the Plan satisfies the feasibility standard of section 1129(a)(11) of the Bankruptcy Code, and no party has asserted otherwise.

---

[166]    *In re Finlay Enters., Inc.,* No. 09-14873 JMP, 2010 WL 6580628, at *7 (Bankr. S.D.N.Y. June 29, 2010).

[167]    *In re Heritage Org., L.L.C.*, 375 B.R. 230, 311 (Bankr. N.D. Tex. Aug. 31, 2007) (holding that the creation of a creditor trust with res consisting of estate cash and the proceeds of any future successful litigation in addition to a fixed trust governance mechanism qualified as feasible).

[168]    *See* FitzGerald Decl. ¶¶ 40–41.

[169]    *See id.*

[170]    *See generally* Plan, Art. IV.B.

**M.      All Statutory Fees Have or Will Be Paid in Compliance with Section 1129(a)(12)**

116.      Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan."[171]  Section 507(a)(2) of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123 of title 28" are afforded priority as administrative expenses.[172]

117.      The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because Article II.E of the Plan provides that all fees due and payable pursuant to section 1930 of title 28 of the United States Code, shall be paid by the Debtors on the Effective Date.[173]  After the Effective Date, any and all Statutory Fees shall be paid to the U.S. Trustee when due and payable, and the Debtors, the Plan Administrator, and the Litigation Trustee (if any) shall remain obligated to pay the U.S. Trustee Statutory Fees until the earliest of the Debtors' case being closed, dismissed, or converted to case under chapter 7 of the Bankruptcy Code.  Accordingly the Plan satisfies section 1129(a)(12), and no party has asserted otherwise.

**N.      The Debtors Have No Retiree Benefit Obligations (Section 1129(a)(13))**

118.      Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits continue post-confirmation at any levels established in accordance with section 1114 of the Bankruptcy Code.  The Debtors do not have any obligation to pay retiree benefits (as defined in section 1114 of the Bankruptcy Code).  Therefore, section 1129(a)(13) of the Bankruptcy Code is inapplicable to these Chapter 11 Cases or the Plan, and no party has asserted otherwise.[174]

**O.      Sections 1129(a)(14), (a)(15) and (a)(16) Do Not Apply to the Plan**

119.      Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations.  Since the Debtors are not subject to any domestic support obligations, the

---

[171]    11 U.S.C. § 1129(a)(12).

[172]    11 U.S.C. § 507(a)(2).

[173]    *See* FitzGerald Decl. ¶ 42; Plan Art. II.E.

[174]    *See* FitzGerald Decl. ¶ 43

requirements of section 1129(a)(14) of the Bankruptcy Code do not apply.[175]  Likewise, section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual" as defined in the Bankruptcy Code.  Because the Debtors are not an "individual," the requirements of section 1129(a)(15) of the Bankruptcy Code do not apply.[176]  Finally, the Debtors are a moneyed, business, or commercial corporation and therefore section 1129(a)(16) of the Bankruptcy Code, which provides that property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust be made in accordance with any applicable provisions of nonbankruptcy law, is not applicable to these Chapter 11 Cases.[177]

P.     **The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code**

120.    Section 1129(b)(1) of the Bankruptcy Code provides that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, a plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.[178]  To confirm a plan that has not been accepted by all impaired classes (thereby failing to satisfy section 1129(a)(8) of the Bankruptcy Code), the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[179]

---

[175]   *See id.*

[176]   *See id.*

[177]   *See id.*

[178]   11 U.S.C. § 1129(b)(1).

[179]   *John Hancock*, 987 F.2d at 157 n.5; *In re Ambanc La Mesa L.P.,* 115 F.3d 650, 653 (9th Cir. 1997) ("the [p]lan satisfies the 'cramdown' alternative . . . found in 11 U.S.C. § 1129(b), which requires that the [p]lan 'does not discriminate unfairly' against and 'is fair and equitable' towards each impaired class that has not accepted the [p]lan.").

1.     **The Plan is Fair and Equitable and Thus Satisfies Section 1129(b)(2)(B) of the Bankruptcy Code**

121.    A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects a plan (or is deemed to reject a plan) if it follows the "absolute priority" rule.[180]  This requires that an impaired rejecting class of claims or interests either be paid in full or that a class junior to the impaired accepting class not receive any distribution under a plan on account of its junior claim or interest.

122.    The Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code.[181] Notwithstanding the fact that Class 3 and the Deemed Rejecting Classes have not accepted the Plan, the Plan may be confirmed pursuant to section 1129(b)(1) of the Bankruptcy Code.

123.    *First*, all of the requirements of section 1129(a) of the Bankruptcy Code other than section 1129(a)(8) have been met.

124.    *Second*, the Plan is fair and equitable with respect to Class 3 and the Deemed Rejecting Classes.  The Plan has been proposed in good faith, is reasonable and meets the requirements that no Holder of any Claim or Interest that is junior to each such Class will receive or retain any property under the Plan on account of such junior Claim or Interest, and no Holder of a Claim or Interest in a Class senior to such Classes is receiving more than payment in full on account of its Claim or Interest.  Accordingly, the Plan is fair and equitable towards all Holders of Claims and Interests in Class 3 and the Deemed Rejecting Classes.[182]  As a result, the Plan satisfies the fair and equitable standard of section 1129(b)(2)(B) of the Bankruptcy Code, and no party has asserted otherwise.

---

[180]    *Bank of Am.*, 526 U.S. at 441–42 ("As to a dissenting class of impaired unsecured creditors, such a plan may be found to be 'fair and equitable' only if the allowed value of the claim is to be paid in full, § 1129(b)(2)(B)(i), or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property,' § 1129(b)(2)(B)(ii).  That latter condition is the core of what is known as the 'absolute priority rule.'").

[181]    *See* FitzGerald Decl. ¶ 44.

[182]    *See id.* at ¶¶ 44, 47.

2.      **The Plan Does Not Unfairly Discriminate with Respect to the Impaired Classes that Have Not Voted to Accept the Plan in Accordance with Section 1129(b)(1) of the Bankruptcy Code**

125.    Although the Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists, courts typically examine the facts and circumstances of the particular case to make the determination.[183]   In general, courts have held that a plan unfairly discriminates in violation of section 1129(b) of the Bankruptcy Code only if it provides materially different treatment for creditors and interest holders with similar legal rights without compelling justifications for doing so.[184]   A threshold inquiry to assessing whether a proposed plan of reorganization unfairly discriminates against a dissenting class is whether the dissenting class is equally situated to a class allegedly receiving more favorable treatment.

126.    Here, the Plan does not discriminate unfairly with respect to Class 3 and the Deemed Rejecting Classes because similarly situated Claim and Interest Holders will receive substantially similar treatment on account of their Claims or Interests, as applicable, in such class.[185]   Claims in Class 3 and the Deemed Rejecting Classes are not similarly situated to any other Classes, given their distinctly different legal character from all other Claims and Interests. The Plan's treatment of Class 3 and the Deemed Rejecting Classes is proper because no similarly situated class will receive more favorable treatment.  The remaining Classes set forth in the Plan

---

[183]   *In re 203 N. LaSalle St. Ltd. P'ship.*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995), *rev'd on other grounds*, *Bank of Am.*, 526 U.S. 434 (1999) (noting "the lack of any clear standard for determining the fairness of a discrimination in the treatment of classes under a Chapter 11 plan" and that "the limits of fairness in this context have not been established."); *In re Aztec Co.*, 107 B.R. 585, 589–91 (Bankr. M.D. Tenn. 1989) ("Courts interpreting language elsewhere in the Code, similar in words and function to § 1129(b)(1), have recognized the need to consider the facts and circumstances of each case to give meaning to the proscription against unfair discrimination."); *In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances").

[184]   *See Coram*, 315 B.R. at 349 (citing cases and noting that separate classification and treatment of claims is acceptable if the separate classification is justified because such claims are essential to a reorganized debtor's ongoing business); *In re Lernout & Hauspie Speech Prods., N.V.*, 301 B.R. 651, 661 (Bankr. D. Del. 2003) (permitting different treatment of two classes of similarly situated creditors upon a determination that the debtors showed a legitimate basis for such discrimination); *Ambanc La Mesa*, 115 F.3d at 656–57 (same); *Aztec Co.*, 107 B.R. at 589–91 (stating that plan which preserved assets for insiders at the expense of other creditors unfairly discriminated); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) (stating that interests of objecting class were not similar or comparable to those of any other class and thus there was no unfair discrimination).

[185]   *See* FitzGerald Decl. ¶¶ 45–47.

have either voted to accept the Plan or are deemed to have accepted the Plan, rending section 1129(b) of the Bankruptcy Code inapplicable to them.[186]  Therefore, the Plan may be confirmed despite the fact that not all Impaired Classes have voted to accept the Plan, and no party has asserted otherwise.

### Q.    The Debtors Complied with Sections 1129(d) and (e) of the Bankruptcy Code

127.    Section 1129(d) of the Bankruptcy Code provides that "the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933."[187]  The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933.  Moreover, no governmental unit or any other party has requested that the Court decline to confirm the Plan on such grounds.  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.[188]

128.    Lastly, section 1129(e) of the Bankruptcy Code is inapplicable because the Chapter 11 Cases are not a "small business case."[189]  Thus, the Plan satisfies the Bankruptcy Code's mandatory confirmation requirements, and no party has asserted otherwise.

### R.    Modifications to the Plan

129.    Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan at any time before confirmation as long as such modified plan meets the requirements of sections 1122 and 1123 of the Bankruptcy Code.[190]  Further, when the proponent of a plan files the plan with modifications with the court, the plan as modified becomes the plan.[191]  Bankruptcy Rule 3019 provides that modifications after a plan has been accepted will be deemed accepted by all creditors and equity security holders who have previously accepted the plan if the court finds that the proposed modifications do not adversely change the treatment of the claim of any creditor

---

[186]    *See id.*

[187]    *See* 11 U.S.C. § 1129(d).

[188]    *See* FitzGerald Decl. ¶ 48.

[189]    *See* 11 U.S.C. § 1129(e).

[190]    11 U.S.C. § 1127(a).

[191]    *Id.*

or the interest of any equity security holder.[192]    Interpreting Bankruptcy Rule 3019, courts consistently have held that a proposed modification to a previously accepted plan will be deemed accepted where the proposed modification is not material or does not adversely affect the way creditors and stakeholders are treated.[193]

130.    Pursuant to section 1127 of the Bankruptcy Code, the modifications to the Plan included in the *Fourth Amended Joint Chapter 11 Plan of Liquidation for Seaplane Debtor 1, Inc. (f/k/a Icon Aircraft, Inc.) and its Debtor Affiliates*, filed on October 11, 2024, and any additional modifications to the Plan described or set forth in the Proposed Confirmation Order or in any Plan filed prior to the entry of the Proposed Confirmation Order (collectively, the "Plan Modifications") constitute technical or clarifying changes, changes with respect to particular Claims by agreement with Holders of such Claims, or modifications that do not otherwise materially and adversely affect or change the treatment of any other Claim or Interest under the Plan.    These Plan Modifications are consistent with the disclosures previously made pursuant to the Disclosure Statement and Solicitation Materials (as defined in the Disclosure Statement Order) served pursuant to the Disclosure Statement Order, and notice of these Plan Modifications was adequate and appropriate under the facts and circumstances of these Chapter 11 Cases.    None of the modifications adversely affect the treatment of any party-in-interest without their consent, and the additional changes to the Plan include, among other things, including a non-voting Convenience Claims Class (Class 4) and establishing a Litigation Trust.[194]

---

[192]    Bankruptcy Rule 3019.

[193]    *See, e.g., In re Federal–Mogul Global Inc.*, 2007 Bankr. LEXIS 3940, *113 (Bankr. D. Del. 2007) (additional disclosure under section 1125 is not required where plan "modifications do not materially and adversely affect or change the treatment of any Claim against or Equity Interest in any Debtor"); *Beal Bank, S.S.B. v. Jack's Marine, Inc. (In re Beal Bank, S.S.B.)*, 201 B.R. 376, 380 n. 4 (E.D. Pa. 1996) (further disclosure and solicitation not required under section 1127(b) and (c) where modifications to the plan were immaterial); *In re Global Safety Textiles Holdings LLC*, No. 09-12234 (KG), 2009 WL 6825278, at *4 (Bankr. D. Del. Nov. 30, 2009) (finding that nonmaterial modifications to plan do not require additional disclosure or resolicitation); *In re Burns & Roe Enters., Inc., No. 08-4191 (GEB)*, 2009 WL 438694, at *23 (D. N.J. Feb. 23, 2009) (confirming plan as modified without additional solicitation or disclosure because modifications did "not adversely affect creditors").

[194]    *See* FitzGerald Decl. ¶ 50.

131.    In accordance with Bankruptcy Rule 3019, the Plan Modifications do not require additional disclosure under section 1125 of the Bankruptcy Code or the re-solicitation of votes under section 1126 of the Bankruptcy Code, and they do not require that Holders of Claims or Interests be afforded an opportunity to change previously cast acceptances or rejections of the Plan. Accordingly, the Plan, as modified, is properly before this Court and all votes cast with respect to the Plan prior to such modification shall be binding and shall apply with respect to the Plan.

### S.    Good Cause Exists to Waive the Stay of the Proposed Confirmation Order

132.    Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."[195] Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.  Each rule also permits modification of the imposed stay upon court order.

133.    The Debtors submit that good cause exists for waiving and eliminating any stay of the Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the Confirmation Order will be effective immediately upon its entry.[196]   As noted above, these Chapter 11 Cases and the related transactions have been negotiated and implemented in good faith and with a high degree of transparency and public dissemination of information.[197]   Additionally, each day the Debtors remain in chapter 11, it incurs significant administrative and professional costs that directly reduce the amount of distributable value for creditors.[198]

---

[195]    Bankruptcy Rule 3020(e).

[196]    *See, e.g., In re Source Home Entm't, LLC*, No. 14-11553 (KG) (Bankr. D. Del, Feb. 20, 2015) (waiving stay of confirmation order and causing it to be effective and enforceable immediately upon its entry by the court); *In re GSE Envtl., Inc.*, No. 13-11126 (MFW) (Bankr. D. Del. July 25, 2014) (same); *In re Physiotherapy Holdings, Inc.*, No. 13-12965 (KG) (Bankr. D. Del. Dec. 23, 2013) (same); *In re Gatehouse Media, Inc.*, No. 13-12503 (MFW) (Bankr. D. Del. Nov. 6, 2013) (same); *In re Dex One Corp.*, No. 13-10533 (KG) (Bankr. D. Del. Apr. 29, 2013) (same); *In re Geokinetics Inc.*, No. 13-10472 (KJC) (Bankr. D. Del. Apr. 25, 2013) (same).

[197]    *See* FitzGerald Decl. ¶ 52.

[198]    *Id.*

134.    Based on the foregoing, the Debtors request a waiver of any stay imposed by the Bankruptcy Rules so that the Confirmation Order may be effective immediately upon its entry.

### The Objections to the Plan Should Be Overruled

135.    The deadline to file objections to the Plan was July 10, 2024, at 4:00 p.m. (prevailing Eastern Time), (together with extensions of certain parties, the "Plan Objection Deadline").[199]  As of the Plan Objection Deadline (as extended for certain parties), the Debtors received four (4) Objections to confirmation of the Plan.  Except as noted below, the Debtors do not believe they will be able to resolve the remaining Objections and instead asks the Court to overrule such Objections for the reasons set forth below.

**A.    The U.S. Trustee's Objection Should Be Overruled.**

136.    The U.S. Trustee objects to the Third-Party Release and injunction provisions contained in Article IX of the Plan, as well as certain other matters.  Specifically, among other things, the U.S. Trustee argues that: (a) the Plan's release provisions are non-consensual third-party releases and therefore impermissible; (b) the Plan's injunction provision is unauthorized; and (c) the Plan grants the liquidating a discharge in violation of the Code.  As set forth more fully below, the Plan's release and injunction provisions comply with applicable Third Circuit law, are reasonable, and should be approved.  Further, the Plan does not grant a discharge to the Debtors.

**1.    The Third-Party Releases Are Appropriate and Lawful.**

137.    The Plan provides for the Third-Party Releases.[200]  Courts in the Third Circuit routinely approve release provisions if they are consensual and appropriately tailored.[201]  The Third-Party Releases are both consensual and appropriately tailored.

---

[199]    The deadline for the Office of the United States Trustee for the U.S. Trustee and PDSTI to object to the Plan and final approval of the Disclosure Statement was October 28, 2024.

[200]    Plan Art. IX.B.

[201]    *See, e.g., In re Indianapolis Downs*, 486 B.R. at 304–05 (approving third-party release that applied to unimpaired holders of claims presumed to accept the plan as consensual); *U.S. Bank Nat'l Ass'n v. Wilmington Trust Co.* (*In re Spansion, Inc.*), 426 B.R. at 144 (same); *In re Wash. Mut.*, 442 B.R. at 352 (observing that consensual third-party releases are permissible); *In re Zenith Elecs. Corp.*, 241 B.R. at 105, 111 (approving non-debtor releases for creditors that voted in favor of the plan).

138.     The U.S. Trustee argues that the Third-Party Release "are contrary to United States Supreme Court precedent and applicable state law"[202] because the Plan provides for (a) non-consensual third-party releases from Holders of Claims or Interests who vote to accept or reject the Plan and who do not check an opt-out box on a ballot, (b) non-consensual third-party releases from holders of non-voting Claims deemed to accept the Plan that do not file an objection to the release, (c) non-consensual third-party releases from Holders of non-voting administrative and priority claims that do not file an objection to the release, and (d) non-consensual third-party releases from Affiliates and Related Parties of the Releasing Parties.[203]

139.     *Consensual* third-party releases have long been permitted in the Third Circuit, and in this Court, which *Purdue* did not impact.[204]    Importantly, the Supreme Court in *Purdue* specifically held that "[n]othing in what we have said should be construed to call into question consensual third-party releases offered in connection with a bankruptcy reorganization plan . . . ."[205]  This Court need not, and should not, deviate from its prior rulings and broaden the scope of the Supreme Court's holding.

140.     The U.S. Trustee contends that the Plan provides for a Third-Party Release "on those who vote to accept or reject the Plan but do not opt out.  But voting for or against a plan without checking an opt-out box does not constitute the affirmative consent necessary to reflect acceptance of an offer to enter a contract to release claims against non-debtors."[206]  Further, the U.S. Trustee argues that "merely voting for a plan without checking an opt-out box does not constitute the affirmative consent necessary to reflect acceptance of an offer to enter a contract to release claims against non-debtors."[207]  The U.S. Trustee's contention that the Third-Party Release

---

[202]  UST Obj. ¶ 1.

[203]  *Id.* at ¶¶ 1, 23–70.

[204]  *See id.* ("Consensual releases, on the other hand, are commonplace.")

[205]  144 S. Ct. at 2087-88.

[206]  UST Obj. ¶ 19.

[207]  *Id.*

is nonconsensual based on state law contradicts the precedent in this Court.[208]  Opt-outs for creditors who have been provided notice about such opt-outs and affirmatively vote on a plan have long been used in the bankruptcy context.  Just recently, this Court has held, post-*Purdue Pharma*, that creditors who "were clearly and conspicuously informed that voting on the plan (whether the creditor voted to accept or reject it) would constitute a release *unless* the creditor opted out" sufficiently demonstrated affirmative consent to a third-party release.[209]

141.    One determining factor when evaluating the propriety of such opt-outs is whether parties in interest were provided adequate notice of the opt-out.[210]  Here, the Third-Party Releases provide affected parties due process and a meaningful opportunity to opt out.

142.    Holders of Claims in Classes 3 and 5 (*i.e.*, the Voting Classes) were provided detailed notice about the Plan, the deadline to object to the Plan confirmation, the voting deadline, and the opportunity to opt out of the Third-Party Release.  The Disclosure Statement included a detailed description about the Third-Party Release and the opt-out.  The Solicitation Packages (as defined in the Disclosure Statement Order) were sent to Holders of Claims on or about June 6, 2024.[211]  The Solicitation Packages provided Holders of Claims in Classes 3 and 5 with a ballot (a "<u>Ballot</u>") that contained an election to opt out of the Third-Party Release.  Each Ballot contained bold and conspicuous language informing the Holder of the opt-out.

143.    The Debtors also caused the Third-Party Release language to be published in *The New York Times* (national edition) and the *Sacramento Bee* on June 10, 2024, and June 11, 2024, respectively.[212]  The Supplemental Voting Report shows the votes of the Holders in the Voting

---

[208]  *Smallhold*, No. 24-10267, at 6.

[209]  *Id.*

[210]  *See id.* at 33 (noting there must be "conspicuous notice of the opt-out mechanism"); *In re Arsenal Intermediate Holdings, LLC*, No. 23-10097 (CTG), 2023 WL 2655592, at *7 (Bankr. D. Del. Mar. 27, 2023) (noting that the opt outs resulted in consensual third party releases because "each affected party received notice and had an opportunity to be heard").

[211]  *See Affidavit of Service* [Docket No. 269].

[212]  *See Affidavit of Publication of the Notice of (I) Conditional Approval of Disclosure Statement and (II) the Hearing to Consider (A) Final Approval of the Disclosure Statement as Containing Adequate Information,*

Classes and which Holders deemed to accept the Plan opted out of the Third-Party Release, demonstrating that parties in interest had sufficient notice of the Third-Party Release and were able to consent or not.

144.    The U.S. Trustee argues that the Voting Classes who voted to accept or reject the Plan but did not opt out of the Third-Party Release did not affirmatively consent to the Third-Party Release, and "silence" may not operate as acceptance of the Third-Party Release.[213]  Yet this contention is against precedent in this Court and other districts.[214]  "[R]egardless of how . . . creditors voted on the Plan, the vote is an affirmative step, and coupled with conspicuous notice of the opt-out mechanism, suffices as consent to the third-party releases under general contract principles."  As noted above, the Ballots contained a conspicuous notice of the opt-out.  Thus, those Holders that voted in favor of the plan but chose to not opt out of the Third-Party Release, of which they were sufficiently informed, were not "silent."  They have taken an affirmative step."[215]  These Holders have demonstrated affirmative consent sufficient to be bound by the Third-Party Release.[216]  Likewise, those Holders who voted against the Plan and elected not to opt out of the Third-Party Release also had sufficient notice that voting against the Plan would show agreement to the Third-Party Release if they did not opt-out on a Ballot.  Their votes evidence both that the creditors were on notice of the releases and that they were "actively engaged."[217]  It

---

*(B) Confirmation of the Joint Chapter 11 Plan of Liquidation for ICON Aircraft, Inc. and its Debtor Affiliates, and (C) Related Voting and Objection Deadlines* [Docket No. 275].

[213]  UST Obj. ¶¶ 48, 51.

[214]  *See, e.g., Smallhold*, No. 24-10267, at 33 (holding that creditors who voted, after receiving instruction that votes would operate to grant a release barring an opt out, are deemed to have given the release); *In re Fisker Inc.*, No. 24-11390 (TMH) (Bankr. D. Del. Octo. 16, 2024) [Docket No. 722] (confirming a plan including "all holders of Claims who are sent a Ballot or Non-Voting Opt-Out Form and do not timely elect to opt-out of the releases provided by the Plan in accordance with the Solicitation Procedures"); *In re BowFlex Inc.*, No. 24-12364 (ABA) (Bankr. D.N.J. Aug. 19, 2024) [Docket No. 614] (confirming a plan where "all Holders of Claims or Interests that vote to accept this Plan," and "all Holders of Claims or Interests that vote to reject this Plan or are deemed to reject this Plan and who do not affirmatively opt out of the releases provided by this Plan" were Releasing Parties).

[215]  *Smallhold*, No. 24-10267, at 33.

[216]  *Id.* (holding that "under ordinary contract principles," creditors who voted in favor of a plan and elected to not opt out, after being informed of the releases, have taken affirmative steps to demonstrate consent).

[217]  *Id.* at 34.

is not implausible, as the U.S. Trustee argues,[218] for a party to vote to reject the Plan and fail to opt out of the Third-Party Release.

145.     Further, the Notice of Non-Voting Status Packages provided those Holders of Claims deemed to accept the Plan (i.e., Classes 1, 2, and 4) with an opt-out release form to opt-out of the Third-Party Release under the Plan (the "Opt-Out Form").  Each Ballot and Opt-Out Form contained bold and conspicuous language informing the Holder of the opt-out.  Thus, these Holders of Claims were adequately informed that the Plan would release their claims against third parties. *Purdue Pharma* did not address whether "creditors whose claims are satisfied in full under a plan may be subject to a release."[219]  However, the Third-Party Release is still appropriate and lawful for the Deemed Accepting Classes.  As discussed above, the Debtors are paying these Holders of Claims in full.  These Holders should therefore not be entitled to recover against a non-debtor for the exact same injury, and inclusion of the Deemed Accepting Classes as Releasing Parties is appropriate.  Further, courts in this and other districts have approved similar releases.[220]

146.     The U.S. Trustee further argues that a non-consensual Third-Party Release will be imposed on holders of administrative claims and priority tax claims, and "[t]he scope of the release of their direct claims against non-debtors is far broader than the claims upon which they will be paid."[221]  As discussed above, Holders of Claims deemed to have accepted the Plan that have not filed an objection to the release are appropriately included as Releasing Parties.

---

[218]  UST Obj. ¶ 56.

[219]  *Smallhold*, No. 24-10267, at 6.

[220]  *See, e.g.*, *In re Fisker*, No. 24-11390 (TMH) [Docket No. 722] (confirming a plan including "all holders of Claims who are sent a Ballot or Non-Voting Opt-Out Form and do not timely elect to opt-out of the releases provided by the Plan in accordance with the Solicitation Procedures"); *In re NanoString Technologies, Inc.*, No. 24-10160 (CTG) (Bankr. D. Del. June 18, 2024) [Docket No. 659] (confirming a plan including as "Releasing Parties" "all Holders of Claims deemed hereunder to have accepted the Plan (i.e., Holders of Claims in Unimpaired Classes of Claims) that have not Filed an objection to the release in Section 11.11(b) of the Plan prior to the deadline to object to Confirmation of the Plan"); *In re Tricida, Inc.*, No. 23-10024 (JTD) (Bankr. D. Del. May, 23, 2023) [Docket No. 515] (including as a "Releasing Party" "all Holders of Claims deemed hereunder to have accepted the Plan that have not filed an objection to the release contained in Article IX herein prior to the Voting Deadline"); *In re BowFlex*, No. 24-12364 (ABA) [Docket No. 614] (including as a "Releasing Party" "all Holders of Claims or Interests that are deemed to accept this Plan and who do not affirmatively opt out of the releases provided in this Plan").

[221]  UST Obj. ¶ 65.

147.     Further, the Debtors' inclusion of Affiliates and Related Parties in "Releasing Parties" is likewise appropriate.  Affiliates and Related Parties are only considered to release Claims or Causes of Action that they could bring on behalf of or in a derivative capacity by or through the Entity they are related to.[222]  The inclusion of such parties as Releasing Parties is consistent with precedent in this Court and other districts.[223]  Affiliates and Related Parties are also included as "Released Parties."[224]  As such, as consideration for giving a release as Releasing Parties, Affiliates and Related Parties are also getting a release as Released Parties.  Likewise, all parties in interest were provided notice of these Chapter 11 cases, the Disclosure Statement, the Plan, and the Third-Party Release, satisfying due process.

148.     Because *Purdue* has no effect on the Debtors' Third-Party Release, the Court should follow its long-standing precedent of approving such releases and the use of opt-outs to obtain consent.

## 2.   The Injunction Provision is Appropriate and Integral to the Plan.

149.     The U.S. Trustee argues that "there is no Code provision that authorizes chapter 11 plans or confirmation orders to include injunctions to enforce them."[225]  The U.S. Trustee ignores that the injunction provision in Article IX.D of the Plan (the "Injunction Provision") contains standard language found in other Third Circuit precedent cases.[226]

150.     The Injunction Provision is necessary to effectuate the Debtors' releases and exculpation provisions.  As detailed above, the Injunction Provision is a key provision of the Plan

---

[222]  Plan, Art. I.A.104.

[223]  *See In re Fisker*, No. 24-11390 (TMH) [Docket No. 722] (including as related parties as a "Releasing Party"); *In re Tricida, Inc.*, No. 23-10024 (JTD) [Docket No. 515] (confirming the Debtor's plan, which includes Affiliates and Related Parties, solely to the extent such parties "may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through" an entity); *In re BowFlex*, No. 24-12364 (ABA) [Docket No. 614] (confirming a plan where Related Parties were Released Parties "solely to the extent such Related Party may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an Entity").

[224]  Plan, Art. I.A.103.

[225]  UST Obj. ¶ 71.

[226]  *In re Fisker*, No. 24-11390 (TMH) [Docket No. 722] (confirming a plan including an injunction provision); *In re NanoString*, No. 24-10160 (CTG) [Docket No. 659] (same); *In re Joann Inc.*, No. 24-10418 (CTG) (Bankr. D. Del. Apr. 25, 2024) [Docket No. 303] (same); *In re BowFlex*, No. 24-12364 (ABA) [Docket No. 614] (same).

and implements critical terms of the Plan (*i.e.*, the release and exculpation provisions).  Despite the U.S. Trustee's contention that there is no "irreparable injury," the Debtors' release and exculpation provisions would be rendered useless without the Injunction Provision.

### 3.  The Debtors Will Not Receive a Discharge.

151.    The Objection claims that the Plan grants the Debtors a discharge because they are included in the definition of "Released Party" and the Debtors will receive the released included in Article IX.B.[227]  The Objection further claims that the Injunction Provision in Article IX.D is inappropriate because it operates as a discharge injunction in violation of section 1141(d)(3) of the Bankruptcy Code.[228]

152.    The Debtors make clear in the current iteration of the Plan, however, that they are not entitled to a discharge of obligations.[229]  Further, the language of the "Released Party" definition and Injunction Provision is similar to other chapter 11 liquidating cases that have been approved by bankruptcy courts in this Circuit.[230]

### B.      PDSTI's Objection Should Be Overruled.

153.    PDSTI objects to both the 9019 Motion and the Debtors' Plan.  Specifically, among other things, PDSTI argues that (a) the Settlement is not in the estates' best interest under section 363 of the Bankruptcy Code or Bankruptcy Rule 9019 and (b) PDSTI's proposal is superior to advance all creditors' and the estates' interests.  Further, PDSTI alleges that the Plan violates sections 1129(a)(1), 1121(a), and 1123(a)(4).  As set forth more fully below, the Settlement is in the estates' best interests, PDSTI's proposal was not the superior option, and the Plan's provisions comply with the Bankruptcy Code.

---

[227]  UST Obj. ¶ 75.

[228]  *Id.*; 11 U.S.C. § 1141(d)(3)(A) ("The confirmation of a plan does not discharge a debtor if—the plan provides for the liquidation of all or substantially all of the property of the estate").

[229]  *See* Plan, Art. IX.E ("Because the Debtors are liquidating, they are not entitled to a discharge of obligations pursuant to section 1141 of the Bankruptcy Code with regard to any Holders of Claims or Interests.").

[230]  *See In re Casa Systems, Inc.*, No. 24-10695 (KBO) (Bankr. D. Del. June 6, 2024) [Docket No. 421] (confirming the debtors' plan); *In re Tricida*, No. 23-10024 (JTD) [Docket No. 515] (same).

## 1.  The Debtors' Settlement with the Derivative Litigation Plaintiffs is in the Best Interests of Creditors and the Estates.

154.    The Debtors have established that there was a sound business reason pursuant to section 363 to sell the Derivative Litigation Claims rather than treat them the same as other Retained Causes of Action. The sale of the Derivative Litigation Claims to the Derivative Litigation Plaintiffs pursuant to a private assignment under section 363 (the "Derivative Claim Assignment") monetizes the Derivative Litigation Claims for the benefit of the estates without the need to engage in litigation with the Derivative Litigation Defendants, in accordance with Section 363(b) of the Bankruptcy Code. The PDSTI Objection also alleges that the Debtors failed to take into consideration PDSTI's interests as the largest creditor.[231]  PDSTI's claims are all insider claims or based on their interests in the Debtors and are subject to subordination to General Unsecured Claims.  Further, as discussed in detail below, the Derivative Litigation Plaintiffs' offer was the highest and best offer.

155.    Further, the purchase price for the Derivative Litigation Claims is fair and reasonable.  The Derivative Claims Assignment will result in the satisfaction or assumption of substantially all non-insider General Unsecured Claims.  The Debtors will receive $2.5 million in cash, which will satisfy the substantial majority in number of general unsecured claims.  The Derivative Litigation Plaintiffs will be assuming millions in unsecured claims.  The claims were also marketed as part of the Debtors' sale process, although ultimately no actionable bids were received.

156.    The Debtors have also met their burden under Bankruptcy Rule 9019.  In *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996), the United States Court of Appeals for the Third Circuit set forth a four-factor balancing test under which bankruptcy courts are to analyze proposed settlements.  The factors the Court must consider are: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and

---

[231]   PDSTI Obj. ¶ 21.

the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."[232]

157.     As already highlighted in the 9019 Motion, the *Martin* factors have been met.  If the Parties had failed to reach a consensual resolution, the Debtors might have been forced to litigate with the Derivative Litigation Plaintiffs with respect to the Standing Motion, Disclosure Statement, and Plan.  The Settlement allows the Debtors to proceed without the uncertainty of litigation regarding the Disputed Issues and, if Derivative Claim Assignment path is pursued, the Derivative Litigation Claims.

158.     Likewise, absent the Settlement, resolving the Disputed Issues between the Parties would involve costly and time consuming litigation, which would not only increase the administrative expense incurred by the Debtors' estates, but would also put confirmation and distributions to creditors at risk.  The Settlement provides finality and certainty to all creditors in the Debtors' bankruptcy case, conserves estate resources, and facilitates an efficient timeline to confirmation.

159.     Finally, the Settlement resolves all issues between the Debtors and the Derivative Litigation Plaintiffs regarding the Derivative Litigation Claims, Plan, and Disclosure Statement. The Derivative Claim Assignment would result in the payment of $2.5 million in cash to the estates to fund the Convenience Claims Class and wind down the estates.  Thus, PDSTI is incorrect that the *Martin* factors have not been met.[233]

160.     PDSTI claims its proposal was superior to the Derivative Litigation Plaintiffs' proposal.[234]  However, PDSTI's proposal was inferior for the following reasons.

161.     First, the cash consideration offered by PDSTI was not greater than the consideration offered by the Derivative Litigation Plaintiffs.  PDSTI offered $3.0 million, which was equal to the $2.5 million cash consideration from the Derivative Litigation Plaintiffs and the

---

[232]   *Martin*, 91 F.3d at 393.

[233]   PDSTI Obj. ¶¶ 22-25.

[234]   *Id.* at ¶ 27.

$500,000 break up fee.  Indeed, if the Debtors accepted PDSTI's proposal, confirmation of the Plan would necessarily be delayed by at least a month to account for the additional notice required and the continuation of litigation with the Derivative Litigation Plaintiffs.  This delay would result in an estimated cost of delay plus additional litigation costs of approximately $1.5 million, leaving approximately $1.0 million for distribution to creditors (as opposed to the Derivative Litigation Plaintiffs' $2.5 million).

162.    Second, even if PDSTI were to offer $1.5 million to account for the cost of delay and additional litigation, the Debtors would require this amount upfront to ensure an ability to get to the extended confirmation date.  Otherwise, the Debtors would not have the ability to finance the delay or attendant litigation.

163.    Third, under the Derivative Litigation Plaintiffs' proposal, the Debtors keep claims against Kirk Hawkins, which recoveries will benefit the estates.  Under PDSTI's proposal, they would be assigned the causes of action against Hawkins.  This further reduces available recovery for the estate as compared to the Derivative Litigation Plaintiffs' proposal.

164.    Fourth, the Debtors would require a fiduciary out in any deal with PDSTI.  Absent this, the Debtors could not represent to the Court that they were properly fulfilling their fiduciary obligations.

165.    Finally, the foregoing assumes the Derivative Litigation Plaintiffs do not proceed with the purchase option, which provides approximately $8.0 million in additional consideration in the form of assumption of certain liabilities.  As such, PDSTI is incorrect, and its proposal was not superior to the terms of the 9019 Motion.

### 2.    The Plan Complies with Sections 1129(a)(1), 1121(a), and 1123(a)(4) of the Bankruptcy Code.

166.    PDSTI argues that the Debtors have not complied with sections 1129(a)(1), 1122(a), and 1123(a)(4).[235]  As discussed in detail above, the Debtors have indeed complied with all these sections of the Bankruptcy Code.

167.    The Debtors filed the Third Amended Plan to reflect changes pursuant to the terms of the Settlement, as reflected in the 9019 Motion.  Despite PDSTI's contention that the Debtors provided "no justification"[236] for these changes, the changes included in the Third Amended Plan demonstrate the outcome of the Parties' Settlement.  Further, PDSTI argues that "[t]he Debtors' material modifications to a plan which was already solicited and voted on are improper."[237]  As previously discussed, Bankruptcy Rule 3019 provides:

> after a plan has been accepted and before its confirmation, the proponent may file a modification of the plan.  If the court finds after hearing on notice to the trustee, any committee appointed under the Code, and any other entity designated by the court that the proposed modification *does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification*, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan.[238]

168.    Courts consistently have held that a proposed modification to a previously accepted plan will be deemed accepted where the proposed modification is not material or does not adversely affect the way creditors and stakeholders are treated.[239]  For the reasons discussed above,

---

[235]    *Id.* at ¶ 35.

[236]    *Id.* at ¶ 37.

[237]    *Id.* at ¶ 4.

[238]    Bankruptcy Rule 3019 (emphasis added).

[239]    *See, e.g., In re Federal–Mogul Global Inc.*, 2007 Bankr. LEXIS 3940, *113 (additional disclosure under section 1125 is not required where plan "modifications do not materially and adversely affect or change the treatment of any Claim against or Equity Interest in any Debtor"); *Beal Bank, S.S.B. v. Jack's Marine, Inc. (In re Beal Bank, S.S.B.)*, 201 B.R. at 380 n. 4 (further disclosure and solicitation not required under section 1127(b) and (c) where modifications to the plan were immaterial); *In re Global Safety Textiles Holdings LLC*, No. 09-12234 (KG), 2009 WL 6825278, at *4 (finding that nonmaterial modifications to plan do not require additional disclosure or resolicitation); *In re Burns & Roe Enters., Inc., No. 08-4191 (GEB)*, 2009 WL 438694, at *23 (D. N.J. Feb. 23,

the Plan, as amended, does not adversely affect the way creditors and stakeholders are treated. Indeed, the inclusion of a litigation trust option is designed to preserve valuable insurance assets, and therefore benefits all stakeholders. In addition, PDSTI's voting deadline was extended until October 28, 2024, seventeen (17) days after the changes reflected in the Third Amended Plan were made available. PDSTI had the opportunity to vote on the changes—and it did—which renders their argument that the Plan was already solicited moot.

169.    The Debtors' classification of Claims and Interest is appropriate. PDSTI argues that the separate classification of Holders of Claims in Classes 4 and 5 is improper as Holders of Claims in Classes 4 and 5 will share in the Plan Assets but Holders of Claims in Class 4 will purportedly be paid in full.[240] However, convenience classes are commonly allowed in this Court for administrative convenience.[241]

170.    Further, the Debtors accurately classified PDSTI's claims, despite PDSTI's contention that not all of its claims are similar.[242] The Debtors did not classify Claims based on the Holders of such Claims. The Debtor had valid legal and factual reasons for the separate classification of the various Claims or Interests into the Classes set forth in the Plan. As previously discussed, reasons for separate classifications of Claims or Interests, including separate classification of unsecured claims, include: (a) where members of a class possess different legal rights; and (b) where there is a good business reason for separate classification.[243] Here, PDSTI

---

2009) (confirming plan as modified without additional solicitation or disclosure because modifications did "not adversely affect creditors").

[240]    PDSTI Obj. ¶ 38.

[241]    *See, e.g.*, *In re Prime Core Techs., Inc.*, No. 23-11161 (JKS) (Bankr. D. Del. Dec. 21, 2023) [Docket No. 644]; *In re SL Liquidation LLC*, No. 23-10207 (TMH) (Bankr. D. Del. Nov. 22, 2023) [Docket No. 713]; *In re PBS Brand Co., LLC*, No. 20-13157 (JKS) (Bankr. D. Del. Apr. 28, 20231) [Docket 552].

[242]    PDSTI Obj. ¶ 40.

[243]    *See John Hancock*, 987 F.2d at 158–59 (holding that, as long as each class represents a voting interest that is "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed," the classification is proper); *In re Mallinckrodt PLC*, 639 B.R. at 858 (permitting the separate classification of unsecured noteholders where the two groups had divergent debt structuring rights); *In re Jersey City Med. Ctr.*, 817 F.2d at 1061 (approving classification of general unsecured creditors into different classes: doctors' indemnification claims, medical malpractice claims, employee benefit claims and trade claims); *In re ECE Wind-down LLC*, No. 22-10320 (JTD) (Dec. 21, 2022) [Docket No. 520] (approving plan with separate classification of general unsecured claims); *In re Masten Space Systems, Inc.*, No. 22-10657 (BLS) (Nov. 9, 2022)

claims related to notes (including the note that it is a successor in interest to), which is a different entitlement as compared to other unsecured claims. The Debtors had a right to separately classify PDSTI's claims.

171.     There is no unfair discrimination in favor of Class 4 to the detriment of Classes 3 and 5. PDSTI also incorrectly notes that Class 4 gets paid in full at the Effective Date, whereas other unsecured creditors have to wait for a recovery.[244] The Plan states that Class 4 shall receive payment "on the *latest* of (i) the Effective Date, or as soon as practicably thereafter, (ii) the date on (A) the Derivative Claim Assignment, if any, is consummated or (B) the Plan Sponsorship Contribution is made, in each case as soon as reasonably practicable thereafter, and (iii) the date that is ten (10) business days after such Convenience Claim becomes an Allowed Claim."[245]

172.     PDSTI argues that Class 5 did not have the opportunity to vote on the Third Amended Plan, despite their recovery profile changing substantially. Despite PDSTI's claims, the treatment of Class 5 is improving. The $2.5 million (if provided) by the Derivative Litigation Plaintiffs will be sufficient to cover all potential General Unsecured Claims that elect for that treatment, and any remaining Class 5 Claims would receive the remainder of that amount on top of the funds that were already anticipated to be available prior to the Settlement.

173.     The Debtors' Plan does not violate the absolute priority rule. PDSTI argues that the Derivative Litigation Plaintiffs will share in the proceeds of the Litigation Trust in violation of the absolute priority rule and will receive a release.[246] Pursuant to the Plan provisions for the Plan Beneficiaries of the Litigation Trust, the Derivative Litigation Plaintiffs, as Holders of Interests, will only get recovery to the extent that allowed Noteholder Claims and General Unsecured Claims are paid.[247] Further, the Derivative Litigation Plaintiffs should receive a release. These parties

---

[Docket No. 226] (same); *In re Insys Therapeutics, Inc., et al.*, No. 19-11292 (KG) (Bankr. D. Del. Dec. 4, 2019) [Docket No. 1115] (same).

[244]     PDSTI Obj. ¶ 39.

[245]     Plan, Art. III.B.4.

[246]     *Id.* at ¶ 42.

[247]     Plan, Art. I.A.92.

provided substantial consideration to these Chapter 11 Cases and the resolutions set forth in the Proposed Confirmation Order, including, among other things: (1) potentially providing cash through the purchase of the Derivative Litigation Claims or sponsorship of the Plan; and (2) agreeing to vote for and otherwise support the Plan.

### C.      The Debtors Are Working to Consensually Resolve the WF Objection.

174.    Wells Fargo filed its limited objection to preserve its rights, noting that it has been in discussion with the Debtors regarding agreed language to confirm that the Wells Fargo security interests are preserved pending satisfaction of its secured claims.[248]  The Debtors are working with Wells Fargo to resolve the objection and anticipate including revised language in a revised Proposed Confirmation Order.

### D.      The Debtors Are Reviewing the SGIA Objection.

175.    The SGIA Objection was filed on October 31, 2024.  The Debtors are reviewing the objection and reserve the right to respond at the Confirmation Hearing.

### Conclusion

176.    For all of the reasons set forth herein and in the Declarations, and as will be further shown at the Confirmation Hearing, the Debtors respectfully request that the Court confirm the Plan as fully satisfying all of the applicable requirements of the Bankruptcy Code by entering the Proposed Confirmation Order, overruling any remaining objections, and granting such other and further relief as is just and proper.

*[Remainder of Page Intentionally Left Blank]*

---

[248]   WF Obj. ¶ 10.

Dated: November 1, 2024
Wilmington, Delaware

*/s/ Ashley E. Jacobs*

**YOUNG CONAWAY STARGATT &
TAYLOR, LLP**
Sean M. Beach (No. 4070)
Ashley E. Jacobs (No. 5635)
S. Alexander Faris (No. 6278)
Jared W. Kochenash (No. 6557)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:    (302) 571-6600
Facsimile:    (302) 571-1253
Email:        sbeach@ycst.com
              ajacobs@ycst.com
              afaris@ycst.com
              jkochenash@ycst.com

**SIDLEY AUSTIN LLP**
Samuel A. Newman (admitted *pro hac vice*)
1999 Avenue of the Stars, Floor 19
Los Angeles, California 90067
Telephone:    (310) 595-9500
Facsimile:    (310) 595-9501
Email:        sam.newman@sidley.com

*and*

Jeri Leigh Miller (admitted *pro hac vice*)
2021 McKinney Avenue, Suite 2000
Dallas, Texas 75201
Telephone:    (214) 981-3300
Facsimile:    (214) 981-3400
Email:        cpersons@sidley.com
              jeri.miller@sidley.com

*and*

Nathan Elner (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone:    (212) 839-5300
Facsimile:    (212) 839-5599
Email:        nelner@sidley.com

32341934.1